Brewster H. Jamieson, ABA No. 8411122
Michael B. Baylous, ABA No. 0905022
LANE POWELL LLC
1600 A Street, Suite 304
Anchorage, Alaska 99501
Telephone: 907.264.3325
        907.264.3303
Email:     jamiesonb@lanepowell.com
        baylousm@lanepowell.com
Attorneys for Defendants

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF ALASKA

| | |
|---|---|
| ELIZABETH BAKALAR,<br><br>               Plaintiff,<br><br>v.<br><br>MICHAEL J. DUNLEAVY; in his individual and official capacities; TUCKERMAN BABCOCK; and the STATE OF ALASKA,<br><br>               Defendants. | Case No. 3:19-cv-00025-JWS<br><br>**DEFENDANTS' MOTION FOR SUMMARY JUDGMENT** |

       Pursuant to Federal Civil Rule 56(a), Defendants the State of Alaska (the "State"), Governor Michael Dunleavy, and Tuckerman Babcock move for summary judgment on all claims advanced by Plaintiff Elizabeth Bakalar.

## I. INTRODUCTION

       Elizabeth Bakalar was an Alaska assistant attorney general, advising and representing the lieutenant governor and the Division of Elections, among other agencies. When the current gubernatorial administration took office, it accepted her pro-forma resignation. Ms. Bakalar also was (and remains) a popular blogger, writing about politics and puerility. Ms. Bakalar claims that her blogging and other social media activity prompted her discharge and that this violated the federal and state constitutions. Her claims turn on a straightforward question: Does state or federal law oblige the people of Alaska to

accept legal counsel and representation from a lawyer who publishes nearly daily about sex, excrement, and politics? The answer is no. Thus, Defendants respectfully request the Court grant summary judgment in their favor.

## II. BACKGROUND[1]

### A. Request for Resignation and Statement of Interest.

Governor Dunleavy won his office in November 2018. In the weeks before inauguration, the Governor's transition team selected staff for the State's executive departments. In this effort, Mr. Babcock sent a memorandum to the State's at-will employees. The memorandum was meant "to give people an opportunity to think about whether they want[ed] to remain with [the new] administration."[2] It requested resignations effective the first day of the Governor's term but stated resignations would not be automatically accepted and encouraged employees to state interest in continuing employment.[3]

Ms. Bakalar received the memorandum, along with all other lawyers in the Alaska Department of Law.

### B. Ms. Bakalar's Service as an Alaska Assistant Attorney General.

The Department of Law hired Ms. Bakalar in 2006 as an Attorney II and promoted her to Attorney III in 2009.[4] Two years later, the Department assigned Ms. Bakalar to advise and represent the Division of Elections and the Office of the Lieutenant Governor,[5] both statutorily mandated to maintain "the nonpartisan nature, integrity, credibility, and impartiality" of election administration. In this role, she handled "initiative applications, ballot challenges, candidate and voter eligibility, and compliance with federal voting

---

[1] Document cited herein are attached as Exhibits A-AL to the March 26, 2021 Declaration of Michael B. Baylous.

[2] Doc. 50, First Am. Compl.("Am. Compl.") ¶ 49.

[3] *Id.* ¶ 50.

[4] *Id*. ¶¶12, 14.

[5] *Id.* ¶ 15.

requirements," provided advice, and drafted legislation and regulations.[6] "The lieutenant governor and the director of elections . . . quickly came to trust her advice."[7] Ms. Bakalar also represented the State in state and federal appeals and spoke to the press, often about elections issues.[8]

Ms. Bakalar became an Attorney IV in 2012, and an Attorney V in 2017.[9] The Attorney V job description shows the influence Ms. Bakalar enjoyed in her relationship with the lieutenant governor, the Division of Elections, and other state agencies, and the independent judgment about sensitive matters that was expected of her:

> Attorneys V work independently except in extraordinary cases. They work almost exclusively on the most difficult cases, for example, where a high order of original and creative legal endeavor is required to obtain a reasonable balance of conflicting interests. Complex factual or policy issues require extensive research, analysis, obtaining and evaluating expert testimony or information in controversial or highly technical areas (scientific, financial, corporate, etc.). Cases typically have substantial impact on large-scale and important activities of state agencies or public or private parties, and cases are often contested by extremely capable legal talent.[10]

The kind of tasks she was expected to perform included:

> Determine how a variety of legal problems will be dealt with (e.g., formal or informal opinion, litigation, negotiated settlement, etc.) and direct the response.

> Draft formal opinions, legislation, regulations and other legal instruments involving complex legal and technical issues. . . .

> Present cases involving complex constitutional problems before the U.S. Supreme Court. . . .

> Conduct the most difficult civil litigation. . . .

---

[6] Ex. A, at 1-2.

[7] *Id*. at 2.

[8] Doc. 1-1, Compl. ¶¶ 19, 21; Ex. B-D.

[9] Am. Compl. ¶¶ 16,19.

[10] Ex. E, at 1-2.

Defendants' Motion for Summary Judgment
*Bakalar v. Dunleavy, et al.* (Case No. 3:19-cv-00025-JWS)

Obtain and evaluate expert testimony and information in highly specialized, technical and/or controversial areas.[11]

Like all Department of Law attorneys, she was always an at-will employee.

