Mark Choate, AK #8011070
Attorney for Plaintiff
CHOATE LAW FIRM LLC
424 N. Franklin Street
Juneau, Alaska 99801
Tel: (907) 586-4490
Fax: (206) 424-9705
Email: lawyers@choatelawfirm.com

Amanda Harber, AK 1011119
Attorney for Plaintiff
49TH STATE LAW LLC
P.O. Box 661
Soldotna, AK 99669
Tel: (907) 420-4290
Email: amanda@49thstatelaw.com

## IN THE UNITED STATES DISTRICT COURT

## DISTRICT OF ALASKA

| | |
|---|---|
| ELIZABETH BAKALAR,<br><br>          Plaintiff,<br><br>v.<br><br>MICHAEL J. DUNLEAVY, in his individual and official capacities; TUCKERMAN BABCOCK; and the STATE OF ALASKA,<br><br>          Defendants. | Case No. 3:19-CV-00025<br><br><br>**AFFIDAVIT OF SCOTT KENDALL IN SUPPORT OF PLAINTIFF'S OPPOSITION TO DEFENDANTS' MOTION FOR SUMMARY JUDGMENT & CROSS-MOTION FOR SUMMARY JUDGMENT** |

| | |
|---|---|
| STATE OF ALASKA | ) |
| | ) ss. |
| FIRST JUDICIAL DISTRICT | ) |

SCOTT KENDALL, being duly sworn upon oath, deposes and states:

1.      I am more than 21 years of age and if called to court would testify as follows:

2. I am currently of counsel with the law firm Homes, Weddle & Barcott, P.C. I have been licensed to practice law and in good standing since May 1, 2004.

3. I know Elizabeth "Libby" Bakalar from cases in which she represented the State of Alaska and I represented private entities with aligned interests. I was always impressed with Ms. Bakalar's excellent work and extraordinary speed in getting out top notch legal work product.

4. I left private practice for a time from 2015-2018. From 2016-2018, I was chief of staff for former Governor Bill Walker.

5. While in that position, I learned that the state had hired Bill Evans to conduct an investigation into Elizabeth Bakalar's personal blog, "One Hot Mess – Alaska."

6. I subsequently received a copy of Mr. Evan's report confirming that Ms. Bakalar broke no rules and that the blog was protected First Amendment speech. I considered any question regarding her blog concluded.

7. The investigation also confirmed what I also observed and heard from others during the Walker Administration. That was that Ms. Bakalar was an excellent lawyer and did an outstanding job on all work assigned to her. While not everyone appreciated her writings, there was never even a hint that her personal political beliefs and convictions were ever a factor in her vigorous representation of the State of Alaska.

8. After Michael Dunleavy won the election in November 2018, Governor Walker and I met with Governor-Elect Dunleavy and his transition chief of staff, Tuckerman Babcock in Anchorage at the Atwood Office Building.

9.      Governor Walker assigned me to do everything we could to get off on the right foot with the incoming administration. This included specifically working with the transition chief of staff, Tuckerman Babcock.

10.     I worked closely with Mr. Babcock and his transition team over the next several weeks.

11.     Because each administration brings in a number of political appointees (usually around 100-120), I offered to Mr. Babcock to send out an email under my name requesting the resignations of the individuals the Walker Administration had appointed, but that the incoming Dunleavy Administration wanted to replace. I thought this would give the Dunleavy Administration a fresh start and any negatives regarding the request for resignations would fall on me as the outgoing chief of staff.

12.     Mr. Babcock and I continued with this plan for a period of time, but at some point, I learned that Mr. Babcock requested a list from the Governor's Office Administrative head for a list of everyone employed by the State of Alaska who "could be fired"—essentially everyone who was not covered by a union contract or otherwise protected from termination. I instructed this person to comply with Mr. Babcock's request. As I recall, this list was between 1,000 and 2,000 people.

13.     Many of these individuals perform important and routine state functions that are not associated with either politics or the particular agenda and policies of the governor. Some of them were prosecutors or defense attorneys (and included essentially the entire Department of Law). I didn't think it was fair or right to demand that non-political employees be asked to resign. I told Mr. Babcock that if he wished to request the resignation of that many employees, including non-political employees, that I was withdrawing my offer to send out an email

requesting the resignations. I was not willing to terrorize state employees who were clearly not in political positions.

14.     Subsequently, Mr. Babcock said that he was going to request these state employees resign and reapply for their jobs. The reason he gave me was that he needed to know everyone was going to be loyal to Governor Dunleavy and the incoming administration's agenda.

15.     While I disagreed with this and thought it an improper loyalty oath, my staff continued to work with Mr. Babcock and his transition staff. He was provided a list with everyone who was not a classified employee and protected from firing by a collective bargaining agreement.

16.     I learned that list of state employees was subsequently color-coded for who the new administration wanted to get rid of. Individuals with identified liberal or progressive postings on social media were targeted. In addition, certain state employees were targeted simply because they had engaged in some non-political behavior (the example I was given: signing a child support garnishment letter) which irritated individuals in Governor Dunleavy's political orbit.

17.     I recall having at least two if not three conversations with Tuckerman Babcock about Libby Bakalar. He was unhappy with her blog and her criticism of President Trump and said he wanted to fire her.

18.     I cautioned him against that because her political speech was clearly protected by the First Amendment and the Alaska Constitution. I told him he could not fire her for her speech. Specifically, I told him that "you can fire her for no reason, but not an unlawful reason, and in my opinion firing her for political speech is an unlawful reason."

19. He only specifically complained about her political speech regarding President Trump. He mentioned no concerns about the language she used in her blog which can be off-color.

20. He then said that she works in the Division of Elections and shouldn't be in that position because it might cause people to question the independence of elections. I told him that issue could be raised and if she did not want to restrict her speech, she could easily be moved to another section in the Attorney General's office, like Torts. That would remedy any reasonable concern without violating her rights. I repeated that she couldn't be fired for her personal political speech.

21. Just at the end of the transition, on Friday, November 30, 2018, central Alaska experienced an earthquake. This was the last day that resignation letters were supposed to be received.

22. I spoke with Mr. Babcock that day and advised that I thought the time to receive the resignations should be extended. At the same time, he discussed the fact that he didn't like the "tone" of Libby's resignation letter and was going to fire her.

23. My thoughts at that time, and to this day, were that Mr. Babcock clearly was looking for a pretext to fire her for her political speech critical of President Trump.

24. Based on my multiple conversations with Mr. Babcock and working with him and his team during the transition, I believe Ms. Bakalar was fired because of her personal political speech. I believe that speech was protected and if she needed to be removed from the Elections position, she could have been easily moved to a different section in the Department of Law.

25. I believe that any claim by Mr. Babcock that his termination of Ms. Bakalar was not primarily motivated by her political positions and speech is patently false.

26.     Mr. Babcock's motivations regarding Ms. Bakalar's termination are further corroborated by his decision to terminate another attorney, Ruth Bottstein. Like Ms. Bakalar, Ms. Bottstein was known to be an excellent attorney and in fact had just successfully argued in John Sturgeon's appeal to the United States Supreme Court. I was told, although not directly by Mr. Babcock, that Ms. Bottstein was also terminated because she had made a small number of posts on social media many months earlier, that were critical of then-President Trump. I do not believe Ms. Bottstein's posts contained any profanity.

FURTHER, AFFIANT SAYETH NAUGHT.

Dated this 27th day of July, 2021 at Anchorage, Alaska.

Scott Kendall

SUBSCRIBED AND SWORN TO before me this 27th day of July, 2021.

Notary Public for the State of Alaska
My Commission Expires: 9-18-2022