# In The Matter Of:
*Bakalar v. Dunleavy, et al.*
*Case No. 3:19-cv-00025 JWS*

*Joanne Grace*
*April 29, 2021*

*Glacier Stenographic Reporters Inc.*
*P.O. Box 32340*
*Juneau, Alaska 99803*
*www.glaciersteno.com*



Original File Joanne Grace 4-29-2021.txt
Min-U-Script® with Word Index

Case 3:19-cv-00025-JWS   Document 69-9   Filed 07/30/21   Page 1 of 7
EXPS Opposition to Motion Summary Judgment & Cross-Motion for Summary Judgment
Page 1 of 7

Bakalar v. Dunleavy, et al.  
Case No. 3:19-cv-00025 JWS

Joanne Grace  
April 29, 2021

Page 37

1    Q.   Okay. And would you describe her as
2 somebody who was a personal friend?
3    A.   I would describe her as somebody who
4 was a professional friend.
5    Q.   Okay. And what do you mean by a
6 "professional friend"?
7    A.   I mean, she was a friend. I didn't --
8 I mean, first of all, she lived in Juneau, so, you
9 know, we didn't do things outside of work except
10 maybe get a drink after if she happened to be in
11 Anchorage, or maybe if I was -- maybe one time in
12 Juneau I might have got a drink with her. But, you
13 know, we don't -- we don't live in the same town.
14 We don't -- we didn't do things together like
15 personal friends might do.
16    Q.   Would you agree that attorneys can have
17 political opinions that -- attorneys in the
18 Department of Law can have political opinions and
19 still -- strong political opinions and still be
20 able to effectively represent the Department of
21 Law?
22    A.   Represent the Department of Law?
23    Q.   Uh-huh, in working -- in performing
24 their job duties.
25    A.   Well, that depends on their job duties.

Page 38

1 I mean, I do agree that people can have whatever
2 beliefs they want and adequately perform their
3 duties. It's not so much a representation of the
4 Department of Law; it's more a representation of
5 the state and our clients. But having beliefs is
6 absolutely compatible with doing the work of an
7 assistant attorney general.
8    Q.   Now, your -- strike that.
9        In your work with Ms. Bakalar as a
10 professional and as her professional friend, what
11 were the things that you liked about her as an
12 attorney?
13    A.   What were the things I liked about her
14 as an attorney?
15    Q.   Right, yeah, as an attorney.
16    A.   But not as a -- do you want me to
17 distinguish that from the things I liked about her
18 personally?
19    Q.   Yes.
20    A.   She was a great colleague. She was
21 very helpful. She had a great attitude about
22 helping other people. She was a good team player.
23 She was very responsive if you needed her -- an
24 answer to something. She was kind, like friendly,
25 just kind of fun to work with.

Page 39

1    Q.   Did you ever -- strike that.
2        What were your -- what were the
3 things you liked about her as an individual, as a
4 friend?
5    A.   She's a warm person. She's a loyal
6 person. She's funny. She's fun, considerate.
7 Probably some other things, too, that's not -- that
8 aren't coming to mind.
9    Q.   Okay. Were you ever aware of
10 Ms. Bakalar's personal political beliefs
11 interfering or affecting her ability to represent
12 the State of Alaska? And by that I mean causing a
13 bias or a lack of advocacy or a reduction in her
14 advocacy on the part of the state because of her
15 personal political beliefs.
16    A.   So, yes, aware of her -- not her
17 political beliefs but her political speech and her
18 political actions becoming more and more
19 problematic to her ability to do her job.
20    Q.   And I'm going to get to that frame that
21 you guys have adopted here, but I want to talk
22 about -- because it's a frame. But I want to talk
23 about whether or not in her work you ever saw that
24 her work performance, meaning the product that she
25 produced, was affected negatively in any fashion by

