Brewster H. Jamieson, ABA No. 8411122
Michael B. Baylous, ABA No. 0905022
LANE POWELL LLC
1600 A Street, Suite 304
Anchorage, Alaska 99501
Telephone:  907.264.3325
            907.264.3303
Email:    jamiesonb@lanepowell.com
          baylousm@lanepowell.com
Attorneys for Defendants

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF ALASKA

| | |
|---|---|
| ELIZABETH BAKALAR,<br><br>                     Plaintiff,<br><br>v.<br><br>MICHAEL J. DUNLEAVY; in his individual and official capacities; TUCKERMAN BABCOCK; and the STATE OF ALASKA,<br><br>                 Defendants. | Case No. 3:19-cv-00025-JWS<br><br>**DEFENDANTS' BRIEF IN SUPPORT OF THEIR MOTION FOR SUMMARY JUDGMENT AND IN OPPOSITION TO PLAINTIFF'S CROSS-MOTION FOR SUMMARY JUDGMENT** |

Defendants State of Alaska (the "State"), Governor Michael Dunleavy, and Tuckerman Babcock reply in support of their Motion for Summary Judgment and oppose Plaintiff Elizabeth Bakalar's Cross-Motion for Summary Judgment.

## I.  INTRODUCTION

Elizabeth Bakalar was an Alaska assistant attorney general advising the lieutenant governor and the Division of Elections. She was also a popular blogger of partisan invective and potty humor. When the current gubernatorial administration took office, it terminated her employment. Ms. Bakalar contends this violated her First Amendment and Alaska free speech right. It did not. The State need not retain a lawyer whose side gig undermines her representation and counsel. Ms. Bakalar's argument to the contrary

ignores the things she said and avoids the duties she performed. It offers instead lengthy exposition of legal matters that "go[] without saying"[1] and do not concern disputed issues. But this case concerns facts, not abstractions, and it turns on the point Ms. Bakalar's brief obscures—a senior government lawyer, advising the lieutenant governor on elections law is a policymaking employee under *Branti v. Finkel*, 445 U.S. 507 (1980), who may be discharged for her political identity, political association, or speech.

## II. <u>ADDITIONAL BACKGROUND</u>

Elizabeth Bakalar was an attorney V in the Alaska Department of Law. Ms. Bakalar advised and represented the Division of Elections, serving as "primary counsel for the [l]ieutenant [g]overnor," who heads the Division.[2] She was the only person filling this role year-round.[3] She handled "numerous high[-]profile matters" as a senior lawyer in this sensitive position.[4] Her work included "voter registration issues, ballot initiatives, legal certifications, referendum matters," as well as "draft[ing] regulations for precincts after redistricting" and drafting "legislation."[5] Ms. Bakalar represented the State in trials on elections issues and in appeals.[6] She spoke to the press in connection with her cases.[7]

This work was "high-level and politically sensitive."[8] An e-mail from Ms. Bakalar to her colleagues illustrates the point. She wrote that one of her elections matters was

---

[1] Pl.'s Cross-Mot. 42 (Dkt. 75 at 42)..

[2] Pl.'s Cross-Mot. 8 (Dkt. 75 at 8) (quotations omitted).

[3] Sept. 24, 2021 Supp. Decl. Michael B. Baylous ("Supp. Baylous Decl.") Ex. AM (Grace Dep. Tr. 95:3–6).

[4] Pl.'s Cross-Mot. 8 (Dkt. 75 at 8) (quotations omitted).

[5] Pl.'s Cross-Mot. 8 (Dkt. 75 at 8).

[6] Pl.'s Cross-Mot. 7 (Dkt. 75 at 7).

[7] Pl.'s Cross-Mot. 34 (Dkt. 75 at 34).

[8] Compl. Ex. 1 (Dkt. 6-2 at 31).

Defs.' Brief in Supp. of Their Mot. Summ. J. and Opp'n to Pl.'s Cross-Mot. Summ. J.
*Bakalar v. Dunleavy, et al.* (Case No. 3:19-cv-00025-JWS)                              Page 2 of 31

Case 3:19-cv-00025-JWS   Document 86   Filed 09/24/21   Page 2 of 31

"highly politically-charged . . . with significant media interest."[9] She reported that the governor's office and the lieutenant governor had "an acute interest" in the matter and wanted "a full briefing of the legal and political ramifications" of the State's position.[10] Like all Department of Law lawyers, Ms. Bakalar was an at-will employee, serving at the pleasure of the Attorney General. Ms. Bakalar disputes none of this—her Cross-Motion provides much of this detail.[11]

It is also undisputed that Ms. Bakalar was a popular blogger, reaching an audience of 20,000 Alaskans and others.[12] "Her goal was always to get more views" for her blog and "to get national attention, to get more and more attention."[13] Ms. Bakalar did not write about her cases directly.[14] But while advising the Division of Elections, she posted about the people Alaskans chose in those elections, including Justice Joel Bolger, Justice Peter Maassen, Senator Lisa Murkowski, Representative Don Young, and Lieutenant Governor Byron Mallott, her client.[15]

Before the 2016 election—which her client administered with her help—Ms. Bakalar wrote in the *Anchorage Daily News* about supporters of then-candidate Donald Trump, "[I]t feels like a profound and personal betrayal to discover that people I know, like and respect . . . want a man at the helm of this country who literally advocates treating me 'like s***' and courts entire voting blocks who want me and my family dead."[16] The night of the 2016 general election, she posted repeatedly on Twitter,

---

[9] Supp. Baylous Decl. Ex. AN.

[10] Supp. Baylous Decl. Ex. AN.

[11] Pl.'s Cross-Mot. 7–8 (Dkt. 75 at 7-8).

[12] *Compare* Mot. 4 (Dkt. 56 at 4), *with* Pl.'s Cross-Mot. 9–11 (Dkt. 75 at 9-11).

[13] Grace Dep. Tr. 86:18–21.

[14] *Compare* Mot. 17 (Dkt. 56 at 17), *with* Pl.'s Cross-Mot. 42 (Dkt. 75 at 42).

[15] *Compare* Mot. 5 (Dkt. 56 at 5), *with* Pl.'s Cross-Mot. 3, 42–43 (Dkt 75 at 3, 42-43).

[16] Bayous Decl. Ex. H (Dkt. 56-8).

Defs.' Brief in Supp. of Their Mot. Summ. J. and Opp'n to Pl.'s Cross-Mot. Summ. J.
*Bakalar v. Dunleavy, et al.* (Case No. 3:19-cv-00025-JWS)                    Page 3 of 31

Case 3:19-cv-00025-JWS   Document 86   Filed 09/24/21   Page 3 of 31

including that "no legitimate election lawyer would embarrass him or herself" by representing Mr. Trump in an elections case in Nevada.[17]

Ms. Bakalar's Internet postings became more political, and no less profane, following election night.[18] In the two years before her discharge, she was "compelled to write about Trump so that . . . if the sh[**] hits the fan [her] kids will have a contemporaneous Handmaid's Tale-style record of What the F[**]k You Did to Us."[19] Perhaps for this reason, she suggested President Trump should "text Satan a dick pic at 1:00 a.m., and ask if [he] can come down to hell for a booty call."[20] In late October 2018, Ms. Bakalar recalled in a post that the day after the 2016 election, she "cried because [she] knew when [she] went into work that morning that there were people IN [HER] OFFICE who had voted for Trump."[21] Ms. Bakalar wrote this reminiscent post approximately a week before her client the Division of Elections conducted the 2018 general election.

Governor Dunleavy won that election. Before his administration took office, it requested the pro forma resignations of hundreds of State employees. Ms. Bakalar's resignation letter was one of a relatively small number the new administration accepted. This could not have surprised Ms. Bakalar. "Everyone in [Ms. Bakalar's] personal and professional life kn[ew] about [her] blog."[22] Her own evidence shows that "not everyone appreciated her writings."[23] She was, nonetheless, "willing to take personal and

---

[17] Mot. 5 (Dkt. 56 at 5) (quotations omitted).

[18] Pl.'s Cross-Mot. 10 (Dkt. 75 at 10).

[19] Mot. 6 (Dkt. 56 at 6) (quotations omitted).

[20] Mot. 7 (Dkt. 56 at 7) (quotations omitted).

[21] *Compare* Mot. 5 (Dkt. 56 at 5), *with* Pl.'s Cross-Mot. 3, 42–43 (Dkt 75 at 3, 42-43).

[22] Mot. 7 (Dkt. 56 at 7) (quotations omitted).

[23] Kendall Aff. ¶ 7 (Dkt. 75-2 at 2).