## C. Ms. Bakalar's Social Media Presence.

In 2014, Ms. Bakalar began a popular blog that would be "written up in every local newspaper"[12] and reach a readership of 20,000 Alaskans and others.[13] A local paper reprinted her posts about politics and life in Alaska.[14] Despite the public forum and the ease of ascertaining her identity, Ms. Bakalar regarded the blog as her refuge.[15]

Some posts "blast[ed] . . . all over the Internet" Ms. Bakalar's "most horrendously mortifying observations" about herself and those around her.[16] She touted her secret "personal strategy" for "weekday work pooping,"[17] explained the bravery she feels in confronting "[t]he fetid slurry of wadded up toilet paper and piss and sh[**]" in portable toilets,[18] reminisced about romantic rejection,[19] and lamented that the "[c]ute [d]ude [a]t [t]he [p]harmacy" knew all her prescribed medications and might "think [she was] a walking . . . STD."[20] As Ms. Bakalar put it, "I write about farts, nipples, Cheetos, and Donald Trump's spray tan for tweets, shares and viral laughs."[21]

---

[11] *Id*. at 2.

[12] Ex. F (*PSA: I'm Done Doing Dudes' Homework for Them*).

[13] Ex. G (*Why I Stay Part II (Crisis/Mantra Edition)*).

[14] *See, e.g.*, Ex. H.

[15] Ex. I (*Why Anonymous Content is Bullshit*).

[16] Ex. J (*CDATPharm + Small Alaskan City = Mortification!*).

[17] Ex. K (*Fart Etiquette on Point?*).

[18] Ex. L (*The Porta Potty is the High Dive of Potties*).

[19] Ex. M (*A Dudebro I Once Tried and Failed to Bang Became a Priest, Because of Course He Did*).

[20] Ex. J.

[21] Ex. N (*Not Equipped*).

Other posts were political. Ms. Baklar urged retention of Justices Joel Bolger and Peter Maassen,[22] described her affinity for Senator Lisa Murkowski,[23] called Representative Don Young "Alaska's State Fossil and resident Balcony Muppet,"[24] and praised Lieutenant Governor Byron Mallott for "always ha[ving] an inspiring word to share."[25]

The candidacy of Donald Trump "ma[de] [her] sick to [her] stomach and incredibly sad" that she had friends who supported Mr. Trump, as she put it in a post picked up by the Anchorage Daily News.[26] Ms. Bakalar obsessively tweeted about Mr. Trump on Election Day, 2016—"[i]f this country makes Trump president, it deserves everything it gets, and the rest who repudiated him go into the abyss," and as the results became clearer, "America just texted the whole world a dick pic," and "Sad! Unbelievable! Disaster! USA is BIGLY f[**]ked!"[27] Some of her posts invoked her expertise as an election lawyer, including when she said, "no legitimate election lawyer would embarrass him or herself" by representing Mr. Trump in Nevada.[28] The day after the 2016 election, Ms. Bakalar "cried because [she] knew when [she] went into work that morning that there were people IN [HER] OFFICE who had voted for Trump."[29]

---

[22] Ex. O (*Out of State and Out of Touch: Juneau Empire Georgia-Based Corporate HQ is Meddling with the Alaska Supreme Court*).

[23] Ex. P (*Reclaiming Light and Patriotism*).

[24] Ex. Q (*Don Young Almost Stabbed his Colleague in the Face and Ho Hum Whatevs NBD!*).

[25] Ex. R, at 8-9 (*2018 Alaska Social Justice Group Therapy in Photos*).

[26] Ex. H.

[27] Ex. S, at 1-3.

[28] *Id.* at 3.

[29] Ex. T (*The Barn Test*).

From that point, Ms. Bakalar lost her "fears of personal and/or professional reprisal borne of calling Donald Trump a fascist cantaloupe on the [I]nternet every day."[30] It is an exaggeration to say Ms. Bakalar wrote about Donald Trump every day, but "Trump" appears in 301 of her posts, and countless others feature a nickname for President Trump, such as "Cheeto Satan."[31] As Ms. Bakalar put it, "Before Trump, I wrote a lot more about parenting. Now I feel compelled to write about Trump so that . . . if the sh[**] hits the fan my kids will have a contemporaneous Handmaid's Tale-style record of What the F[**]k You Did to Us."[32] She argued, "Our POTUS is a manifestly delusional, likely senile, sociopathic, treasonous, semi-literate, lecherous oligarch who is scissoring the Constitution into red white and blue confetti like Edward Cheeto-Hands with the help of Congress, all at the direction of a repellent, rheumy-eyed alcoholic who legit wants to destroy democracy and perpetuate the master race."[33]

A member of the public complained about Ms. Bakalar's posts.[34] After the Department of Law declined to take action, Ms. Bakalar declared, "Ever since a stalker wingnut tried and failed to get me fired for criticizing Donald Trump as if Alaska were communist Russia with no First and Fourteenth Amendments, I've only been emboldened to criticize him more, as often as possible."[35] President Trump was "ever-present in everyone's mental landscape, if only because he wakes each day to make a spectacle of himself at the expense of everything else, including national security and unity," Ms. Bakalar said, as she made him ever-present in her blog.[36]

---

[30] Ex. U (*I'm Totally Giving up on Socks*).

[31] Ex. V (*The Cottonwood Tree Money Shot*).

[32] Ex. W (*My Kids Make Me Reeeeaaally Fucking Nuts Sometimes*).

[33] Ex. X (*Shopkins Ain't Shit, School Lunch is Not a Top Chef Quick Fire Challenge, and Nothing Matters Anyway*).

[34] Am. Compl. ¶¶ 32-36.

[35] Ex. Y (*POTUS Is Fully Losing his Goddamnt Mahnd!*).

[36] Ex. Z (*American Depression: The Struggle Is Real*).