Page 40

1 her political beliefs.
2        MR. JAMIESON: And when you say
3 "work product," what are you including in "work
4 product"?
5    Q.   I'm talking about -- I'm talking about
6 the decisions that she wrote, the AGOs that she
7 authored. Let's start there. Are you aware of
8 whether she ever authored an Attorney General's
9 Opinion that you believe was affected or biased
10 because of her personal political beliefs?
11    A.   I'm not aware of that, no.
12    Q.   Okay. Are you aware of her ever making
13 an argument in court on behalf of the state,
14 whether it was in trial courts, the Alaska Supreme
15 Court, or the U.S. Supreme Court, in which her
16 personal political beliefs negatively created a
17 bias or a harm to the state?
18    A.   Well, I am not aware because I wouldn't
19 know, but I will say that because she was
20 representing the Division of Elections, and it's a
21 foundational principle of the Division of Elections
22 that the administration of elections be
23 nonpartisan, have credibility, integrity, and be
24 impartial, that the more outspoken the elections
25 attorney is, the more partisan and the more extreme

Bakalar v. Dunleavy, et al.  
Case No. 3:19-cv-00025 JWS

Joanne Grace  
April 29, 2021

Page 49

1   agenda.  Don't reapply or don't plan to work for
2   the state unless you agree to support it"?
3           MR. JAMIESON: The question is:
4   Did you see that?
5       A.  Did I see that?
6           MR. JAMIESON: In writing.
7       A.  No.  No, but I don't think that
8   Dunleavy's policies or plans were a secret.  We had
9   just gone through an election.
10      Q.  So what were the policies and plans
11  that you understood at that time the 1,200 state
12  workers were being asked to support in retaining or
13  seeking to be rehired for their jobs?
14          MR. JAMIESON: Let me object to
15  the form of that question.  It assumes facts that
16  are definitely not in evidence.
17      Q.  You said the Dunleavy administration
18  was going to be making changes, and that the reason
19  they were asking for 1,200 people to resign and
20  reapply was to make sure they were on board with
21  the changes.
22          My question is:  What was your
23  understanding of the changes that the Dunleavy
24  administration was making?
25          MR. JAMIESON: I think that you've

Page 50

1   misstated her prior testimony, but she can answer
2   the question to the extent she understands it.
3       A.  Every new administration comes in with
4   new ideas and new agendas.  And career state
5   employees understand that those people have been
6   elected, that the electorate wishes them to do the
7   things they promised to do, and that accomplishing
8   those things requires the work of many people, more
9   or less everyone in the executive branch, and
10  that's how I understood it.
11      Q.  Did you have any specific understanding
12  as to what were the changes that the new
13  administration was going to implement that required
14  1,200 people to basically quit their jobs, resign,
15  and then reapply because they were going to be on
16  board with these changes?
17          MR. JAMIESON: Same objection to
18  the form of that question.
19          Are you able to answer it?
20          THE WITNESS: Yeah.
21      A.  I mean, I don't -- I don't think that
22  it was -- I think that -- I think that your
23  statement is overthinking the request.  It was just
24  more of a general like, "Hey, new governor.  Are
25  you on board with continuing to, you know, do the

Page 51

1   state's business?"  That's how I would interpret
2   it.
3       Q.  In the 30 years that you've worked for
4   the Department of Law, had you ever seen a request
5   of basically this entire state workforce to resign
6   and reapply?
7       A.  No.
8       Q.  I'm talking about 1,200 people.
9       A.  No.
10      Q.  This was unusual; right?
11      A.  Unprecedented.
12      Q.  Unprecedented.  How did it affect the
13  morale of your -- the people that you were in
14  charge of to be told that they were required to
15  resign and reapply for their jobs?
16      A.  Negatively.
17      Q.  I'm going to show you what we'll mark
18  as Exhibit 26.
19          (Exhibit 26 duly marked.)
20  BY MR. CHOATE:
21      Q.  Can you see this?  This is an article
22  by Jeff Landfield dated November 18, 2018, called
23  "Playing Politics with Prosecutors."
24      A.  Uh-huh.
25      Q.  Do you recall ever seeing this?