Defs.' Brief in Supp. of Their Mot. Summ. J. and Opp'n to Pl.'s Cross-Mot. Summ. J.
*Bakalar v. Dunleavy, et al.* (Case No. 3:19-cv-00025-JWS)                    Page 4 of 31

Case 3:19-cv-00025-JWS   Document 86   Filed 09/24/21   Page 4 of 31

professional risks to say what [she] thinks."[24] Indeed, when there was a complaint, Ms. Bakalar would say, "I don't care what they do to me. I'm not going to stop."[25]

When a member of the public complained about Ms. Bakalar's blog, Ms. Bakalar, urged her colleagues and supervisors to discount the concerns of the complainant, whom she labeled "an under-employed attorney living in the Mat-Su Valley [with] . . . documented white supremacist leanings."[26] She said that "while it might be politically expedient/necessary to 'investigate' me, it won't be economical to spend thousands of dollars doing this to every lawyer in our office at the whim of a lunatic, whether she has the ear of the legislature or not."[27] She warned that others would suffer from the "instigation of one individual with a vendetta."[28] The matter became "a general topic, particularly because [Ms. Bakalar] was very, very upset about it and brought it up a lot and wanted to talk to people about it a lot."[29] "There was general concern that [Ms. Bakalar's] actions were negatively impacting her ability to do the job, were becoming more and more concerning for the legislature, for the administration, for the department, for the Division of Elections, for the public . . . ."[30] This left her colleagues "alarmed by what [Ms. Bakalar] was doing."[31] They also perceived that Ms. Bakalar's "self-destructive actions . . . seemed to be getting more . . . and more important to her."[32]

All of this was unbecoming of a senior government lawyer and especially of a senior government lawyer in Ms. Bakalar's position. Lawyers who advised the Division

---

[24] Mot. 8 (Dkt. 56 at 8) (quotations omitted).

[25] Grace Dep. Tr. 84:19–21.

[26] Supp. Baylous Decl. Ex. AO.

[27] Supp. Baylous Decl. Ex. AO.

[28] Supp. Baylous Decl. Ex. AO.

[29] Grace Dep. Tr. 70:4–7.

[30] Grace Dep. Tr. 82:13–18.

[31] Grace Dep. Tr. 82:23.

[32] Grace Dep. Tr. 83:4–6.

Defs.' Brief in Supp. of Their Mot. Summ. J. and Opp'n to Pl.'s Cross-Mot. Summ. J.
*Bakalar v. Dunleavy, et al.* (Case No. 3:19-cv-00025-JWS)                    Page 5 of 31

Case 3:19-cv-00025-JWS   Document 86   Filed 09/24/21   Page 5 of 31

of Elections understood they were "better off not registering with a political party . . . not having fundraisers, not putting bumper stickers on [their] car[s], because all of those things impact [a lawyer's] ability to adequately represent the Division of Elections."[33] The State knows that "perception is . . . the foundation of public trust in elections, and . . . public trust is essential to people accepting the results of an election."[34] As Department of Law Civil Division Director Joanne Grace testified, "If [Ms. Bakalar] is . . . very outspoken in . . . social media and taking extreme and hostile views of, for example, Republicans, then . . . she would undermine the arguments that the conduct of the Division of Elections . . . was impartial and has integrity and credibility."[35] Even if Ms. Bakalar failed to see it, her colleagues understood "how fragile public trust is in the election process, even when it's done in an obviously fair and impartial way by people who are not taking very public stances . . . that show bias one way or the other."[36] Recent events show the Department of Law was right to worry about public perception. "[P]eople stormed the Capitol [on January 6, 2020,] because they thought the election was rigged, and that's in a situation where you, for the most part, had public officials who were not publicly expressing extreme bias toward one side."[37]

In light of these considerations, there was in the Department of Law a "concern that [Ms. Bakalar's] actions were negatively impacting her ability to do the job, were becoming more and more concerning for the legislature, the administration, for the department, for the Division of Elections, for the public."[38] Private citizens were not the only ones to complain. The counsel for the legislature's Republican majority wrote to the Department of Law that one of her posts was "absolutely unacceptable for a *professional*

---

[33] Grace Dep. Tr. 96:1–8.

[34] Grace Dep. Tr. 43:23–44:1.

[35] Grace Dep. Tr. 41:14–21.

[36] Grace Dep. Tr. 99:4–9.

[37] Grace Dep. Tr. 99:10–14.

[38] Grace Dep. Tr. 82:13–18.

Defs.' Brief in Supp. of Their Mot. Summ. J. and Opp'n to Pl.'s Cross-Mot. Summ. J.
*Bakalar v. Dunleavy, et al.* (Case No. 3:19-cv-00025-JWS)                    Page 6 of 31

Case 3:19-cv-00025-JWS    Document 86    Filed 09/24/21    Page 6 of 31

state government attorney."[39] He wrote that if she were "assigned to advise on any legislative issues, I think she'd struggle with general credibility."[40] Legislators also complained about Ms. Bakalar.[41]

The day Ms. Bakalar received the incoming administration's resignation request, she blogged about "the occasional empty threat to [her] body and livelihood from wannabe Nazis."[42] In the next five days, she tweeted about President Trump nine times. Then she submitted a letter asking to be retained. She touted her representation of the Division of Elections in court, her testimony about legislation and her "help draft[ing] legislation and regulations in the area of elections law."[43] She explained that her "resignation [was] not voluntary, but [was] instead being made at the request of Mr. Babcock, who [had] indicated that if [she] [did] not submit [her] resignation as requested [her] employment [would] be terminated."[44] In the two weeks after writing the letter, Ms. Bakalar tweeted about President Trump seven more times.

Mr. Babcock intended the resignation request to ascertain whether employees could "do the job that [they were] expected to do to implement the policies of the people elected by the people of Alaska."[45] With this goal, "[i]t really d[id]n't matter what [their] personal politics [were]."[46] What mattered to Mr. Babcock was that state employees "perform in [their] professional capacity to the best of [their] abilit[ies] to implement policies, whether [they] agree[d] with them or not."[47] For this reason, in evaluating

---

[39] Supp. Baylous Decl. Ex AR.

[40] Supp. Baylous Decl. Ex AR.

[41] Grace Dep. Tr. 71:5–14.

[42] Mot. 8 (Dkt. 56 at 8) (quotations omitted).

[43] Baylous Decl. Ex. AK (Dkt. 56-37).

[44] Baylous Decl. Ex. AK (Dkt. 56-37)..

[45] Supp. Baylous Decl. Ex. AP (Babcock Dep. Tr. 75:24–76:1).

[46] Babcock Dep. Tr. 76:1–2.

[47] Babcock Dep. Tr. 76:7–10.

Defs.' Brief in Supp. of Their Mot. Summ. J. and Opp'n to Pl.'s Cross-Mot. Summ. J.
*Bakalar v. Dunleavy, et al.* (Case No. 3:19-cv-00025-JWS)                    Page 7 of 31

Case 3:19-cv-00025-JWS   Document 86   Filed 09/24/21   Page 7 of 31

resignation letters to determine whether to retain employees in their positions, Mr. Babcock considered whether the employee submitted a letter at all and "what sort of attitude might be expressed in a letter of resignation that might lead you to think, 'Well, this is probably not likely to be a productive working relationship.'"[48] In other words, Mr. Babcock was concerned with "what we could discern from the resignation letter itself about attitude of a potential at-will employee."[49] He considered this, which he referred to as "style," together with "personal knowledge" and "incoming commissioners' desire for their departments."[50]

When he read Ms. Bakalar's resignation letter, Mr. Babcock detected "grumbling" and a lack of professionalism in it.[51] He was also generally aware "that there were some doubts among various people that [Ms. Bakalar] could separate her . . . professionalism from her strong opinions."[52] Mr. Babcock accepted Ms. Bakalar's resignation because her letter "demonstrated her unwillingness to . . . treat th[e] new administration professionally."[53] Ms. Bakalar was discharged on December 3, 2018.

This lawsuit followed, asserting violations of Ms. Bakalar's rights under the Federal Constitution and the Alaska Constitution, as well as related federal and state-law claims. Defendants moved for summary judgment on the dispositive issue that Ms. Bakalar engaged in no constitutionally protected activity.[54] In doing so, they assumed, for the purposes of their motion, that Ms. Bakalar was fired for her speech and reserved argument on the questions whether Ms. Bakalar's "activity was a substantial

---

[48] Babcock Dep. Tr. 98:24–99:2.

[49] Babcock Dep. Tr. 117:20–22.

[50] Babcock Dep. Tr. 121:4–7.

[51] Babcock Dep. Tr. 133:17–24, 134:13–15.

[52] Babcock Dep. Tr. 138:11–14.

[53] Babcock Dep. Tr. 139:6–7.

[54] Mot. 9–10 (Dkt. 56 at 9-10).

Defs.' Brief in Supp. of Their Mot. Summ. J. and Opp'n to Pl.'s Cross-Mot. Summ. J.
*Bakalar v. Dunleavy, et al.* (Case No. 3:19-cv-00025-JWS)                    Page 8 of 31

Case 3:19-cv-00025-JWS   Document 86   Filed 09/24/21   Page 8 of 31

factor in [her] termination" and whether "she would have been discharged in the absence of protected activity."[55] Ms. Bakalar responded with a 75-page cross-motion.