Later, during Judge Brett Kavanaugh's confirmation process, Ms. Bakalar mourned the death of her "last vestige of faith that our third branch of government will be a reliable shelter from the abusive relationship women are now in with our government."[37] She reduced her criticism of Mr. Kavanaugh to verse, riffing on a popular song:

> If you get blackout drunk and you're gropin'
> Oh yes son, I'm talking to you
> If you went to Yale and STILL mopin'
> Oh yes son, I'm talking to you
> If you boofed in the Devil's Triangle[38]
> Oh yes son, I'm talking to you
> Wanna get us with your money
> Oh no, I don't want no
> No scrub, no scrub
> No scrub, no scrub.[39]

Her political criticism blended into the sexual and scatological in her other posts, such as when she reflected that "the only thing that could be more nauseating than Trump himself is Trump's dick. Especially in a pic"[40] or separately suggested that Trump should "text Satan a dick pic at 1:00 a.m., and ask if [he] can come down to hell for a booty call."[41] Ms. Bakalar "use[d] the word 'dick' on the Internet a lot. Like, a lot."[42] The word appears in more than 160 of her posts.

Ms. Bakalar titled her blog, *One Hot Mess*. "Everyone in [Ms. Bakalar's] personal and professional life kn[ew] about [her] blog,"[43] or as she put it another time, her

---

[37] Ex. AA (*It Feels Extra Bad Being a Woman Lawyer this Week*).

[38] *See* Jason Le Miere, *What Does "Devil's Triangle" and "Boofed" Mean? Brett Kavanaugh Challenged over Meaning of Yearbook Entries*, Newsweek, Sept. 27, 2018, https://www.newsweek.com/devils-triangle-boofed-mean-brett-kavanaugh-1142748.

[39] Ex. AB (*I Rewrote No Scrubs for 2018*).

[40] Ex. AC (*If Trump Has a Dick Pic, Dick Pics Are Done*).

[41] Ex. AD (*By the Time Dick Cheney Is Calling Your Policies Inhumane, You Are Officially Satan's #1 Bottom Bitch*).

[42] Ex. AE (*I Feel Like I Receive a Disproportionate Amount of Penis Enlargement Spam*).

[43] Ex. AF (*Let's Just Clear a Few Things Up Right Now*).

"hazardous exploits in the First Amendment and social media."[44] Ms. Bakalar wrote she "couldn't be less afraid of the ramifications (personal or professional) of speaking out loudly—and often."[45] She was, after all, "willing to take personal and professional risks to say what [she] thinks."[46] The day she received Mr. Babcock's memorandum, Ms. Bakalar, reflected on "the occasional empty threat to [her] body and livelihood from wannabe Nazis."[47] In the five days before she asked to be retained, she tweeted about President Trump nine times.

**D.     Ms. Bakalar's Discharge.**

Ms. Bakalar responded to Mr. Babcock's memorandum by offering her resignation and requesting retention. She highlighted her work "on election matters on behalf of the Office of the Lieutenant Governor," noting "[she] represent[ed] the Division of Elections in litigation; provid[ed] agency advice; testify[ed] on legislation; assist[ed] with federal compliance; and help[ed] draft legislation and regulations in the area of elections law."[48] She noted she advised and represented the Office of the Governor, the Department of Health and Social Services, the Department of Administration, the Department of Public Safety, the Department of Education and Early Development, the Department of Military and Veterans Affairs, the Department of Labor and Workforce Development, the Department of Commerce, and the Alaska Court System.[49]

In the roughly two weeks between writing this letter and Governor Dunleavy's inauguration, Ms. Bakalar tweeted about President Trump seven times. The incoming administration accepted Ms. Bakalar's resignation and discharged her shortly after

---

[44] Ex. AG (*Mustard and Cheerios*).

[45] Ex. AH (*Energy and the Laws of Motion: Final Reflections on the Women's March on Washington*).

[46] Ex. AI (*O.H.M. Turns Three*).

[47] Ex. AJ (*OMG, Sophie Scholl Is my New Shero*).

[48] Ex. AK.

[49] *Id*.

Governor Dunleavy took office. She eventually found a "full-time job as a municipal attorney for a mid-sized rural city [that] is rewarding and interesting."[50]

**E.     This Lawsuit.**

This suit followed in state court. Defendants removed the case to this Court. Ms. Bakalar's Amended Complaint alleges her termination violated federal and state free speech rights, the implied covenant of good faith and fair dealing, public policy, and the Alaska Constitution's merit principle.[51] Ms. Bakalar seeks damages and an injunction.[52]

## III.    ARGUMENT

Commonsense and case law entitle elected officials to choose employees to counsel them and speak on their behalves. Accordingly, "an employee's status as a policymaking . . . employee [is] dispositive of," *Biggs v. Best, Best & Krieger*, 189 F.3d 989, 994–95 (9th Cir. 1999), or at least, at odds with, *see City & Borough of Sitka v. Swanner*, 649 P.2d 940, 945 (Alaska 1982), a claim of retaliation for speech.

Determining policymaker status presents a "mixed question of fact and law." *Walker v. City of Lakewood*, 272 F.3d 1114, 1132 (9th Cir. 2001). "When a mixed question of fact and law involves undisputed underlying facts," as it does here, "summary judgment is appropriately granted." *Han v. Mobil Oil Corp.*, 73 F.3d 872, 875 (9th Cir. 1995). Because Ms. Bakalar was a policymaking employee, her discharge (A) violated no federal or state free speech right, leaving groundless her claims under (B) section 1983 and (C) state law. Defendants are entitled to summary judgment.

**A.     Ms. Bakalar's Discharge Violated No Federal or State Free Speech Right.**

A claim that discharge from public employment violated a free speech right requires a three-part showing that (1) Ms. Bakalar engaged in protected activity, (2) her activity was a substantial factor in termination, and (3) the State has failed to show she would have been

---

[50] Ex. AL (*Big Apocalypse Energy Is my New Aesthetic*).