Page 52

1       A.  No.
2       Q.  And what he says in the first paragraph
3   is: "It is customary for a new governor to ask for
4   resignations of political appointees.  These
5   include commissioners, deputy commissioners,
6   directors, deputy directors, and the governor's
7   staff.  However, it's unprecedented to ask for the
8   resignation of all EX" -- that would be exempt --
9   "and PX" -- partially exempt -- "employees.  These
10  include prosecutors, IT staff, secretaries,
11  assistants and more.  To give some context, when
12  Governor Walker was elected, he asked for the
13  resignations of about 250 people.  According to
14  state data, there were 1,454 partially exempt and
15  exempt positions, nearly 10 percent of the state
16  workforce."
17          Would you agree it was
18  unprecedented?
19      A.  I think I already said that.
20      Q.  Okay.  And then they quote Mr. Babcock
21  below -- or Mr. Landfield quotes him as saying,
22  "Dunleavy just wants all of the state employees who
23  are at-will -- partially exempt, exempt
24  employees -- to affirmatively say yes. 'Yes, I
25  want to work for the Dunleavy administration.' Not

Min-U-Script®                    Glacier Stenographic Reporters Inc.                    (13) Pages 49 - 52
                                 www.glaciersteno.com

Case 3:19-cv-00025-JWS   Document 69-9   Filed 07/30/21   Page 3 of 7
Ex. PSF - Opposition to Motion Summary Judgment & Cross-Motion for Summary Judgment
Page 3 of 7

Page 69

1  11:31 AM
2  **THE REPORTER:** We're back on
3  record.
4  (Exhibit 29 duly marked.)
5  **BY MR. CHOATE:**
6  Q. Ms. Grace, I've shown to you what is
7  marked as Exhibit 29. This is a March 16, 2017,
8  letter to James Cantor from William Evans. Have
9  you seen this before?
10  A. Yes.
11  Q. Okay. And were you aware of the
12  letter -- were you aware of the request made to
13  investigate Ms. Bakalar's social media presence in
14  2017?
15  A. Yes.
16  Q. Okay. How did you become aware of it?
17  A. From Libby and possibly from an e-mail
18  she sent. Also she told me.
19  Q. Okay. So you learned it from Libby, as
20  opposed to somebody in the administration or higher
21  up in the Attorney General's office?
22  A. I learned it from Libby for sure. I
23  don't know if I was also on -- no, I think -- I
24  think the first time I knew about it was from
25  Libby.

Page 70

1  Q. After Libby told you about this, did
2  you talk to anybody else in the department about
3  the investigation?
4  A. I would say it was a general topic,
5  particularly because Libby was very, very upset
6  about it and brought it up a lot and wanted to talk
7  to people about it a lot.
8  Q. What was -- what did Libby tell you she
9  was upset about?
10  A. Well, I think there's an e-mail that --
11  she either copied me or sent me the e-mails that
12  she wrote when -- after she was told that the
13  investigation was being done. And she also copied
14  me on e-mails about one of the complainants, Nancy
15  Stroup, and copied me on her responses to the
16  Attorney General and the deputy attorney general
17  and the director and her supervisor, and so all of
18  her expressions in those things I was aware of.
19  Q. As I understand it, then, you were --
20  because Libby copied you or Libby talked to you,
21  you were aware of this investigation, but you
22  weren't -- you were not part of the decision-making
23  process to begin an investigation; is that correct?
24  A. Correct. Correct.
25  Q. And in your -- and who is Mr. Cantor,