## III.  ARGUMENT

Nothing requires an incoming gubernatorial administration to retain an elections lawyer who is also a profane political blogger. Ms. Bakalar's discharge from this position (A) violated no federal or state free speech right, and she therefore lacks a basis for claims under (B) section 1983 and (C) state law.

This case can be decided on the common sense that Ms. Bakalar's job advising Alaska's lieutenant governor on elections issues is a policymaking one under *Branti*. The facts concerning Ms. Bakalar's "particular duties" are undisputed, so the Court may determine policymaker status as a matter of law and grant summary judgment to Defendants. *Walker v. City of Lakewood*, 272 F.3d 1114, 1132 (9th Cir. 2001). Alternatively, the Court may determine that the State's interest in public perceptions of election fairness outweighed Ms. Bakalar's speech interests under *Pickering v. Board of Education*, 391 U.S. 563 (1968).

If Defendants are not entitled to summary judgment, there should be a trial. "[A] reasonable jury could return a verdict" for Defendants by crediting Mr. Babcock's testimony that he discharged Ms. Bakalar for reasons unrelated to her speech. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). Accordingly, there is—at least—a "genuine dispute as to" facts material to Ms. Bakalar's claims, and her request for summary judgment should be denied. Fed. R. Civ. P. 56(a).

**A.     Ms. Bakalar's Discharge Violated No Federal or State Free Speech Right.**

Ms. Bakalar's claim that her discharge was unconstitutional requires showing (1) she engaged in protected activity, (2) her activity was a substantial factor in her termination, and (3) that the State has failed to show she would have been discharged in the absence of protected activity. *Mt. Healthy City Sch. Dist. Bd. of Educ. v. Doyle*, 429 U.S. 274, 287 (1977); *Wickwire v. State*, 725 P.2d 695, 700 (Alaska 1986). Failure of the

---

[55] Mot. 9–10 (Dkt 56 at 9-10).

Defs.' Brief in Supp. of Their Mot. Summ. J. and Opp'n to Pl.'s Cross-Mot. Summ. J.
*Bakalar v. Dunleavy, et al.* (Case No. 3:19-cv-00025-JWS)                    Page 9 of 31

Case 3:19-cv-00025-JWS   Document 86   Filed 09/24/21   Page 9 of 31

first element requires summary judgment in favor of Defendants. A genuine dispute about the reasons for Ms. Bakalar's termination—the second and third elements—requires denial of her Cross-Motion.

### 1. Ms. Bakalar Enjoyed No First Amendment Right to Blog While Serving as the State's Elections Lawyer.

Courts generally apply the *Pickering* balancing test to determine "whether the state's legitimate administrative interests outweigh the employee's First Amendment rights." *Eng v. Cooley*, 552 F.3d 1062, 1071 (9th Cir. 2009). This balancing test presents five questions to be addressed in any order. *Dahlia v. Rodriguez*, 735 F.3d 1060, 1067 n.4 (9th Cir. 2013) (en banc). But "'an employee's status as a policymaking or confidential employee'" under *Branti* is "'dispositive of any First Amendment retaliation claim.'" *Hobler v. Brueher*, 325 F.3d 1145, 1150 (9th Cir. 2003) (quoting *Biggs v. Best, Best & Krieger*, 189 F.3d 989, 994–95 (9th Cir. 1999)). "Thus, where the *Branti* exception applies the employee can be fired for purely political reasons without any *Pickering* balancing." *Id.* (quotations omitted). This is true even if the employee engages in no "on-the-job acts even hinting at disloyalty or insubordination." *Latham v. Office of Attorney Gen. of State of Ohio*, 395 F.3d 261, 266 (6th Cir. 2005). Here, determining Ms. Bakalar's policymaker status is the first—and only—step necessary to dispose of her claims.

Under *Branti*, "policymaker . . . refers to a position in which political considerations are appropriate requirements for the effective performance of the public office involved." *Fazio v. City & County of San Francisco*, 125 F.3d 1328, 1333 (9th Cir. 1997) (quotations omitted). "The *Branti* rule applies not merely to party affiliation, but more broadly to political beliefs, expression, and support." *Hobler*, 325 F.3d at 1149. For this reason, the fact that a discharged employee and the officials she advises hold "nonpartisan positions does not affect the *Branti* policymaking analysis." *Biggs*, 189 F.3d at 996. That the Division of Elections is nonpartisan[56] does not bear on whether the

---

[56] Pl.'s Cross-Mot. 31 (Dkt. 75 at 31) (citing AS 15.10.105(b)).

Defs.' Brief in Supp. of Their Mot. Summ. J. and Opp'n to Pl.'s Cross-Mot. Summ. J.
*Bakalar v. Dunleavy, et al.* (Case No. 3:19-cv-00025-JWS)                    Page 10 of 31

Case 3:19-cv-00025-JWS   Document 86   Filed 09/24/21   Page 10 of 31

lawyer advising it is a policymaker. Nor does it matter whether Ms. Bakalar claims retaliation for speech, party membership, or association.

Determining policymaker status begins with "the particular duties of a position." *Walker*, 272 F.3d at 1132. "[T]he work [the discharged employee] did" may make her a policymaker even when others with the same job title are not. *See Hobler*, 325 F.3d at 1151; *see also Bardzik v. County of Orange*, 635 F.3d 1138, 1151 (9th Cir. 2009). Conversely, the discharged employee may not escape policymaker status by pointing to narrow duties if she held a position with expansive duties. *See Biggs*, 189 F.3d at 997. Accordingly, *either* Ms. Bakalar's duties advising the Division of Elections or the generic duties of an Attorney V may qualify her as a policymaker. Both do.

According to her own Cross-Motion, Ms. Bakalar was "primary counsel for the [l]ieutenant [g]overnor and the [D]ivision of [E]lections," where she "handled numerous high[-]profile matters" and "drafted regulations . . . as well as . . . legislation."[57] As she wrote in her resignation letter, this was the work she was "primarily" assigned to.[58] In addition to drafting regulations and legislation and advising the lieutenant governor, she authored attorney general opinions related to high-profile initiatives and referenda addressing environmental, tax, drug, and economic matters.[59] Ms. Bakalar "represented the State in many important and sometimes high[-]profile cases."[60] As her e-mail about one of her matters put it, her work concerned issues that were "highly politically-charged . . . with significant media interest."[61] For this reason, the lieutenant governor was "acute[ly] interest[ed]" in it and wanted "a full briefing of the legal and political ramifications."[62]

---

[57] Pl.'s Cross-Mot. 8 (Dkt. 75 at 8).

[58] Bakalar Aff. Ex. 30 (Dkt. 75-33).

[59] Mot. 12 (Dkt 56 at 12).

[60] Pl.'s Cross-Mot. 8 (Dkt. 75 at 8).

[61] Supp. Baylous Decl. Ex. AN.

[62] Supp. Baylous Decl. Ex. AN.

Defs.' Brief in Supp. of Their Mot. Summ. J. and Opp'n to Pl.'s Cross-Mot. Summ. J.
*Bakalar v. Dunleavy, et al.* (Case No. 3:19-cv-00025-JWS)                                        Page 11 of 31

Case 3:19-cv-00025-JWS   Document 86   Filed 09/24/21   Page 11 of 31

These duties befit Ms. Bakalar's role as an attorney V.[63] Attorney Vs constitute the "'expert' or supervisory class" of state lawyers, people who "frequently direct the work of other attorneys" and work on cases "where a high order of original and creative legal endeavor is required to obtain a reasonable balance of conflicting interests."[64] The matters on which attorney Vs work "typically have substantial impact on large-scale and important activities of state agencies or public or private parties."[65]

Ms. Bakalar was a policymaker because she met the factors the Ninth Circuit considers in making this determination:

> vague or broad responsibilities, relative pay, technical competence, power to control others, authority to speak in the name of policymakers, public perception, influence over programs, contact with elected officials, and responsiveness to partisan politics and political leaders.

*Fazio*, 125 F.3d at 1334 n.5. Ms. Bakalar had "vague or broad responsibilities," *id.*, providing advice about matters requiring her to "obtain a reasonable balance of conflicting interests."[66] She was paid over $100,000 per year as an employee falling under range 25-F in Alaska's statutory salary schedule, *see* AS 39.27.011, giving her a high "relative pay," *Fazio*, 125 F.3d at 1334 n.5. She was an "expert"[67] in a professional setting requiring "technical competence." *Id.* She spoke on behalf of the State when she signed pleadings or reported on her cases to the media and had "authority to speak on behalf of policymakers" and was surely regarded as one in "public perception." *Id.* And she advised the lieutenant governor on high-profile matters, including lawsuits, regulations and legislation she drafted, giving her "contact with elected officials" and influence over policy. *See id*. These features of Ms. Bakalar's position make her a

---

[63] *See* Mot. 2–4 (explaining Ms. Bakalar's progression through the Department of Law).

[64] Baylous Decl. Ex. E (Dkt. 56-5).