[51] Am. Compl. ¶¶ 76-140.

[52] *Id*. ¶¶141-147.

Case 3:19-cv-00025-JWS   Document 56   Filed 03/26/21   Page 9 of 21

discharged in the absence of protected activity. *Mt. Healthy Cty. Sch. Dist. Bd. of Educ. v. Doyle*, 429 U.S. 274, 287 (1977); *Wickwire v. State of Alaska*, 725 P.2d 695, 700 (Alaska 1986). For now, Defendants contest only the first inquiry, reserving the other two inquiries. Defendants ask the Court to consider whether, as an assistant attorney general, Ms. Bakalar had a constitutional right to blog about genitalia, excrement, and her distaste for Mr. Trump and Justice Kavanaugh.

She did not. "When a citizen enters government service, the citizen by necessity must accept certain limitations on . . . her freedom." *Garcetti v. Ceballos*, 547 U.S. 410, 418 (2006). This is true both of the right to free speech secured by the First Amendment to the United States Constitution and applied to the states by the Fourteenth Amendment, *see id.*, and of the Alaska Constitution's similar guarantee, *see Wickwire*, 725 P.2d at 700–03. Ms. Bakalar took a sensitive position in state government that required her to advise state agencies, earn the trust of the lieutenant governor and department heads, and speak on the State's behalf, both in court and in the media. Doing so limited the rights she otherwise had to broadcast her political preferences and potty humor without consequence.

**1.      Government Lawyers in Ms. Bakalar's Position May Be Discharged for Speech Without Offending the First Amendment.**

Courts generally apply the balancing test set forth in *Pickering v. Board of Education*, 391 U.S. 563 (1968), to determine "whether the state's legitimate administrative interests outweigh the employee's First Amendment rights." *Eng v. Cooley*, 552 F.3d 1062, 1071 (9th Cir. 2009). But there is "an exception to this general rule." *Fazio v. City & County of San Francisco*, 125 F.3d 1328, 1331 (9th Cir. 1997). "Under *Elrod v. Burns*, 427 U.S. 347 (1976), a public official who is a 'policymaker' may be fired for political reasons without offending the United States Constitution." *Id.* Accordingly, "an employee's status as a policymaking . . . employee . . . dispos[es] of any First Amendment retaliation claim." *Biggs*, 189 F.3d at 995. And only if the employee "was not in such a position do[es] [a court] ask [whether] the . . . activities were protected under *Pickering*."

*Walker*, 272 F.3d at 1131.[53] Accordingly, if Ms. Bakalar was a "policymaker," *Elrod* and subsequent cases extinguish her claim to *Pickering*-protected activity.[54]

Ms. Bakalar was a policymaker. Under *Branti v. Finkel*, 445 U.S. 507 (1980), "policymaker . . . does not mean 'one who makes policy.' Rather, the term refers to a position in which political considerations are 'appropriate requirement[s] for the effective performance of the public office involved.'" *Fazio*, 125 F.3d at 1333 (quoting *Branti*, 445 U.S. at 519). This determination is made with reference to "vague or broad responsibilities, relative pay, technical competence, power to control others, authority to speak in the name of policymakers, public perception, influence on programs, contact with elected officials, and responsiveness to partisan politics and political leaders." *Fazio*, 125 F.3d 1334 n.5.

Under these factors, assistant attorneys general like Ms. Bakalar are policymakers, particularly when they represent the Division of Elections and advise high-ranking elected officials. "[A]ll circuit court decisions—and almost all other court decisions—involving attorneys in government service, other than public defenders, have held that *Elrod/Branti* do not protect these positions." *Gordon v. County of Rockland*, 110 F.3d 886, 890–91 (2d Cir. 1997).[55] The Ninth Circuit has quoted this observation to withhold protection from

---

[53] *See also Bardzik v. County of Orange*, 635 F.3d 1138, 1151 (9th Cir. 2011) ("*Fazio* holds that if a plaintiff is a policymaker, the court will not consider the plaintiff's claim that under *Pickering* . . . the plaintiff's interest in free speech outweighs the [defendant's] interest in running an efficient office." (quotations omitted)).

[54] This is so whether or not the employee's political affiliation differs from her supervisor's and whether or not the employee's office is affiliated with partisan politics. *Hobler v. Brueher*, 325 F.3d 1145, 1149 (9th Cir. 2003); *Biggs*, 189 F.3d at 996. "The . . . rule applies not merely to party affiliation, but more broadly to political beliefs, expression, and support." *Hobler*, 325 F.3d at 1149. And it is true whether or not the employee's speech relates to policy views or a political agenda. *Bardzik*, 635 F.3d 1138.

[55] "The other circuits that have addressed the *Elrod–Branti* exception in the context of government attorney dismissals, whether for assistant district attorneys or other government attorneys, have held that these attorneys occupy positions requiring political loyalty and are not protected from political dismissals under the First Amendment." *Aucoin v. Haney*, 306 F.3d 268, 275 (5th Cir. 2002) (listing several examples of government lawyers held to be policymakers); *see also Borzilleri v. Mosby*, 874 F.3d 187, 193 (4th Cir.

assistant district attorneys and associates in private law firms contracted to perform the services of city attorney. *Biggs*, 189 F.3d at 995; *Fazio*, 125 F.3d at 1333. Assistant attorneys general are no different from city attorneys in this regard. *Latham v. Office of the Attorney Gen. of the State of Ohio*, 395 F.3d 261, 268 (6th Cir. 2005); *Americanos v. Carter*, 74 F.3d 138, 141–42 (6th Cir. 1996); *see also Bavaro v. Pataki*, 130 F.3d 46, 50-51 (2d Cir. 1997) (holding similarly for associate counsel in state health department).