Page 71

1  who this letter is addressed to?
2  A. He was the deputy attorney general --
3  Q. Okay.
4  A. -- at the time.
5  Q. And do you know or did you ever learn
6  what precipitated the investigation into
7  Ms. Bakalar?
8  A. Yes. She -- in one of her e-mails that
9  she sent about the investigation, she identified
10  the source of the investigation as a citizen, which
11  I believe was Nancy Stroup because she had sent me
12  that complaint, or somebody had sent me that
13  complaint, and a couple of legislators who I know
14  to be -- I know who they are.
15  Q. Okay. And Ms. Stroup -- are you aware
16  that Ms. Stroup had targeted Ms. Bakalar in her
17  blog, saying that Ms. Bakalar should not be working
18  for the State of Alaska because of her political
19  beliefs?
20  **MR. JAMIESON:** I'll object to the
21  form. You're characterizing what Ms. Stroup was
22  saying, and you are probably inappropriately or
23  incorrectly characterizing it.
24  But you can answer the question.
25  A. So I saw the complaint that she wrote.

Page 72

1  Q. Uh-huh.
2  A. And I saw that in that complaint she
3  had, I would say, two major concerns. One was that
4  it seemed that Libby was using state time and
5  resources to post social media things or blogs, and
6  the second was that Libby had declared that she
7  didn't want to have anything to do with anyone who
8  voted for Donald Trump, and that Ms. Stroup didn't
9  see how Libby could represent the interests of the
10  citizens of Alaska, the majority of whom had voted
11  for Donald Trump. And she expressed concern that
12  the top election attorney for the state could
13  perform her job in a fair and impartial way when
14  she was posting these kinds of things.
15  Q. And Ms. Stroup is a Republican; is that
16  right?
17  A. I have no idea.
18  Q. You're not familiar with her writings
19  about politics and her views on government and
20  elections?
21  A. I'm only aware of the things that Libby
22  said about her in the e-mails that she sent.
23  Q. Did you at some point receive a copy --
24  sometime in March, let's say, of 2017, did you
25  receive a copy of Mr. Evans' letter that's marked

Min-U-Script®     Glacier Stenographic Reporters Inc.     (18) Pages 69 - 72
www.glaciersteno.com

Case 3:19-cv-00025-JWS Document 69-9 Filed 07/30/21 Page 4 of 7
Ex. FF to Opposition to Motion for Summary Judgment & Cross-Motion for Summary Judgment
Page 4 of 7

Page 73

1 here as Exhibit 29?
2   A.   I did.
3   Q.   Okay. And did you understand that
4 Mr. Evans had -- his conclusions were that her blog
5 took place predominantly on her own time and would
6 appear to be a protected activity?
7   A.   Yes. I'm aware of the two complaints
8 that Ms. Stroup made. The investigation only
9 related to one of them.
10  Q.   I'm going to show you now what we'll
11 mark as No. 30.
12          (Exhibit 30 duly marked.)
13 BY MR. CHOATE:
14  Q.   And this is an e-mail chain that
15 involves -- you're cc'd on it, and I think we can
16 go to the beginning of it, which is on the second
17 page, page 2 of Exhibit 30. And this is an e-mail
18 from Chad Hutchison, who was the attorney for the
19 Senate majority. So he's an attorney for that
20 Republican -- it was a Republican majority here in
21 Juneau for the Senate, and he complained about
22 Ms. Bakalar's speech in her blog, "One Hot Mess."
23 Do you see that?
24  A.   I'm not sure how to get to the second
25 page.

Page 74

1          MR. JAMIESON: Oh, you have to
2 press the down button, arrow.
3          THE WITNESS: Oh, right here?
4          MR. JAMIESON: Oh, yeah. You can
5 do that.
6          THE WITNESS: Okay.
7          MR. JAMIESON: No, I guess you
8 can't. You have to get -- oh, boy. This guy here.
9          THE WITNESS: Oh, got you. Okay.
10  A.   (Reading.) Sorry. Am I on page 2 now?
11         MR. JAMIESON: So, Mark, it's a
12 good thing I'm in the same room.
13  A.   Oh, it is, because he's like a
14 technical wiz compared to me. All right. So
15 I'm --
16  Q.   It's so cool to consider Brewster --
17  A.   It's a low bar.
18  Q.   -- a technical wiz. I just -- that's
19 really neat.
20  A.   What did I just do? I just went back
21 to the other one. All right. I'm sorry. Hold on.
22 Give me a second. Okay. Now I'm on the second
23 page.
24  Q.   And you see at the bottom there is an
25 e-mail from Chad Hutchison --