[65] Baylous Decl. Ex. E (Dkt. 56-5).

[66] Baylous Decl. Ex. E (Dkt. 56-5).

[67] Baylous Decl. Ex. E (Dkt. 56-5).

Defs.' Brief in Supp. of Their Mot. Summ. J. and Opp'n to Pl.'s Cross-Mot. Summ. J.
*Bakalar v. Dunleavy, et al.* (Case No. 3:19-cv-00025-JWS)                    Page 12 of 31

Case 3:19-cv-00025-JWS    Document 86    Filed 09/24/21    Page 12 of 31

policymaker. This is so even if certain criteria were missing, *see Bardzik*, 635 F.3d at 1145–46, and regardless of whether her work was "subject to review" by others, *Biggs*, 189 F.3d at 997.

A lawyer's duties so closely align with factors determining policymaker status that when a position "encompass[es] the rendering of legal advice to, and legal representation of" a government official, the official is "entitled to appoint to the position an attorney in whom he can repose his trust and confidence." *Bauer v. Bosley*, 802 F.2d at 1058, 1063 (8th Cir. 1986). It does not matter whether the lawyer represents a city, county, or state. *See Butler v. N.Y. State Dep't of Law*, 211 F.3d 739, 744–45 (2d Cir. 2000) (holding assistant attorney general was a policymaker even when supervised on policy issues); *Sahar v. Bowers*, 114 F.3d 1097, 1110 (11th Cir. 1997) (holding attorney general's interest in promoting efficiency outweighed a junior lawyer's associational rights).[68]

The Ninth Circuit has held government lawyers like Ms. Bakalar are policymakers. *See Biggs*, 189 F.3d at 997 (associate attorney in a law firm advising a city); *Fazio*, 125 F.3d at 1334 (assistant district attorney). In so doing, it joins "a unanimous chorus of courts of appeals." *Borzilleri v. Mosby*, 874 F.3d 187, 193 (4th Cir. 2017) (referring to assistant prosecutors). As the Ninth Circuit explained in *Biggs v. Best, Best & Krieger*, 189 F.3d 989 (9th Cir. 1999), "All circuit court decisions—and almost all other court decisions—involving attorneys in government service, other than public defenders, have held that *Elrod/Branti* do not protect these positions." *Id.* at 995 (quotations omitted). The Court should apply this precedent here and dismiss Ms. Bakalar's claims as barred by her policymaker status.[69]

---

[68] *See also* Mot. 12 (Dkt. 56 at 12) (citing additional cases).

[69] Ms. Bakalar contends this is no rule. But she cites no circuit court decision holding a government lawyer to be other than a policymaker. The single unpublished district court opinion she cites concerned a motion to dismiss on bare-bones factual allegations. *See Simpson v. County of Contra Costa*, No. 12-cv-05303 YGR, 2013 WL 1283348, at *3 (N.D. Cal. Mar. 26, 2013). That case has been cited only once, for an unrelated proposition. *See Mwasi v. Corcoran State Prison*, No. 1:13-cv-00695-AWI-JLT, 2015

Ms. Bakalar addresses several arguments to this dispositive issue. None are availing.

First, Ms. Bakalar asserts that the Alaska Executive Branch Ethics Act renders her not a policymaker because it did not require her to file certain disclosures as an "employee of the Office of the Governor." *See* AS. 39.52.180(f).[70] The statute bears on a narrow question of state law. Analysis of policymaker status in the context relevant here "is not intended to be formalistic." *Walker*, 272 F.3d at 1132. It does not turn on "whether . . . titles fit into [a] pigeonhole." *Hobler*, 325 F.3d at 1151. "What matters is whether [a discharged employee's] actual duties" made her a policymaker. *Id.* Ms. Bakalar's did.

It is true some courts begin with statutes to determine a position's duties. *See, e.g.*, *Curtis v. Christian County*, 963 F.3d 777, 788–89 (8th Cir. 2020); *Rose v. Stephens*, 291 F.3d 917, 924 (6th Cir. 2002); *Jenkins v. Medford*, 119 F.3d 1156, 1163 (4th Cir. 1997). The Ninth Circuit takes a different approach. In *Diruzza v. County of Tehama*, 206 F.3d 1304 (9th Cir. 2000), the court noted California law does not define deputy sheriff as "a clear job category." *Id.* at 1309. It then held that the "[t]he critical inquiry is the job actually performed." *Id.* at 1310. In doing so, it explained that "[a]ny categorization based upon job title alone obscures rather than clarifies" the analysis and rejected this "simplified, label-based approach." *Id.* at 1309. Ms. Bakalar's authority is not to the contrary. *See Simpson*, 2013 WL 1283348, at *3 ("A job title is not determinative of whether a public employee is a . . . 'policymaker.'").

Applying this principle, the Ninth Circuit rejected in *Biggs* the precise argument Ms. Bakalar makes here. The lawyer plaintiff in that case sought to avoid policymaker status "because she did not have to complete a financial disclosure statement that Redlands [her city client] and the State of California required certain high-level employees to file." *Biggs*, 189 F.3d at 997. The Court held, "The Redlands financial

---

WL 3419203, at *7 (E.D. Cal. May 27, 2015). The law is as the Ninth Circuit said it is in *Biggs*.

[70] Pl.'s Cross-Mot. 27–32 (Dkt. 75 at 27-32).

Defs.' Brief in Supp. of Their Mot. Summ. J. and Opp'n to Pl.'s Cross-Mot. Summ. J.
*Bakalar v. Dunleavy, et al.* (Case No. 3:19-cv-00025-JWS)                              Page 14 of 31

Case 3:19-cv-00025-JWS   Document 86   Filed 09/24/21   Page 14 of 31

disclosure requirements do not add anything to the analysis. . . . [N]othing indicates that these rules provide a definitive test of who is or is not a policymaking employee. . . ." *Id.* So too here. This constitutional question does not turn on state employment classifications or who must file statements with the Alaska Public Offices Commission. An athlete offside in a game of soccer has not violated the rules of football—it is the substance, not the label, that matters.

Second, Ms. Bakalar contends that she could not be a policymaker under *Branti* because she advised the Division of Elections, which is a nonpartisan office under state law.[71] This cannot be. Again, the Ninth Circuit has rejected exactly this argument. *See Biggs*, 189 F.3d at 996 ("The fact that the city attorney, and even the city council, are nonpartisan positions in Redlands, does not affect the *Branti* policymaking analysis."). Ms. Bakalar's circumstances show why the argument fails—she should not be able to use her client's non-partisan status to protect her hyper-partisan blogging. It is enough that Ms. Bakalar "placed [her]self in a position such that [her] State employer might not be able to trust [her] to implement fully the employer's policies." *Latham*, 395 F.3d at 267. That the Division of Elections is nonpartisan does not change this.

In fact, the Division of Election's non-partisan character makes it all the more important that the State choose suitable lawyers to advise its elections. Public trust in elections is fragile even when they are "done in an obviously fair and impartial way by people who are not taking very public stances . . . that show bias one way or the other."[72] Seasoned members of the Department of Law understood this, even as Ms. Bakalar imperiled that trust by lamenting in the *Anchorage Daily News* the "profound and personal betrayal" she felt in people who supported a candidate she disfavored.[73] The events of January 6, 2020, show what happens when people think an election was

---

[71] Pl.'s Cross-Mot. 31 (Dkt. 75 at 31).

[72] Grace Dep. Tr. 99:4–9.

[73] Baylous Decl. Ex. H (Dkt. 56-8).

Defs.' Brief in Supp. of Their Mot. Summ. J. and Opp'n to Pl.'s Cross-Mot. Summ. J.
*Bakalar v. Dunleavy, et al.* (Case No. 3:19-cv-00025-JWS)                    Page 15 of 31

Case 3:19-cv-00025-JWS   Document 86   Filed 09/24/21   Page 15 of 31

rigged—and how readily they may perceive unfairness where none existed.[74] By blogging as the State's elections lawyer, Ms. Bakalar was playing with fire in a tinderbox. *Branti* permitted the State to act—and good thing it did.

Third, Ms. Bakalar attempts to marginalize the scope of her professional responsibilities and authority to assert she falls short of policymaker status.[75] This assertion cannot be squared with Ms. Bakalar's own statements—including in her Cross-Motion—regarding her position. Ms. Bakalar handled "novel, highly complicated" legal matters, representing the State in "high[-]profile" cases and drafting legislation and regulations.[76] That Ms. Bakalar worked with supervision does not diminish her duties. *See Biggs*, 189 F.3d at 997 ("[T]he mere fact that an attorney was a subordinate does not imply that the attorney has no policymaking authority whatsoever."). Nor does it matter that much of Ms. Bakalar's work was on individual cases. *See Latham*, 395 F.3d at 269. Ms. Bakalar's other assertions to this end also fail to hold water. It is not true that she "had no regular interaction with . . . political leaders"[77]—she advised the lieutenant governor. It is not true she had no "influence over . . . government programs"[78]—she wrote legislation and regulations. At bottom, Ms. Bakalar's argument is that as a "stellar" lawyer, who rose through the ranks to handle "complex matters" and advise the lieutenant governor, she was less influential than an associate at a private law firm retained by a city.[79] That defies common sense.