Ms. Bakalar's duties show why this is so. She provided agency advice, testified on legislation, assisted with federal compliance, and helped draft legislation and regulations. She represented the State in numerous appeals and spoke to the media about her cases, including the actions and positions of her client agencies.[56] Her work turned on good client relationships and was improved by the trust of client representatives.

Her primary client, the Office of the Lieutenant Governor, is charged with administering Alaska's election processes and overseeing the Division of Elections. AS 44.19.020; AS 15.10.105(b). As the State's election lawyer, Ms. Bakalar played an influential role in that effort by advising multiple lieutenants governor with little experience, if any, navigating the complexities of election law. Between 2011 and 2018, Ms. Bakalar authored over a dozen publicly available attorney general opinions providing guidance on high profile and controversial initiatives and referenda pertaining to environmental management, oil and gas tax, legalization of marijuana, minimum wage, regulation of fisheries and subsistence, Medicaid, health insurance, and the conduct of elected officials.[57] For compliant initiatives and referenda, she prepared, on behalf of the

---

2017) (referring to a "unanimous chorus of courts of appeals" holding that "an assistant prosecutor occupies a policymaking decision under *Elrod* and *Branti*").

[56] *See supra* n.8.

[57] Op. Att'y Gen., 2011 WL 6156901 (Nov. 29, 2011) (coastal management act initiative); Op. Att'y Gen., 2013 WL 1854054 (Apr. 24, 2013) (oil and gas tax referendum); Op. Att'y Gen., 2013 WL 7029127 (June 11, 2013) (marijuana legalization initiative); Op. Att'y Gen, 2013 WL 7154745 (June 20, 2013) (minimum wage initiative); Op. Att'y Gen., 2014 WL 186636 (Jan. 3, 2014) (fisheries management initiative); Op. Att'y Gen., 2014 WL 6847741 (Nov. 26, 2014) (criminalization of corruption initiative); Op. Att'y Gen., 2015

lieutenant governor, the ballot title and the proposition, which is statutorily required to provide voters a "true and impartial summary" of the law. AS 15.45.180; AS 14.45.410. She also publicly instructed the director of elections how to handle three efforts to recall elected officials.[58]

Division of Elections employees with roles less influential and public than Ms. Bakalar's were prohibited from engaging in certain political activity in light of the importance of maintaining the Division's "nonpartisan nature, integrity, credibility, and impartiality." AS 15.10.105(b). Ms. Bakalar was surely more a policymaking employee than an associate in a private law firm performing similar work for a city. *See Biggs*, 189 F.3d at 995–96 (describing attendance at city council meetings, rendering of advice, and drafting of regulations and ordinances).

Because of the sensitive nature of her work, the Constitution exposes Ms. Bakalar to discharge for broadcasting her affinity for the prior lieutenant governor, her graphic toilet descriptions, or her repeated references to President Trump's penis. Ms. Bakalar was right that writing as she did entailed "personal and professional" risks. She was wrong to think the Constitution requires Alaska to share those risks by permitting her to continue representing the State.

### 2. The Result is the Same Under the Alaska Constitution.

The Court must "apply the law as [it] believe[s] the [Alaska] Supreme Court would apply it" to Ms. Bakalar's state constitutional claims. *Astaire v. Best Film & Video Corp.*, 116 F.3d 1297, 1300 (9th Cir. 1997). The Alaska Supreme Court would apply the state constitution to reach the same result this Court reaches on Ms. Bakalar's First Amendment

---

WL 4607704 (July 29, 2015) (voting and PFD initiative); Op. Att'y Gen., 2017 WL 4103825, at *1 (Sept. 6, 2017) (environmental regulation initiative); Op. Att'y Gen., 2017 WL 4764487, at *1 (Sept. 29, 2017) (Medicaid regulation initiatives); Op. Att'y Gen., 2017 WL 4764488, at *1 (Oct. 6, 2017) (legislator ethics initiative).

[58] Op. Att'y Gen., 2011 WL 5848617, at *1 (Oct. 3, 2011); Op. Att'y Gen., 2013 WL 6593253, at *1 (Dec. 6, 2013); Op. Att'y Gen. 2014 WL 5323741, at *1 (Sept. 30, 2014) (John Atchak recall).

claim. While the Alaska free speech right is broader than the federal right in some respects, *Alaskans for a Common Language v. Kritz*, 170 P.3d 183, 203 (Alaska 2007), the few Alaska cases concerning public employee speech rely on federal cases. *See id.*; *Wickwire*, 725 P.2d at 700; *State of Alaska v. Haley*, 687 P.2d 305, 312 (Alaska 1984); *City & Borough of Sitka*, 649 P.2d at 944–45. The "unanimous chorus" of federal appellate cases intone that a government lawyer in Ms. Bakalar's role is a policymaker. *Borzilleri v. Mosby*, 874 F.3d 187, 193 (4th Cir. 2017). No Alaska case holds to the contrary. Accordingly, Ms. Bakalar's speech is unprotected by the Alaska Constitution for the independent reasons that (a) she is a policymaker and (b) her speech fails the *Pickering* balancing test.

### a. Policymaker Status Precludes Ms. Bakalar's Free Speech Claim.

In the decades after *Branti*, courts across the country have readily disposed of the free speech claims of policymaking employees. The First, Sixth, Seventh, and Tenth Circuits apply the *Branti* policymaker exception to dismiss speech claims "relate[d] to either [the employee's] political affiliation or substantive policy views." *Rose v. Stephens*, 291 F.3d 917, 921 (6th Cir. 2002) (summarizing cases). In this approach, "the *Pickering* balance favors the government as a matter of law" because the "government enjoys the right to choose or dismiss [policymaking] employees on the basis of their political views." *Id.* at 922. And the Ninth Circuit considers policymaking status dispositive of free speech claims, regardless of the content of the speech. *See, e.g.*, *Bardzik*, 635 F.3d at 1151.