Page 75

1   A.   Right.
2   Q.   -- who I'll represent to you was the
3 attorney for the Senate majority, so for the
4 Republican majority, and he sent this letter to
5 Cori Mills. And do you know who Cori Mills is?
6   A.   I do.
7   Q.   Who is he -- or she? She.
8   A.   It's a she.
9   Q.   That's right. I keep -- you told me
10 that earlier.
11  A.   Right. She's now the deputy attorney
12 general. At the time she was our legislative
13 liaison and our press person.
14  Q.   Okay. And then looking at the first
15 page --
16         MR. JAMIESON: You mean page 1, or
17 do you mean --
18         MR. CHOATE: Page 1. Page 1 of
19 Exhibit 30.
20         MR. JAMIESON: Okay.
21  A.   Okay. Got it.
22 BY MR. CHOATE:
23  Q.   On October 8th Cori Mills wrote, "Just
24 so you all have it, here is the revised draft of
25 the social media policy. This policy is focused

Page 76

1 more on state use of social media, not personal
2 use. When it comes to personal use of social
3 media, it is fraught with pitfalls, and putting a
4 firm policy in writing telling employees what they
5 can do on their personal time has a tendency to be
6 viewed by the courts as overbroad and as an
7 infringement on First Amendment rights. This
8 doesn't mean you can't discipline attorneys, but
9 you have to show a strong nexus to their work.
10         "These issues seem to be coming up
11 in a number of departments. DPS is also working on
12 a policy for personal use of social media."
13         And she finishes, "In the end,
14 this is a really a question of off-duty conduct and
15 how and when it can be related to your employment.
16 This is really a Division of Personnel question.
17 I'm wondering if there should be guidance from the
18 Division of Personnel and Law to all departments on
19 this."
20         Do you recall receiving this?
21  A.   Yes.
22  Q.   Do you recall seeing a revised draft of
23 social media policy at this time period?
24  A.   So this was the -- I think she was
25 referring to the State of Alaska policy, not the

Min-U-Script®         Glacier Stenographic Reporters Inc.         (19) Pages 73 - 76
                     www.glaciersteno.com

Case 3:19-cv-00025-JWS   Document 69-9   Filed 07/30/21   Page 5 of 7
Ex Parte Opposition to Motion Summary Judgment & Cross-Motion for Summary Judgment
Page 5 of 7

Bakalar v. Dunleavy, et al.  
Case No. 3:19-cv-00025 JWS

Joanne Grace  
April 29, 2021

Page 77

1 Department of Law policy, and it looks like it was
2 maybe attached to the e-mail. I can't --
3    Q.   I just haven't seen this. Do you
4 recall seeing a social media policy, a draft of
5 social media policy?
6    A.   It looks like it was attached to this
7 e-mail --
8    Q.   Okay.
9    A.   -- but it was not -- as she said, it
10 was more a policy about state -- the state using
11 social media, in other words, the Department of
12 Public Safety having a Facebook account or the
13 governor's office having a Facebook account and,
14 you know, the things they can and can't do related
15 to that. This really wasn't about individuals' use
16 of social media. I think that's what she's saying.
17 And I do think -- I don't know, but I think
18 probably, if you go to the Department of
19 Administration, you'll maybe find a social media --
20 a statewide social media policy.
21    Q.   Okay.
22    A.   Or maybe it's not public. I don't
23 know.
24    Q.   Then right above this e-mail on page 1
25 of Exhibit 30, there is an e-mail from Jahna