Fourth, Ms. Bakalar asserts "Governor Dunleavy is unique in having sought mass resignations of ordinary employees"[80] and implies that the *other* state employees who

---

[74] Grace Dep. Tr. 99:10–14.

[75] Pl.'s Cross-Mot. 32–39 (Dkt. 75 at 32-39).

[76] Pl.'s Cross-Mot. 6, 8 (Dkt. 75 at 6, 8) (quotations omitted).

[77] Pl.'s Cross-Mot. 35 (Dkt. 75 at 35).

[78] Pl.'s Cross-Mot. 33 (Dkt. 75 at 33).

[79] *Compare* Pl.'s Cross-Mot. 6–7 (Dkt. 75 at 6-7), *with id.* at 37 (Dkt. 75 at 37).

[80] Pl.'s Cross-Mot. 38 (Dkt. 75 at 38).

Defs.' Brief in Supp. of Their Mot. Summ. J. and Opp'n to Pl.'s Cross-Mot. Summ. J.
*Bakalar v. Dunleavy, et al.* (Case No. 3:19-cv-00025-JWS)                     Page 16 of 31

Case 3:19-cv-00025-JWS   Document 86   Filed 09/24/21   Page 16 of 31

received the resignation request make Ms. Bakalar not a policymaker. This is not so. Policymaker status depends on the duties of the position at issue, not the duties of positions not at issue. When courts have considered dismissals implicating more than one position, they have treated the positions one-by-one. *See Bardzik*, 635 F.3d at 1151 (holding the plaintiff was a policymaker in one position and not another); *Vazquez Rios v. Hernandez Colon*, 819 F.2d 319 (1st Cir. 1987) (holding an incoming governor's janitorial staff were not policymakers but that the governor was reasonable in thinking an editing assistant was). Ms. Bakalar's duties make her a policymaker. She cannot escape this by pointing to the duties of persons who did not bring suit.

*       *       *       *

Policymaker status is "dispositive of" Ms. Bakalar's First Amendment claim. *Biggs*, 189 F.3d at 994. This accords with the common sense that a state need not permit the lawyer advising its elections to blog about state politicians, the President's penis, or the tears she shed when people she knew voted for one candidate over another. But even if Ms. Bakalar were not a policymaker, the State would be entitled to dismiss her under *Pickering*, as set forth below in describing analogous state-law considerations.

### 2.  Ms. Bakalar Enjoyed No State Constitutional Right to Blog While Serving as the State's Elections Lawyer.

The result is the same under the Alaska Constitution. The few Alaska Supreme Court cases concerning public employee speech rely on federal cases. *See Wickwire*, 725 P.2d at 700; *State v. Haley*, 687 P.2d 305, 312 (Alaska 1984); *City & Borough of Sitka v. Swanner*, 649 P.2d 940, 944–45 (1982). Accordingly, the Alaska Supreme Court would dispose of Ms. Bakalar's claim, either because (a) she was a policymaker or, in the alternative, (b) the *Pickering* balancing test weighs against her.

### a.  The Alaska Supreme Court Would Dispose of Ms. Bakalar's Claim Because She Is a Policymaker.

The Alaska Supreme Court would hold that Ms. Bakalar's advice to the lieutenant governor on sensitive elections issues and other legal work make her a policymaker. In doing so, it would follow "a unanimous chorus" of federal appellate cases holding that

Defs.' Brief in Supp. of Their Mot. Summ. J. and Opp'n to Pl.'s Cross-Mot. Summ. J.
*Bakalar v. Dunleavy, et al.* (Case No. 3:19-cv-00025-JWS)                     Page 17 of 31

Case 3:19-cv-00025-JWS   Document 86   Filed 09/24/21   Page 17 of 31

government lawyers are policymakers. *Borzilleri*, 874 F.3d at 193 (addressing prosecutors). And it would follow the courts across the country that readily dispose of the free speech claims of policymaking employees. *See Rose*, 291 F.3d at 920–22 (summarizing cases). Ms. Bakalar argues otherwise. Her arguments fail.

First, Ms. Bakalar urges that the Alaska Constitution is more protective of free speech than is the Federal Constitution.[81] This does not mean that Alaska law favors free speech plaintiffs in every case or that it protects Ms. Bakalar's conduct here. And Ms. Bakalar's illustration of this principle with case law concerning speech of public concern is irrelevant to this case—there is no dispute here that Ms. Bakalar's speech concerned matters of public concern.[82]

Second, Ms. Bakalar urges the Court to follow the nearly forty-year-old dictum in *City & Borough of Sitka v. Swanner*, 649 P.2d 940 (Alaska 1982).[83] *Swanner* concerned a police captain terminated for expressing dissatisfaction with department policy. *Id.* at 942. The court held that the police captain's statements were not so "intemperate" to warrant dismissal for "insubordination, misconduct, or poor job performance." *Id.* at 944. The court then held that Sitka police captains were not policymakers. *Id.* at 945. It nonetheless observed that designation of the plaintiff as a policymaker was "of minimal value in its own right, but instead only one of the factors to be considered in determining whether [the plaintiff's] First Amendment rights were infringed." *Id.* at 946. Ms. Bakalar would turn this cryptic statement into a rule setting Alaska apart from other courts to consider the relationship between policymaker status and the *Pickering* balancing test.

But the statement was dictum because it was not "not necessary to the decision" and was therefore without precedential effect. *Exp. Grp. v. Reef Indus., Inc.*, 54 F.3d 1466, 1472 (9th Cir. 1995) (quotations omitted). Having determined the police captain was not a policymaker, there was no need for the Alaska Supreme Court to address the

---

[81] Pl.'s Cross-Mot. 62–65 (Dkt. 75 at 62-65).

[82] *See* Pl.'s Cross-Mot. 64 (Dkt. 75 at 64).

[83] Pl.'s Cross-Mot. 65 (Dkt. 75 at 65).

Defs.' Brief in Supp. of Their Mot. Summ. J. and Opp'n to Pl.'s Cross-Mot. Summ. J.
*Bakalar v. Dunleavy, et al.* (Case No. 3:19-cv-00025-JWS)                    Page 18 of 31

Case 3:19-cv-00025-JWS   Document 86   Filed 09/24/21   Page 18 of 31

consequence of determining otherwise. Because the statement in *Swanner* was not well-"considered" dictum, the Court should not follow it against the wisdom of the other courts that hold policymaker status disposes of a public employee free speech claim. *See Rocky Mountain Fire & Cas. Co. v. Dairyland Ins. Co.*, 452 F.2d 603, 603–04 (9th Cir. 1971).

Third, Ms. Bakalar states she has a freedom of association claim permitting her to "associate with her chosen political party."[84] This is puzzling. Her Complaint alleges no such claim. In any event, freedom of association is "correlative" of freedom of speech. *Alaska Gay Coal. v. Sullivan*, 578 P.2d 951, 959 (Alaska 1978). Ms. Bakalar cites no authority that an associational rights claim survives where a free speech claim does not.[85]

> **b.** **The Alaska Supreme Court Would Hold that Ms. Bakalar's Conduct is Unprotected Under *Pickering*.**

---

[84] Pl.'s Cross-Mot. 65 (Dkt. 75 at 65).

[85] Ms. Bakalar cites *Anchorage Police Department Employees Association v. Municipality of Anchorage*, 24 P.3d 547 (Alaska 2001). *See* Pl.'s Cross-Mot. 66. But the cited text concerns Alaska's protection against unreasonable search and seizure, not association or expression. *Anchorage Police Dep't Emps. Ass'n*, 24 P.3d at 550. So, too, *Hudson v. Craven*, 403 F.3d 691 (9th Cir. 2005), treats free speech and association claims under the same analysis. *Id.* at 695–98. Further, her frequent references to "loyalty" pledges, oaths, and tests do not help her analysis. *See, e.g.*, Pl.'s Cross-Mot. 2–3, 5, 12-15, 19, 21, 23, 25–27, 31, 40, 51, 53–56, 69. Had Ms. Bakalar cited authority to support her contention that she was subject to a "loyalty" test, she would have encountered two problems. First, unconstitutional loyalty oaths are generally backed by threat of criminal punishment. *See Baird v. State Bar of Ariz.*, 401 U.S. 1, 9 (1971) (Stewart, J., concurring in judgment); *Baggett v. Bullitt*, 377 U.S. 360, 374 (1964). Here, there is no criminal punishment at issue. Second, unconstitutional exercises in patronage involve non-policymaking employees and either political party affiliation or electoral support. *See O'Hare Truck Serv., Inc. v. City of Northlake*, 518 U.S. 712, 714–15 (1996); *Rutan v. Republican Party of Ill.*, 497 U.S. 62, 66 (1990); *Branti*, 445 U.S. at 509–10; *Elrod v. Burns*, 427 U.S. 347, 351 (1976). Here, there is no record evidence of Ms. Bakalar's political affiliation or whom she supported in the gubernatorial election. And even if there were, it would not matter—Ms. Bakalar is a policymaker who may be discharged under *Branti*.