The Alaska Supreme Court would follow the overwhelming consensus in holding that Ms. Bakalar's prolific posts justified the State in discharging her from a policymaking role. It does not matter whether Alaska would follow the Ninth Circuit's view that policymakers may be discharged for any speech or the alternative view that policymakers may be discharged for speaking on policy and partisan politics. True, before the overwhelming federal position developed, the Alaska Supreme Court stated in dictum that policymaking status is merely one factor in the *Pickering* analysis. *See City & Borough of Sitka*, 649 P.2d at 945. But the case concerned an employee held not to be a policymaker,

*id.*, and the Court should not regard the nearly-forty-year-old statement as considered dicta. *See Rocky Mountain Fire & Cas. Co. v. Dairyland Ins. Co.*, 452 F.2d 603, 604 (9th Cir. 1971); *see also McKenna v. Ortho Pharm. Corp.*, 622 F.2d 657, 662 (3d Cir. 1980) ("[A] federal court should be circumspect in surrendering its own judgment concerning what the state law is on account of dicta.").

### b. Ms. Bakalar's Speech Fails the *Pickering* Balancing Test.

Ms. Bakalar's speech claim also comes up short under the *Pickering* balancing test's six factors:

> (1) maintenance of discipline by immediate supervisors; (2) preservation of harmony among co-workers; (3) maintenance of personal loyalty and confidence when necessary to the proper functioning of a close working relationship; (4) maintenance of the employee's proper performance of daily duties; (5) public impact of the statement; [and] (6) impact of the statement on the operation of the governmental entity.

*Haley*, 687 P.2d at 311 (citing *Pickering*, 391 U.S. 569–73).[59]

Even in the few jurisdictions that do not automatically dismiss the claims of policymakers, "the *Pickering* balance generally tips in favor of the government because of its overriding interest in ensuring an elected official's ability to implement his policies through his subordinates." *Borzilleri*, 874 F.3d at 194. "Common sense tells us the expressive activities of a highly placed supervisory, confidential, policymaking, or advisory employee will be more disruptive to the workplace than similar activity by a low level employee with little authority or discretion." *McEvoy v. Spencer*, 124 F.3d 92, 103 (2d Cir. 1997). The facts here show why—a state lawyer cannot counsel and represent state officials when she posts luridly about state and national elected officials. *Cf. City & Borough of Sitka*, 649 P.2d at 944 (assuming an "intemperate" statement would give a

---

[59] A seventh factor—whether the speech concerns an issue of legitimate public concern—is a condition precedent for applying the other six factors and is, therefore, conceptually distinct. *See Wickshire*, 725 P.2d at 700. For the purposes of this Motion, the State assumes Ms. Bakalar meets this condition.

public employer "grounds for dismissal . . . on the basis of insubordination, misconduct, or poor job performance").

First, Ms. Bakalar's posts threatened her relationships with client agencies about to be headed by Governor Dunleavy's appointees. Ms. Bakalar's political postings were intemperate in tone and unrestrained in frequency. In the first days after receiving Mr. Babcock's resignation request, Ms. Bakalar tweeted about President Trump nearly twice a day, only slackening her pace when she submitted her request to be retained. Ms. Bakalar did not confine her criticism to President Trump himself. She also criticized those who voted for him, distraught that Trump voters could be found "IN [HER] OWN OFFICE."[60] The incoming administration could have considered that given this view, Ms. Bakalar would fail to earn the trust of agency heads and the lieutenant governor. Ms. Bakalar's statements, accordingly, implicated "preservation of harmony among co-workers," "maintenance of personal loyalty and confidence when necessary to the proper functioning of a close working relationship" with her clients, and therefore "maintenance of the employee's proper performance of daily duties." *See Haley*, 687 P.2d at 311.

Second, the public knew who Ms. Bakalar was and what job she held. The same newspaper that reported Ms. Bakalar's comments about state cases also republished her blog posts. "The burden of caution employees bear with respect to the words they speak will vary with the extent of authority and public accountability the employee's role entails." *Rankin v. McPherson*, 483 U.S. 378, 390 (1987). Ms. Bakalar was among the highest ranking attorneys in the Department of Law, with significant influence over the central institution of Alaska's representative democracy—elections. She guided decisions on whether and how Alaskans could exercise their constitutional rights to make, reform, or repeal laws. She drafted ballot language that would apprise voters of the subject matter of citizen legislation. She instructed on the legality of recall efforts. And she did all this publicly, not behind closed doors. Her direction and advice implicated the interests of every

[60] Ex. T.

voter in Alaska. Further, public trust in Alaska's elections depends on its belief that they are run in a fair, nonpartisan manner. The incoming administration could have anticipated that Ms. Bakalar's statements about everything from the President and those who support him to genitalia and toilets would make her an unsuitable spokesperson about the State's legal positions, especially its positions about elections. Accordingly, her statements had a "public impact" and affected "the operation of the governmental entity." *See Haley*, 687 P.2d at 311.