Page 78

1 Lindemuth again to Cori Mills, and you're cc'd
2 along with Mr. Sniffen and Ms. Hafner. And it
3 says, "Re: More Bakalar Issues - For AG. Thanks.
4 Let's ask DOP" -- that would be the Division of
5 Personnel -- "whether an employee can be fired for
6 political speech outside work that is contrary to
7 politics of administration. Libby may become the
8 example, so good to know answer sooner than later.
9 If so, this info should go to employees so they can
10 make informed decisions. Or if they can't, it
11 might be good to get policy or FAQs out before
12 election."
13         Do you recall receiving this?
14    A.   Yes.
15    Q.   And do you know, why is it that --
16 strike that.
17         Do you know whether or not the
18 Division of Personnel was ever asked to provide an
19 opinion as to whether employees could be fired for
20 political speech outside of work that is contrary
21 to the politics of the administration?
22    A.   I don't think that we ever did because
23 I think Janell's response above is a legal
24 question, and the Division of Personnel is just
25 going to ask us.

Page 79

1    Q.   Okay. So Janell says, "Jahna, I agree
2 we want to know the parameters surrounding this
3 issue, though I think the concerns you've flagged
4 will likely require more legal analysis from us at
5 Law re what can theoretically happen and what the
6 recourse might be, rather than anything from DOP,
7 which would probably kick this type of inquiry back
8 to us anyhow. If that's okay, I'll reach out to Ed
9 and Joanne and share my thoughts on this in person
10 and figure out the best way to get what you're
11 looking for."
12         So did Janell Hafner reach out to
13 you and Mr. Sniffen regarding developing or
14 articulating a policy as to whether or not
15 employees could be fired for political speech
16 outside work that is contrary to the politics of
17 the administration?
18    A.   I don't remember. I just don't
19 remember.
20    Q.   Okay. Do you recall ever -- there ever
21 being a document, a writing in which you saw -- you
22 participated in or saw that said, "Department of
23 Law employees can be fired for political speech
24 outside of work that is contrary to the politics of
25 the administration"?

Page 80

1    A.   So I think there was a group of us who
2 tried to develop a policy, but it wasn't about --
3 it wasn't about whether someone could be fired for
4 political speech that was contrary to the politics
5 of the administration. I think the way Jahna
6 framed that was not actually the question that we
7 were looking for. It was whether we could develop
8 a policy about outside political speech that
9 related to what was acceptable and not acceptable,
10 given the functions of your job.
11         And we weren't successful in doing
12 that because it's so fact-specific that it turned
13 out to be -- it would turn out to be a legal memo
14 of all the things you would consider to determine
15 whether outside political speech or -- it wasn't
16 just political speech -- outside speech, social
17 media activities, I guess, were acceptable or not.
18 It was just not a meaningful policy. It was more
19 like, "Here's the particular five-part weighing
20 task," kind of -- something more like that. And it
21 really depended on the job.
22         So, for example, the criminal
23 division wanted -- you know, might have more
24 restrictive limitations than the civil division
25 would because they have had people who put things

Min-U-Script®          Glacier Stenographic Reporters Inc.          (20) Pages 77 - 80
                       www.glaciersteno.com

Case 3:19-cv-00025-JWS   Document 69-9   Filed 07/30/21   Page 6 of 7
Ex. 9 – Opposition to Motion Summary Judgment & Cross-Motion for Summary Judgment
Page 6 of 7

Bakalar v. Dunleavy, et al.  
Case No. 3:19-cv-00025 JWS

Joanne Grace  
April 29, 2021

Page 81

 1 that are racist or, you know, problematic on social
 2 media that impacts their ability to prosecute, to,
 3 you know, appropriately do the job of a prosecutor.
 4         In the civil division, it just
 5 depends so much on each job that it just became
 6 this sort of factual application of the facts to
 7 law, and that's not a meaningful policy. It would
 8 just turn out to be like "Consider what your job is
 9 and the impact of what you're doing on your job and
10 your clients and use good judgment." And so I
11 don't think we ever ended up with anything.
12   Q.   Did you ever produce anything in
13 writing that would be advisory to Department of Law
14 employees as to how they should -- what they should
15 consider in using social media in their personal
16 life?
17   A.   No.
18   Q.   Were any of the communications by this
19 group that you've described -- were any of those,
20 where you discussed this back and forth -- did any
21 of that go into writing where there were e-mails or
22 a draft -- efforts to create drafts of a policy or
23 a process, you know, an advisory? Let's call it an
24 advisory.
25   A.   I think there might have been, and it