Even if Ms. Bakalar's policymaker status did not dispose of her free speech claim, the claim would fail the *Pickering* balancing test. In conducting the test, Alaska courts consider:

> (1) maintenance of discipline by immediate superiors; (2) preservation of harmony among co-workers; (3) maintenance of personal loyalty and confidence when necessary to the proper functioning of a close working relationship; (4) maintenance of the employee's proper performance of daily duties; (5) public impact of the statement; (6) impact of the statement on the operation of the governmental entity; and (7) existence or nonexistence of an issue of legitimate public concern.

*Haley*, 687 P.2d at 311. The seventh factor is a condition precedent for applying the other six factors. *Wickwire*, 725 P.2d at 700. But this factor is not disputed here. The other six factors cut clearly against Ms. Bakalar. The State's "interest in promoting efficiency in its operation"—including in maintaining voter confidence in the fairness of its elections— "outweigh[ed]" Ms. Bakalar's interest in blogging, *id.*, especially in an "intemperate" manner, *City & Borough of Sitka*, 649 P.2d at 944.

Ms. Bakalar posted to the Internet about politics incessantly, including in the days before and after asking to be retained in her position. She had written that the electoral preferences of her colleagues brought her to tears.[86] A member of the public complained. So did the legislature's majority counsel. So did legislators. The investigation of Ms. Bakalar's blog became "a general topic" because Ms. Bakalar "brought it up a lot and wanted to talk to people about it a lot."[87] The incoming administration was entitled to predict that Ms. Bakalar would fail to earn the trust of agency heads who thought differently from her. Her statements accordingly imperiled "preservation of harmony among co-workers," "maintenance of personal loyalty and confidence when necessary to the proper functioning of a close working relationship" with her clients, and the "proper performance of daily duties." *See Haley*, 687 P.2d at 311.

---

[86] Baylous Decl. Ex. T (Dkt. 56-20).

[87] Grace Dep. Tr. 70:4–7.

Defs.' Brief in Supp. of Their Mot. Summ. J. and Opp'n to Pl.'s Cross-Mot. Summ. J.
*Bakalar v. Dunleavy, et al.* (Case No. 3:19-cv-00025-JWS)                    Page 20 of 31

Case 3:19-cv-00025-JWS   Document 86   Filed 09/24/21   Page 20 of 31

The incoming administration was also permitted to consider the public's perception of Ms. Bakalar's role. *See McMullen v. Carson*, 754 F.2d 936, 939 (11th Cir. 1985). The same newspaper that published her comments about cases on behalf of the State also published selected entries from her blog, including one stating Ms. Bakalar felt "betrayed by people who know [her] personally and/or professionally and who support [Donald Trump] for president" and reflecting on that "profound and personal betrayal" Ms. Bakalar felt when she learned friends and colleagues supported then-candidate Trump.[88] Defendants could reasonably conclude that Ms. Bakalar's blogging made her an unsuitable advisor and spokesperson about legal matters, particularly regarding elections. If she expressed public misgivings about the political leanings of her friends and colleagues, how could she be trusted to give a fair shake to voters she had never met or to counsel the lieutenant governor? The public had already complained about Ms. Bakalar's blogging, though Ms. Bakalar discounts the concerns.[89] Accordingly, her statements had a "public impact" and affected "the operation of the governmental entity." *See Haley*, 687 P.2d at 311.

Lastly, Defendants could consider that Ms. Bakalar's blog posts about members of the judiciary were inappropriate. Ms. Bakalar posted about Justice Brett Kavanaugh ten times in the months before her termination.[90] She also posted about Alaska Supreme Court Justices Maasen and Bolger. It was fair to think Ms. Bakalar's commentary on judges would impede her cases and bore on the "proper performance of daily duties" and the "operation of the governmental entity." *See id.*

Ms. Bakalar argues that this concern about her hyper-partisan and vulgar blogging is "pretext."[91] She discounts its impact, saying she had been blogging for years without

---

[88] *Compare* Baylous Decl. Ex. B (Dkt. 56-2), *with* Baylous Decl. Ex. H (Dkt 56-8).

[89] Pl.'s Cross-Mot. 10–11 (Dkt. 75 at 10-11).

[90] Baylous Decl. Ex. T, AB (Dkt. 56-20, 56-28); Supp. Baylous Decl. Ex. AQ.

[91] Pl.'s Cross-Mot. 51 (Dkt. 75 at 51).

Defs.' Brief in Supp. of Their Mot. Summ. J. and Opp'n to Pl.'s Cross-Mot. Summ. J.
*Bakalar v. Dunleavy, et al.* (Case No. 3:19-cv-00025-JWS)                    Page 21 of 31

Case 3:19-cv-00025-JWS    Document 86    Filed 09/24/21    Page 21 of 31

consequence, that she had been found faultless in a personnel investigation, and that no judges read her posts about Justice Kavanaugh. These assertions fail to address reality.

First, Ms. Bakalar's Complaint states her blog became more political in the aftermath of the 2016 election.[92] This is true. She wrote in November 2017 that she had begun "a concerted effort to unburden herself of f[**]ks," including "fears of personal and/or professional reprisal borne of calling Donald Trump a fascist cantaloupe on the [I]nternet every day."[93] After then-Judge Kavanaugh was nominated to the Supreme Court, Ms. Bakalar wrote ten blog posts critical of him in September and October 2018. The last of these, written a few days before the 2018 gubernatorial election, described "lobbying Senator Murkowski on Kavanaugh" and reminisced about crying the day after the 2016 election because people in the Department of Law voted for President Trump.[94] It is no answer to say that Ms. Bakalar had maintained a blog for years. What she said and when she said it are indisputable.

Second, the personnel investigation arising from that complaint excused none of this. That investigation "was limited to two threshold questions: (1) whether Ms. Bakalar posted or in any manner worked on her blog during work time or with the aid of state funds or resources; and (2) whether, if the answer to the first question was 'yes,' such activity violated any law or policy applicable to Ms. Bakalar."[95] The investigation had nothing to do with the disruption occasioned by state's elections lawyer blogging about politics.

Third, concern about Ms. Bakalar's blogging about judges does not hinge on whether a judge actually read her blog. A legal employer can rationally worry about the consequence of a lawyer blogging about the judiciary in a widely read blog. True, some lawyers around the country objected to Justice Kavanaugh's confirmation. But this does

---

[92] Compl. ¶ 26 (Dkt 6-2 at 7).

[93] Baylous Decl. Ex. U (Dkt. 56-21).

[94] Baylous Decl. Ex. T (Dkt. 56-20).

[95] Bakalar Aff. Ex. 20 at 1-2 (Dkt. 75-23 at 1-2).

Defs.' Brief in Supp. of Their Mot. Summ. J. and Opp'n to Pl.'s Cross-Mot. Summ. J.
*Bakalar v. Dunleavy, et al.* (Case No. 3:19-cv-00025-JWS)                    Page 22 of 31

Case 3:19-cv-00025-JWS   Document 86   Filed 09/24/21   Page 22 of 31

not mean that Ms. Bakalar was protected in doing so in graphic terms *as the elections lawyer of the State of Alaska.*

Public employers are entitled to make "reasonable predictions" of disruption, *Robinson v. York*, 566 F.3d 817, 824 (9th Cir. 2009), and to act on "necessarily" disruptive speech, *Haley*, 687 P.2d at 314. This is especially so when employee speech threatens the government employer's credibility with the public or entangles in politics a public employer "with a strong and recognized interest in maintaining its political neutrality." *Hudson*, 403 F.3d at 700; *see also McMullen*, 754 F.2d at 939.

### 3. There Is a Genuine Dispute as to the Reasons for Ms. Bakalar's Termination.

The Court need only consider the reasons for Ms. Bakalar's termination if it determines she had a protected speech right under *Branti* and *Pickering*. She did not. But even if she did, there is a genuine dispute as to whether she was discharged because of her speech.

Mr. Babcock had a legitimate reason for requesting resignations. He wanted to ascertain whether the State's employees were willing to "implement the policies of the people elected by the people of Alaska."[96] This was about professionalism, not personal politics.[97] And the tone of a resignation letter mattered to what Mr. Babcock saw as a professional—not political—test.[98] He detected "grumbling" and a lack of professionalism in Ms. Bakalar's resignation letter.[99] While he knew "there were some doubts among various people that [Ms. Bakalar] could separate her . . . professionalism from her strong opinions,"[100] Mr. Babcock acted only on what he perceived in the letter when he discharged Ms. Bakalar. He thought her resignation letter "demonstrated her

---

[96] Babcock Dep. Tr. 75:24–76:1.

[97] Babcock Dep. Tr. 76:1–2, 76:7–10.