Third, Ms. Bakalar made public statements about judges. She supported the retention of Alaska Supreme Court justices but opposed the confirmation of Justice Kavanaugh to the Supreme Court, suggesting his nomination would change her view of the judiciary.[61] The incoming administration could anticipate that Ms. Bakalar would not represent it well if called to do so in the Supreme Court, and that her cynical view of the judiciary would impede her other cases. Her statements bore on the "maintenance of [her] proper performance of daily duties" and the "operation of the governmental entity." *See Haley*, 687 P.2d at 311.[62]

Little public value weighs against the impediment Ms. Bakalar's statements posed to her effective representation of the State. Ms. Bakalar's statements failed to serve the purposes Alaska's application of *Pickering* is meant to achieve—"encourag[ing] employee speech about the operations of government since the employees often are in the best position to offer informed opinions." *Alaskans for a Common Language*, 170 P.3d at 203 (quotations omitted). Ms. Bakalar rarely—if ever—drew on her experiences in the Department to comment on politics. Instead, she achieved the dubious feat of imperiling

---

[61] Exhibit AA (*It Feels Extra Bad Being a Woman Lawyer this Week*).

[62] It is no answer to these concerns to say Ms. Bakalar's intemperance had not yet matured into an adverse result for the state. The State was entitled to act when her statements "necessarily, or probably had a material and substantial effect" under *Pickering*. *Haley*, 687 P.2d at 314; *see also Brewster*, 149 F.3d at 979 ("[P]ublic employers need not allege that an employee's expression actually disrupted the workplace; 'reasonable predictions of disruption' are sufficient." (quoting *Waters v. Churchill*, 511 U.S. 661, 673 (1994)).

Defendants' Motion for Summary Judgment
*Bakalar v. Dunleavy, et al.* (Case No. 3:19-cv-00025-JWS)

Page 17 of 21

Case 3:19-cv-00025-JWS   Document 56   Filed 03/26/21   Page 17 of 21

voter in Alaska. Further, public trust in Alaska's elections depends on its belief that they are run in a fair, nonpartisan manner. The incoming administration could have anticipated that Ms. Bakalar's statements about everything from the President and those who support him to genitalia and toilets would make her an unsuitable spokesperson about the State's legal positions, especially its positions about elections. Accordingly, her statements had a "public impact" and affected "the operation of the governmental entity." *See Haley*, 687 P.2d at 311.

Third, Ms. Bakalar made public statements about judges. She supported the retention of Alaska Supreme Court justices but opposed the confirmation of Justice Kavanaugh to the Supreme Court, suggesting his nomination would change her view of the judiciary.[61] The incoming administration could anticipate that Ms. Bakalar would not represent it well if called to do so in the Supreme Court, and that her cynical view of the judiciary would impede her other cases. Her statements bore on the "maintenance of [her] proper performance of daily duties" and the "operation of the governmental entity." *See Haley*, 687 P.2d at 311.[62]

Little public value weighs against the impediment Ms. Bakalar's statements posed to her effective representation of the State. Ms. Bakalar's statements failed to serve the purposes Alaska's application of *Pickering* is meant to achieve—"encourag[ing] employee speech about the operations of government since the employees often are in the best position to offer informed opinions." *Alaskans for a Common Language*, 170 P.3d at 203 (quotations omitted). Ms. Bakalar rarely—if ever—drew on her experiences in the Department to comment on politics. Instead, she achieved the dubious feat of imperiling

---

[61] Exhibit AA (*It Feels Extra Bad Being a Woman Lawyer this Week*).

[62] It is no answer to these concerns to say Ms. Bakalar's intemperance had not yet matured into an adverse result for the state. The State was entitled to act when her statements "necessarily, or probably had a material and substantial effect" under *Pickering*. *Haley*, 687 P.2d at 314; *see also Brewster*, 149 F.3d at 979 ("[P]ublic employers need not allege that an employee's expression actually disrupted the workplace; 'reasonable predictions of disruption' are sufficient." (quoting *Waters v. Churchill*, 511 U.S. 661, 673 (1994)).

Defendants' Motion for Summary Judgment
*Bakalar v. Dunleavy, et al.* (Case No. 3:19-cv-00025-JWS)          Page 17 of 21

Case 3:19-cv-00025-JWS   Document 56   Filed 03/26/21   Page 17 of 21

her client representations without speaking about them. The Alaska Constitution does not compel the State to accept representation and counsel from a lawyer who does this.

**B.      Ms. Bakalar's Section 1983 Claim Fails Without a Constitutional Violation.**

Ms. Bakalar's section 1983 claim against Governor Dunleavy and Mr. Babcock fails because her discharge violated no constitutional right. *See Graham v. Connor*, 490 U.S. 386, 393 (1989). ("[Section] 1983 is not itself a source of substantive rights but merely provides a method for vindicating federal rights elsewhere conferred."). And, of course, Ms. Bakalar has no section 1983 claim against the State. *See Will v. Mich. Dep't of State Police*, 491 U.S. 58, 66 (1989).[63] Accordingly, Ms. Bakalar's claim for an injunction and damages should be dismissed.

Ms. Bakalar's claim for damages fails for the additional reason that Governor Dunleavy and Mr. Babcock are entitled to qualified immunity. *See Wood v. Moss*, 572 U.S. 744, 748 (2014). The Court may grant qualified immunity at either of two steps—first, "decid[ing] whether the facts . . . make out a violation of a constitutional right" and second, "decid[ing] whether the right at issue was 'clearly established' at the time of . . . alleged misconduct." *Pearson v. Callahan*, 555 U.S. 223, 232 (2009). As explained above, Ms. Bakalar's policymaking status precludes her free speech claim. Even if Ms. Bakalar had a free speech claim, she does not have one that is clearly established. *See Kramer v. Cullian*, 878 F.3d 1156, 1163 (9th Cir. 2018). Ms. Bakalar bears the "burden of demonstrating that the right at issue was clearly established." *Id.*; *Moran v. Washington*, 147 F.3d 839, 844 (9th Cir. 1998). She cannot meet it. Public employee free speech rights are "rarely, if ever, sufficiently clearly established to preclude qualified immunity" because their determination turns on "a fact-sensitive, context-specific balancing of competing interests." *Brewster*, 149 F.3d at 980. And, here, the "unanimous chorus" of federal appellate cases holds government lawyers are policymakers.