Page 82

 1 might have been the criminal division that was
 2 really primarily working on that. We were trying
 3 to do one that could be department-wide, but I
 4 don't know if we -- I just don't recall if we ever
 5 got anything in there that was -- that went beyond
 6 the criminal division.
 7   Q.   Did you believe or -- strike that.
 8         Was there a belief among
 9 yourselves -- you, Jahna Lindemuth, and Janell
10 Hafner -- that Libby Bakalar might be fired or
11 discharged for her speech by the Dunleavy
12 administration if he was elected?
13   A.   There was general concern that Libby's
14 actions were negatively impacting her ability to do
15 the job, were becoming more and more concerning for
16 the legislature, for the administration, for the
17 department, for the Division of Elections, for the
18 public; and that as the complaints came in, she,
19 instead of taking them to heart, became more
20 adamant and more defiant and seemed to accelerate
21 rather than -- rather than pull back.
22         And so I think that there was
23 alarm. We were alarmed by what she was doing. We
24 were concerned by what she was doing. And, I mean,
25 when this investigation was going on, we were

Page 83

 1 concerned that she was going to be disciplined by
 2 this administration. It wasn't just -- it didn't
 3 really have to do with the Dunleavy administration;
 4 it had to do with her kind of self-destructive
 5 actions that seemed to be getting more -- to be
 6 more and more and more important to her.
 7   Q.   So can you point out -- I mean, we've
 8 got -- we've asked for lots of discovery from the
 9 state in this case, but can you point out any
10 writing in which you wrote to Libby Bakalar and put
11 on sort of the record, "Libby, I have concerns" or
12 "we have concerns regarding your personal political
13 speech and what you're saying in your blog, and we
14 want to admonish you or warn you that you might
15 lose your job or might face dismissal because of
16 your speech"?
17   A.   No, because -- for several reasons.
18 One is this was very important to Libby. She was
19 very -- she repeatedly said, "I don't care what
20 they do to me, I'm never going to stop." Number
21 two, she's an attorney herself who claims to be an
22 expert in the First Amendment. Three, she had her
23 own attorney, Mr. Sheehan, representing her in
24 these matters. And, four, we were not -- we didn't
25 want her to get in trouble.

Page 84

 1         We were hoping that it wouldn't
 2 happen, and these complaints and the concerns about
 3 her behavior were being handled at the highest
 4 level, by the Attorney General. So, no, nobody was
 5 going to step in between -- you know, get out in
 6 front of the Attorney General and say, "Libby, stop
 7 doing this."
 8   Q.   Well, I mean, I have to say I'm trying
 9 to look for where her friends were, her
10 professional friends and lawyers were in giving --
11 putting in writing in any place, you know, "Libby,
12 you are facing a risk of adverse job consequences.
13 You could get fired because of your outspoken
14 political speech mainly about Donald Trump." Was
15 that in writing to anybody? Did you ever see that
16 in writing to her?
17   A.   I wouldn't write that to somebody,
18 number one. Number two, Libby understood that.
19 Every time there was a complaint, she would say, "I
20 don't care what they do to me. I'm not going to
21 stop." She would become more determined to do
22 this, not less determined.
23         And so, you know, I would say that
24 we all believed that she understood that her
25 behavior was becoming more and more reckless, and

Min-U-Script®                Glacier Stenographic Reporters Inc.                (21) Pages 81 - 84  
                             www.glaciersteno.com

Case 3:19-cv-00025-JWS  Document 69-9  Filed 07/30/21  Page 7 of 7  
Expert Opposition to Motion Summary Judgment & Cross-Motion for Summary Judgment  
Page 7 of 7