[98] *See* Babcock Dep. Tr. 98:24–99:2, 117:20–23.

[99] Babcock Dep. Tr. 133:17–24, 134:13–15.

[100] Babcock Dep. Tr. 138:11–14.

Defs.' Brief in Supp. of Their Mot. Summ. J. and Opp'n to Pl.'s Cross-Mot. Summ. J.
*Bakalar v. Dunleavy, et al.* (Case No. 3:19-cv-00025-JWS)                Page 23 of 31

Case 3:19-cv-00025-JWS   Document 86   Filed 09/24/21   Page 23 of 31

unwillingness to . . . treat th[e] new administration professionally."[101] Ms. Bakalar's letter shows an effort to protest the resignation request, even as she purported to satisfy it. Mr. Babcock was entitled to anticipate a problem, particularly in light of the sensitive duties the letter advertised Ms. Bakalar as performing.

Ms. Bakalar points to the circumstances of her discharge to argue for a "retaliatory motive."[102] This misses the mark. Causation "involves questions of fact that normally should be left for trial." *Ulrich v. City & County of San Francisco*, 308 F.3d 968, 979 (9th Cir. 2002). Ms. Bakalar's cases address only what a plaintiff needs to show to survive judgment as a matter of law, not what is required to win summary judgment in her favor. *See, e.g.*, *Marable v. Nitchman*, 511 F.3d 924, 930 (9th Cir. 2007) (reviewing summary judgment entered against plaintiff); *Alpha Energy Savers, Inc. v. Hansen*, 381 F.3d 917, 928 (9th Cir. 2004) (reviewing summary judgment entered against plaintiff); *Allen v. Iranon*, 283 F.3d at 1070, 1077 (9th Cir. 2002) (reviewing challenge to sufficiency of the evidence); *Ulrich*, 308 F.3d at 980 (reviewing summary judgment entered against plaintiff). Defendants concede Ms. Bakalar has evidence to survive summary judgment on the causation elements of her claim—if the Court reaches this element. But so do Defendants. Mr. Babcock testified he discharged Ms. Bakalar because of the unprofessional tone of her resignation letter, about which she asserts no free speech claim. The letter was snarky. A reasonable jury could find for Defendants on this. If the Court does not dismiss Ms. Bakalar's claim, the case should go to a jury.

## B. Ms. Bakalar's Section 1983 Claim Fails Without a Constitutional Violation.

"[Section] 1983 is not itself a source of substantive rights[] but merely provides a method for vindicating federal rights elsewhere conferred." *Graham v. Connor*, 490 U.S. 386, 393–94 (1989) (quotations omitted). Ms. Bakalar's section 1983 claim should be dismissed because she lacks a federal constitutional right to base it on.

---

[101] Babcock Dep. Tr. 139:6–7.

[102] Pl.'s Cross-Mot. 43–44 (Dkt. 75 at 43-44).

Defs.' Brief in Supp. of Their Mot. Summ. J. and Opp'n to Pl.'s Cross-Mot. Summ. J.
*Bakalar v. Dunleavy, et al.* (Case No. 3:19-cv-00025-JWS)                                         Page 24 of 31

Case 3:19-cv-00025-JWS   Document 86   Filed 09/24/21   Page 24 of 31

Ms. Bakalar's section 1983 damages claim fails for the additional reason that Governor Dunleavy and Mr. Babcock are entitled to qualified immunity. "The doctrine of qualified immunity shields officials from civil liability so long as their conduct does not violate clearly established . . . constitutional rights of which a reasonable person would have known." *Mullenix v. Luna*, 577 U.S. 7, 11 (2015) (per curiam) (quotations omitted). Ms. Bakalar bears the "burden of demonstrating that the right at issue was clearly established." *Kramer v. Cullinan*, 878 F.3d 1156, 1164 (9th Cir. 2018). This requires a case with "similar circumstances" to her own, *White v. Pauly*, 137 S. Ct. 548, 552 (2017) (per curiam), showing the violative nature of "*particular* conduct," *Mullenix*, 577 U.S. at 12 (quotations omitted).

Ms. Bakalar makes no effort to meet this burden by pointing to a case holding a government lawyer doing her work was anything other than a policymaking employee. Indeed, there is no such federal appellate opinion. *See Biggs*, 189 F.3d at 995. Instead, she makes three failed arguments.

First, Ms. Bakalar rehashes her argument for a constitutional violation, arguing she was not a policymaker.[103] The style of this argument shows its flaw. Ms. Bakalar attempts to build her case from abstract principles. Even if this could prove a constitutional violation, it cannot prove a clearly established one. This ignores her duty to point to a case showing the violative nature of "*particular* conduct." *Mullenix*, 577 U.S. at 12 (quotations omitted).

Second, Ms. Bakalar argues that the rights of *other* Alaska employees were clearly established.[104] She contends that the clear establishment of these unnamed person's rights vitiates Governor Dunleavy and Mr. Babcock's qualified immunity against *her* claim. Her confusing argument rests on two assumptions—that the resignation request violated *somebody's* clearly established right and that that somebody can be *other* than Ms. Bakalar. Both these assumptions are wrong.

---

[103] Pl.'s Cross-Mot. 54 (Dkt. 75 at 54).

[104] Pl.'s Cross-Mot. 55–56 (Dkt. 75 at 55-56).

There was nothing unconstitutional about the resignation request. It did not solicit "loyalty" from any recipient. The resignation request did not concern political party affiliation—and there is no record evidence of the party affiliation or electoral activity of any recipient. Nor did criminal punishment lurk in the background of the resignation request. Indeed, most people who received it were retained; nobody who failed to resign was prosecuted. Ms. Bakalar's pointing to *Elrod v. Burns* and *Rutan v. Republican Party of Illinois*—cases involving discharge or hindered hiring based on political party membership—does not meet her duty to point to a case with "similar circumstances," *White*, 137 S. Ct. at 552, given that the persons whose rights she references hailed from all political parties (and none) and given that the overwhelming majority were retained in their positions.

The next assumption also fails—even if *others'* rights were clearly established by *Branti* (and they were not), Ms. Bakalar cannot assert those rights to strip Governor Dunleavy and Mr. Babcock of qualified immunity against *her* claims. To argue otherwise, Ms. Bakalar cites *Eng v. Cooley*, 552 F.3d 1062 (9th Cir. 2009). The case concerned a plaintiff claiming retaliation for words his lawyer spoke on his behalf. *Id.* at 1066. The court held that defendants could not urge their qualified immunity by pointing to a dispute about the plaintiff's standing to invoke his lawyer's clearly established right to speak. *Id.* at 1068. *Eng*'s broadest reading therefore precludes defendants from invoking a non-merits bar to liability (such as prudential standing) to refute rights that are otherwise clearly established. *See id.*; *see also Triad Assocs., Inc. v. Robinson*, 10 F.3d 492, 499–500 (7th Cir. 1993) (referring to standing of a corporation).

The issues here are different. Ms. Bakalar makes no claim to recover for violation of *others'* rights. She asserts no right that is clearly established but for a jurisdictional or prudential obstacle—this is not a case about third-party standing. Instead, Ms. Bakalar raises the other recipients of the resignation request to cloud that *Branti* and cases applying it eviscerate her claim, thereby precluding clear establishment of any right of *hers*. There is no logical connection between Ms. Bakalar's claim and the rights of *others*

Defs.' Brief in Supp. of Their Mot. Summ. J. and Opp'n to Pl.'s Cross-Mot. Summ. J.
*Bakalar v. Dunleavy, et al.* (Case No. 3:19-cv-00025-JWS)                                    Page 26 of 31

Case 3:19-cv-00025-JWS   Document 86   Filed 09/24/21   Page 26 of 31

she contends were clearly established. Governor Dunleavy and Mr. Babcock's argument for qualified immunity is merits-based in invoking *Branti* and *Biggs*. *Eng* is not relevant to the qualified immunity inquiry here.

In any event, Ms. Bakalar misunderstands how *Branti* applies to discharges affecting multiple positions. Courts have addressed this, though Ms. Bakalar fails to acknowledge the relevant cases, including a Ninth Circuit opinion. *See Bardzik*, 635 F.3d at 1151; *Vazquez Rios*, 819 F.2d at 321. The cases require a position-by-position analysis to determine whether a government official could reasonably have considered an employee a policymaker. *See Bardzik*, 635 F.3d at 1151; *Vazquez Rios*, 819 F.2d at 321. Ms. Bakalar has no clearly established right because her duties—and the duties of an attorney V—make her a policymaker.

Third, Ms. Bakalar argues that not all *Pickering* balancing is so sensitive to preclude clear establishment of an employee's rights.[105] Perhaps. But this ignores Ms. Bakalar's burden to point to a case showing the violative nature of the "*particular conduct*" against her. *See Mullenix*, 577 U.S. at 12 (quotations omitted). No case establishes the right of a state elections lawyer to blog about her distaste for approximately half the electorate. It is Ms. Bakalar who must present the case establishing her rights, not Governor Dunleavy and Mr. Babcock who must prove such a case does not exist or who must re-engage in the *Pickering* balancing test. *See Kramer*, 878 F.3d at 1164 ("The plaintiff bears the burden of demonstrating that the right at issue was clearly established.").