---

[63] Nor does Ms. Bakalar have a claim for damages against Governor Dunleavy in his official capacity. *Will*, 491 U.S. at 71 & n.10.

Defendants' Motion for Summary Judgment
*Bakalar v. Dunleavy, et al.* (Case No. 3:19-cv-00025-JWS)                                           Page 18 of 21

Ms. Bakalar points to no constitutional violation—and certainly no clearly established one. Her section 1983 claim should be dismissed. This claim is the only claim she alleges against Mr. Babcock and Governor Dunleavy, and dismissal of this claim requires dismissal of the individuals from this suit.

**C.    Ms. Bakalar's State-Law Claims Fail Without a Constitutional Violation.**

Just as section 1983 cannot carry a flawed constitutional claim, Ms. Bakalar's duplicative state-law claims for violation of (1) Alaska's free speech protection, (2) the implied covenant of good faith and fair dealing, (3) public policy, and (4) Alaska's merit principle, fail and should be dismissed.

**1.    Alaska's Free Speech Clause Does not Supply a Cause of Action.**

The Court should dismiss this claim because Alaska law does not "imply a cause of action for damages under the Alaska constitution except in cases of flagrant constitutional violations where little or no alternative remedies are available." *Larson v. State of Alaska*, 284 P.3d 1, 10 (Alaska 2012). This case presents no constitutional violation—much less a flagrant one—and even if it did, other state and federal causes of action would mark alternative paths to seek a remedy.

**2.    The Implied Covenant of Good Faith and Fair Dealing is Not Breached in this Case Without a Constitutional Violation.**

As an at-will employee, Ms. Bakalar could "be fired for any reason that d[id] not violate the implied covenant of good faith and fair dealing." *McAnally v. Thompson*, 397 P.3d 322, 324 n.1 (Alaska 2017) (quotations omitted). The covenant has "both a subjective and an objective component. The subjective component prohibits an employer from acting with a subjectively improper motive; the objective component prohibits the employer from dealing with the employee in a manner that a reasonable person would regard as unfair." *Lentine v. State*, 282 P.3d 369, 376 (Alaska 2012) (internal citation and quotation omitted).

Ms. Bakalar grounds her claim for breach of this covenant on supposed violation of her constitutional rights. But there was no such violation, and her discharge could not offend the objective component of the covenant of good faith and fair dealing. Nor did it offend the subjective component because Ms. Bakalar lacks evidence to clear the high bar

of showing "personal animus" by anybody who participated in the decision to discharge her. *Id.* at 377. The Court should dismiss the claim.

### 3. Wrongful Discharge Duplicates the Failed Implied Covenant of Good Faith and Fair Dealing Claim.

To prove wrongful discharge, Ms. Bakalar must prove "(1) that [she] was discharged . . . and (2) that the [State] breached a contract or committed a tort in connection with the" discharge. *Okpik v. City of Barrow*, 230 P.3d 672, 679 (Alaska 2010). Ms. Bakalar's wrongful discharge claim merely restates her implied covenant of good faith and fair dealing claim and should be dismissed for the same reasons.

### 4. Alaska's Merit Principle Provides No End-Run Around the State's Public Employee Free Speech Caselaw.

Ms. Bakalar's merit principle claim fails for the same reason as her other state-law claims—it hinges on a non-existent constitutional violation. *Cf. Peterson v. State of Alaska*, 236 P.3d 355, 368 n.44 (Alaska 2010) (holding a good faith and fair dealing claim "subsumed" a merit principle claim). The Alaska Constitution requires the legislature to "establish a system under which the merit principle will govern the employment of persons by the State." Alaska Const. Art. XII, § 6. The Alaska Constitution thereby presaged *Elrod* by prohibiting a state "spoils system." *See Moore v. State of Alaska*, 875 P.2d 765, 768 (Alaska 1994). But to say this or point to related statute, *see* AS 39.25.178, does not mean Ms. Bakalar can write whatever she wants without employment consequence. The merit principle permits the State to govern efficiently. *See Moore*, 875 P.2d at 768 (addressing outsourcing of state positions). And nothing in the merit principle sets aside the Alaska Supreme Court's use of the *Pickering* balancing test to weigh the speech of public employees. *See Alaskans for a Common Language*, 170 P.3d at 203–04 (ignoring the merit principle); *Wickwire*, 725 P.2d at 700 (same). Even classified employees, whose protections exceed Ms. Bakalar's, are shielded only from "unlawful discrimination due to political beliefs." *Compare* AS § 39.25.160(f), *with* AS § 39.25.160(g). The States' actions accorded with the federal and Alaska constitutions and were therefore lawful. This claim should be dismissed.

# IV. <u>CONCLUSION</u>

Courts do not require the government to retain a lawyer who renders herself unsuitable by making political and scatological statements to a wide Internet audience. Neither the First Amendment nor the Alaska Constitution afford this much protection to a person charged with the sensitive public duty Ms. Bakalar undertook. Summary judgment dismissal of her claims is appropriate.

DATED this 26th day of March, 2021.

LANE POWELL LLC
Attorneys for Defendants


By  s/ Michael B. Baylous
    Brewster H. Jamieson, ABA No. 8411122
    Michael B. Baylous, ABA No. 0905022

I certify that on March 26, 2021, a copy of
the foregoing was served electronically on:

Mark Choate, mark@choatelawfirm.com [ECF]

and served via email on:
Amanda Harber, Amanda.harber@gmail.com

s/ Michael B. Baylous