Governor Dunleavy and Mr. Babcock are entitled to qualified immunity. Because her section 1983 claim is the only claim asserted against Governor Dunleavy and Mr. Babcock personally, they should be dismissed from this case, even if Ms. Bakalar's other claims survive.

---

[105] Pl.'s Cross-Mot. 57 (Dkt. 75 at 57).

Defs.' Brief in Supp. of Their Mot. Summ. J. and Opp'n to Pl.'s Cross-Mot. Summ. J.
*Bakalar v. Dunleavy, et al.* (Case No. 3:19-cv-00025-JWS)

**C.    Ms. Bakalar's State-Law Claims Fail Without a Constitutional Violation.**

Ms. Bakalar's state-law claims suffer the same defect as her flawed section 1983 claim—they fail without a constitutional violation. Ms. Bakalar's (1) stand-alone Alaska constitution claim, (2) implied covenant of good faith and fair dealing claim, (3) wrongful discharge claim, and (4) merit principle claims should each be dismissed.

**1.    Alaska's Free Speech Clause Does Not Supply a Cause of Action.**

Alaska law does not "imply a cause of action for damages under the Alaska Constitution except in cases of flagrant constitution violations where little or no alternative remedies are available." *Larson v. State*, 284 P.3d 1, 10 (Alaska 2012) (quotations omitted). Ms. Bakalar suffered no constitutional violation, much less a flagrant one, and even with a violation, Ms. Bakalar has other vehicles to bring such a claim. Her stand-alone Alaska Constitution claim should be dismissed. Ms. Bakalar's argument to the contrary points to *Bivens v. Six Unknown Named Agents of Fed. Bureau of Narcotics*, 403 U.S. 388 (1971).[106] But the Alaska Supreme Court has "never recognized a *Bivens*-type private right of action for constitutional torts under the Alaska Constitution." *Lowell v. Hayes*, 117 P.3d 745, 753 (Alaska 2005). This Court is accordingly powerless to do so.

**2.    Ms. Bakalar Lacks a Claim for Breach of Implied Covenant of Good Faith and Fair Dealing Without a Constitutional Violation.**

Ms. Bakalar contends her discharge violated both the subjective and objective component of the implied covenant of good faith and fair dealing. This is not so.

The subjective component of the implied covenant of good faith and fair dealing bars terminating an employee for the purpose of depriving the employee of benefits, such as bonus pay or retirement benefits. *Ramsey v. City of Sand Point*, 936 P.2d 126, 133 (Alaska 1997). There is no evidence that Defendants acted to deprive Ms. Bakalar of retirement benefits or anything of the sort. And Ms. Bakalar's argument that she was not discharged for reasons she would have regarded as appropriate, even if credited, would

---

[106] Pl.'s Cross-Mot. 69 (Dkt. 75 at 69).

not support a claim that the subjective component of the covenant was breached. "[I]n the at-will employment context, it is *insufficient* to show that an employee was discharged for reasons unrelated to job performance." *Era Aviation, Inc. v. Seekins*, 973 P.2d 1137, 1141 (Alaska 1999) (emphasis added).

The objective component of the implied covenant of good faith and fair dealing bars "dealing with [an] employee in a manner that a reasonable person would regard as unfair." *Crowley v. State*, 253 P.3d 1226, 1232 (Alaska 2011). Ms. Bakalar does not have a violation of either the Federal Constitution or the Alaska Constitution on which to ground a claim for violation of the objective component of the implied covenant of good faith and fair dealing. That leaves her to argue that the Court should concoct a public policy to save her claim. The Alaska Supreme Court has recognized that disparate treatment and violation of privacy violate the covenant of good faith and fair dealing. *Luedtke v. Nabors Alaska Drilling, Inc.*, 834 P.2d 1220, 1226 (Alaska 1992). But, here, it was not unreasonable for Defendants to discharge an elections lawyer who blogged about politics while retaining lawyers who did not. To the extent Defendants treated Ms. Bakalar differently from her colleagues, they were fair in doing so.

### 3. Ms. Bakalar Lacks a Stand-Alone Claim for Wrongful Discharge.

Ms. Bakalar addresses her wrongful discharge as part of her claim for breach of the implied covenant of good faith and fair dealing.[107] The one should be dismissed for the same reason as the other.

### 4. Alaska's Merit Principle Provides No Independent Basis to Challenge a Termination Permitted by *Branti* and *Pickering*.

The Alaska Constitution requires the legislature to "establish a system under which the merit principle will govern the employment of persons by the State." Alaska Const. Art. XII, § 6. The State Personnel Act defines and implements the merit principle. *Moore v. State*, 875 P.2d 765, 768 (Alaska 1994). It provides Ms. Bakalar no protection relevant here.

---

[107] Pl.'s Cross-Mot. 6 (Dkt. 75 at 6).

Defs.' Brief in Supp. of Their Mot. Summ. J. and Opp'n to Pl.'s Cross-Mot. Summ. J.
*Bakalar v. Dunleavy, et al.* (Case No. 3:19-cv-00025-JWS)                                    Page 29 of 31

Case 3:19-cv-00025-JWS   Document 86   Filed 09/24/21   Page 29 of 31

The Personnel Act shields employees in the classified service from "unlawful discrimination due to political beliefs." AS 39.25.160(g). But Ms. Bakalar is in the partially exempt service, not the classified service. *See* AS 39.25.120(c)(3) (defining the partially exempt service to include lawyers in the Department of Law); AS 39.25.100 (defining the classified service to exclude the partially exempt service). She does not enjoy the protection afforded classified employees. *See* AS 39.25.160(g); AS 39.25.160(f). But even if Ms. Bakalar had such protection, it would only be from "unlawful" retaliation, AS 39.25.160(g), and the Personnel Act does not establish what is "unlawful" political discrimination. That leaves background law to supply the answer. Because Ms. Bakalar was a policymaking employee under *Branti* and, separately, because her discharge was permissible under *Pickering*, her discharge was not an act of "unlawful discrimination due to [her] political beliefs."

Ms. Bakalar argues that she nonetheless had a Personnel Act right to "express political opinions." AS 39.25.178(3). This right is not as absolute as Ms. Bakalar imagines. The Personnel Act prohibits display of partisan materials "while engaged on official business." *Id.* And the Executive Branch Ethics Act and the regulations applying it bar outside activities, including unpaid activities, that are "incompatible or in conflict with the proper discharge of [the employee's] official duties." AS 39.52.170(a); *see also* AAC 9.52.090. Alaska law has not provided employees with an unlimited right to speak. This is why Alaska cases follow *Pickering* rather than simply citing the merit principle in every instance involving the speech of an employee covered by the Personnel Act. *See Alaskans for a Common Language v. Kritz*, 170 P.3d 183, 203–04 (Alaska 2007) (ignoring the merit principle); *Wickwire*, 725 P.2d at 700 (same). Ms. Bakalar cannot therefore rely on the merit principle to save her claims' failures under *Branti* and *Pickering*. Just as those cases do not require the State to retain the services of an election lawyer who is a publicly partisan, profane, and vulgar idealogue, neither does the merit principle.

Defs.' Brief in Supp. of Their Mot. Summ. J. and Opp'n to Pl.'s Cross-Mot. Summ. J.
*Bakalar v. Dunleavy, et al.* (Case No. 3:19-cv-00025-JWS)                                    Page 30 of 31

Case 3:19-cv-00025-JWS   Document 86   Filed 09/24/21   Page 30 of 31

# IV.  CONCLUSION

Ms. Bakalar invokes the sacred constitutional principle that political expression should be free and uncoerced. But it is also sacred that our democracy depends on elections that are fair and trusted. Ms. Bakalar was a political blogger while also being a high-ranking government elections lawyer. The State was not required to acquiesce in her very bad judgment. That is what the law provides. And it is right.

DATED: September 24, 2021

LANE POWELL LLC
Attorneys for Defendants


By  s/Michael B. Baylous
    Brewster H. Jamieson, ABA No. 8411122
    Michael B. Baylous, ABA No. 0905022

I certify that on September 24, 2021, a copy of
the foregoing was served electronically on:

Mark Choate, mark@choatelawfirm.com [ECF]

Amanda Harber, Amanda.harber@gmail.com [ECF]

Adam Hansen adam@apollow-law.com [ECF]

s/Michael B. Baylous

Defs.' Brief in Supp. of Their Mot. Summ. J. and Opp'n to Pl.'s Cross-Mot. Summ. J.
*Bakalar v. Dunleavy, et al.* (Case No. 3:19-cv-00025-JWS)                    Page 31 of 31

Case 3:19-cv-00025-JWS   Document 86   Filed 09/24/21   Page 31 of 31