# In The Matter Of:

*Bakalar v. Dunleavy, et al.*
*Case No. 3:19-cv-00025 JWS*

---

*Joanne Grace*
*April 29, 2021*

---

*Glacier Stenographic Reporters Inc.*
*P.O. Box 32340*
*Juneau, Alaska 99803*
*www.glaciersteno.com*



Original File Joanne Grace 4-29-2021.txt
Min-U-Script® with Word Index

## Page 1

```
 1            IN THE UNITED STATES DISTRICT COURT

 2                    DISTRICT OF ALASKA

 3

 4   ELIZABETH BAKALAR,                )
                                       )
 5          Plaintiff,                 )
                                       )
 6   v.                                )
                                       )
 7   MICHAEL J. DUNLEAVY, IN HIS       )
     INDIVIDUAL AND OFFICIAL           )
 8   CAPACITIES; TUCKERMAN BABCOCK;    )
     AND THE STATE OF ALASKA,          )
 9                                     )
            Defendants.                )
10   _____ )

11   Case No. 3:19-cv-00025 JWS

12

13

14

15        VIDEO DEPOSITION OF JOANNE GRACE

16            VIA ZOOM VIDEOCONFERENCE

17

18        Pages 1 through 107, Inclusive

19          Taken:  April 29, 2021

20

21

22

23

24

25
```

## Page 2

```
 1   Zoom Videoconference Deposition of JOANNE GRACE

 2

 3              INDEX OF EXAMINATIONS

 4                                          PAGE

 5

 6   Examination by Mr. Choate  .....................6

 7

 8

 9              INDEX OF EXHIBITS

10   NO.                                      PAGE

11   Exhibit 24 ................................35
        Workplace Alaska Attorney V Class
11      Specification Bulletin

12
     Exhibit 25 ................................47
13      "Dunleavy's Transition Asks Roughly
        1,200 At-will State Workers to Submit
14      Resignations"

15   Exhibit 26 ................................51
        "Playing Politics with Prosecutors"
16
     Exhibit 27 ................................66
17      11/26/2018 letter from James Fayette
        to Jahna Lindemuth
18
     Exhibit 28 ................................66
19      11/26/2018 letter from Joanne Grace
        to Jahna Lindemuth
20
     Exhibit 29 ................................69
21      3/16/2017 letter from William Evans to
        James Cantor
22
     Exhibit 30 ................................73
23      October 2018 e-mail string
        Re:  More Bakalar Issues - For AG
24

25
```

## Page 3

```
 1              INDEX OF EXHIBITS, CONTINUED

 2   NO.                                      PAGE

 3   Exhibit 31 ...............................103
        State of Alaska v. Holder, 1:12-cv-1376
 4      Complaint for Declaratory Judgment
        and Injunctive Relief
 5

 6              INDEX OF EXHIBITS REFERENCED

 7   NO.                                      PAGE

 8   Exhibit 11 ................................24
        Alaska DOA Personnel and Labor Relations,
 9      Frequently Asked Questions,
        Classification System and Method
10      Questions

11   Exhibit 13 ................................62
        Form sent to employees for use in
12      drafting their resignation letters

13   Exhibit 14 ................................55
        11/16/2018 Memorandum from Tuckerman
14      Babcock Re:  Request for Resignation

15   Exhibit 15 ................................87
        Excel spreadsheet - Resignation
16      Memo Sent List

17   Exhibit 16 ................................89
        Resignation letter from Elizabeth
18      Bakalar to AG Jahna Lindemuth

19

20

21

22

23

24

25
```

## Page 4

```
 1   A P P E A R A N C E S:

 2     For the Plaintiff:

 3        MARK CHOATE, ESQ.
          Choate Law Firm LLC
 4        424 N. Franklin Street
          Juneau, Alaska  99801
 5
          AMANDA J. HARBER, ESQ.
 6        49th State Law LLC
          P.O. Box 661
 7        Soldotna, Alaska  99669

 8     For the Defendants:

 9        BREWSTER H. JAMIESON, ESQ.
          Lane Powell LLC
10        1600 A Street, Suite 304
          Anchorage, Alaska  99501
11
          DEVON MCCURDY, ESQ.
12        Lane Powell LLC
          1420 5th Avenue, Suite 4200
13        Seattle, Washington  98101

14

15

16        BE IT REMEMBERED, that pursuant to Notice of Taking

17   Individual and 30(b)(6) Witness Depositions of Joanne

18   Grace, and beginning on Thursday, the 29th day of April,

19   2021, commencing at the hour of 9:39 a.m. thereof, via Zoom

20   Videoconference, before me, LYNDA BARKER, Registered

21   Diplomate Reporter and Notary Public in and for the State

22   of Alaska, appeared via Zoom Videoconference:

23                    JOANNE GRACE

24   called as a witness by the plaintiff, who was

25   thereafter examined as hereinafter set forth.
```

**Exhibit AM**
**Page 2 of 41**

Case 3:19-cv-00025-JWS   Document 87-1   Filed 09/24/21   Page 2 of 41

Bakalar v. Dunleavy, et al.
Case No. 3:19-cv-00025 JWS

Joanne Grace
April 29, 2021

Page 5

1         THURSDAY, APRIL 29, 2021
2             9:39 A.M.
3
4       **THE REPORTER:** We are on record.
5 Today is Thursday, April 29, 2021. The time is now
6 9:39 a.m. We are here today to take the deposition
7 of Joanne Grace on behalf of the plaintiff in the
8 case of Bakalar v. Dunleavy, et al., Case No.
9 3:19-cv-00025 JWS.
10       We are conducting this deposition
11 via Zoom Videoconference.
12       My name is Lynda Barker, and I
13 work for Glacier Stenographic Reporters. My
14 business address is P.O. Box 32340, Juneau, Alaska
15 99803.
16       Would counsel please identify
17 themselves for the record?
18       **MR. CHOATE:** My name is Mark
19 Choate. I'm the attorney for Libby Bakalar.
20       **MR. JAMIESON:** Brewster Jamieson
21 for the defendants and for the witness, Ms. Grace.
22       **MR. McCURDY:** And Devon McCurdy,
23 associated with Brewster.
24       **THE REPORTER:** All right. Thank
25 you. I'll now place the witness under oath.

Page 6

1       Can I have you raise your right
2 hand for me, Joanne?
3       **THE WITNESS:** Yes.
4       (Oath administered.)
5       **THE WITNESS:** I do.
6       **THE REPORTER:** Thank you very
7 much.
8       The witness has been sworn. You
9 may proceed.
10
11         JOANNE GRACE
12
13 having been first duly sworn by the court reporter to
14 tell the truth, the whole truth, and nothing but the
15 truth, testified via Zoom Videoconference as follows:
16
17         **EXAMINATION**
18
19 BY MR. CHOATE:
20   Q.   Good morning, Ms. Grace.
21   **A.**   **Good morning.**
22   Q.   This is the time set for the taking of
23 your deposition. We're actually going to do two
24 depositions today. One will be a 30(b)(6) and then
25 the second will be your individual deposition. I'm

Page 7

1 going to start with your 30(b)(6) since I spent
2 five hours with Mr. Babcock and forgot to ask him
3 the 30(b)(6) section of it, so I'm going to see if
4 we can get a stipulation that he'll confirm that
5 his testimony in that deposition, in his individual
6 deposition also applies for the 30(b)(6) categories
7 that he was going to testify about.
8       I have --
9       **MR. JAMIESON:** So, Mark?
10       **MR. CHOATE:** Yes?
11       **MR. JAMIESON:** If I might just
12 say, we have prepared Ms. Grace as a 30(b)(6)
13 witness because that's what we understood --
14       **MR. CHOATE:** Right.
15       **MR. JAMIESON:** -- you wanted. We
16 did not prepare her as a more general witness. It
17 may not matter --
18       **MR. CHOATE:** Uh-huh.
19       **MR. JAMIESON:** -- because the
20 topics that she is going to testify about will be
21 the topics that she is -- you know, has the most
22 knowledge of as a 30(b)(6) witness.
23       **MR. CHOATE:** Okay.
24       **MR. JAMIESON:** But I will reserve
25 the right to object to scope to the extent we're

Page 8

1 getting into areas we didn't have any anticipation
2 that she would be asked about today.
3       **MR. CHOATE:** Okay. Well, my
4 understanding of 30(b)(6) is that if we extend
5 outside of the scope of the 30(b)(6), then she no
6 longer can bind the state as to her testimony, but
7 it doesn't prevent us from asking her questions
8 about her personal knowledge. We can get -- we'll
9 see if we get there one way or the other.
10       **MR. JAMIESON:** Yeah. I'm hoping
11 it won't be a problem, but I just wanted to let you
12 know that we sort of had proceeded with the
13 understanding that she'd be the 30(b)(6) witness.
14       **MR. CHOATE:** Okay.
15       **MR. JAMIESON:** And that's what we
16 prepped her on --
17       **MR. CHOATE:** Sure.
18       **MR. JAMIESON:** -- and that she
19 prepared for. So --
20       **MR. CHOATE:** That's fine. Okay.
21 Great.
22 BY MR. CHOATE:
23   Q.   Ms. Grace, can you briefly summarize
24 your education history for me?
25   **A.**   **I have a Bachelor of Arts degree from**

Exhibit AM
Page 3 of 41

Bakalar v. Dunleavy, et al.
Case No. 3:19-cv-00025 JWS

Joanne Grace
April 29, 2021

Page 9

1 the University of Alaska Fairbanks in northern
2 studies. I have a law degree from Harvard Law
3 School, and I have an LL.M. from Georgetown Law
4 Center in federal taxation.
5    Q. When did you finish your B.A.?
6    A. 1981.
7    Q. And how about your J.D.?
8    A. 1985.
9    Q. And how about your LL.M.?
10    A. 1987.
11    Q. Did you go straight from your J.D.
12 program into Georgetown's LL.M. program?
13    A. No. I had a judicial clerkship in
14 between.
15    Q. And who was that with?
16    A. That was with Justice Jay Rabinowitz
17 with the Alaska Supreme Court.
18    Q. Can you give me your work -- briefly
19 summarize your work history for me since you
20 completed your clerkship with Justice Rabinowitz?
21    A. I worked for one year for Perkins Coie
22 in Anchorage, I worked for three years for the law
23 offices of Cabot Christianson in Anchorage, and
24 I've worked for 30 years for the Alaska Department
25 of Law.

Page 10

1    Q. In regards to your work at the
2 Department of Law, what year did you start?
3    A. 1991.
4    Q. And when you were first hired by the
5 Department of Law, what was -- what were you hired
6 as?
7    A. I was hired as an assistant attorney
8 general.
9    Q. And do you remember what level that
10 was? Attorney I, II, III?
11    A. I'm sorry. I don't.
12    Q. Okay. Do you recall at some point
13 getting a promotion and knowing what your title --
14 what level you were at?
15    A. The only time I remember what level I
16 was promoted to was when I was promoted to an
17 attorney V.
18    Q. Okay. And when were you promoted to an
19 attorney V?
20    A. I don't know.
21    Q. Okay.
22    A. I don't know offhand. Obviously I
23 could figure that out.
24    Q. Okay.
25    A. Yeah.

Page 11

1    Q. What were you doing when you were first
2 promoted to an attorney V?
3    A. I was the head of a subgroup of the
4 natural resources section that had a specialized
5 practice in what we called statehood defense, which
6 is defending against, I would say, encroachments on
7 state authority by the federal government.
8    Q. Do you recall what years you were in
9 that section, or that subsection, subgroup?
10    A. No. I was in the natural resources
11 section from 1991 to 2003, but I was not the head
12 of that subsection that entire time.
13    Q. Okay. So sometime before 2003 you
14 became an attorney V?
15    A. Right.
16    Q. Okay. Then what was your next position
17 after the head of that subgroup?
18    A. The Department of Law created an
19 appellate section, and I became an appellate
20 attorney in that section.
21    Q. And do you recall if you were still an
22 attorney V, or did you become -- were you promoted
23 to an attorney VI?
24    A. I was an attorney V for two years. In
25 2005 I became the supervisor of the appellate

Page 12

1 section, and I believe at that point I became an
2 attorney VI because our supervisors are all
3 attorney VIs.
4    Q. How long were you an attorney VI?
5    A. Until 2018.
6    Q. And what happened in 2018?
7    A. I became the director of the civil
8 division.
9    Q. Is that as an attorney VIII -- or
10 attorney VII? I'm sorry.
11    A. No, there's not -- it's just a
12 director.
13    Q. Okay.
14    A. It's a range -- I think it's a range
15 27, which is a range higher, just one range higher
16 than an attorney VI.
17    Q. Okay. Does that position require
18 legislative confirmation?
19    A. No.
20    Q. Who is your immediate superior or
21 supervisor?
22    A. The deputy attorney general --
23    Q. Okay.
24    A. -- Cori Mills.
25    Q. Do you know if that position requires

Exhibit AM
Page 4 of 41

Bakalar v. Dunleavy, et al.
Case No. 3:19-cv-00025 JWS

Joanne Grace
April 29, 2021

1 legislative confirmation?
2 **A.** It does not.
3 **Q.** And do you know who his supervisor is?
4 **A.** It's a woman. Cori Mills is a woman,
5 **and her supervisor --**
6 **Q.** I'm sorry. My apologies, Cori.
7 **A.** Yes. Her supervisor is the Attorney
8 **General.**
9 **Q.** Okay. Since -- strike that.
10 In your work for the State of
11 Alaska Department of Law, how many Attorney
12 Generals would you say you've worked for?
13 **A.** I don't know the exact number, but I
14 **would say it's in the range of 13 to 16.**
15 **Q.** Okay. And if I'm correct, I think
16 there's been three so far in this Dunleavy
17 administration; right?
18 **A.** Yes.
19 **Q.** Is it your understanding that AGs,
20 people in the Department of Law, work at the
21 pleasure of the Attorney General or at the pleasure
22 of the governor?
23 **A.** The appointment letters that we send
24 **out when we hire someone say that the AAGs work at**
25 **the pleasure of the Attorney General, at-will at**

1 **the pleasure of the Attorney General.**
2 **Q.** Have you, in your work at the Attorney
3 General's office, at the Department of Law, have
4 you had experience in the hiring and promotion of
5 lawyers in the department?
6 **A.** Yes.
7 **Q.** Is there a -- what process do you look
8 to when hiring lawyers for the Department of Law to
9 determine whether they are qualified to perform the
10 job duties for the position that you're hiring them
11 for?
12 **A.** Sorry. Can you -- what was the
13 **beginning of that sentence? What do I look to?**
14 **Q.** What process do you utilize to
15 determine whether someone would qualify for the
16 job, a job as a lawyer in the Department of Law?
17 **A.** Currently -- this isn't necessarily
18 **always the way it's been, but currently, when**
19 **there's a vacancy in a section, we'll get approval**
20 **to recruit for the vacancy. Then our recruitment**
21 **will go out to -- generally a recruitment will go**
22 **out. We don't have to do it that way, but**
23 **generally we'll do a recruitment that goes on our**
24 **website. And sometimes we will pay to have the ABA**
25 **send out an e-mail, and sometimes we'll do things**

1 like try to target certain schools or programs.
2 Then there's an open period where
3 we accept applications. Then the supervisor of the
4 section -- and generally almost all sections will
5 put together a committee of attorneys to do a first
6 round of interviews. And then they will choose the
7 person that they want for the job. And the
8 supervisor will write a hiring memo, explaining
9 things like who applied, the various pros and cons
10 of maybe the top several candidates, or maybe
11 there's only one person they are interested in.
12 And they send that to me, the
13 director. And -- excuse me -- I read the memo, and
14 then I ask -- I ask the deputy's assistant to set
15 up a second interview, and then the deputy attorney
16 general and I do a second interview, and we make a
17 recommendation to the Attorney General.
18 If the Attorney General approves
19 of the hire, then there is another level of
20 approval to the governor's office, I think to OMB
21 first and then to the governor's office. And then
22 if we get approval from the governor's office, then
23 we will make an offer.
24 **Q.** How long have you had this process
25 where -- how long have you had this process?

1 Because you said -- you used the word "currently,"
2 and so what do you mean by that in terms of time?
3 **A.** I think we've had this process for as
4 **long as I can remember, but the thing that's**
5 **changed is not the process. And I can't -- I just**
6 **don't really remember like what the process was**
7 **years and years ago. It was probably something**
8 **like that.**
9 But one thing that has changed is
10 **that we have much smaller pools of applicants than**
11 **we used to have, and that changes the hiring**
12 **decisions a little bit because formerly the**
13 supervisor and the upper management would look for
14 **somebody who could step in and take over the**
15 **caseload of the person who departed.**
16 And that's just not quite as easy
17 to do anymore, and so sometimes what we'll have to
18 **do is hire somebody with less experience but who we**
19 **think is capable of developing into a good**
20 **attorney, and we'll have to move the work around in**
21 the section to give them some more appropriate work
22 **to help them develop into a higher-level attorney**
23 **because they may not be ready to just step into a**
24 **difficult caseload that requires somebody with more**
25 **experience.**

Exhibit AM
Page 5 of 41

Bakalar v. Dunleavy, et al.
Case No. 3:19-cv-00025 JWS

Joanne Grace
April 29, 2021

Page 17

1     Q.   And just generally -- I think I know
2 this answer from a prior deposition you and I were
3 in, but why is it that the state is having a
4 smaller pool of applicants for its positions with
5 the Department of Law?
6     **A.   I don't know. What do you think I said**
7 **before?**
8     Q.   I think you said that you were doing a
9 salary study because you felt that your salaries
10 were not competitive with other employers looking
11 for the same applicants. That's what I recall from
12 our deposition.
13     **A.   That is correct. And we got the**
14 **results of that salary study, and it showed that,**
15 **for the most part, we are competitive except at the**
16 **higher levels. We are competitive. So we are not**
17 **able to increase our salaries, and, therefore, I'm**
18 **honestly not really sure. I think it could -- it's**
19 **probably a combination of factors.**
20     Q.   Okay. I would say getting rid of the
21 old retirement system was part of it, but that's
22 just my view, my very biased view.
23           Looking at the issue of -- as I
24 understand it, you pass on or pass up to the
25 Attorney General applicants, and this would be for

Page 18

1 any position in the Department of Law, right,
2 including attorney I positions?
3     **A.   I'm sorry. Could you --**
4     Q.   I'm sorry.
5     **A.   Attorney I positions, we interview for**
6 **them, yes.**
7     Q.   I'm sorry. But does every attorney
8 hired by the Department of Law require the Attorney
9 General's approval?
10     **A.   Yes.**
11     Q.   Okay. And that includes for the most
12 routine, sort of the most entry-level positions; is
13 that correct?
14     **A.   Yes. Entry-level attorney positions.**
15     Q.   Entry-level attorney positions. If
16 you're aware, what are reasons why the Attorney
17 General would disapprove a recommendation of
18 somebody who has applied for the Department of Law?
19 Has it occurred, that you recall?
20     **A.   Since I've been director for three**
21 **years, the Attorney General has never**
22 **disapproved --**
23     Q.   What about --
24     **A.   -- a recommendation.**
25     Q.   Sure. Sure. And what about -- have

Page 19

1 any of your recommendations been disapproved by the
2 governor's office?
3     **A.   This is -- this is a bonus question.**
4           MR. JAMIESON: You know what?
5 We're going to need to take a short, short break
6 while I discuss -- because this may invoke -- it
7 may impact the deliberative process privilege.
8           THE WITNESS: I can answer the
9 question. I don't -- I can answer the question
10 without doing that, I think.
11           MR. JAMIESON: Okay.
12 BY MR. CHOATE:
13     Q.   I'm not asking you -- I'm not asking
14 you who; I'm just asking has it happened.
15     **A.   It has happened.**
16     Q.   Okay. And how many times has it
17 happened since you have been the director?
18     **A.   Once.**
19     Q.   Then I'll ask -- I think there may be
20 an objection, but can you tell me, not the name of
21 the person, but what were the reasons that were
22 provided, if you were -- were you provided any
23 reasons as to why that applicant was not approved
24 by the governor's office?
25           MR. JAMIESON: So the question is:

Page 20

1 Were you provided the reason, yes or no? And so
2 I'll let her answer that, but the next question
3 would be: What were the reasons? And then I would
4 object and instruct her not to answer.
5           MR. CHOATE: Sure.
6     **A.   The answer is no.**
7 BY MR. CHOATE:
8     Q.   Okay. You weren't provided a reason?
9     **A.   No.**
10     Q.   In your -- let's just go back. Prior
11 to your becoming a director, were you aware of the
12 Attorney General ever rejecting recommendations for
13 the hiring or promotion of lawyers within the
14 Department of Law?
15     **A.   Let me unpack that a little bit.**
16     Q.   Sure. I think it's probably -- let's
17 divide it up. Let's say, first of all, hiring.
18     **A.   No. I -- as a supervisor, none of the**
19 **people I recommended were not approved. I would**
20 **have no way of knowing whether other supervisors'**
21 **recommendations were approved or not.**
22     Q.   Right. And we talked about hiring, but
23 we haven't talked about promotions. Since the time
24 that you've been the director, have any of your
25 recommendations for promotions of attorneys within

Exhibit AM
Page 6 of 41

Bakalar v. Dunleavy, et al.
Case No. 3:19-cv-00025 JWS

Joanne Grace
April 29, 2021

1 the Department of Law been rejected by the Attorney
2 General?
3     **A.**    **That's not exactly how it works.**
4     Q.   Okay. Tell me -- tell me about how
5 that works.
6           MR. JAMIESON: This is the
7 process --
8           THE WITNESS: Right. Okay.
9           MR. JAMIESON: -- for that. Yes.
10     **A.**    **So there's criteria for being promoted.**
11 **Supervisors will make a recommendation when they**
12 **think someone meets those criteria. And generally**
13 **there's a -- I don't know precisely where these**
14 **cutoffs are, but, you know, maybe I to II and maybe**
15 **II to III are within the authority of the director**
16 **to approve. And I think above maybe III to IV --**
17 **it could be II to III, even, are within the**
18 **authority of the deputy attorney general. And**
19 **promotion to a V is a decision that's made with the**
20 **Attorney General.**
21     Q.   Are you familiar with the Alaska
22 Constitution Article XII, Section 6 regarding the
23 merit system?
24     **A.**    **Yes.**
25     Q.   Okay. And do you understand that

1 Alaska's -- state employment in Alaska operates
2 under the merit principles?
3           MR. JAMIESON: So let me object.
4 You're asking her for a legal opinion, and I think
5 that's certainly not what we have -- we're not
6 producing her as someone to provide legal opinions
7 on behalf of the Department of Law regarding the
8 merit principle. We have not designated her for
9 that, and it's not like you've asked for anyone.
10           MR. CHOATE: That's fine. I think
11 the question still goes to the issues of her
12 30(b)(6) testimony, and so I'm going to -- I
13 understand you may not be bound -- that you're not
14 binding the Department of Law by your opinion as
15 the director.
16           MR. JAMIESON: And I think she has
17 the ability to decline to provide you the opinion,
18 her own, her own opinion. I mean, she's not here
19 to provide you legal opinions. You can ask her if
20 she's aware of law, but your interpretation or your
21 characterization of law is not something that she's
22 here to agree or disagree with.
23           MR. CHOATE: Well, the issue of
24 whether employees are protected -- Department of
25 Law employees are protected by the merit principles

1 is at issue in this case, and so -- because one of
2 the claims here is that there was a retaliation
3 against Ms. Bakalar because of her speech, her
4 political speech. So I think that her
5 understanding of merit principles and whether it
6 applies to the Department of Law -- I mean, she can
7 be right or wrong about that, but she has got to
8 have an opinion. And so -- and I think it's
9 relevant because we're going to talk about these
10 issues in regards to Ms. Bakalar. So I think --
11           MR. JAMIESON: Maybe you could ask
12 it a different way without asking her to agree or
13 disagree with your characterization of what the
14 merit principle does.
15 **BY MR. CHOATE:**
16     Q.   Well, let me just ask -- I'm going to
17 read it to you just so we're on the same page here.
18 Article 12, Section 6 says, "Merit system. The
19 legislature shall establish a system under which
20 the merit principle will govern the employment of
21 persons by the state."
22           Do you agree that's the language
23 in the Constitution, if I represent to you that I
24 read it correctly?
25     **A.**    **If you read it correctly, then I agree**

1 **that you read it correctly.**
2     Q.   Okay. And you understand -- and you do
3 agree that the merit principle applies to the
4 employment of persons by the State of Alaska; isn't
5 that correct?
6     **A.**    **Yes.**
7     Q.   Now, let me see if I can pull this up
8 here. I'm going to show you what has been marked
9 as Exhibit 11 in the prior deposition. Can you see
10 this, ma'am?
11     **A.**    **It's a little small.**
12     Q.   Okay. You can probably maybe pinch it
13 with the trackpad there to make it larger. Is that
14 helping?
15     **A.**    **I'm not really sure how to do that.**
16     Q.   I don't know what kind of computer you
17 have there.
18     **A.**    **Oh, no. It worked. It worked.**
19     Q.   Good. Okay. And this is a -- I'll
20 represent to you that Exhibit 11 is a page from the
21 website of the Alaska Department of
22 Administration's Personnel and Labor Relations. Do
23 you recall ever seeing this before?
24     **A.**    **I don't know if I've seen this**
25 **particular page.**

Bakalar v. Dunleavy, et al.
Case No. 3:19-cv-00025 JWS

Joanne Grace
April 29, 2021

1 Q. This is an FAQ, and it involves
2 classification system and method questions. And
3 down below here it describes what the merit
4 principle. And it says, "The merit principle is
5 the foundation on which our system of personnel
6 administration is built. At its most basic the
7 merit principle requires standards for hiring and
8 promoting based on specific objective
9 qualifications so that the person best qualified to
10 perform the functions for the state will be
11 employed and that an effective career service will
12 be encouraged, developed, and maintained."
13    Do you agree with that statement?
14 A. Sure.
15 Q. Would you agree that that statement
16 should apply to attorneys hired by the Department
17 of Law?
18 A. Yeah. I mean, as a guiding principle.
19 Q. Okay.
20 A. I don't think it means that there's no
21 exceptions that --
22 Q. Well --
23 A. -- allow them to keep their jobs no
24 matter what.
25 Q. Well, I understand. We may have -- we

1 may have some differences in some of this, but
2 let's go -- let's talk -- down below here it says,
3 "AS 39.25.010(b) defines the merit principle of
4 employment as including" -- and you can read along
5 with me -- "1, recruiting, selecting, and advancing
6 employees on the basis of their relative ability,
7 knowledge, and skills, including open consideration
8 of qualified applicants for initial appointment."
9 Do you agree with that?
10 A. (Reading.)
11    MR. JAMIESON: Is this an actual
12 quote from the statute?
13    MR. CHOATE: Yes.
14    MR. JAMIESON: Okay. Well, if
15 you're asking whether she agrees that it's an
16 accurate --
17    MR. CHOATE: I'm asking her
18 whether she agrees because I don't -- I don't think
19 it should be that difficult, that in hiring
20 attorneys for the Department of Law, one of the
21 requirements of the merit principle is that you
22 recruit, select, and advance them "on the basis of
23 their relative ability, knowledge, and skills,
24 including open consideration of qualified
25 applicants for initial appointment."

1 A. Yeah. The one thing I would say is I'm
2 not sure what "open consideration of qualified
3 applicants for initial appointment" means because I
4 know for attorneys we're not required to recruit
5 and consider anyone. We can just appoint anyone we
6 want. So I don't know if that really applies to
7 attorneys or not.
8 Q. So is it your position, then, that
9 if -- that when recruiting you do not need to
10 consider all qualified applicants who apply for a
11 position?
12 A. No. I think -- I think that's a good
13 point. We consider all applicants.
14 Q. All right.
15 A. For sure. But we don't have to
16 recruit, I guess, is what I'm saying.
17 Q. Okay. I see.
18 A. So, no, I guess -- I guess that's
19 accurate then, and we would consider all
20 applicants.
21 Q. And then next, 2, it says "Regular
22 integrated salary programs based on the nature of
23 the work performed." Do you agree that that's one
24 of the things that the Department of Law follows,
25 is that it follows a regular integrated salary

1 program?
2 A. Yeah. I'm not really sure what
3 "regular integrated salary program" means.
4 Q. I would say that it means that there's
5 a structure in place that says if you're an
6 attorney V, range -- you know, range blank, step
7 blank, this is what you'll get paid.
8 A. Right. It's statutory.
9 Q. It's statutory?
10 A. Salary is statutory.
11 Q. And then it says, "3: Retention of
12 employees with permanent status on the basis of the
13 adequacy of their performance, reasonable efforts
14 of temporary duration for correction in inadequate
15 performance, and separation for cause."
16 A. Yes.
17 Q. Okay. "4: Equal treatment of
18 applicants and employees with regard only to
19 consideration within the merit principles of
20 employment."
21 A. I mean, I would go back to 3 and say
22 that attorneys are at-will employees and don't --
23 there does not need to be cause for attorneys --
24 Q. Okay.
25 A. -- to be terminated.

Exhibit AM
Page 8 of 41

Bakalar v. Dunleavy, et al.
Case No. 3:19-cv-00025 JWS

Joanne Grace
April 29, 2021

1    Q.    When it says, "Equal treatment of
2  applicants and employees with regard only to
3  consideration within the merit principles of
4  employment," do you agree with that?
5    A.    Yes.
6    Q.    Okay.  And then 5 is "Selection and
7  retention of an employee's position secure from
8  political influences."  Do you agree with that?
9    **A.    I agree with that as a general**
10  **principle.  It obviously isn't true for every**
11  **position in the department or in the state.**
12    Q.    Can you tell me for what positions you
13  believe that it's not true within the Department of
14  Law?
15    **A.    I believe it's not true -- (Reading.)**
16  **I believe -- I'm actually not sure what "secure**
17  **from political influences" means.**
18    Q.    You don't know what that means?
19    **A.    Not -- "secure from political**
20  **influences"?  No, I'm not sure what that means.**
21  **But I think to the extent that it means that**
22  **political considerations sometimes might be an**
23  **appropriate requirement for a job, that would not**
24  **apply to the Attorney General.  It would not apply**
25  **to the deputy attorney general necessarily.  It**

1  **would not apply to special assistants necessarily,**
2  **and it would not apply to the elections attorney.**
3    Q.    You've got a -- you're breaking out a
4  new category here, a special one for elections
5  attorney?
6    **A.    I beg your pardon?**
7    Q.    You've identified that it's generally
8  the Attorney General, the deputy, and the special
9  assistants who are all -- special assistants are
10  generally political appointees; right?
11    **A.    Right.**
12    Q.    And then you have a new category called
13  the elections attorney?
14    **A.    To the extent that the political**
15  **considerations do play a part in the core**
16  **principles of that person's job, yes.**
17    Q.    Okay.  And can you identify where it
18  says that the political considerations play a core
19  part or are a part of the elections attorney's job
20  that's different than other attorneys general or
21  Department of Law attorneys?
22    **A.    I can explain why.  I can't point to**
23  **anything why.**
24    Q.    Let me just ask you --
25    **A.    Any job -- any job in the department**

1  **where somebody's actions harm and undermine their**
2  **clients' -- the interests of their clients be**
3  **included in the core functions of their job.**
4    Q.    I'm sorry.  You identified "elections
5  attorney."  Can you point to anything in writing
6  when someone is hired to the elections attorney's
7  position at the Department of Law where it says,
8  "You will be evaluated based upon some political
9  consideration or political influences"?
10    **A.    I can't, but I can say that any**
11  **attorney whose conduct undermines the interests of**
12  **their clients, that is something that is a**
13  **consideration of their selection and retention.**
14    Q.    And we'll get to that.
15    **A.    Uh-huh.**
16    Q.    In your work as the director -- and I'm
17  just going to exclude Ms. Bakalar here for purposes
18  of this question -- have you ever made decisions
19  about whether someone should be hired, retained, or
20  promoted because of their personal politics?
21    **A.    No.**
22    Q.    Okay.  You'd agree that that would be
23  generally improper; right?
24    **A.    For the kinds of attorney positions --**
25  **for the kind of positions that I hire for, yes.**

1    Q.    Well, and you're the entire civil
2  division; right?
3    **A.    Right.  But I don't hire -- I don't**
4  **hire the Attorney General's office people.  He's**
5  **got his own people.**
6    Q.    Right.  But would you say the Attorney
7  General's office people are political appointees?
8  Right?
9    **A.    To the extent that they are -- that the**
10  **governor and the Attorney General are entitled to**
11  **have people who will share their values and serve**
12  **their agenda, yes.**
13    Q.    And those appointments -- and those
14  positions normally last the length of an
15  administration; right?
16    **A.    No, not necessarily.  We've definitely**
17  **had deputies who have lasted through several**
18  **administrations.  We've had an Attorney General who**
19  **lasted through --**
20    Q.    Right.
21    **A.    -- two different administrations.**
22  **Special assistants generally stay on, not**
23  **necessarily in that job.**
24    Q.    In the work -- for the individuals that
25  you hire, promote, retain, and supervise as the

Exhibit AM
Page 9 of 41

Bakalar v. Dunleavy, et al.
Case No. 3:19-cv-00025 JWS

Joanne Grace
April 29, 2021

1 director, though, would you agree that normally
2 their positions should be secure from political
3 influences?
4     **A.   Yes.**
5     Q.   Do you recall in your career, which is
6 now 30 years with the State of Alaska, prior to the
7 Dunleavy administration coming into power, ever
8 being asked to evaluate one of the -- an attorney
9 in the civil division based upon their politics?
10           MR. JAMIESON: Can you define what
11 you mean by "politics"?
12     Q.   By their political beliefs.
13     **A.   Right. I mean, there's a -- you know,**
14 **there's obviously a distinction between political**
15 **beliefs and actions; but, no, the answer is no, not**
16 **based on political beliefs.**
17     Q.   Okay. How about political actions
18 before the Dunleavy administration?
19     **A.   Not me personally, but I'm aware that**
20 **it's happened.**
21     Q.   Okay. And can you give me some
22 examples of when it has happened?
23     **A.   Yeah. I'm not going to be able to**
24 **remember names, probably, pretty well.**
25           MR. JAMIESON: Well, and these

1 would be personnel issues and other issues.
2     **A.   Yeah, I mean -- and also I don't have**
3 **personal knowledge of it. This is people -- people**
4 **were non-retained, and, you know, we don't really**
5 **find out why.**
6     Q.   Okay.
7     **A.   And so it would be more based on what**
8 **I'd heard.**
9     Q.   All right. Let me see if I can make
10 this one -- I'll switch over here.
11           Do you believe that your political
12 beliefs have ever affected your hiring, promotion,
13 or retention while working for the Department of
14 Law?
15     **A.   My political beliefs?**
16     Q.   Sure.
17     **A.   Have influenced the people I've hired?**
18     Q.   No. Have your political beliefs ever
19 affected your hiring, promotion, or retention in
20 the Department of Law? Do you have a belief
21 whether they do or not, if they have or not?
22     **A.   Whether my political beliefs have made**
23 **a difference to the people who hired me or promoted**
24 **me?**
25     Q.   Yes.

1     **A.   No, I don't believe so.**
2     Q.   I'm going to show you what we will mark
3 as our next exhibit, which is going to turn out to
4 be 24.
5           (Exhibit 24 duly marked.)
6 **BY MR. CHOATE:**
7     Q.   This is the attorney V description from
8 Workplace Alaska.
9     **A.   Uh-huh.**
10     Q.   Are you familiar with this?
11     **A.   Yes.**
12     Q.   And I'm just going to -- you might want
13 to look through it real quickly before you answer
14 this question, but I'm going to ask you whether or
15 not you're aware of someone who is holding an
16 attorney V being able to be -- that part of their
17 skill set, knowledge, abilities, or qualifications
18 would involve them having certain political
19 beliefs. Are political beliefs part of the job
20 requirements of an attorney V with the Department
21 of Law?
22     **A.   Not political beliefs, no.**
23     Q.   Okay. Is there anything that, to your
24 knowledge, describes political expression, saying
25 that as an attorney V you are prohibited or

1 prevented from personal political expression?
2     **A.   No, not -- not any attorney class, but**
3 **that doesn't -- that's not to say that there aren't**
4 **times when that could be problematic based on an**
5 **assistant attorney general's client.**
6     Q.   In your work as an attorney general, or
7 as the -- not just as the director, but prior to
8 that, did you know of Libby Bakalar?
9     **A.   I'm sorry. Prior to being director?**
10     Q.   Yes.
11     **A.   Yes.**
12     Q.   How long have you known Libby Bakalar?
13     **A.   I've known Libby Bakalar a long time.**
14 **I'm not sure I can put a date on it.**
15     Q.   How did you first come into contact
16 with her? Can you recall that?
17     **A.   No. I mean, working at the AG's office**
18 **for a long time, people, you know, come and go.**
19 **And they come later, and eventually I'll get to**
20 **know them, some of them really well, but I can't**
21 **necessarily remember like the first time I met them**
22 **or how I met them.**
23     Q.   Do you -- would you describe Libby
24 Bakalar as somebody that you knew well?
25     **A.   Yes.**

Bakalar v. Dunleavy, et al.
Case No. 3:19-cv-00025 JWS

Joanne Grace
April 29, 2021

1    Q.    Okay.  And would you describe her as
2  somebody who was a personal friend?
3    A.    I would describe her as somebody who
4  was a professional friend.
5    Q.    Okay.  And what do you mean by a
6  "professional friend"?
7    A.    I mean, she was a friend.  I didn't --
8  I mean, first of all, she lived in Juneau, so, you
9  know, we didn't do things outside of work except
10 maybe get a drink after if she happened to be in
11 Anchorage, or maybe if I was -- maybe one time in
12 Juneau I might have got a drink with her.  But, you
13 know, we don't -- we don't live in the same town.
14 We don't -- we didn't do things together like
15 personal friends might do.
16   Q.    Would you agree that attorneys can have
17 political opinions that -- attorneys in the
18 Department of Law can have political opinions and
19 still -- strong political opinions and still be
20 able to effectively represent the Department of
21 Law?
22   A.    Represent the Department of Law?
23   Q.    Uh-huh, in working -- in performing
24 their job duties.
25   A.    Well, that depends on their job duties.

1  I mean, I do agree that people can have whatever
2  beliefs they want and adequately perform their
3  duties.  It's not so much a representation of the
4  Department of Law; it's more a representation of
5  the state and our clients.  But having beliefs is
6  absolutely compatible with doing the work of an
7  assistant attorney general.
8    Q.    Now, your -- strike that.
9          In your work with Ms. Bakalar as a
10 professional and as her professional friend, what
11 were the things that you liked about her as an
12 attorney?
13   A.    What were the things I liked about her
14 as an attorney?
15   Q.    Right, yeah, as an attorney.
16   A.    But not as a -- do you want me to
17 distinguish that from the things I liked about her
18 personally?
19   Q.    Yes.
20   A.    She was a great colleague.  She was
21 very helpful.  She had a great attitude about
22 helping other people.  She was a good team player.
23 She was very responsive if you needed her -- an
24 answer to something.  She was kind, like friendly,
25 just kind of fun to work with.

1    Q.    Did you ever -- strike that.
2          What were your -- what were the
3  things you liked about her as an individual, as a
4  friend?
5    A.    She's a warm person.  She's a loyal
6  person.  She's funny.  She's fun, considerate.
7  Probably some other things, too, that's not -- that
8  aren't coming to mind.
9    Q.    Okay.  Were you ever aware of
10 Ms. Bakalar's personal political beliefs
11 interfering or affecting her ability to represent
12 the State of Alaska?  And by that I mean causing a
13 bias or a lack of advocacy or a reduction in her
14 advocacy on the part of the state because of her
15 personal political beliefs.
16   A.    So, yes, aware of her -- not her
17 political beliefs but her political speech and her
18 political actions becoming more and more
19 problematic to her ability to do her job.
20   Q.    And I'm going to get to that frame that
21 you guys have adopted here, but I want to talk
22 about -- because it's a frame.  But I want to talk
23 about whether or not in her work you ever saw that
24 her work performance, meaning the product that she
25 produced, was affected negatively in any fashion by

1  her political beliefs.
2          MR. JAMIESON:  And when you say
3  "work product," what are you including in "work
4  product"?
5    Q.    I'm talking about -- I'm talking about
6  the decisions that she wrote, the AGOs that she
7  authored.  Let's start there.  Are you aware of
8  whether she ever authored an Attorney General's
9  Opinion that you believe was affected or biased
10 because of her personal political beliefs?
11   A.    I'm not aware of that, no.
12   Q.    Okay.  Are you aware of her ever making
13 an argument in court on behalf of the state,
14 whether it was in trial courts, the Alaska Supreme
15 Court, or the U.S. Supreme Court, in which her
16 personal political beliefs negatively created a
17 bias or a harm to the state?
18   A.    Well, I am not aware because I wouldn't
19 know, but I will say that because she was
20 representing the Division of Elections, and it's a
21 foundational principle of the Division of Elections
22 that the administration of elections be
23 nonpartisan, have credibility, integrity, and be
24 impartial, that the more outspoken the elections
25 attorney is, the more partisan and the more extreme

Bakalar v. Dunleavy, et al.
Case No. 3:19-cv-00025 JWS

Joanne Grace
April 29, 2021

1 and the more public she becomes about partisan
2 issues, the more that undermines her ability to
3 stand up in court and argue that an action of the
4 Division of Elections, which she probably advised
5 them to take, was impartial and fair.
6    Q.   And I understand that's a -- that's
7 sort of a generalized, "Well, because of her --
8 because of her personal partisan political beliefs,
9 it would affect the way somebody might view her" --
10    A.   Not her beliefs.  Not her beliefs.
11    Q.   Her speech?
12    A.   Her speech.
13    Q.   Her personal speech?
14    A.   Her personal speech.  If she is
15 somebody who is very outspoken in various forms of
16 social media and taking extreme and hostile views
17 of, for example, Republicans, then it becomes hard
18 for -- then she would undermine the arguments that
19 the conduct of the Division of Elections that
20 perhaps Republicans felt was unfair was impartial
21 and has integrity and credibility.
22    Q.   Okay.  I think that's interesting given
23 the state's -- the Attorney General's -- I think
24 the extraordinary politicization of the Attorney
25 General's office during the Dunleavy

1 administration, that that would be a concern, But
2 let's go on here.
3            Are you aware of whether Ms. --
4        MR. JAMIESON: Mark, I guess your
5 comments, side comments -- I'm not sure those are
6 questions or proper questions, but I would object
7 to the form.
8        MR. CHOATE: That's fine.  That's
9 fine.  I mean --
10        MR. JAMIESON: If you have
11 questions for the witness, please go ahead and ask
12 them.
13        MR. CHOATE: Well, I'm going to
14 get there.
15 BY MR. CHOATE:
16    Q.   Other than the perception that you've
17 identified that she had to advocate for specifically
18 Republicans concerned about Ms. Bakalar's personal
19 political speech, are you aware of any case in
20 which her personal politics caused her to not
21 represent the state in an impartial manner,
22 advocating for the interest that she had
23 identified, that she was told to advocate for on
24 behalf of the Department of Law?  That's a terrible
25 question.  Let me just -- let me just strike that.

1            Can you tell me in any situation
2 where Ms. Bakalar's work as a Department of Law
3 attorney was compromised in the sense that her work
4 was altered or she didn't do the job she was
5 supposed to do consistent with her expectations,
6 the expectations of her employment?
7    A.   I'm just going to answer -- I'm just
8 going to tell you what I think you're asking me --
9    Q.   Uh-huh.
10    A.   -- because I'm a little bit queasy
11 about the question.  But I do think that it's
12 problematic for an elections attorney to be making
13 arguments that impact an election if she's
14 outspoken in one direction or the other.  I don't
15 have -- I don't ever think Libby herself changed --
16 developed a legal position or argued a legal
17 position because of her personal beliefs.
18    Q.   Okay.  So am I correct that your
19 identification of problems with her goes to the
20 perception that her -- that her personal political
21 partisanship would cause others to think that she
22 would not be fair?
23    A.   Understanding that perception is kind
24 of the foundation of public trust in elections, and
25 that public trust is essential to people accepting

1 the results of an election, perception, you know,
2 can mean a lot of different things.  I'm just
3 saying perception in public trust and the results
4 in the administration of elections is a pretty
5 significant thing.
6    Q.   Let me just make sure I differentiate
7 it.  We've talked about perception, but in terms of
8 actual performance, are you aware of any place that
9 her work, in terms of what she did, was compromised
10 by her personal political beliefs?
11        MR. JAMIESON: You're
12 distinguishing between perception and performance
13 as if they are to be separate.
14        MR. CHOATE: Well --
15        MR. JAMIESON: I think the witness
16 has already answered the question that they're not.
17        MR. CHOATE: Well, I understand
18 that what she's saying is that because of her
19 political partisanship people may not have believed
20 that she would be fair in the way she acted.  My
21 question is:  Is she aware of any situation, any
22 work that she performed for the state where the
23 work she performed was influenced or altered, you
24 know, affected by her personal political beliefs.
25    A.   I don't think that her personal

Bakalar v. Dunleavy, et al.
Case No. 3:19-cv-00025 JWS

Joanne Grace
April 29, 2021

1 **political beliefs affected her work. I think that**
2 **her actions affected her ability to do her job.**
3 **BY MR. CHOATE:**
4    Q.   And, that's, again the public
5 perception of fairness of elections; right?
6    **A.   Right.**
7    Q.   Okay. But you didn't have a problem
8 when your former boss, Ed Sniffen, sent a letter
9 attempting to join the Texas litigation challenging
10 the certification of the presidential election
11 because of the same types of perceptions that there
12 was a problem with the elections in the United
13 States at the federal level; right?
14           **MR. JAMIESON:** So that's
15 argumentative, and she's not here to talk about the
16 actions of Ed Sniffen. That's not what this case
17 involves at all. This is just pure argument, Mark.
18 I'd ask that you move on.
19    **A.   Also I don't think my view of that has**
20 **to do with anything.**
21    Q.   Well, the issue was that the Attorney
22 General of the State of Alaska contributed to a
23 false perception of election integrity in the
24 United States, and that was not something that you
25 felt was a problem or that you should complain to

1 the Bar about his actions; right?
2           **MR. JAMIESON:** Again, I would ask
3 that you move on as this is pure argument, and it
4 is -- unpacking it, there's lots of foundational
5 issues, problems with that, but basically you're
6 trying to make a political point, Mark, and this is
7 not the forum in which to do that. And I would ask
8 that you move on and ask questions that are
9 appropriate for this witness and for the purposes
10 that she has been designated by the state as a
11 30(b)(6) witness.
12           **MR. CHOATE:** And I'm just going to
13 say that if perception is important, then
14 perception has to apply to everyone involved; and I
15 would say that it didn't, and it doesn't.
16    **A.   Well, I mean --**
17           **MR. JAMIESON:** That's not what
18 this case is about, but you can -- you can make
19 that political argument some other time, but I
20 don't think that has anything to do with this case.
21 **BY MR. CHOATE:**
22    Q.   Let's keep going here. In regards to
23 the transition, the Dunleavy transition, did you
24 learn at some point in time that there was going to
25 be a request that some 1,200 state employees submit

1 resignations?
2    **A.   Yes.**
3    Q.   Okay. When did you learn that?
4    **A.   I do not have an exact date on that.**
5 **Presumably it was after November -- after election**
6 **day and before inauguration day.**
7    Q.   Okay. And how did you learn about
8 that?
9    **A.   I can't really be precise, but I**
10 **imagine that the Attorney General informed the**
11 **department.**
12    Q.   Okay. I'm going to show you just an
13 article dated November 16th which just captures the
14 fact that approximately 1,200 state workers would
15 be asked to resign and reapply for their jobs.
16         (Exhibit 25 duly marked.)
17 **BY MR. CHOATE:**
18    Q.   What is your understanding, or what
19 were you told as to why the incoming Dunleavy
20 administration was going to request some 1,200
21 state workers to resign and reapply for their jobs?
22    **A.   My understanding was that the governor**
23 **was going to come in, and he had things he wanted**
24 **to accomplish, and that there was going to be a**
25 **change in direction in policy. And he just wanted**

1 **an affirmation by the, I guess, partially exempt**
2 **and exempt employees that they understood that, and**
3 **that they were willing to work, you know, move in a**
4 **different direction with him.**
5    Q.   I asked Mr. Babcock in his deposition
6 whether there was anything in writing that was sent
7 to this group of 1,200 state employees identifying
8 what the policy changes -- what were the policy
9 changes that were going to occur with the Dunleavy
10 administration so they would know what the new
11 course was for this new governor. Did you ever see
12 anything in writing describing what these policy
13 changes were going to be that these state employees
14 were going to be required to support or, you know,
15 pledge loyalty to?
16           **MR. JAMIESON:** Well, I'm going to
17 object to the form of that. There is a lot there
18 that is not -- you know, I'm going to object to the
19 form.
20           **MR. CHOATE:** Let me just -- let me
21 just clean it up.
22 **BY MR. CHOATE:**
23    Q.   Did you ever see in writing where the
24 1,200 state employees were provided with something
25 saying, "This is the Dunleavy administration's

Exhibit AM
Page 13 of 41

Bakalar v. Dunleavy, et al.
Case No. 3:19-cv-00025 JWS

Joanne Grace
April 29, 2021

1  agenda.  Don't reapply or don't plan to work for
2  the state unless you agree to support it"?
3          MR. JAMIESON: The question is:
4  Did you see that?
5    **A.    Did I see that?**
6          MR. JAMIESON: In writing.
7    **A.    No.  No, but I don't think that**
8  **Dunleavy's policies or plans were a secret.  We had**
9  **just gone through an election.**
10   Q.    So what were the policies and plans
11  that you understood at that time the 1,200 state
12  workers were being asked to support in retaining or
13  seeking to be rehired for their jobs?
14         MR. JAMIESON: Let me object to
15  the form of that question.  It assumes facts that
16  are definitely not in evidence.
17   Q.    You said the Dunleavy administration
18  was going to be making changes, and that the reason
19  they were asking for 1,200 people to resign and
20  reapply was to make sure they were on board with
21  the changes.
22         My question is:  What was your
23  understanding of the changes that the Dunleavy
24  administration was making?
25         MR. JAMIESON: I think that you've

1  misstated her prior testimony, but she can answer
2  the question to the extent she understands it.
3    **A.    Every new administration comes in with**
4  **new ideas and new agendas.  And career state**
5  **employees understand that those people have been**
6  **elected, that the electorate wishes them to do the**
7  **things they promised to do, and that accomplishing**
8  **those things requires the work of many people, more**
9  **or less everyone in the executive branch, and**
10  **that's how I understood it.**
11   Q.    Did you have any specific understanding
12  as to what were the changes that the new
13  administration was going to implement that required
14  1,200 people to basically quit their jobs, resign,
15  and then reapply because they were going to be on
16  board with these changes?
17         MR. JAMIESON: Same objection to
18  the form of that question.
19         Are you able to answer it?
20         THE WITNESS: Yeah.
21    **A.    I mean, I don't -- I don't think that**
22  **it was -- I think that -- I think that your**
23  **statement is overthinking the request.  It was just**
24  **more of a general like, "Hey, new governor.  Are**
25  **you on board with continuing to, you know, do the**

1  state's business?"  That's how I would interpret
2  it.
3    Q.    In the 30 years that you've worked for
4  the Department of Law, had you ever seen a request
5  of basically this entire state workforce to resign
6  and reapply?
7    **A.    No.**
8    Q.    I'm talking about 1,200 people.
9    **A.    No.**
10   Q.    This was unusual; right?
11   **A.    Unprecedented.**
12   Q.    Unprecedented.  How did it affect the
13  morale of your -- the people that you were in
14  charge of to be told that they were required to
15  resign and reapply for their jobs?
16   **A.    Negatively.**
17   Q.    I'm going to show you what we'll mark
18  as Exhibit 26.
19         (Exhibit 26 duly marked.)
20  **BY MR. CHOATE:**
21   Q.    Can you see this?  This is an article
22  by Jeff Landfield dated November 18, 2018, called
23  "Playing Politics with Prosecutors."
24   **A.    Uh-huh.**
25   Q.    Do you recall ever seeing this?

1    **A.    No.**
2    Q.    And what he says in the first paragraph
3  is: "It is customary for a new governor to ask for
4  resignations of political appointees.  These
5  include commissioners, deputy commissioners,
6  directors, deputy directors, and the governor's
7  staff.  However, it's unprecedented to ask for the
8  resignation of all EX" -- that would be exempt --
9  "and PX" -- partially exempt -- "employees.  These
10  include prosecutors, IT staff, secretaries,
11  assistants and more.  To give some context, when
12  Governor Walker was elected, he asked for the
13  resignations of about 250 people.  According to
14  state data, there were 1,454 partially exempt and
15  exempt positions, nearly 10 percent of the state
16  workforce."
17         Would you agree it was
18  unprecedented?
19   **A.    I think I already said that.**
20   Q.    Okay.  And then they quote Mr. Babcock
21  below -- or Mr. Landfield quotes him as saying,
22  "Dunleavy just wants all of the state employees who
23  are at-will -- partially exempt, exempt
24  employees -- to affirmatively say yes.  'Yes, I
25  want to work for the Dunleavy administration.'  Not

Bakalar v. Dunleavy, et al.
Case No. 3:19-cv-00025 JWS

Joanne Grace
April 29, 2021

1 just bureaucracy staying in place, but sending out
2 the message, 'Do you want to work on the agenda?
3 Do you want to work in this administration?  Just
4 let us know.'"
5       Do you see that?
6 **A.**  **Yes.**
7    Q.  Okay.  Did you have the impression that
8 the lawyers that were working for you prior to this
9 request for resignation were just working in the
10 bureaucracy, that they were not committed to their
11 jobs?
12       **MR. JAMIESON:** So, you know, we
13 did not put this witness up as a 30(b)(6) witness
14 for the topic -- and I'm struggling to understand,
15 generally speaking, why her impressions of these
16 statements or her general impressions of the
17 Department of Law are related to this dispute.  But
18 that's certainly not within the scope of what we're
19 putting her up as a 30(b)(6) witness for.
20       **MR. CHOATE:** I think her
21 personal --
22       **MR. JAMIESON:** And I'm being
23 patient with you, Mark, but, you know, there are
24 some real scope issues here.  And I'm not telling
25 her at this point to not answer, but I would ask

1 that you get to the points that we have designated
2 her for as a 30(b)(6) witness because that's what
3 this deposition is.
4 **BY MR. CHOATE:**
5    Q.  You can answer.
6   **A.**  **I forgot what the question was.**
7       **MR. CHOATE:** Lynda, can you read
8 that one back?
9       **MR. JAMIESON:** And would it be
10 actually --
11       **MR. CHOATE:** Let's take -- why
12 don't we take a break before we come back to it?
13 How's that?
14       **MR. JAMIESON:** I need to tend to
15 some other business.
16       **MR. CHOATE:** So, what, five
17 minutes or ten minutes?
18       **MR. JAMIESON:** Yeah, five to ten
19 minutes.
20       **MR. CHOATE:** Okay.
21       **MR. JAMIESON:** All right.  Thank
22 you.
23       **MR. CHOATE:** Thank you.
24       **THE REPORTER:** Off record.
25 10:50 AM

1       (Off record.)
2       (Pending question read back.)
3 11:02 AM
4       **THE REPORTER:** Back on the record.
5       **MR. JAMIESON:** And I will renew my
6 objection to that question.  If you can ask a new
7 one.
8   **A.**  **No.**
9    Q.  In fact, you're -- isn't it true you're
10 pretty proud of the lawyers that work for you,
11 aren't you?
12   **A.**  **Yeah.**
13    Q.  I'm going to show you what has
14 previously been marked as Exhibit 14 and ask if you
15 recall seeing this memorandum.  Can you see that?
16 Let me try again.  It's a memorandum dated
17 November 16, 2018.  Can you see that?
18       **THE WITNESS:** Do you see it?
19       **MR. JAMIESON:** I see it, yes.
20   **A.**  **Oh, maybe there is something --**
21       **MR. JAMIESON:** Try going to 14.
22 Just go to the AgileLaw.  Oh, I see.
23       **MR. CHOATE:** Sometimes I talk to
24 people, and I just -- it could just be a really
25 terrible question.

1       **MR. JAMIESON:** There we go.  Yeah.
2       **THE WITNESS:** Okay.
3       **MR. JAMIESON:** So now that's up.
4 So you're --
5       **THE WITNESS:** Okay.
6       **MR. JAMIESON:** Would you like to
7 get rid of that screen?
8       **THE WITNESS:** Yeah.  Thank you.
9       **MR. JAMIESON:** How do we do that?
10       **THE WITNESS:** I don't know.  It
11 was gone last time.  Oh, maybe --
12       **MR. JAMIESON:** Maybe what I have
13 to do is minimize view and -- oh, I just moved
14 that.
15       **THE WITNESS:** That's all right.  I
16 can live with it.
17       **MR. JAMIESON:** Okay.  Oh, I know
18 what we can do.  We can minimize it and then press
19 that, and it should -- no.  It's always staying on
20 top.  Anyway, if you can live with it, I can live
21 with it.
22       **THE WITNESS:** All right.  I'll try
23 not to look at it.
24 **BY MR. CHOATE:**
25    Q.  So have you seen this memorandum

Exhibit AM
Page 15 of 41

Bakalar v. Dunleavy, et al.
Case No. 3:19-cv-00025 JWS

Joanne Grace
April 29, 2021

1  before?
2  **A.  I'm sorry.  I'm just looking at it now.**
3  Q.  Okay.
4  **A.  And I need to have more time.**
5  Q.  Take your time.
6  **A.  (Reading.)  Yeah.  I think I got this.**
7  Q.  Okay.  Let me ask this question.  Did
8  you have any role in writing it?
9  **A.  No.**
10  Q.  Okay.  Do you have any idea whether
11  anybody in the Department of Law assisted in
12  writing this memorandum?
13      **MR. JAMIESON:** The question is:
14  Are you aware if anyone in the Department of Law
15  assisted in writing the memorandum?
16  **A.  I'm not aware, and I would say, based**
17  **on my conversations with upper management, they did**
18  **not have anything to do with that.  I don't know.**
19  **I don't know.**
20  Q.  Okay.  When you spoke to upper
21  management -- when you learned about this request
22  for resignation, were you asked to provide any
23  legal opinions on the legality of this request
24  to -- I'm not asking what your opinions were, the
25  were you asked to provide any opinions on the

1  legality of requesting 1,200 state employees to
2  resign?
3      **MR. JAMIESON:** The question is
4  whether you were asked to provide an opinion.
5  **A.  Me, the Department of Law, or me,**
6  **Joanne Grace?**
7  Q.  You, the Department of Law.
8      **MR. JAMIESON:** You can answer
9  whether the Department of Law was asked.
10  **A.  I do not believe the Department of Law**
11  **was asked before the initial request was made.**
12  Q.  Okay.
13  **A.  But that would have probably been above**
14  **my level, so I can't say that for sure.**
15  Q.  Okay.  But at least within the civil
16  division you're unaware of anybody asking for an
17  opinion before this memorandum went out; is that
18  correct?
19      **MR. JAMIESON:** Can you answer that
20  without invading a privilege?
21      **THE WITNESS:** I'm going to have to
22  talk to you about this.  I don't know how to --
23      **MR. JAMIESON:** So with the need
24  for a potential privilege objection, Mark, do you
25  mind if we take a moment?  We'll just -- we'll

1  leave everything up and on.  We'll just go --
2      **THE WITNESS:** Just step out for
3  one second?
4      **MR. CHOATE:** Sure.
5      **THE WITNESS:** Okay.
6      **THE REPORTER:** Off the record.
7  11:07 AM
8      (Off record.)
9  11:12 AM
10      **THE REPORTER:** We're back on
11  record.
12  **BY MR. CHOATE:**
13  Q.  Okay.  So can you answer my question?
14  **A.  Can you repeat the question, please?**
15  Q.  Okay.  My question was:  Did you --
16      **MR. CHOATE:** Lynda, give it back
17  to me again.  I'm sorry.  I want to make sure I get
18  it right.
19      **THE REPORTER:** Just a moment,
20  please.  Pending question:  But at least within the
21  civil division you're unaware of anybody asking for
22  an opinion before this memorandum went out; is that
23  correct?
24  **A.  So I'm not entirely sure about the**
25  **timing, but advice was sought from the civil**

1  **division about resignations, and advice was**
2  **provided sometime during -- you know, sometime**
3  **between the election and inauguration.**
4  **BY MR. CHOATE:**
5  Q.  And do you recall who provided that
6  advice, what attorney?  Just the name.
7      **MR. JAMIESON:** The question is:
8  Do you recall who provided it?
9  **A.  The answer --**
10      **MR. JAMIESON:** The question is:
11  Do you recall?
12  **A.  Yes, yes and no.**
13  Q.  Okay.  What do you recall -- what do
14  you recall about who was given the task or assigned
15  this job?
16  **A.  So there were various questions, and I**
17  **think they went to various people.**
18  Q.  Okay.  And was there a question -- did
19  the civil division provide an attorney opinion
20  regarding the request for resignation that was sent
21  out to state employees?
22      **MR. JAMIESON:** So did the civil
23  division provide that opinion?
24  **A.  I don't know.**
25  Q.  When you say that there is --

Exhibit AM
Page 16 of 41

Bakalar v. Dunleavy, et al.
Case No. 3:19-cv-00025 JWS

Joanne Grace
April 29, 2021

1    A.    I'm sorry.  You're asking me about
2  this, you know, sort of general request, the
3  initial general request?
4    Q.    Yes.
5    A.    I don't know.
6    Q.    Okay.  Was the civil division asked to
7  give an opinion about the specific request that
8  1,200 employees resign from the state?
9    A.    I don't know.
10    Q.    Okay.  What about the language of this
11  memorandum?
12         MR. JAMIESON: What about it?
13    A.    What about it?  Yeah.
14    Q.    Was the civil division asked to give an
15  opinion as to the drafting of this memorandum,
16  whether it complied with law?
17         MR. JAMIESON: All right.  So,
18  Mark, I think you're now seeking to invade the
19  privilege as to what questions were asked and what
20  answers were given, and basically by drilling down
21  into, you know, the questions that were asked, that
22  could imply the answers that were given.  So it
23  does -- you're beginning to invade the
24  attorney-client privilege, which we are
25  asserting --

1         MR. CHOATE: Well --
2         MR. JAMIESON: -- and I'll
3  instruct the client not to allow you to invade.
4  The basic question of was advice sought and was
5  advice given has been answered, and the general
6  timing, which this witness doesn't have a good
7  specific knowledge of, was also provided.  And
8  she's not being put up as a state witness on the
9  topic of legal opinions sought and provided in
10  connection with this episode.  So I would ask that
11  you move on now.  You've got as much as you're
12  going to get.
13    A.    Just to be clear, my job is really to
14  oversee the attorneys in the Department of Law.  I
15  really don't have this high-level interaction with
16  the governor's office or the transition team.  It's
17  not -- that wasn't my role.
18  BY MR. CHOATE:
19    Q.    Okay.  I'm going to ask if you've seen
20  this document.  I'm showing you what has been
21  marked as Exhibit 13.  Can you see this?
22    A.    Yes.
23    Q.    Okay.  This is apparently a template
24  that was sent out to the affected state employees
25  with a suggested format for their resignation

1  letters.  Do you know whether the Department of Law
2  was consulted about the drafting of -- the language
3  in this template?
4    A.    I don't know.
5    Q.    I'm going to ask you just -- let me
6  strike that.
7         Do you know how many of your
8  Department of Law employees decided to resign from
9  the state voluntarily, meaning that they resigned
10  and didn't seek reemployment or getting their old
11  positions back?
12    A.    The only person I can think of was the
13  special assistant, but I don't recall that there
14  was anyone else.
15    Q.    And who was the special assistant?
16    A.    Alex?  I can't remember his name.
17    Q.    Okay.
18    A.    Yeah.  Sorry.  I didn't refresh my
19  memory about that.
20    Q.    Okay.
21    A.    I could confirm it if you knew it.
22    Q.    Okay.  Did you have any role in
23  reviewing the resignation letters from Department
24  of Law employees?
25    A.    In reviewing the letters?  No.

1    Q.    Right.
2    A.    No.
3    Q.    Did you have any role in deciding which
4  Department of Law employee resignations would be
5  accepted --
6    A.    No.
7    Q.    -- and they not be reoffered positions?
8    A.    No.
9    Q.    Let's see if I can find the right one
10  here.  I wonder if -- let me see if I can get this
11  to you here.
12         Did you have any conversations
13  with the people you supervised as to the content
14  they should include in their resignation letters?
15    A.    I probably suggested to people that
16  they follow the template.
17    Q.    Okay.
18    A.    When I say "probably," I mean I
19  certainly did.
20    Q.    Okay.
21    A.    But there may have also been more
22  in-depth conversations that I don't recall.
23    Q.    And can you identify for me as to how
24  this template, the language in this template, would
25  identify or act as a way for the new administration

Bakalar v. Dunleavy, et al.
Case No. 3:19-cv-00025 JWS

Joanne Grace
April 29, 2021

Page 65

1  to determine the willingness of the employee to
2  somehow confirm that they are on board with the new
3  administration's policies?
4          MR. JAMIESON: Object to form.
5  This is well beyond the scope of what she's put up
6  for. You're asking for her personal views, and if
7  she has them, I'll allow it. But, again, Mark,
8  you're going pretty far afield.
9      Q.   What about that template would give the
10  new administration any information about the
11  employee's understanding of the administration's
12  policies and desire to somehow work with them in a
13  way that was different than they had worked for the
14  state before this administration?
15          MR. JAMIESON: Same objection.
16          MR. CHOATE: That's fine.
17      A.   In the context of the previous memo
18  that was sent explaining the reasons for the
19  resignation letter, I think the sentence that says,
20  "I'm submitting my name for consideration for the
21  current position" was understood by people to mean
22  that, yup, they want to continue to work for the
23  new administration.
24  BY MR. CHOATE:
25      Q.   I'm going to ask you if you've ever

Page 66

1  seen this letter here. We'll mark it as 27.
2          (Exhibit 27 duly marked.)
3  BY MR. CHOATE:
4      Q.   And this is a letter by a senior
5  assistant district attorney in Anchorage, James
6  Fayette. Do you know Mr. Fayette?
7      A.   He's in the criminal -- he's in the
8  criminal division, or at least he was in the
9  criminal division, so I don't really know him. I
10  know a little -- a couple things about him.
11      Q.   Okay. Were you ever -- did you ever
12  see this letter during the Dunleavy transition?
13      A.   No.
14      Q.   Let me show you another one. Maybe
15  you'll recognize this one here.
16          (Exhibit 28 duly marked.)
17  BY MR. CHOATE:
18      Q.   Okay. This is marked as 28, and is
19  this your resignation letter?
20      A.   This is mine?
21      Q.   Uh-huh.
22      A.   Oh. (Reading.) I guess I've seen it,
23  then.
24      Q.   I hope you have. Otherwise --
25      A.   I haven't looked at it -- I haven't

Page 67

1  looked at it for a while.
2      Q.   Let's just go through this letter that
3  you sent here. The first paragraph basically says
4  that you're submitting this notice in regards to a
5  memorandum from Transition Chair Tuckerman Babcock,
6  and you understand that the resignation is
7  effective "only upon receiving notice from you or a
8  new Attorney General"; is that right?
9      A.   Yes.
10      Q.   And then you ask that they consider
11  continuing your employment as director, and you go
12  through the fact that you have a 27-year career
13  with the Department of Law as an attorney, section
14  chief, and division director, that you manage and
15  coordinate the legal work of attorneys,
16  paraprofessionals, and support staff in seven
17  offices, as well as managing other aspects of the
18  day-to-day operations of the civil division. You
19  found your job duties to be complex and challenging
20  yet professionally rewarding. You believe your
21  experience and legal skills will continue to serve
22  the people of Alaska well. Your knowledge of the
23  people and procedures in the Department of Law,
24  other executive branch offices, and the various
25  courts that serve Alaska will benefit the new

Page 68

1  administration in governing the state and
2  implementing its vision for Alaska.
3          Is there anything in this letter
4  which -- and you do say -- sorry. You do say at
5  the end of it "I hope they'll continue" -- you hope
6  to continue serving the state in your current
7  position and hope your resignation is not accepted.
8          Do you believe the language in
9  this letter was professional?
10      A.   Yes.
11      Q.   Prior to the request for resignation
12  sent out by Mr. Babcock, have you ever dealt with
13  concerns regarding Libby Bakalar's social media
14  presence?
15      A.   Yes.
16      Q.   And do you recall -- let me see if I
17  can find it here. One second. I'm sorry. Do you
18  recall -- I'm just going to have to do a search.
19  One second.
20          MR. CHOATE: Let's just go off the
21  record one second, Lynda, while I find what I'm
22  looking for here.
23          THE REPORTER: Off the record.
24  11:28 AM
25          (Off record.)

Exhibit AM
Page 18 of 41

Bakalar v. Dunleavy, et al.
Case No. 3:19-cv-00025 JWS

Joanne Grace
April 29, 2021

1  11:31 AM
2          THE REPORTER: We're back on
3  record.
4          (Exhibit 29 duly marked.)
5  BY MR. CHOATE:
6      Q.  Ms. Grace, I've shown to you what is
7  marked as Exhibit 29.  This is a March 16, 2017,
8  letter to James Cantor from William Evans.  Have
9  you seen this before?
10     A.  Yes.
11     Q.  Okay.  And were you aware of the
12 letter -- were you aware of the request made to
13 investigate Ms. Bakalar's social media presence in
14 2017?
15     A.  Yes.
16     Q.  Okay.  How did you become aware of it?
17     A.  From Libby and possibly from an e-mail
18 she sent.  Also she told me.
19     Q.  Okay.  So you learned it from Libby, as
20 opposed to somebody in the administration or higher
21 up in the Attorney General's office?
22     A.  I learned it from Libby for sure.  I
23 don't know if I was also on -- no, I think -- I
24 think the first time I knew about it was from
25 Libby.

1      Q.  After Libby told you about this, did
2  you talk to anybody else in the department about
3  the investigation?
4      A.  I would say it was a general topic,
5  particularly because Libby was very, very upset
6  about it and brought it up a lot and wanted to talk
7  to people about it a lot.
8      Q.  What was -- what did Libby tell you she
9  was upset about?
10     A.  Well, I think there's an e-mail that --
11 she either copied me or sent me the e-mails that
12 she wrote when -- after she was told that the
13 investigation was being done.  And she also copied
14 me on e-mails about one of the complainants, Nancy
15 Stroup, and copied me on her responses to the
16 Attorney General and the deputy attorney general
17 and the director and her supervisor, and so all of
18 her expressions in those things I was aware of.
19     Q.  As I understand it, then, you were --
20 because Libby copied you or Libby talked to you,
21 you were aware of this investigation, but you
22 weren't -- you were not part of the decision-making
23 process to begin an investigation; is that correct?
24     A.  Correct.  Correct.
25     Q.  And in your -- and who is Mr. Cantor,

1  who this letter is addressed to?
2      A.  He was the deputy attorney general --
3      Q.  Okay.
4      A.  -- at the time.
5      Q.  And do you know or did you ever learn
6  what precipitated the investigation into
7  Ms. Bakalar?
8      A.  Yes.  She -- in one of her e-mails that
9  she sent about the investigation, she identified
10 the source of the investigation as a citizen, which
11 I believe was Nancy Stroup because she had sent me
12 that complaint, or somebody had sent me that
13 complaint, and a couple of legislators who I know
14 to be -- I know who they are.
15     Q.  Okay.  And Ms. Stroup -- are you aware
16 that Ms. Stroup had targeted Ms. Bakalar in her
17 blog, saying that Ms. Bakalar should not be working
18 for the State of Alaska because of her political
19 beliefs?
20          MR. JAMIESON: I'll object to the
21 form.  You're characterizing what Ms. Stroup was
22 saying, and you are probably inappropriately or
23 incorrectly characterizing it.
24          But you can answer the question.
25     A.  So I saw the complaint that she wrote.

1      Q.  Uh-huh.
2      A.  And I saw that in that complaint she
3  had, I would say, two major concerns.  One was that
4  it seemed that Libby was using state time and
5  resources to post social media things or blogs, and
6  the second was that Libby had declared that she
7  didn't want to have anything to do with anyone who
8  voted for Donald Trump, and that Ms. Stroup didn't
9  see how Libby could represent the interests of the
10 citizens of Alaska, the majority of whom had voted
11 for Donald Trump.  And she expressed concern that
12 the top election attorney for the state could
13 perform her job in a fair and impartial way when
14 she was posting these kinds of things.
15     Q.  And Ms. Stroup is a Republican; is that
16 right?
17     A.  I have no idea.
18     Q.  You're not familiar with her writings
19 about politics and her views on government and
20 elections?
21     A.  I'm only aware of the things that Libby
22 said about her in the e-mails that she sent.
23     Q.  Did you at some point receive a copy --
24 sometime in March, let's say, of 2017, did you
25 receive a copy of Mr. Evans' letter that's marked

Bakalar v. Dunleavy, et al.
Case No. 3:19-cv-00025 JWS

Joanne Grace
April 29, 2021

Page 73

1 here as Exhibit 29?
2    **A.    I did.**
3    Q.    Okay.  And did you understand that
4 Mr. Evans had -- his conclusions were that her blog
5 took place predominantly on her own time and would
6 appear to be a protected activity?
7    **A.    Yes.  I'm aware of the two complaints**
8 **that Ms. Stroup made.  The investigation only**
9 **related to one of them.**
10    Q.    I'm going to show you now what we'll
11 mark as No. 30.
12                (Exhibit 30 duly marked.)
13 BY MR. CHOATE:
14    Q.    And this is an e-mail chain that
15 involves -- you're cc'd on it, and I think we can
16 go to the beginning of it, which is on the second
17 page, page 2 of Exhibit 30.  And this is an e-mail
18 from Chad Hutchison, who was the attorney for the
19 Senate majority.  So he's an attorney for that
20 Republican -- it was a Republican majority here in
21 Juneau for the Senate, and he complained about
22 Ms. Bakalar's speech in her blog, "One Hot Mess."
23 Do you see that?
24    **A.    I'm not sure how to get to the second**
25 **page.**

1                **MR. JAMIESON:** Oh, you have to
2 press the down button, arrow.
3                **THE WITNESS:** Oh, right here?
4                **MR. JAMIESON:** Oh, yeah.  You can
5 do that.
6                **THE WITNESS:** Okay.
7                **MR. JAMIESON:** No, I guess you
8 can't.  You have to get -- oh, boy.  This guy here.
9                **THE WITNESS:** Oh, got you.  Okay.
10    **A.    (Reading.)  Sorry.  Am I on page 2 now?**
11                **MR. JAMIESON:** So, Mark, it's a
12 good thing I'm in the same room.
13    **A.    Oh, it is, because he's like a**
14 **technical wiz compared to me.  All right.  So**
15 **I'm --**
16    Q.    It's so cool to consider Brewster --
17    **A.    It's a low bar.**
18    Q.    -- a technical wiz.  I just -- that's
19 really neat.
20    **A.    What did I just do?  I just went back**
21 **to the other one.  All right.  I'm sorry.  Hold on.**
22 **Give me a second.  Okay.  Now I'm on the second**
23 **page.**
24    Q.    And you see at the bottom there is an
25 e-mail from Chad Hutchison --

1    **A.    Right.**
2    Q.    -- who I'll represent to you was the
3 attorney for the Senate majority, so for the
4 Republican majority, and he sent this letter to
5 Cori Mills.  And do you know who Cori Mills is?
6    **A.    I do.**
7    Q.    Who is he -- or she?  She.
8    **A.    It's a she.**
9    Q.    That's right.  I keep -- you told me
10 that earlier.
11    **A.    Right.  She's now the deputy attorney**
12 **general.  At the time she was our legislative**
13 **liaison and our press person.**
14    Q.    Okay.  And then looking at the first
15 page --
16                **MR. JAMIESON:** You mean page 1, or
17 do you mean --
18                **MR. CHOATE:** Page 1.  Page 1 of
19 Exhibit 30.
20                **MR. JAMIESON:** Okay.
21    **A.    Okay.  Got it.**
22 BY MR. CHOATE:
23    Q.    On October 8th Cori Mills wrote, "Just
24 so you all have it, here is the revised draft of
25 the social media policy.  This policy is focused

1 more on state use of social media, not personal
2 use.  When it comes to personal use of social
3 media, it is fraught with pitfalls, and putting a
4 firm policy in writing telling employees what they
5 can do on their personal time has a tendency to be
6 viewed by the courts as overbroad and as an
7 infringement on First Amendment rights.  This
8 doesn't mean you can't discipline attorneys, but
9 you have to show a strong nexus to their work.
10                "These issues seem to be coming up
11 in a number of departments.  DPS is also working on
12 a policy for personal use of social media."
13                And she finishes, "In the end,
14 this is a really a question of off-duty conduct and
15 how and when it can be related to your employment.
16 This is really a Division of Personnel question.
17 I'm wondering if there should be guidance from the
18 Division of Personnel and Law to all departments on
19 this."
20                Do you recall receiving this?
21    **A.    Yes.**
22    Q.    Do you recall seeing a revised draft of
23 social media policy at this time period?
24    **A.    So this was the -- I think she was**
25 **referring to the State of Alaska policy, not the**

Bakalar v. Dunleavy, et al.
Case No. 3:19-cv-00025 JWS

Joanne Grace
April 29, 2021

1  Department of Law policy, and it looks like it was
2  maybe attached to the e-mail. I can't --
3     Q.   I just haven't seen this. Do you
4  recall seeing a social media policy, a draft of
5  social media policy?
6     A.   It looks like it was attached to this
7  e-mail --
8     Q.   Okay.
9     A.   -- but it was not -- as she said, it
10 was more a policy about state -- the state using
11 social media, in other words, the Department of
12 Public Safety having a Facebook account or the
13 governor's office having a Facebook account and,
14 you know, the things they can and can't do related
15 to that. This really wasn't about individuals' use
16 of social media. I think that's what she's saying.
17 And I do think -- I don't know, but I think
18 probably, if you go to the Department of
19 Administration, you'll maybe find a social media --
20 a statewide social media policy.
21    Q.   Okay.
22    A.   Or maybe it's not public. I don't
23 know.
24    Q.   Then right above this e-mail on page 1
25 of Exhibit 30, there is an e-mail from Jahna

1  Lindemuth again to Cori Mills, and you're cc'd
2  along with Mr. Sniffen and Ms. Hafner. And it
3  says, "Re: More Bakalar Issues - For AG. Thanks.
4  Let's ask DOP" -- that would be the Division of
5  Personnel -- "whether an employee can be fired for
6  political speech outside work that is contrary to
7  politics of administration. Libby may become the
8  example, so good to know answer sooner than later.
9  If so, this info should go to employees so they can
10 make informed decisions. Or if they can't, it
11 might be good to get policy or FAQs out before
12 election."
13         Do you recall receiving this?
14    A.   Yes.
15    Q.   And do you know, why is it that --
16 strike that.
17         Do you know whether or not the
18 Division of Personnel was ever asked to provide an
19 opinion as to whether employees could be fired for
20 political speech outside of work that is contrary
21 to the politics of the administration?
22    A.   I don't think that we ever did because
23 I think Janell's response above is a legal
24 question, and the Division of Personnel is just
25 going to ask us.

1     Q.   Okay. So Janell says, "Jahna, I agree
2  we want to know the parameters surrounding this
3  issue, though I think the concerns you've flagged
4  will likely require more legal analysis from us at
5  Law re what can theoretically happen and what the
6  recourse might be, rather than anything from DOP,
7  which would probably kick this type of inquiry back
8  to us anyhow. If that's okay, I'll reach out to Ed
9  and Joanne and share my thoughts on this in person
10 and figure out the best way to get what you're
11 looking for."
12         So did Janell Hafner reach out to
13 you and Mr. Sniffen regarding developing or
14 articulating a policy as to whether or not
15 employees could be fired for political speech
16 outside work that is contrary to the politics of
17 the administration?
18    A.   I don't remember. I just don't
19 remember.
20    Q.   Okay. Do you recall ever -- there ever
21 being a document, a writing in which you saw -- you
22 participated in or saw that said, "Department of
23 Law employees can be fired for political speech
24 outside of work that is contrary to the politics of
25 the administration"?

1     A.   So I think there was a group of us who
2  tried to develop a policy, but it wasn't about --
3  it wasn't about whether someone could be fired for
4  political speech that was contrary to the politics
5  of the administration. I think the way Jahna
6  framed that was not actually the question that we
7  were looking for. It was whether we could develop
8  a policy about outside political speech that
9  related to what was acceptable and not acceptable,
10 given the functions of your job.
11         And we weren't successful in doing
12 that because it's so fact-specific that it turned
13 out to be -- it would turn out to be a legal memo
14 of all the things you would consider to determine
15 whether outside political speech or -- it wasn't
16 just political speech -- outside speech, social
17 media activities, I guess, were acceptable or not.
18 It was just not a meaningful policy. It was more
19 like, "Here's the particular five-part weighing
20 task," kind of -- something more like that. And it
21 really depended on the job.
22         So, for example, the criminal
23 division wanted -- you know, might have more
24 restrictive limitations than the civil division
25 would because they have had people who put things

Exhibit AM
Page 21 of 41

Bakalar v. Dunleavy, et al.
Case No. 3:19-cv-00025 JWS

Joanne Grace
April 29, 2021

1 that are racist or, you know, problematic on social
2 media that impacts their ability to prosecute, to,
3 you know, appropriately do the job of a prosecutor.
4     In the civil division, it just
5 depends so much on each job that it just became
6 this sort of factual application of the facts to
7 law, and that's not a meaningful policy. It would
8 just turn out to be like "Consider what your job is
9 and the impact of what you're doing on your job and
10 your clients and use good judgment." And so I
11 don't think we ever ended up with anything.
12     Q.   Did you ever produce anything in
13 writing that would be advisory to Department of Law
14 employees as to how they should -- what they should
15 consider in using social media in their personal
16 life?
17     A.   No.
18     Q.   Were any of the communications by this
19 group that you've described -- were any of those,
20 where you discussed this back and forth -- did any
21 of that go into writing where there were e-mails or
22 a draft -- efforts to create drafts of a policy or
23 a process, you know, an advisory? Let's call it an
24 advisory.
25     A.   I think there might have been, and it

1 might have been the criminal division that was
2 really primarily working on that. We were trying
3 to do one that could be department-wide, but I
4 don't know if we -- I just don't recall if we ever
5 got anything in there that was -- that went beyond
6 the criminal division.
7     Q.   Did you believe or -- strike that.
8         Was there a belief among
9 yourselves -- you, Jahna Lindemuth, and Janell
10 Hafner -- that Libby Bakalar might be fired or
11 discharged for her speech by the Dunleavy
12 administration if he was elected?
13     A.   There was general concern that Libby's
14 actions were negatively impacting her ability to do
15 the job, were becoming more and more concerning for
16 the legislature, for the administration, for the
17 department, for the Division of Elections, for the
18 public; and that as the complaints came in, she,
19 instead of taking them to heart, became more
20 adamant and more defiant and seemed to accelerate
21 rather than -- rather than pull back.
22         And so I think that there was
23 alarm. We were alarmed by what she was doing. We
24 were concerned by what she was doing. And, I mean,
25 when this investigation was going on, we were

1 concerned that she was going to be disciplined by
2 this administration. It wasn't just -- it didn't
3 really have to do with the Dunleavy administration;
4 it had to do with her kind of self-destructive
5 actions that seemed to be getting more -- to be
6 more and more and more important to her.
7     Q.   So can you point out -- I mean, we've
8 got -- we've asked for lots of discovery from the
9 state in this case, but can you point out any
10 writing in which you wrote to Libby Bakalar and put
11 on sort of the record, "Libby, I have concerns" or
12 "we have concerns regarding your personal political
13 speech and what you're saying in your blog, and we
14 want to admonish you or warn you that you might
15 lose your job or might face dismissal because of
16 your speech"?
17     A.   No, because -- for several reasons.
18 One is this was very important to Libby. She was
19 very -- she repeatedly said, "I don't care what
20 they do to me, I'm never going to stop." Number
21 two, she's an attorney herself who claims to be an
22 expert in the First Amendment. Three, she had her
23 own attorney, Mr. Sheehan, representing her in
24 these matters. And, four, we were not -- we didn't
25 want her to get in trouble.

1         We were hoping that it wouldn't
2 happen, and these complaints and the concerns about
3 her behavior were being handled at the highest
4 level, by the Attorney General. So, no, nobody was
5 going to step in between -- you know, get out in
6 front of the Attorney General and say, "Libby, stop
7 doing this."
8     Q.   Well, I mean, I have to say I'm trying
9 to look for where her friends were. Her
10 professional friends and lawyers were in giving --
11 putting in writing in any place, you know, "Libby,
12 you are facing a risk of adverse job consequences.
13 You could get fired because of your outspoken
14 political speech mainly about Donald Trump." Was
15 that in writing to anybody? Did you ever see that
16 in writing to her?
17     A.   I wouldn't write that to somebody,
18 number one. Number two, Libby understood that.
19 Every time there was a complaint, she would say, "I
20 don't care what they do to me. I'm not going to
21 stop." She would become more determined to do
22 this, not less determined.
23         And so, you know, I would say that
24 we all believed that she understood that her
25 behavior was becoming more and more reckless, and

Bakalar v. Dunleavy, et al.
Case No. 3:19-cv-00025 JWS

Joanne Grace
April 29, 2021

1 that that was not what was important to -- that it
2 was more important to her to be able to speak out
3 in whatever way she wanted, no matter how extreme,
4 no matter how vulgar, that was her right, and that
5 she understood that that was problematic because of
6 the complaints that came in, and that it was more
7 important for her to continue to do those things
8 than to worry about her job.
9         There were two sides of the coin,
10 and it seemed very clear to me, anyway, that she
11 was making -- she was assessing the risk and making
12 her decision. It's not like she was some
13 uninformed person who just couldn't understand the
14 consequences of her actions. She was the elections
15 attorney. It was her client that -- whose entire
16 foundational principle is to be nonpartisan and to
17 make sure that the public sees you as a fair and
18 impartial organization. Nobody needed to tell
19 Libby that.
20    Q.    Well, I understand that's your opinion,
21 but do you believe that maybe Libby thought that
22 even as a state employee and even as a member of
23 the Department of Law, that she had a right to
24 express her political views in private and that
25 that right would be protected, not only by the

1 Constitution, but by people like you with your
2 education and your 30 years of state government,
3 that you would make sure that your employees'
4 political speech was protected?
5         MR. JAMIESON: So you qualified
6 the statement by "political beliefs in private."
7 Are you including -- are you including her
8 political media posts in that?
9    Q.    By that I mean that -- her social media
10 post was never made as a state -- as a state
11 employee; right? It was always her private, her
12 personal social media; correct?
13    A.    They were public -- they were public --
14 they were published public statements.
15    Q.    Yeah.
16    A.    She -- they were not private. She
17 didn't -- she doesn't put privacy things on her
18 social media. Her goal was always to get more
19 views, more -- that was part of her, I think,
20 desire to do this, was get national attention, to
21 get more and more attention, number one.
22         Number two, I don't know what you
23 mean by wasn't it my obligation to protect her
24 right. I didn't have any opportunity to protect --
25 to quote, unquote protect her right, even assuming

1 that I thought she had that right.
2    Q.    Well, I understand that you apparently
3 don't believe that she had a right to this speech,
4 and I think -- and I have to say --
5    A.    I don't. I disagree with that. I
6 don't -- I'm not saying she doesn't have the right
7 to that speech. She absolutely has the right to
8 publish and say whatever she wants about anybody,
9 but that wasn't compatible with the position that
10 she held.
11    Q.    Why not change her position, then? If
12 you didn't think she was -- she should give that
13 speech as the elections attorney, why not move her
14 into another department where, as you say, it was
15 not as partisan?
16    A.    This, again, was being handled by the
17 Attorney General. The Attorney General did not
18 think, apparently, that she needed to be moved from
19 her position. I wasn't going to move her from her
20 position.
21    Q.    Okay.
22    A.    And, you know, nor was there an
23 opportunity to do that.
24    Q.    I'm going to show you what's been
25 marked as Exhibit 15. And this is a color-coded

1 spreadsheet. It doesn't have -- it doesn't have
2 1,200 names on it, but it does have 805. And I
3 would ask you if you've ever seen this spreadsheet
4 before.
5    A.    (Reading.) I don't think I've seen
6 this spreadsheet. I have seen a spreadsheet, but
7 it doesn't look like this.
8    Q.    What does the spreadsheet that you saw
9 look like?
10         MR. JAMIESON: Well, wait a
11 second. So if you were shown the spreadsheet as
12 part of your involvement in the control group of
13 this lawsuit, I mean, you should distinguish -- we
14 should distinguish when she saw a spreadsheet --
15         MR. CHOATE: Okay.
16         MR. JAMIESON: -- because in
17 regards to --
18         MR. CHOATE: That's fine.
19 BY MR. CHOATE:
20    Q.    Do you recall seeing a spreadsheet
21 during the Dunleavy transition which identified
22 employees to whom e-mails had been sent requiring
23 them to resign on threat of losing their jobs?
24    A.    I might have. I might have. It's
25 possible that someone showed it to me. It wouldn't

Bakalar v. Dunleavy, et al.
Case No. 3:19-cv-00025 JWS

Joanne Grace
April 29, 2021

1  have been something that was given to me as part of
2  my duties.
3       Q.   Okay.  I'm going to show you what's
4  been marked as Exhibit 16.  And this is the -- I'll
5  represent to you is a letter from Libby Bakalar to
6  Jahna Lindemuth.  And I'm going to ask you
7  specifically about the first paragraph where she
8  says, "Per the November 16, 2018, request of
9  Transition Chair Tuckerman Babcock, please accept
10 this letter as notice of my resignation from my
11 position as assistant attorney general in the Labor
12 and State Affairs section of the Department of Law.
13 My resignation is not voluntary, but is instead
14 being made at the request of Mr. Babcock, who has
15 indicated that if I do not submit my resignation as
16 requested my employment will be terminated.  I
17 would like to continue serving the State of Alaska
18 in the new Governor Dunleavy administration in my
19 current position and hope that my resignation is
20 not accepted."
21           Is there anything about the
22 language in that paragraph that you believe is
23 unprofessional?
24      A.   (Reading.)  No.  I don't know.
25      Q.   It's not, is it?

1       A.   I wouldn't call it unprofessional.
2       Q.   It's not offensive, is it?
3       A.   No.
4       Q.   Okay.  Then on the second page, if you
5  look at page 2, underneath a description of the
6  various things that she had done and worked in, she
7  goes, "To clarify, I am submitting this notice in
8  response to the November 16, 2018, mass e-mail
9  memorandum from Mr. Babcock seeking my and other
10 similarly situated state employees' resignations.
11 I understand this resignation is only effective
12 upon receiving notice from you or a new Attorney
13 General, and in no event will it be effective
14 earlier than December 3, 2018, at noon."
15           This is very much like the
16 language in everyone else's resignations; right?
17      A.   I don't know that I know what the
18 language in everyone else's resignation was, but it
19 doesn't seem unusual to me.
20      Q.   And that's not unprofessional, is it?
21      A.   No.
22      Q.   Are you aware -- did you ever talk to
23 Tuckerman Babcock about these -- about Libby's
24 resignation letter, about Libby's position as an
25 attorney general with the State of Alaska?

1       A.   I have never talked to Tuckerman
2  Babcock at all.
3       Q.   Okay.  So during the time period when
4  the transition was going on, did you -- were you
5  ever informed that Tuckerman Babcock believed that
6  the language in this letter was so offensive that
7  Libby Bakalar should be -- not be retained by the
8  State of Alaska or not reemployed?
9       A.   Was I -- sorry.  Was I ever informed?
10      Q.   Right.
11      A.   No.
12      Q.   Were you ever informed that Tuckerman
13 Babcock's sole reason for discharging Libby Bakalar
14 from her job, what he said, is because of the
15 language of this letter?
16           MR. JAMIESON: Well, hang on.  So
17 can you distinguish in time?  Because, again, she
18 at times has been in the control group of this
19 litigation, and I want to distinguish what she
20 might have heard during the transition or shortly
21 thereafter and before the litigation, from during
22 the litigation.
23      Q.   Well, let me just rephrase that, then.
24 Are you aware that when Tuckerman Babcock's
25 deposition was taken last week, he testified that

1  the only reason Ms. Bakalar was discharged was
2  because of the offensive nature of the language in
3  this letter?
4           MR. JAMIESON: And let me object
5  to the form.  It mischaracterizes his testimony,
6  which was considerably longer than that.  But
7  anyway, I guess the question is:  Were you informed
8  of the substance of his testimony last week?  Is
9  that what you're asking, Mark?
10          MR. CHOATE: I asked her whether
11 she was aware that he testified that the reason he
12 terminated Libby -- he thought Libby Bakalar -- or
13 decided to terminate her was because of the
14 language in this letter.
15          MR. JAMIESON: So if she learned
16 that from me, the answer -- or from one of my
17 colleagues, I'm not going to allow her to answer.
18 You know, I think that you -- you know, we do
19 have -- why don't you ask it from a relative time
20 period that is not going to be -- is not going to
21 draw a privilege objection from me.
22 BY MR. CHOATE:
23      Q.   During the transition, did you ever
24 hear from anybody the reasons why Libby Bakalar's
25 resignation was accepted and she was not rehired?

Exhibit AM
Page 24 of 41

Bakalar v. Dunleavy, et al.
Case No. 3:19-cv-00025 JWS

Joanne Grace
April 29, 2021

Page 93

1    A.    No.
2    Q.    Are you aware of Libby Bakalar, during
3  the time period that she was working for the State
4  of Alaska Department of Law, ever receiving
5  anything other than a good or excellent evaluation
6  in her annual performance evaluations?
7    A.    No.
8    Q.    We talked about the areas in the
9  30(b)(6) that you'll be discussing, and one of the
10  ones that Mr. -- that has been identified was
11  performance.  Did you believe that there were
12  performance reasons why Libby Bakalar should be
13  dismissed from the Department of Law in November of
14  2018?
15    A.    I did not want Libby Bakalar to be
16  dismissed in 2018.  I think that there were -- I
17  don't know if "performance" issues is the right
18  word because I think she performed the functions of
19  her job well, but I do think that to the extent
20  that her outside social media activities impacted
21  her ability to appropriately do her job, that that
22  could have been a reason.
23    Q.    Are you aware of whether or not her
24  outside social media -- other than drawing
25  complaints from conservative Republicans, which

Page 94

1  I'll say is the people that were complaining about
2  her, are you aware of whether or not Ms. Bakalar's
3  outside political activities and speech affected
4  her ability to do her job?
5          MR. JAMIESON: A, it's asked and
6  answered.  B, I'm going to object to form as you're
7  characterizing everybody who made a complaint is a
8  conservative Republican.  But, anyway, go ahead.
9    A.    Yeah.  Yeah.  Here's what I would say
10  about that.  People in the Department of Law who
11  work on elections matters are very aware of the
12  critical importance that the Division of Elections
13  administer elections in a very fair and impartial,
14  nonpartisan way.  And the reason for that is
15  because elections are essentially the
16  foundational -- the foundation of our system of
17  government, and that they only can work if the
18  public trusts in the integrity of the election.  I
19  think the 2020 election is a good example of how
20  fragile that can be.  People need to believe that
21  the election process is fair.
22          And so in the -- and it's -- yeah,
23  it's critically important to the parties and the
24  political interests involved.  Whether they're
25  Republican or Democrat, they need to believe that

Page 95

1  the Division of Elections is operating in a
2  nonpartisan way, and the stakes are really high.
3          And in the Department of Law we
4  have one position that's designated the election
5  attorney position, and that was the position that
6  Libby had.  But every election cycle, every two
7  years, the work becomes too much for one person,
8  and so we have a team of attorneys who are
9  available to answer questions on election day, help
10  with the issues that come up prior to the election,
11  and help with the litigation that inevitably arises
12  during the election cycle, which sometimes can be
13  pretty heavy.
14          So there's a team of people in the
15  Department of Law, along with the elections
16  attorney, who work on elections.  And we all have
17  known and have been told and understand for years
18  and years and years, because I was on that team,
19  that if you want to work on election matters, then
20  you have to -- the Division of Elections, as you,
21  I'm sure, know, have really stringent limitations
22  on their public political activities.  And the
23  Department of Law attorneys who wanted to work on
24  those things obviously didn't have the same exact
25  prohibitions, but we all understood that if you

Page 96

1  want to work on these things, then you're better
2  off not registering with a political party, not
3  involving yourself in party activities, not
4  donating to political candidates, not having
5  fundraisers, not putting bumper stickers on your
6  car, because all of those things impact your
7  ability to adequately represent the Division of
8  Elections.  And Libby also seemed to understand
9  that and follow those rules, I would say, until --
10  maybe until Donald Trump started running for
11  office.
12          But it's not really -- it really
13  doesn't matter whether the people complaining were
14  Republicans.  They were Republicans because her
15  postings were about Republicans, and they were
16  initially primarily about Donald Trump, and they
17  were very extreme and hostile.  But eventually they
18  became also about his cabinet members, members of
19  Congress, judicial nominees, and even some state
20  people.
21          And so that makes it very hard for
22  people who care about the values and agendas of
23  maybe more conservative people to have faith that
24  the attorney who is advising the Division of
25  Elections in every aspect of the elections,

Exhibit AM
Page 25 of 41

Bakalar v. Dunleavy, et al.
Case No. 3:19-cv-00025 JWS

Joanne Grace
April 29, 2021

1 including which ballots to count, how things should
2 appear on the ballots, what summary should go into
3 the election pamphlets, is going to give them a
4 fair shake.
5        And, again, I would just look at
6 the 2020 election. Election officials who were
7 doing nothing but their job in a fair and impartial
8 way were deeply criticized and even threatened.
9 And, I mean, imagine if you had somebody advising
10 those election agencies who was very publicly
11 critical of people running in those elections.
12   Q.   Can you identify one instance where
13 Libby's advice in the elections process was
14 identified as being partisan or designed to
15 accomplish or assist in a partisan way?
16        MR. JAMIESON: Asked and answered,
17 but go ahead.
18   Q.   One instance.
19   A.   That's not my point.
20   Q.   Well, I --
21   A.   My point is that the Division of
22 Elections -- it is critically important for them to
23 maintain both the reality and the perception of
24 being very fair and very impartial. And so the
25 person who is advising them how to administer the

1 election, if that person isn't -- is very openly
2 hostile and vulgar and partisan, then the public is
3 not going to trust that the administration of the
4 election is unbiased.
5   Q.   And I understand that's the defense in
6 this case, but my question is: Isn't it true,
7 Ms. Grace, that the 2020 election was challenged
8 over the perception that it was unfair throughout
9 the country. It's going on right now in Arizona
10 where they're recounting -- they're recounting
11 ballots. But the reality is, every objective --
12 all the objective evidence is that that was nothing
13 but a lie. That was a -- that was something
14 created by a number of politicians, including the
15 former president, and that was a lie about the
16 election system, irrespective of whether people
17 were political partisans or not.
18        MR. JAMIESON: Mark, maybe we
19 should take a breath. I mean, that is your view.
20 I understand that's your view.
21        MR. CHOATE: That's not my view;
22 that is a reality that has been demonstrated by
23 every court case in this country.
24   A.   But, I mean, I would like to respond to
25 that.

1 BY MR. CHOATE:
2   Q.   Sure.
3   A.   And I would say I don't disagree with
4 you about that, but it shows how fragile public
5 trust is in the election process, even when it's
6 done in an obviously fair and impartial way by
7 people who are not taking very public stances that
8 show -- that show bias one way or the other, and
9 that it's -- I mean, look what happened. I mean,
10 people stormed the Capitol because they thought the
11 election was rigged, and that's in a situation
12 where you, for the most part, had public officials
13 who were not publicly expressing extreme bias
14 toward one side.
15   Q.   All right. But as I take it, as I
16 understand it, Ms. Bakalar, to your knowledge, was
17 not -- the decision to not retain her was not one
18 that you participated in; is that correct?
19   A.   Absolutely not.
20   Q.   Okay. And her performance, to your
21 knowledge, other than the generalized -- this
22 generalized issue that she had these very strong
23 personal political beliefs, it didn't affect her
24 performance, to your knowledge; right? In the
25 sense of anything she did was -- strike that. I'll

1 just say -- I'll just say that. Performance.
2        MR. JAMIESON: Object. Asked and
3 answered and --
4   A.   Yeah. I mean, I don't know if you're
5 asking me -- are you asking me a different
6 question, or asking me the same question?
7   Q.   No, I'm returning to it, and I don't
8 need to do that again.
9   A.   Yeah. I mean, I would -- yeah.
10   Q.   The judge would cut me off and go, "You
11 already asked that," so that's fine.
12   A.   And, you know, to the extent that --
13 sorry.
14        MR. JAMIESON: There is no
15 question.
16   A.   I just want to say -- I was just going
17 to -- it's just an --
18        MR. JAMIESON: Go ahead and expand
19 on the question -- on your answer.
20   A.   Okay. All right. I'm just going to
21 say this. To the extent that some of the
22 complainers were Republicans in the legislature,
23 they care very, very much about the elections
24 because that's how they get their job. So, you
25 know, yeah, they were Republicans, but they get

Bakalar v. Dunleavy, et al.
Case No. 3:19-cv-00025 JWS

Joanne Grace
April 29, 2021

1  their jobs through an election, and they want
2  that -- they want to believe that that's a fair
3  process.
4      Q.  Right.  And I don't disagree.  I
5  understand that.  I agree.  I agree with you in
6  that regard.
7          I also -- I guess we could go
8  through some examples where I think this
9  administration has engaged in extreme political
10 agendas, but I don't know if that would be helpful
11 to this right now.
12         MR. JAMIESON: And that would
13 definitely bring up objections about scope, but go
14 ahead.
15         MR. CHOATE: You know, that's one
16 of the things I get to do, is I get to -- if I
17 think it's wrong, I get to do something about it.
18     Why don't we take a break here and
19 let me go through my notes.  I may be almost done.
20         MR. JAMIESON: Okay.
21         MR. CHOATE: I know I promised
22 Lynda I would be done faster than last time because
23 she's got an afternoon deposition coming up.
24         MR. JAMIESON: All right.
25         THE WITNESS: So how long?

1          MR. JAMIESON: Do you want to
2  take --
3          MR. CHOATE: Let's just take five
4  minutes.
5          THE WITNESS: Five minutes?
6          MR. JAMIESON: Five minutes?
7  Okay.
8          THE REPORTER: Off the record.
9  12:20 PM
10         (Off record.)
11 12:25 PM
12         THE REPORTER: Back on record.
13 BY MR. CHOATE:
14     Q.  I'm just going to ask you a few general
15 questions about Ruth Botstein.  And I don't intend
16 to go very far with them, but I just want to
17 confirm a few things.
18         MR. JAMIESON: Right.  And our
19 position is we're not -- we're not going to be
20 talking about a state -- a former state employee
21 who is not part of this litigation, but, you know,
22 I guess we'll see how far you really are --
23         MR. CHOATE: It's going to be very
24 limited.
25         MR. JAMIESON: Okay.

1  BY MR. CHOATE:
2      Q.  Ms. Grace, is it your understanding
3  that Ms. Botstein was also terminated during this
4  transition in November of 2018?
5      A.  Yes.
6      Q.  Okay.  Now, you had worked with
7  Ms. Botstein on a number of cases; am I correct?
8      A.  Yes.
9      Q.  Okay.  And I'm just going to just
10 identify those real quickly, or a few of them.  I
11 put your name and her name in Google and you guys
12 show up a lot.
13         The first one I'll just call to
14 your attention is a complaint filed back in the
15 U.S. District Court -- let me find this -- in the
16 District of Columbia called State of Alaska -- I
17 have to bring that up.  Let me see if I can show
18 that here.
19         (Exhibit 31 duly marked.)
20         MR. JAMIESON: So, Mark, I guess,
21 you know, I think we can stipulate that
22 Ms. Botstein and Ms. Grace worked on a number of
23 cases together.
24         MR. CHOATE: Yeah.
25         MR. JAMIESON: I don't think we --

1          MR. CHOATE: Let me just do it
2  this way.  I'll speed it up.
3  BY MR. CHOATE:
4      Q.  You worked with Ms. Botstein on a
5  number of cases together; right?
6      A.  I'm sure we worked on some cases.  I
7  don't know what the number was, but I was also her
8  supervisor.
9      Q.  Okay.  Well, I'm looking for -- I just
10 saw places where your name and her name were on
11 like Supreme Court -- U.S. Supreme Court filings,
12 taking cases to the U.S. Supreme Court.  Do you
13 recall that?
14     A.  I don't know.
15     Q.  Okay.  Well, the Voting Rights Act,
16 Alaska's participation in the Voting Rights Act
17 litigation, that was a case that you worked on with
18 her; right?
19     A.  I worked on it.  I don't really
20 remember if Ruth did.  Sorry.
21     Q.  If you don't -- if you don't remember
22 it --
23     A.  It was a long time ago.
24     Q.  If you don't remember it, that's fine.
25     A.  Yeah.  I wouldn't -- it wouldn't

Exhibit AM
Page 27 of 41

Bakalar v. Dunleavy, et al.
Case No. 3:19-cv-00025 JWS

Joanne Grace
April 29, 2021

Page 105

1 surprise me.

2 Q.  I think that's all I have.

3       **MR. JAMIESON:** All right.  Thank

4 you.  We have no questions.

5       **MR. CHOATE:** Thank you very much.

6       **THE REPORTER:** All right.  We'll

7 go off record.

8

9       (Deposition concluded at 12:28 p.m.)

10       (Signature reserved.)

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

---

Page 106

1       WITNESS CERTIFICATE

2 Re:  Bakalar v. Dunleavy, et al.
  Case No.:  3:19-cv-00025 JWS
3 Deposition of:  Joanne Grace
  Date Taken:  April 29, 2021

4
      I hereby certify that I have read the foregoing
5 deposition and accept it as true and correct, with
  the following exceptions:
6 =====================================================
  Page   Line       Description/Reason for Change
7 =====================================================

8 _____  _____     _____

9 _____  _____     _____

10 _____  _____     _____

11 _____  _____     _____

12 _____  _____     _____

13 _____  _____     _____

14 _____  _____     _____

15 _____  _____     _____

16 _____  _____     _____

17 _____  _____     _____

18 _____  _____     _____

19 _____  _____     _____

20

21 _____     _____

22 SIGNATURE                              DATE

23 Please sign your name and date it on the above line.
  As needed, use additional paper to note corrections,
24 dating and signing each page.  If you have no
  corrections, please write the word "None" above and
25 sign, date, and return this page.

---

Page 107

1       C E R T I F I C A T E

2

3 S T A T E  O F  A L A S K A    )
                                 ) ss.
4 FIRST  JUDICIAL  DISTRICT       )

5

6       I, LYNDA BARKER, Registered Diplomate Reporter
  and Notary Public duly commissioned and qualified in
7 and for the State of Alaska, do hereby certify that
  the foregoing deposition was reported stenographically
8 and thereafter reduced to typewriting by me or at my
  direction;

9
      That the deponent, before examination, was first
10 duly sworn by me to testify truthfully; and that the
  foregoing transcript is a full, true, and correct
11 transcript of the deposition, including questions,
  answers, objections, statements, motions, and exceptions
12 made and taken at the time of this deposition;

13      That all documents and/or things marked for
  identification as exhibits to the deposition have been
14 annexed to and included with the deposition, unless
  waived by the witness and the respective counsel;

15
      That I am not a relative or employee or attorney
16 or counsel of any of the parties in this case, nor
  a relative or employee of such attorney or counsel;
17 and that I am not financially interested in this
  case or the outcome thereof.

18
      IN WITNESS WHEREOF, I have set my hand and
19 affixed my Notarial Seal this 6th day of May, 2021.

20

21

22                          _Lynda Barker_

23                          _____
                              LYNDA BARKER, RDR
24                          Notary Public for Alaska
  My commission expires: 5/6/2024
25

---

**Exhibit AM**
**Page 28 of 41**

Bakalar v. Dunleavy, et al.
Case No. 3:19-cv-00025 JWS

Joanne Grace
April 29, 2021

## A

**AAGs (1)**
13:24
**ABA (1)**
14:24
**abilities (1)**
35:17
**ability (12)**
22:17;26:6,23;39:11,
19;41:2;45:2;81:2;
82:14;93:21;94:4;96:7
**able (6)**
17:17;33:23;35:16;
37:20;50:19;85:2
**above (4)**
21:16;58:13;77:24;
78:23
**absolutely (3)**
38:6;87:7;99:19
**accelerate (1)**
82:20
**accept (2)**
15:3;89:9
**acceptable (3)**
80:9,9,17
**accepted (4)**
64:5;68:7;89:20;
92:25
**accepting (1)**
43:25
**accomplish (2)**
47:24;97:15
**accomplishing (1)**
50:7
**According (1)**
52:13
**account (2)**
77:12,13
**accurate (2)**
26:16;27:19
**act (3)**
64:25;104:15,16
**acted (1)**
44:20
**action (1)**
41:3
**actions (10)**
31:1;33:15,17;39:18;
45:2,16;46:1;82:14;
83:5;85:14
**activities (3)**
80:17;93:20;94:3;
95:22;96:3
**activity (1)**
73:6
**actual (2)**
26:11;44:8
**actually (4)**
6:23;29:16;54:10;
80:6
**adamant (1)**

82:20
**address (1)**
5:14
**addressed (1)**
71:1
**adequacy (1)**
28:13
**adequately (2)**
38:2;96:7
**administer (2)**
94:13;97:25
**administered (1)**
6:4
**administration (34)**
13:17;25:6;32:15;
33:7,18;40:22;42:1;
44:4;47:20;48:10;
49:17,24;50:3,13;53:3;
64:25;65:10,14,23;
68:1;69:20;77:19;78:7,
21;79:17,25;80:5;
82:12,16;83:2,3;89:18;
98:3;101:9
**administration' (1)**
52:25
**administrations (2)**
32:18,21
**Administration's (4)**
24:22;48:25;65:3,11
**admonish (1)**
83:14
**adopted (1)**
39:21
**advance (1)**
26:22
**advancing (1)**
26:5
**adverse (1)**
84:12
**advice (6)**
59:25;60:1,6;62:4,5;
97:13
**advised (1)**
41:4
**advising (3)**
96:24;97:9,25
**advisory (3)**
81:13,23,24
**advocacy (2)**
39:13,14
**advocate (1)**
42:23
**advocating (1)**
42:22
**Affairs (1)**
89:12
**affect (3)**
41:9;51:12;99:23
**affected (9)**
34:12,19;39:25;40:9;
44:24;45:1,2;62:24;
94:3
**affecting (1)**

39:11
**affirmation (1)**
48:1
**affirmatively (1)**
52:24
**afield (1)**
65:8
**afternoon (1)**
101:23
**AG (1)**
78:3
**again (10)**
45:4;46:2;55:16;
59:17;65:7;78:1;87:16;
91:17;97:5;100:8
**against (2)**
11:6;23:3
**agencies (1)**
97:10
**agenda (3)**
32:12;49:1;53:2
**agendas (1)**
50:4;96:22;101:10
**AgileLaw (1)**
55:22
**ago (2)**
16:7;104:23
**AGOs (1)**
40:6
**agree (21)**
22:22;23:12,22,25;
24:3;25:13,15;26:9;
27:23;29:4,8,9;31:22;
33:1;37:16;38:1;49:2;
52:17;79:1;101:5,5
**agrees (2)**
26:15,18
**AGs (1)**
13:19
**AG's (1)**
36:17
**ahead (5)**
42:11;94:8;97:17;
100:18;101:14
**al (1)**
5:8
**alarm (1)**
82:23
**alarmed (1)**
82:23
**Alaska (25)**
5:14;9:1,17,24;
13:11;21:21;22:1;24:4,
21;33:6;35:8;39:12;
40:14;45:22;67:22,25;
68:2;71:18;72:10;
76:25;89:17;90:25;
91:8;93:4;103:16
**Alaska's (2)**
22:1;104:16
**Alex (1)**
63:16
**allow (4)**

25:23;62:3;65:7;
92:17
**almost (2)**
15:4;101:19
**along (3)**
26:4;78:2;95:15
**altered (2)**
43:4;44:23
**always (4)**
14:18;56:19;86:11,
18
**Amendment (2)**
76:7;83:22
**among (1)**
82:8
**analysis (1)**
79:4
**Anchorage (4)**
9:22,23;37:11;96:5
**annual (1)**
93:6
**answered (5)**
44:16;62:5;94:6;
97:16;100:3
**anticipation (1)**
8:1
**anymore (1)**
16:17
**apologies (1)**
13:6
**apparently (3)**
62:23;87:2,18
**appear (2)**
73:6;97:2
**appellate (3)**
11:19,19,25
**applicant (1)**
19:23
**applicants (12)**
16:10;17:4,11,25;
26:8,25;27:3,10,13,20;
28:18;29:2
**application (1)**
81:6
**applications (1)**
15:3
**applied (2)**
15:9;18:18
**applies (4)**
7:6;23:6;24:3;27:6
**apply (7)**
25:16;27:10;29:24,
24;30:1,2;46:14
**appoint (1)**
27:5
**appointees (3)**
30:10;32:7;52:4
**appointment (4)**
13:23;26:8,25;27:3
**appointments (1)**
32:13
**appropriate (3)**
16:21;29:23;46:9

**appropriately (2)**
81:3;93:21
**approval (2)**
14:19;15:20,22;18:9
**approve (1)**
21:16
**approved (3)**
19:23;20:19,21
**approves (1)**
15:18
**approximately (1)**
47:14
**APRIL (2)**
5:1,5
**areas (2)**
8:1;93:8
**argue (1)**
41:3
**argued (1)**
43:16
**argument (4)**
40:13;45:17;46:3,19
**argumentative (1)**
45:15
**arguments (2)**
41:18;43:13
**arises (1)**
95:11
**Arizona (1)**
98:9
**around (1)**
16:20
**arrow (1)**
74:2
**Article (4)**
21:22;23:18;47:13;
51:21
**articulating (1)**
79:14
**Arts (1)**
8:25
**aspect (1)**
96:25
**aspects (1)**
67:17
**asserting (1)**
61:25
**assessing (1)**
85:11
**assigned (1)**
60:14
**assist (1)**
97:15
**assistant (8)**
10:7;15:14;36:5;
38:7;63:13,15;66:5;
89:11
**assistants (5)**
30:1,9,9;32:22;52:11
**assisted (1)**
57:11,15
**associated (1)**
5:23

Bakalar v. Dunleavy, et al.
Case No. 3:19-cv-00025 JWS

Joanne Grace
April 29, 2021

**assumes (1)**
49:15
**assuming (1)**
86:25
**attached (2)**
77:2,6
**attempting (1)**
45:9
**attention (3)**
86:20,21;103:14
**attitude (1)**
38:21
**attorney (104)**
5:19;10:7,10,17,19;
11:2,14,20,22,23,24;
12:2,3,4,9,10,16,22;
13:7,11,21,25;14:1,2;
15:15,17,18;16:20,22;
17:25;18:2,5,7,8,14,15,
16,21;20:12;21:1,18,
20;28:6;29:24,25;30:2,
5,8,13;31:5,11,24;32:4,
6,10,18;33:8;35:7,16,
20,25;36:2,5,6;38:7,12,
14,15;40:8,25;41:23,
24;43:3,12;45:21;
47:10;60:6,19;66:5;
67:8,13;69:21;70:16,
16;71:2;72:12;73:18,
19;75:3,11;83:21,23;
84:4,6;85:15;87:13,17,
17;89:11;90:12,25;
95:5,16;96:24
**attorney-client (1)**
61:24
**attorneys (17)**
15:5;20:25;25:16;
26:20;27:4,7;28:22,23;
30:20,21;37:16,17;
62:14;67:15;76:8;95:8,
23
**attorney's (2)**
30:19;31:6
**at-will (3)**
13:25;28:22;52:23
**authored (2)**
40:7,8
**authority (3)**
11:7;21:15,18
**available (1)**
95:9
**aware (32)**
18:16;20:11;22:20;
33:19;35:15;39:9,16;
40:7,11,12,18;42:3,19;
44:8,21;57:14,16;
69:11,12,16;70:18,21;
71:15;72:21;73:7;
90:22;91:24;92:11;
93:2,23;94:2,11

**B**

**BA (1)**
9:5
**Babcock (11)**
7:2;48:5;52:20;67:5;
68:12;89:9,14;90:9,23;
91:2,5
**Babcock's (2)**
91:13,24
**Bachelor (1)**
8:25
**back (16)**
20:10;28:21;54:8,12;
55:2,4;59:10,16;63:11;
69:2;74:20;79:7;81:20;
82:21;102:12;103:14
**Bakalar (25)**
5:8,19;23:3,10;
31:17;36:8,12,13,24;
38:9;71:7,16,17;78:3;
82:10;83:10;89:5;91:7,
13;92:1,12;93:2,12,15;
99:16
**Bakalar's (8)**
39:10;42:18;43:2;
68:13;69:13;73:22;
92:24;94:2
**ballots (3)**
97:1,2;98:11
**Bar (2)**
46:1;74:17
**Barker (1)**
5:12
**based (8)**
25:8;27:22;31:8;
33:9,16;34:7;36:4;
57:16
**basic (2)**
25:6;62:4
**basically (5)**
46:5;50:14;51:5;
61:20;67:3
**basis (3)**
26:6,22;28:12
**became (8)**
11:14,19,25;12:1,7;
81:5;82:19;96:18
**become (4)**
11:22;69:16;78:7;
84:21
**becomes (3)**
41:1,17;95:7
**becoming (4)**
20:11;39:18;82:15;
84:25
**beg (1)**
30:6
**begin (1)**
70:23
**beginning (3)**
14:13;61:23;73:16
**behalf (4)**
5:7;22:7;40:13;
42:24

**behavior (2)**
84:3,25
**belief (2)**
34:20;82:8
**beliefs (28)**
33:12,15,16;34:12,
15,18,22;35:19,19,22;
38:2,5;39:10,15,17;
40:1,10,16;41:8,10,10;
43:17;44:10,24;45:1;
71:19;86:6;99:23
**below (3)**
25:3;26:2;52:21
**benefit (1)**
67:25
**best (2)**
25:9;79:10
**better (1)**
96:1
**beyond (2)**
65:5;82:5
**bias (3)**
39:13;40:17;99:8,13
**biased (2)**
17:22;40:9
**bind (1)**
8:6
**binding (1)**
22:14
**bit (3)**
16:12;20:15;43:10
**blank (2)**
28:6,7
**blog (4)**
71:17;73:4,22;83:13
**blogs (1)**
72:5
**board (4)**
49:20;50:16,25;65:2
**bonus (1)**
19:3
**boss (1)**
45:8
**both (1)**
97:23
**Botstein (5)**
102:15;103:3,7,22;
104:4
**bottom (1)**
74:24
**bound (1)**
22:13
**Box (1)**
5:14
**boy (1)**
74:8
**branch (2)**
50:9;67:24
**break (3)**
19:5;54:12;101:18
**breaking (1)**
30:3
**breath (1)**

98:19
**Brewster (3)**
5:20,23;74:16
**briefly (2)**
8:23;9:18
**bring (2)**
101:13;103:17
**brought (1)**
70:6
**built (1)**
25:6
**bumper (1)**
96:5
**bureaucracy (2)**
53:1,10
**business (3)**
5:14;51:1;54:15
**button (1)**
74:2

**C**

**cabinet (1)**
96:18
**Cabot (1)**
9:23
**call (3)**
81:23;90:1;103:13
**called (2)**
11:5;30:12;51:22;
103:16
**came (2)**
82:18;85:6
**Can (76)**
6:1;7:4;8:6,8,23;
9:18;14:12;16:4;19:8,
9,20;22:19;23:6;24:7,
9,12;26:4;27:5;29:12;
30:17,22;31:5,10;
33:10,21;34:9;36:14,
16;37:16,18;38:1;43:1;
44:2;46:18,18;50:1;
51:21;54:5,7;55:6,15,
17;56:16,18,18,20,20;
58:8,19;59:13,14;
62:21;63:12;64:9,10,
23;68:17;71:24;73:15;
74:4;76:5,15;77:14;
78:5,9;79:5,23;83:7,9;
91:17;94:17,20;95:12;
97:12;103:17,21
**candidates (2)**
15:10;96:4
**Cantor (2)**
69:8;70:25
**capable (1)**
16:19
**Capitol (1)**
99:10
**captures (1)**
47:13
**car (1)**
96:6

98:19
**care (4)**
83:19;84:20;96:22;
100:23
**career (4)**
25:11;33:5;50:4;
67:12
**case (11)**
5:8,8;23:1;42:19;
45:16;46:18;83:9;
98:6,23;104:17
**caseload (2)**
16:15,24
**cases (5)**
103:7,23;104:5,6,12
**categories (1)**
7:6
**category (2)**
30:4,12
**cause (3)**
28:15,23;43:21
**caused (2)**
42:17,20
**causing (1)**
39:12
**cc'd (2)**
73:15;78:1
**Center (1)**
9:4
**certain (2)**
15:1;35:18
**certainly (3)**
22:5;53:18;64:19
**certification (1)**
45:10
**Chad (2)**
73:18;74:25
**chain (1)**
73:14
**Chair (2)**
67:5;89:9
**challenged (1)**
98:7
**challenging (2)**
45:9;67:19
**change (2)**
47:25;87:11
**changed (3)**
16:5,9;43:15
**changes (9)**
16:11;48:8,9,13;
49:18,21,23;50:12,16
**characterization (2)**
22:21;23:13
**characterizing (3)**
71:21,23;94:7
**charge (1)**
51:14
**chief (1)**
67:14
**CHOATE (74)**
5:18,19;6:19;7:10,
14,18,23;8:3,14,17,20,
22;19:12;20:5,7;22:10,

Min-U-Script®

Glacier Stenographic Reporters Inc.
www.glaciersteno.com

(2) assumes - CHOATE

Exhibit AM
Page 30 of 41

Bakalar v. Dunleavy, et al.
Case No. 3:19-cv-00025 JWS

Joanne Grace
April 29, 2021

23;23:15;26:13,17;
35:6;42:8,13,15;44:14,
17;45:3;46:12,21;
47:17;48:20,22;51:20;
53:20;54:4,7,11,16,20,
23;55:23;56:24;59:4,
12,16;60:4;62:1,18;
65:16,24;66:3,17;
68:20;69:5;73:13;
75:18,22;88:15,18,19;
92:10,22;98:21;99:1;
101:15,21;102:3,13,23;
103:1,24;104:1,3;
105:5
**choose (1)**
  15:6
**Christianson (1)**
  9:23
**citizen (1)**
  71:10
**citizens (1)**
  72:10
**civil (13)**
  12:7;32:1;33:9;
  58:15;59:21,25;60:19,
  22;61:6,14;67:18;
  80:24;81:4
**claims (2)**
  23:2;83:21
**clarify (1)**
  90:7
**class (1)**
  36:2
**classification (1)**
  25:2
**clean (1)**
  48:21
**clear (2)**
  62:13;85:10
**clerkship (2)**
  9:13,20
**client (3)**
  36:5;62:3;85:15
**clients (4)**
  31:2,12;38:5;81:10
**clients' (1)**
  31:2
**Coie (1)**
  9:21
**coin (1)**
  85:9
**colleague (1)**
  38:20
**colleagues (1)**
  92:17
**color-coded (1)**
  87:25
**Columbia (1)**
  103:16
**combination (1)**
  17:19
**coming (2)**
  33:7;39:8;76:10;

101:23
**comments (2)**
  42:5,5
**commissioners (2)**
  52:5,5
**committed (1)**
  53:10
**committee (1)**
  15:5
**communications (1)**
  81:18
**compared (1)**
  74:14
**compatible (2)**
  38:6;87:9
**competitive (3)**
  17:10,15,16
**complain (1)**
  45:25
**complainants (1)**
  70:14
**complained (1)**
  73:21
**complainers (1)**
  100:22
**complaining (2)**
  94:1;96:13
**complaint (7)**
  71:12,13,25;72:2;
  84:19;94:7;103:14
**complaints (5)**
  73:7;82:18;84:2;
  85:6;93:25
**completed (1)**
  9:20
**complex (1)**
  67:19
**complied (1)**
  61:16
**compromised (2)**
  43:3;44:9
**computer (1)**
  24:16
**concern (3)**
  42:1;72:11;82:13
**concerned (3)**
  42:18;82:24;83:1
**concerning (1)**
  82:15
**concerns (6)**
  68:13;72:3;79:3;
  83:11,12;84:2
**concluded (1)**
  105:9
**conclusions (1)**
  73:4
**conduct (3)**
  31:11;41:19;76:14
**conducting (1)**
  5:10
**confirm (4)**
  7:4;63:21;65:2;
  102:17

**confirmation (2)**
  12:18;13:1
**Congress (1)**
  96:19
**connection (1)**
  62:10
**cons (1)**
  15:9
**consequences (2)**
  84:12;85:14
**conservative (2)**
  93:25;94:8;96:23
**consider (9)**
  27:5,10,13,19;67:10;
  74:16;80:14;81:8,15
**considerably (1)**
  92:6
**considerate (1)**
  39:6
**consideration (8)**
  26:7,24;27:2;28:19;
  29:3;31:9,13;65:20
**considerations (3)**
  29:22;30:15,18
**consistent (1)**
  43:5
**Constitution (3)**
  21:22;23:23;86:1
**consulted (1)**
  63:2
**contact (1)**
  36:15
**content (1)**
  64:13
**context (2)**
  52:11;65:17
**continue (6)**
  65:22;67:21;68:5,6;
  85:7;89:17
**continuing (2)**
  50:25;67:11
**contrary (5)**
  78:6,20;79:16,24;
  80:4
**contributed (1)**
  45:22
**control (2)**
  88:12;91:18
**conversations (3)**
  57:17;64:12,22
**cool (1)**
  74:16
**coordinate (1)**
  67:15
**copied (4)**
  70:11,13,15,20
**copy (2)**
  72:23,25
**core (3)**
  30:15,18;31:3
**Cori (7)**
  12:24;13:4,6;75:5,5,
  23;78:1

**correction (1)**
  28:14
**correctly (3)**
  23:24,25;24:1
**counsel (1)**
  5:16
**count (1)**
  97:1
**country (2)**
  98:9,23
**couple (2)**
  66:10;71:13
**course (1)**
  48:11
**court (11)**
  6:13;9:17;40:13,15,
  15;41:3;98:23;103:15;
  104:11,11,12
**courts (3)**
  40:14;67:25;76:6
**create (1)**
  81:22
**created (3)**
  11:18;40:16;98:14
**credibility (2)**
  40:23;41:21
**criminal (6)**
  66:7,8,9;80:22;82:1,
  6
**criteria (2)**
  21:10,12
**critical (2)**
  94:12;97:11
**critically (2)**
  94:23;97:22
**criticized (1)**
  97:8
**current (3)**
  65:21;68:6;89:19
**Currently (3)**
  14:17,18;16:1
**customary (1)**
  52:3
**cut (1)**
  100:10
**cutoffs (1)**
  21:14
**cycle (2)**
  95:6,12

### D

**data (1)**
  52:14
**date (2)**
  36:14;47:4
**dated (3)**
  47:13;51:22;55:16
**day (3)**
  47:6,6;95:9
**day-to-day (1)**
  67:18
**dealt (1)**

68:12
**December (1)**
  90:14
**decided (2)**
  63:8;92:13
**deciding (1)**
  64:3
**decision (3)**
  21:19;85:12;99:17
**decision-making (1)**
  70:22
**decisions (4)**
  16:12;31:18;40:6;
  78:10
**declared (1)**
  72:6
**decline (1)**
  22:17
**deeply (1)**
  97:8
**defendants (1)**
  5:21
**defending (1)**
  11:6
**defense (2)**
  11:5;98:5
**defiant (1)**
  82:20
**define (1)**
  33:10
**defines (1)**
  26:3
**definitely (3)**
  32:16;49:16;101:13
**degree (2)**
  8:25;9:2
**deliberative (1)**
  19:7
**Democrat (1)**
  94:25
**demonstrated (1)**
  98:22
**departed (1)**
  16:15
**Department (70)**
  9:24;10:2,5;11:18;
  13:11,20;14:3,5,8,16;
  17:5;18:1,8,18;20:14;
  21:1;22:7,14,24;23:6;
  24:21;25:16;26:20;
  27:24;29:11,13;30:21,
  25;31:7;34:13,20;
  35:20;37:18,20,22;
  38:4;42:24;43:2;47:11;
  51:4;53:17;57:11,14;
  58:5,7,9,10;62:14;63:1,
  8,23;64:4;67:13,23;
  70:2;77:1,11,18;79:22;
  81:13;82:17;85:23;
  87:14;89:12;93:4,13;
  94:10;95:3,15,23
**departments (2)**
  76:11,18

Bakalar v. Dunleavy, et al.
Case No. 3:19-cv-00025 JWS

Joanne Grace
April 29, 2021

**department-wide (1)**
82:3
**depended (1)**
80:21
**depends (2)**
37:25;81:5
**deposition (14)**
5:6,10;6:23,25;7:5,6;
17:2,12;24:9;48:5;
54:3;91:25;101:23;
105:9
**depositions (1)**
6:24
**deputies (1)**
32:17
**deputy (10)**
12:22;15:15;21:18;
29:25;30:8;52:5,6;
70:16;71:2;75:11
**deputy's (1)**
15:14
**describe (3)**
36:23;37:1,3
**described (1)**
81:19
**describes (2)**
25:3;35:24
**describing (1)**
48:12
**description (2)**
35:7;90:5
**designated (4)**
22:8;46:10;54:1;
95:4
**designed (1)**
97:14
**desire (2)**
65:12;86:20
**determine (4)**
14:9,15;65:1;80:14
**determined (2)**
84:21,22
**develop (3)**
16:22;80:2,7
**developed (2)**
25:12;43:16
**developing (2)**
16:19;79:13
**Devon (1)**
5:22
**difference (1)**
34:23
**differences (1)**
26:1
**different (7)**
23:12;30:20;32:21;
44:2;48:4;65:13;100:5
**differentiate (1)**
44:6
**difficult (2)**
16:24;26:19
**direction (3)**
43:14;47:25;48:4

**director (16)**
12:7,12;15:13;18:20;
19:17;20:11,24;21:15;
22:15;31:16;33:1;36:7,
9;67:11,14;70:17
**directors (2)**
52:6,6
**disagree (5)**
22:22;23:13;87:5;
99:3;101:4
**disapprove (1)**
18:17
**disapproved (2)**
18:22;19:1
**discharged (2)**
82:11;92:1
**discharging (1)**
91:13
**discipline (1)**
76:8
**disciplined (1)**
83:1
**discovery (1)**
83:8
**discuss (1)**
19:6
**discussed (1)**
81:20
**discussing (1)**
93:9
**dismissal (1)**
83:15
**dismissed (2)**
93:13,16
**dispute (1)**
53:17
**distinction (1)**
33:14
**distinguish (5)**
38:17;88:13,14;
91:17,19
**distinguishing (1)**
44:12
**district (3)**
66:5;103:15,16
**divide (1)**
20:17
**division (35)**
12:8;32:2;33:9;
40:20,21;41:4,19;
58:16;59:21;60:1,19,
23;61:6,14;66:8,9;
67:14,18;76:16,18;
78:4,18,24;80:23,24;
81:4;82:1,6,17;94:12;
95:1,20;96:7,24;97:21
**document (2)**
62:20;79:21
**Donald (5)**
72:8,11;84:14;96:10,
16
**donating (1)**
96:4

**done (5)**
70:13;90:6;99:6;
101:19,22
**DOP (2)**
78:4;79:6
**down (4)**
25:3;26:2;61:20;
74:2
**DPS (1)**
76:11
**draft (4)**
75:24;76:22;77:4;
81:22
**drafting (2)**
61:15;63:2
**drafts (1)**
81:22
**draw (1)**
92:21
**drawing (1)**
93:24
**drilling (1)**
61:20
**drink (2)**
37:10,12
**duly (9)**
6:13;35:5;47:16;
51:19;66:2,16;69:4;
73:12;103:19
**Dunleavy (18)**
5:8;13:16;33:7,18;
41:25;46:23;47:19;
48:9,25;49:17,23;
52:22,25;66:12;82:11;
83:3;88:21;89:18
**Dunleavy's (1)**
49:8
**duration (1)**
28:14
**during (11)**
41:25;60:2;66:12;
88:21;91:3,20,21;
92:23;93:2;95:12;
103:3
**duties (6)**
14:10;37:24,25;38:3;
67:19;89:2

## E

**earlier (2)**
75:10;90:14
**easy (1)**
16:16
**Ed (3)**
45:8,16;79:8
**education (2)**
8:24;86:2
**effective (4)**
25:11;67:7;90:11,13
**effectively (1)**
37:20
**efforts (2)**

28:13;81:22
**either (1)**
70:11
**elected (3)**
50:6;52:12;82:12
**election (29)**
43:13;44:1;45:10,23;
47:5;49:9;60:3;72:12;
78:12;94:18,19,21;
95:4,6,9,10,12,19;97:3,
6,6,10;98:1,4,7,16;
99:5,11;101:1
**elections (36)**
30:2,4,13,19;31:4,6;
40:20,21,22,24;41:4,
19;43:12,24;44:4;45:5,
12;72:20;82:17;85:14;
87:13;94:11,12,13,15;
95:1,15,16,20;96:8,25,
25;97:11,13,22;100:23
**electorate (1)**
50:6
**else (2)**
63:14;70:2
**else's (2)**
90:16,18
**e-mail (11)**
14:25;69:17;70:10;
73:14,17;74:25;77:2,7,
24,25;90:8
**e-mails (6)**
70:11,14;71:8;72:22;
81:21;88:22
**employed (1)**
25:11
**employee (6)**
64:4;65:1;78:5;
85:22;86:11;102:20
**employees (29)**
22:24,25;26:6;28:12,
18,22;29:2;46:25;48:2,
7,13,24;50:5;52:9,22,
24;58:1;60:21;61:8;
62:24;63:8,24;76:4;
78:9,19;79:15,23;
81:14;88:22
**employees' (2)**
86:3;90:10
**employee's (2)**
29:7;65:11
**employers (1)**
17:10
**employment (10)**
22:1;23:20;24:4;
26:4;28:20;29:4;43:6;
67:11;76:15;89:16
**encouraged (1)**
25:12
**encroachments (1)**
11:6
**end (2)**
68:5;76:13
**ended (1)**

81:11
**engaged (1)**
101:9
**entire (4)**
11:12;32:1;51:5;
85:15
**entirely (1)**
59:24
**entitled (1)**
32:10
**entry-level (3)**
18:12,14,15
**episode (1)**
62:10
**Equal (2)**
28:17;29:1
**essential (1)**
43:25
**essentially (1)**
94:15
**establish (1)**
23:19
**et (1)**
5:8
**evaluate (1)**
33:8
**evaluated (1)**
31:8
**evaluation (1)**
93:5
**evaluations (1)**
93:6
**Evans (2)**
69:8;73:4
**Evans' (1)**
72:25
**even (7)**
21:17;85:22,22;
86:25;96:19;97:8;99:5
**event (1)**
90:13
**eventually (2)**
36:19;96:17
**everybody (1)**
94:7
**everyone (4)**
46:14;50:9;90:16,18
**evidence (2)**
49:16;98:12
**EX (1)**
52:8
**exact (3)**
13:13;47:4;95:24
**exactly (1)**
21:3
**EXAMINATION (1)**
6:17
**example (4)**
41:17;78:8;80:22;
94:19
**examples (2)**
33:22;101:8
**excellent (1)**

Min-U-Script®
Glacier Stenographic Reporters Inc.
www.glaciersteno.com
(4) department-wide - excellent

Bakalar v. Dunleavy, et al.
Case No. 3:19-cv-00025 JWS

Joanne Grace
April 29, 2021

93:5
**except (2)**
17:15;37:9
**exceptions (1)**
25:21
**exclude (1)**
31:17
**excuse (1)**
15:13
**executive (2)**
50:9;67:24
**exempt (8)**
48:1,2;52:8,9,14,15,
23,23
**Exhibit (21)**
24:9,20;35:3,5;
47:16;51:18,19;55:14;
62:21;66:2,16;69:4,7;
73:1,12,17;75:19;
77:25;87:25;89:4;
103:19
**expand (1)**
100:18
**expectations (2)**
43:5,6
**experience (4)**
14:4;16:18,25;67:21
**expert (1)**
83:22
**explain (1)**
30:22
**explaining (2)**
15:8;65:18
**express (1)**
85:24
**expressed (1)**
72:11
**expressing (1)**
99:13
**expression (2)**
35:24;36:1
**expressions (1)**
70:18
**extend (1)**
8:4
**extent (8)**
7:25;29:21;30:14;
32:9;50:2;93:19;
100:12,21
**extraordinary (1)**
41:24
**extreme (6)**
40:25;41:16;85:3;
96:17;99:13;101:9

## F

**face (1)**
83:15
**Facebook (2)**
77:12,13
**facing (1)**
84:12

**fact (3)**
47:14;55:9;67:12
**factors (1)**
17:19
**facts (2)**
49:15;81:6
**fact-specific (1)**
80:12
**factual (1)**
81:6
**fair (12)**
41:5;43:22;44:20;
72:13;85:17;94:13,21;
97:4,7,24;99:6;101:2
**Fairbanks (1)**
9:1
**fairness (1)**
45:5
**faith (1)**
96:23
**false (1)**
45:23
**familiar (3)**
21:21;35:10;72:18
**FAQ (1)**
25:1
**FAQs (1)**
78:11
**far (4)**
13:16;65:8;102:16,
22
**fashion (1)**
39:25
**faster (1)**
101:22
**Fayette (2)**
66:6,6
**federal (3)**
9:4;11:7;45:13
**felt (3)**
17:9;41:20;45:25
**few (3)**
102:14,17;103:10
**figure (2)**
10:23;79:10
**filed (1)**
103:14
**filings (1)**
104:11
**find (6)**
34:5;64:9;68:17,21;
77:19;103:15
**fine (8)**
8:20;22:10;42:8,9;
65:16;88:18;100:11;
104:24
**finish (1)**
9:5
**finishes (1)**
76:13
**fired (7)**
78:5,19;79:15,23;
80:3;82:10;84:13

**firm (1)**
76:4
**first (17)**
6:13;10:4;11:1;15:5,
21;20:17;36:15,21;
37:8;52:2;67:3;69:24;
75:14;76:7;83:22;89:7;
103:13
**five (6)**
7:2;54:16,18;102:3,
5,6
**five-part (1)**
80:19
**flagged (1)**
79:3
**focused (1)**
75:25
**follow (2)**
64:16;96:9
**follows (3)**
6:15;27:24,25
**forgot (2)**
7:2;54:6
**form (9)**
42:7;48:17,19;49:15;
50:18;65:4;71:21;92:5;
94:6
**format (1)**
62:25
**former (3)**
45:8;98:15;102:20
**formerly (1)**
16:12
**forms (1)**
41:15
**forth (1)**
81:20
**forum (1)**
46:7
**found (1)**
67:19
**foundation (3)**
25:5;43:24;94:16
**foundational (4)**
40:21;46:4;85:16;
94:16
**four (1)**
83:24
**fragile (2)**
94:20;99:4
**frame (2)**
39:20,22
**framed (1)**
80:6
**fraught (1)**
76:3
**friend (6)**
37:2,4,6,7;38:10;
39:4
**friendly (1)**
38:24
**friends (3)**
37:15;84:9,10

**front (1)**
84:6
**fun (2)**
38:25;39:6
**functions (4)**
25:10;31:3;80:10;
93:18
**fundraisers (1)**
96:5
**funny (1)**
39:6

## G

**general (48)**
7:16;10:8;12:22;
13:8,21,25;14:1;15:16,
17,18;17:25;18:17,21;
20:12;21:2,18,20;29:9,
24,25;30:8,20;32:10,
18;36:6;38:7;45:22;
47:10;50:24;53:16;
61:2,3;62:5;67:8;70:4,
16,16;71:2;75:12;
82:13;84:4,6;87:17,17;
89:11;90:13,25;102:14
**generalized (3)**
41:7;99:21,22
**generally (10)**
14:21,23;15:4;17:1;
21:12;30:7,10;31:23;
32:22;53:15
**Generals (1)**
13:12
**General's (9)**
14:3;18:9;32:4,7;
36:5;40:8;41:23,25;
69:21
**Georgetown (1)**
9:3
**Georgetown's (1)**
9:12
**given (7)**
41:22;60:14;61:20,
22;62:5;80:10;89:1
**giving (1)**
84:10
**Glacier (1)**
5:13
**goal (1)**
86:18
**goes (4)**
14:23;22:11;43:19;
90:7
**Good (13)**
6:20,21;16:19;24:19;
27:12;38:22;62:6;
74:12;78:8,11;81:10;
93:5;94:19
**Google (1)**
103:11
**govern (1)**
23:20

**governing (1)**
68:1
**government (4)**
11:7;72:19;86:2;
94:17
**governor (8)**
13:22;32:10;47:22;
48:11;50:24;52:3,12;
89:18
**governor's (8)**
15:20,21,22;19:2,24;
52:6;62:16;77:13
**Grace (11)**
5:7,21;6:11,20;7:12;
8:23;58:6;69:6;98:7;
103:2,22
**Great (3)**
8:21;38:20,21
**group (5)**
48:7;80:1;81:19;
88:12;91:18
**guess (12)**
27:16,18,18;42:4;
48:1;66:22;74:7;80:17;
92:7;101:7;102:22;
103:20
**guidance (1)**
76:17
**guiding (1)**
25:18
**guy (1)**
74:8
**guys (2)**
39:21;103:11

## H

**Hafner (3)**
78:2;79:12;82:10
**hand (1)**
6:2
**handled (2)**
84:3;87:16
**hang (1)**
91:16
**happen (2)**
79:5;84:2
**happened (8)**
12:6;19:14,15,17;
33:20,22;37:10;99:9
**hard (2)**
41:17;96:21
**harm (2)**
31:1;40:17
**Harvard (1)**
9:2
**head (3)**
11:3,11,17
**hear (1)**
92:24
**heard (2)**
34:8;91:20
**heart (1)**

Min-U-Script®

Glacier Stenographic Reporters Inc.
www.glaciersteno.com

(5) except - heart

**Exhibit AM**
**Page 33 of 41**

Bakalar v. Dunleavy, et al.
Case No. 3:19-cv-00025 JWS

Joanne Grace
April 29, 2021

82:19
**heavy (1)**
  95:13
**held (1)**
  87:10
**help (3)**
  16:22;95:9,11
**helpful (2)**
  38:21;101:10
**helping (2)**
  24:14;38:22
**Here's (2)**
  80:19;94:9
**herself (2)**
  43:15;83:21
**Hey (1)**
  50:24
**high (1)**
  95:2
**higher (4)**
  12:15,15;17:16;
  69:20
**higher-level (1)**
  16:22
**highest (1)**
  84:3
**high-level (1)**
  62:15
**hire (7)**
  13:24;15:19;16:18;
  31:25;32:3,4,25
**hired (9)**
  10:4,5,7;18:8;25:16;
  31:6,19;34:17,23
**hiring (12)**
  14:4,8,10;15:8;
  16:11;20:13,17,22;
  25:7;26:19;34:12,19
**history (2)**
  8:24;9:19
**Hold (1)**
  74:21
**holding (1)**
  35:15
**honestly (1)**
  17:18
**hope (5)**
  66:24;68:5,5,7;89:19
**hoping (2)**
  8:10;84:1
**hostile (3)**
  41:16;96:17;98:2
**Hot (1)**
  73:22
**hours (1)**
  7:2
**How's (1)**
  54:13
**Hutchison (2)**
  73:18;74:25

**I**

**idea (2)**
  57:10;72:17
**ideas (1)**
  50:4
**identification (1)**
  43:19
**identified (8)**
  30:7;31:4;42:17,23;
  71:9;88:21;93:10;
  97:14
**identify (6)**
  5:16;30:17;64:23,25;
  97:12;103:10
**identifying (1)**
  48:7
**II (4)**
  10:10;21:14,15,17
**III (4)**
  10:10;21:15,16,17
**imagine (2)**
  47:10;97:9
**immediate (1)**
  12:20
**impact (4)**
  19:7;43:13;81:9;
  96:6
**impacted (1)**
  93:20
**impacting (1)**
  82:14
**impacts (1)**
  81:2
**impartial (10)**
  40:24;41:5,20;42:21;
  72:13;85:18;94:13;
  97:7,24;99:6
**implement (1)**
  50:13
**implementing (1)**
  68:2
**imply (1)**
  61:22
**importance (1)**
  94:12
**important (8)**
  46:13;83:6,18;85:1,
  2,7;94:23;97:22
**impression (1)**
  53:7
**impressions (2)**
  53:15,16
**improper (1)**
  31:23
**inadequate (1)**
  28:14
**inappropriately (1)**
  71:22
**inauguration (2)**
  47:6;60:3
**include (3)**
  52:5,10;64:14
**included (1)**
  31:3

**includes (1)**
  18:11
**including (9)**
  18:2;26:4,7,24;40:3;
  86:7,7;97:1;98:14
**incoming (1)**
  47:19
**incorrectly (1)**
  71:23
**increase (1)**
  17:17
**in-depth (1)**
  64:22
**indicated (1)**
  89:15
**individual (3)**
  6:25;7:5;39:3
**individuals (1)**
  32:24
**individuals' (1)**
  77:15
**inevitably (1)**
  95:11
**influenced (2)**
  34:17;44:23
**influences (5)**
  29:8,17,20;31:9;33:3
**info (1)**
  78:9
**information (1)**
  65:10
**informed (6)**
  47:10;78:10;91:5,9,
  12;92:7
**infringement (1)**
  76:7
**initial (5)**
  26:8,25;27:3;58:11;
  61:3
**initially (1)**
  96:16
**inquiry (1)**
  79:7
**instance (2)**
  97:12,18
**instead (2)**
  82:19;89:13
**instruct (2)**
  20:4;62:3
**integrated (3)**
  27:22,25;28:3
**integrity (4)**
  40:23;41:21;45:23;
  94:18
**intend (1)**
  102:15
**interaction (1)**
  62:15
**interest (1)**
  42:22
**interested (1)**
  15:11
**interesting (1)**

41:22
**interests (4)**
  31:2,11;72:9;94:24
**interfering (1)**
  39:11
**interpret (1)**
  51:1
**interpretation (1)**
  22:20
**interview (3)**
  15:15,16;18:5
**interviews (1)**
  15:6
**into (12)**
  8:1;9:12;16:19,22,
  23;33:7;36:15;61:21;
  71:6;81:21;87:14;97:2
**invade (3)**
  61:18,23;62:3
**invading (1)**
  58:20
**investigate (1)**
  69:13
**investigation (9)**
  70:3,13,21,23;71:6,9,
  10;73:8;82:25
**invoke (1)**
  19:6
**involve (1)**
  35:18
**involved (2)**
  46:14;94:24
**involvement (1)**
  88:12
**involves (1)**
  25:1;45:17;73:15
**involving (1)**
  96:3
**irrespective (1)**
  98:16
**issue (6)**
  17:23;22:23;23:1;
  45:21;79:3;99:22
**issues (11)**
  22:11;23:10;34:1,1,
  41:2;46:5;53:24;76:10;
  78:3;93:17;95:10
**IV (1)**
  21:16

**J**

**Jahna (5)**
  77:25;79:1;80:5;
  82:9;89:6
**James (2)**
  66:5;69:8
**JAMIESON (93)**
  5:20,20;7:9,11,15,19,
  24;8:10,15,18;19:4,11,
  25;21:6,9;22:3,16;
  23:11;26:11,14;33:10,
  25;40:2;42:4,10;44:11,

  15;45:14;46:2,17;
  48:16;49:3,6,14,25;
  50:17;53:12,22;54:9,
  14,18,21;55:5,19,21;
  56:1,3,6,9,12,17;57:13;
  58:3,8,19,23;60:7,10,
  22;61:12,17;62:2;65:4,
  15;71:20;74:1,4,7,11;
  75:16,20;86:5;88:10,
  16;91:16;92:4,15;94:5;
  97:16;98:18;100:2,14,
  18;101:12,20,24;102:1,
  6,18,25;103:20,25;
  105:3
**Janell (3)**
  79:1,12;82:9
**Janell's (1)**
  78:23
**Jay (1)**
  9:16
**JD (2)**
  9:7,11
**Jeff (1)**
  51:22
**Joanne (5)**
  5:7;6:2,11;58:6;79:9
**job (37)**
  14:10,16,16;15:7;
  29:23;30:16,19,25,25;
  31:3;32:23;35:19;
  37:24,25;39:19;43:4;
  45:2;60:15;62:13;
  67:19;72:13;80:10,21;
  81:3,5,8,9;82:15;
  83:15;84:12;85:8;
  91:14;93:19,21;94:4;
  97:7;100:24
**jobs (9)**
  25:23;47:15,21;
  49:13;50:14;51:15;
  53:11;88:23;101:1
**join (1)**
  45:9
**judge (1)**
  100:10
**judgment (1)**
  81:10
**judicial (2)**
  9:13;96:19
**Juneau (4)**
  5:14;37:8,12;73:21
**Justice (2)**
  9:16,20
**JWS (1)**
  5:9

**K**

**keep (3)**
  25:23;46:22;75:9
**kick (1)**
  79:7
**kind (7)**

Min-U-Script®

Glacier Stenographic Reporters Inc.
www.glaciersteno.com

(6) heavy - kind

Exhibit AM
Page 34 of 41

Bakalar v. Dunleavy, et al.
Case No. 3:19-cv-00025 JWS

Joanne Grace
April 29, 2021

24:16;31:25;38:24,
25;43:23;80:20;83:4
**kinds (2)**
31:24;72:14
**knew (3)**
36:24;63:21;69:24
**know' (1)**
53:4
**knowing (2)**
10:13;20:20
**knowledge (12)**
7:22;8:8;26:7,23;
34:3;35:17,24;62:7;
67:22;99:16,21,24
**known (3)**
36:12,13;95:17

## L

**Labor (2)**
24:22;89:11
**lack (1)**
39:13
**Landfield (2)**
51:22;52:21
**language (12)**
23:22;61:10;63:2;
64:24;68:8;89:22;
90:16,18;91:6,15;92:2,
14
**larger (1)**
24:13
**last (5)**
32:14;56:11;91:25;
92:8;101:22
**lasted (2)**
32:17,19
**later (2)**
36:19;78:8
**law (70)**
9:2,2,3,22,25;10:2,5;
11:18;13:11,20;14:3,8,
16;17:5;18:1,8,18;
20:14;21:1;22:7,14,20,
21,25;23:6;25:17;
26:20;27:24;29:14;
30:21;31:7;34:14,20;
35:21;37:18,21,22;
38:4;42:24;43:2;51:4;
53:17;57:11,14;58:5,7,
9,10;61:16;62:14;63:1,
8,24;64:4;67:13,23;
76:18;77:1;79:5,23;
81:7,13;85:23;89:12;
93:4,13;94:10;95:3,15,
23
**lawsuit (1)**
88:13
**lawyer (1)**
14:16
**lawyers (6)**
14:5,8;20:13;53:8;
55:10;84:10

**learn (4)**
46:24;47:3,7;71:5
**learned (4)**
57:21;69:19,22;
92:15
**least (3)**
58:15;59:20;66:8
**leave (1)**
59:1
**legal (12)**
22:4,6,19;43:16,16;
57:23;62:9;67:15,21;
78:23;79:4;80:13
**legality (2)**
57:23;58:1
**legislative (3)**
12:18;13:1;75:12
**legislators (1)**
71:13
**legislature (3)**
23:19;82:16;100:22
**length (1)**
32:14
**less (3)**
16:18;50:9;84:22
**letter (21)**
45:8;65:19;66:1,4,
12,19;67:2;68:3,9;
69:8,12;71:1;72:25;
75:4;89:5,10;90:24;
91:6,15;92:3,14
**letters (5)**
13:23;63:1,23,25;
64:14
**level (7)**
10:9,14,15;15:19;
45:13;58:14;84:4
**levels (1)**
17:16
**liaison (1)**
75:13
**Libby (41)**
5:19;36:8,12,13,23;
43:15;68:13;69:17,19,
22,25;70:1,5,8,20,20;
72:4,6,9,21;78:7;
82:10;83:10,11,18;
84:6,11,18;85:19,21;
89:5;91:7,13;92:12,12,
24;93:2,12,15;95:6;
96:8
**Libby's (4)**
82:13;90:23,24;
97:13
**lie (2)**
98:13,15
**life (1)**
81:16
**liked (4)**
38:11,13,17;39:3
**likely (1)**
79:4
**limitations (2)**

80:24;95:21
**limited (1)**
102:24
**Lindemuth (3)**
78:1;82:9;89:6
**litigation (7)**
45:9;91:19,21,22;
95:11;102:21;104:17
**little (5)**
16:12;20:15;24:11;
43:10;66:10
**live (4)**
37:13;56:16,20,20
**lived (1)**
37:8
**LLM (3)**
9:3,9,12
**long (9)**
12:4;15:24,25;16:4;
36:12,13,18;101:25;
104:23
**longer (2)**
8:6;92:6
**look (11)**
14:7,13;16:13;35:13;
56:23;84:9;88:7,9;
90:5;97:5;99:9
**looked (2)**
66:25;67:1
**looking (8)**
17:10,23;57:2;68:22;
75:14;79:11;80:7;
104:9
**looks (2)**
77:1,6
**lose (1)**
83:15
**losing (1)**
88:23
**lot (5)**
44:2;48:17;70:6,7;
103:12
**lots (2)**
46:4;83:8
**low (1)**
74:17
**loyal (1)**
39:5
**loyalty (1)**
48:15
**Lynda (5)**
5:12;54:7;59:16;
68:21;101:22

## M

**ma'am (1)**
24:10
**mainly (1)**
84:14
**maintain (1)**
97:23
**maintained (1)**

25:12
**major (1)**
72:3
**majority (5)**
72:10;73:19,20;75:3,
4
**makes (1)**
96:21
**making (6)**
40:12;43:12;49:18,
24;85:11,11
**manage (1)**
67:14
**management (3)**
16:13;57:17,21
**managing (1)**
67:17
**manner (1)**
42:21
**many (4)**
13:11;19:16;50:8;
63:7
**March (2)**
69:7;72:24
**Mark (17)**
5:18;7:9;35:2;42:4;
45:17;46:6;51:17;
53:23;58:24;61:18;
65:7;66:1;73:11;74:11;
92:9;98:18;103:20
**marked (16)**
24:8;35:5;47:16;
51:19;55:14;62:21;
66:2,16,18;69:4,7;
72:25;73:12;87:25;
89:4;103:19
**mass (1)**
90:8
**matter (5)**
7:17;25:24;85:3,4;
96:13
**matters (1)**
83:24;94:11;95:19
**may (13)**
6:9;7:17;16:23;19:6,
7,19;22:13;25:25;26:1;
44:19;64:21;78:7;
101:19
**maybe (21)**
15:10,10;21:14,14,
16;23:11;24:12;37:10,
11,11;55:20;56:11,12;
66:14;77:2,19,22;
85:21;96:10,23;98:18
**McCURDY (2)**
5:22,22
**mean (36)**
16:2;22:18;23:6;
25:18;28:21;33:11,13;
34:2;36:17;37:5,7,8;
38:1;39:12;42:9;44:2;
46:16;50:21;64:18;
65:21;75:16,17;76:8;

82:24;83:7;84:8;86:9,
23;88:13;97:9;98:19,
24;99:9,9;100:4,9
**meaning (2)**
39:24;63:9
**meaningful (2)**
80:18;81:7
**means (8)**
25:20;27:3;28:3,4;
29:17,18,20,21
**media (24)**
41:16;68:13;69:13;
72:5;75:25;76:1,3,12,
23;77:4,5,11,16,19,20;
80:17;81:2,15;86:8,9,
12,18;93:20,24
**meets (1)**
21:12
**member (1)**
85:22
**members (2)**
96:18,18
**memo (4)**
15:8,13;65:17;80:13
**memorandum (11)**
55:15,16;56:25;
57:12,15;58:17;59:22;
61:11,15;67:5;90:9
**memory (1)**
63:19
**merit (16)**
21:23;22:2,8,25;
23:5,14,18,20;24:3;
25:3,4,7;26:3,21;
28:19;29:3
**Mess (1)**
73:22
**message (1)**
53:2
**met (2)**
36:21,22
**method (1)**
25:2
**might (17)**
7:11;29:22;35:12;
37:12,15;41:9;78:11;
79:6;80:23;81:25;82:1,
10;83:14,15;88:24,24;
91:20
**Mills (6)**
12:24;13:4;75:5,5,
23;78:1
**mind (2)**
39:8;58:25
**mine (1)**
66:20
**minimize (2)**
56:13,18
**minutes (6)**
54:17,17,19;102:4,5,
6
**mischaracterizes (1)**
92:5

Min-U-Script®

Glacier Stenographic Reporters Inc.
www.glaciersteno.com

(7) kinds - mischaracterizes

Exhibit AM
Page 35 of 41

Case 3:19-cv-00025-JWS    Document 87-1    Filed 09/24/21    Page 35 of 41

Bakalar v. Dunleavy, et al.
Case No. 3:19-cv-00025 JWS

Joanne Grace
April 29, 2021

**misstated (1)**
50:1
**moment (2)**
58:25;59:19
**morale (1)**
51:13
**more (42)**
7:16;16:21,24;34:7;
38:4;39:18,18;40:24,
25,25;41:1,2;50:8,24;
52:11;57:4;64:21;76:1;
77:10;78:3;79:4;80:18,
20,23;82:15,15,19,20;
83:5,6,6,6;84:21,25,25;
85:2,6;86:18,19,21,21;
96:23
**morning (2)**
6:20,21
**most (6)**
7:21;17:15;18:11,12;
25:6;99:12
**move (8)**
16:20;45:18;46:3,8;
48:3;62:11;87:13,19
**moved (2)**
56:13;87:18
**much (9)**
6:7;16:10;38:3;
62:11;81:5;90:15;95:7;
100:23;105:5

## N

**name (10)**
5:12,18;19:20;60:6;
63:16;65:20;103:11,
11;104:10,10
**names (2)**
33:24;88:2
**Nancy (2)**
70:14;71:11
**national (1)**
86:20
**natural (2)**
11:4,10
**nature (2)**
27:22;92:2
**nearly (1)**
52:15
**neat (1)**
74:19
**necessarily (6)**
14:17;29:25;30:1;
32:16,23;36:21
**need (9)**
19:5;27:9;28:23;
54:14;57:4;58:23;
94:20,25;100:8
**needed (3)**
38:23;85:18;87:18
**negatively (4)**
39:25;40:16;51:16;
82:14

**new (19)**
30:4;12;48:10,11;
50:3,4,4,12,24;52:3;
55:6;64:25;65:2,10,23;
67:8,25;89:18;90:12
**next (4)**
11:16;20:2;27:21;
35:3
**nexus (1)**
76:9
**nobody (2)**
84:4;85:18
**nominees (1)**
96:19
**none (1)**
20:18
**nonpartisan (4)**
40:23;85:16;94:14;
95:2
**non-retained (1)**
34:4
**noon (1)**
90:14
**nor (1)**
87:22
**normally (2)**
32:14;33:1
**northern (1)**
9:1
**notes (1)**
101:19
**notice (5)**
67:4,7;89:10;90:7,12
**November (8)**
47:5,13;51:22;55:17;
89:8;90:8;93:13;103:4
**number (12)**
13:13;76:11;83:20;
84:18,18;86:21,22;
98:14;103:7,22;104:5,
7

## O

**oath (2)**
5:25;6:4
**object (12)**
7:25;20:4;22:3;42:6;
48:17,18;49:14;65:4;
71:20;92:4;94:6;100:2
**objection (6)**
19:20;50:17;55:6;
58:24;65:15;92:21
**objections (1)**
101:13
**objective (3)**
25:8;98:11,12
**obligation (1)**
86:23
**Obviously (5)**
10:22;29:10;33:14;
95:24;99:6
**occur (1)**

48:9
**occurred (1)**
18:19
**October (1)**
75:23
**Off (12)**
54:24;55:1;59:6,8;
68:20,23,25;96:2;
100:10;102:8,10;105:7
**off-duty (1)**
76:14
**offensive (3)**
90:2;91:6;92:2
**offer (1)**
15:23
**offhand (1)**
10:22
**office (14)**
14:3;15:20,21,22;
19:2,24;32:4,7;36:17;
41:25;62:16;69:21;
77:13;96:11
**offices (3)**
9:23;67:17,24
**officials (2)**
97:6;99:12
**old (2)**
17:21;63:10
**OMB (1)**
15:20
**Once (1)**
19:18
**One (45)**
6:24;8:9;9:21;12:15;
15:11;16:9;23:1;26:20;
27:1,23;30:4;33:8;
34:10;37:11;43:14;
54:8;55:7;59:3;64:9;
66:14,15;68:17,19,21;
70:14;71:8;72:3;73:9,
22;74:21;82:3;83:18;
84:18;86:21;92:16;
93:9;95:4,7;97:12,18;
99:8,14,17;101:15;
103:13
**ones (1)**
93:10
**only (12)**
10:15;15:11;28:18;
29:2;63:12;67:7;72:21;
73:8;85:25;90:11;92:1;
94:17
**open (4)**
15:2;26:7,24;27:2
**openly (1)**
98:1
**operates (1)**
22:1
**operating (1)**
95:1
**operations (1)**
67:18
**opinion (15)**

22:4,14,17,18;23:8;
40:9;58:4,17;59:22;
60:19,23;61:7,15;
78:19;85:20
**opinions (9)**
22:6,19;37:17,18,19;
57:23,24,25;62:9
**opportunity (2)**
84:20;87:23
**opposed (1)**
69:20
**organization (1)**
85:18
**others (1)**
43:21
**Otherwise (1)**
66:24
**out (26)**
10:23;13:24;14:21,
22,25;30:3;34:5;35:3;
53:1;58:17;59:2,22;
60:21;62:24;68:12;
78:11;79:8,10,12;
80:13,13;81:8;83:7,9;
84:5;85:2
**outside (12)**
8:5;37:9;78:6,20;
79:16,24;80:8,15,16;
93:20,24;94:3
**outspoken (4)**
40:24;41:15;43:14;
84:13
**over (3)**
16:14;34:10;98:8
**overbroad (1)**
76:6
**oversee (1)**
62:14
**overthinking (1)**
50:23
**own (5)**
22:18,18;32:5;73:5;
83:23

## P

**page (15)**
23:17;24:20,25;
73:17,17,25;74:10,23;
75:15,16,18,18;77:24;
90:4,5
**paid (1)**
28:7
**pamphlets (1)**
97:3
**paragraph (4)**
52:2;67:3;89:7,22
**parameters (1)**
79:2
**paraprofessionals (1)**
67:16
**pardon (1)**
30:6

**part (14)**
17:15,21;30:15,19,
19;35:16,19;39:14;
70:22;86:19;88:12;
89:1;99:12;102:21
**partially (4)**
48:1;52:9,14,23
**participated (2)**
79:22;99:18
**participation (1)**
104:16
**particular (2)**
24:25;80:19
**particularly (1)**
70:5
**parties (1)**
94:23
**partisan (7)**
40:25;41:1,8;87:15;
97:14,15;98:2
**partisans (1)**
98:17
**partisanship (2)**
43:21;44:19
**party (2)**
96:2,3
**pass (2)**
17:24,24
**patient (1)**
53:23
**pay (1)**
14:24
**Pending (2)**
55:2;59:20
**people (44)**
13:20;20:19;32:4,5,
7,11;34:3,3,17,23;
36:18;38:1,22;42:25;
44:19;49:19;50:5,8,14;
51:8,13;52:13;55:24;
60:17;64:13,15;65:21;
67:22,23;70:7;80:25;
86:1;94:1,10,20;95:14;
96:13,20,22,23;97:11;
98:16;99:7,10
**Per (1)**
89:8
**percent (1)**
52:15
**perception (13)**
42:16;43:20,23;44:1,
3,7,12;45:5,23;46:13,
14;97:23;98:8
**perceptions (1)**
45:11
**perform (4)**
14:9;25:10;38:2;
72:13
**performance (12)**
28:13,15;39:24;44:8,
12;93:6,11,12,17;
99:20,24;100:1
**performed**

Bakalar v. Dunleavy, et al.
Case No. 3:19-cv-00025 JWS

Joanne Grace
April 29, 2021

27:23;44:22,23;
93:18
**performing (1)**
37:23
**perhaps (1)**
41:20
**period (5)**
15:2;76:23;91:3;
92:20;93:3
**Perkins (1)**
9:21
**permanent (1)**
28:12
**person (14)**
15:7,11;16:15;19:21;
25:9;39:5,6;63:12;
75:13;79:9;85:13;95:7;
97:25;98:1
**personal (30)**
8:8;31:20;34:3;36:1;
37:2,15;39:10,15;
40:10,16;41:8,13,14;
42:18,20;43:17,20;
44:10,24,25;53:21;
65:6;76:1,2,5,12;
81:15;83:12;86:12;
99:23
**personally (2)**
33:19;38:18
**Personnel (8)**
24:22;25:5;34:1;
76:16,18;78:5,18,24
**persons (2)**
23:21;24:4
**person's (1)**
30:16
**pinch (1)**
24:12
**pitfalls (1)**
76:3
**place (6)**
5:25;28:5;44:8;53:1;
73:5;84:11
**places (1)**
104:10
**plaintiff (1)**
5:7
**plan (1)**
49:1
**plans (2)**
49:8,10
**play (2)**
30:15,18
**player (1)**
38:22
**Playing (1)**
51:23
**please (5)**
5:16;42:11;59:14,20;
89:9
**pleasure (4)**
13:21,21,25;14:1
**pledge (1)**

48:15
**pm (1)**
105:9
**PO (1)**
5:14
**point (13)**
10:12;12:1;27:13;
30:22;31:5;46:6,24;
53:25;72:23;83:7,9;
97:19,21
**points (1)**
54:1
**policies (4)**
49:8,10;65:3,12
**policy (22)**
47:25;48:8,8,12;
75:25,25;76:4,12,23,
25;77:1,4,5,10,20;
78:11;79:14;80:2,8,18;
81:7,22
**political (69)**
23:4;29:8,17,19,22;
30:10,14,18;31:8,9;
32:7;33:2,12,14,16,17;
34:11,15,18,22;35:18,
19,22,24;36:1;37:17,
18,19;39:10,15,17,17,
18;40:1,10,16;41:8;
42:19;43:20;44:10,19,
24;45:1;46:6,19;52:4;
71:18;78:6,20;79:15,
23;80:4,8,15,16;83:12;
84:14;85:24;86:4,6,8;
94:3,24;95:22;96:2,4;
98:17;99:23;101:9
**politicians (1)**
98:14
**politicization (1)**
41:24
**politics (11)**
31:20;33:9,11;42:20;
51:23;72:19;78:7,21;
79:16,24;80:4
**pool (1)**
17:4
**pools (1)**
16:10
**position (25)**
11:16;12:17,25;
14:10;18:1;27:8,11;
29:7,11;31:7;43:16,17;
65:21;68:7;87:9,11,19,
20;89:11,19;90:24;
95:4,5,5;102:19
**positions (14)**
17:4;18:2,5,12,14,
15;29:12;31:24,25;
32:14;33:2;52:15;
63:11;64:7
**possible (1)**
88:25
**possibly (1)**
69:17

**post (2)**
72:5;86:10
**posting (1)**
72:14
**postings (1)**
96:15
**posts (1)**
86:8
**potential (1)**
58:24
**power (1)**
33:7
**practice (1)**
11:5
**precipitated (1)**
71:6
**precise (1)**
47:9
**precisely (1)**
21:13
**predominantly (1)**
73:5
**prepare (1)**
7:16
**prepared (2)**
7:12;8:19
**prepped (1)**
8:16
**presence (2)**
68:14;69:13
**president (1)**
98:15
**presidential (1)**
45:10
**press (3)**
56:18;74:2;75:13
**Presumably (1)**
47:5
**pretty (5)**
33:24;44:4;55:10;
65:8;95:13
**prevent (1)**
8:7
**prevented (1)**
36:1
**previous (1)**
65:17
**previously (1)**
55:14
**primarily (2)**
82:2;96:16
**principle (13)**
22:8;23:14,20;24:3;
25:4,4,7,18;26:3,21;
29:10;40:21;85:16
**principles (6)**
22:2,25;23:5;28:19;
29:3;30:16
**prior (10)**
17:2;20:10;24:9;
33:6;36:7,9;50:1;53:8;
68:11;95:10
**privacy (1)**

86:17
**private (4)**
85:24;86:6,11,16
**privilege (6)**
19:7;58:20,24;61:19,
24;92:21
**probably (13)**
16:7;17:19;20:16;
24:12;33:24;39:7;41:4;
58:13;64:15,18;71:22;
77:18;79:7
**problem (4)**
8:11;45:7,12,25
**problematic (5)**
36:4;39:19;43:12;
81:1;85:5
**problems (2)**
43:19;46:5
**procedures (1)**
67:23
**proceed (1)**
6:9
**proceeded (1)**
8:12
**process (15)**
14:7,14;15:24,25;
16:3,5,6;19:7;21:7;
70:23;81:23;94:21;
97:13;99:5;101:3
**produce (1)**
81:12
**produced (1)**
39:25
**producing (1)**
22:6
**product (3)**
39:24;40:3,4
**professional (6)**
37:4,6;38:10,10;
68:9;84:10
**professionally (1)**
67:20
**program (4)**
9:12,12;28:1,3
**programs (2)**
15:1;27:22
**prohibited (1)**
35:25
**prohibitions (1)**
95:25
**promised (2)**
50:7;101:21
**promote (1)**
32:25
**promoted (8)**
10:16,16,18;11:2,22;
21:10;31:20;34:23
**promoting (1)**
25:8
**promotion (6)**
10:13;14:4;20:13;
21:19;34:12,19
**promotions (2)**

20:23,25
**proper (1)**
42:6
**pros (1)**
15:9
**prosecute (1)**
81:2
**prosecutor (1)**
81:3
**Prosecutors (2)**
51:23;52:10
**protect (3)**
86:23,24,25
**protected (5)**
22:24,25;73:6;85:25;
86:4
**proud (1)**
55:10
**provide (9)**
22:6,17,19;57:22,25;
58:4;60:19,23;78:18
**provided (10)**
19:22,22;20:1,8;
48:24;60:2,5,8;62:7,9
**public (18)**
41:1;43:24,25;44:3;
45:4;77:12,22;82:18;
85:17;86:13,13,14;
94:18;95:22;98:2;99:4,
7,12
**publicly (2)**
97:10;99:13
**publish (1)**
87:8
**published (1)**
86:14
**pull (2)**
24:7;82:21
**pure (2)**
45:17;46:3
**purposes (2)**
31:17;46:9
**put (9)**
15:5;36:14;53:13;
62:8;65:5;80:25;83:10;
86:17;103:11
**putting (4)**
53:19;76:3;84:11;
96:5
**PX (1)**
52:9

## Q

**qualifications (2)**
25:9;35:17
**qualified (7)**
14:9;25:9;26:8,24;
27:2,10;86:5
**qualify (1)**
14:15
**queasy (1)**
43:10

Min-U-Script®

Glacier Stenographic Reporters Inc.
www.glaciersteno.com

(9) performing - queasy

**Exhibit AM**
**Page 37 of 41**

Case 3:19-cv-00025-JWS   Document 87-1   Filed 09/24/21   Page 37 of 41

Bakalar v. Dunleavy, et al.
Case No. 3:19-cv-00025 JWS

Joanne Grace
April 29, 2021

**quickly (2)**
35:13;103:10
**quit (1)**
50:14
**quite (1)**
16:16
**quote (3)**
26:12;52:20;86:25
**quotes (1)**
52:21

**R**

**Rabinowitz (2)**
9:16,20
**racist (1)**
81:1
**raise (1)**
6:1
**range (7)**
12:14,14,15,15;
13:14;28:6,6
**rather (3)**
79:6;82:21,21
**Re (2)**
78:3;79:5
**reach (2)**
79:8,12
**read (8)**
15:13;23:17,24,25;
24:1;26:4;54:7;55:2
**Reading (7)**
26:10;29:15;57:6;
66:22;74:10;88:5;
89:24
**ready (1)**
16:23
**real (3)**
35:13;53:24;103:10
**reality (3)**
97:23;98:11,22
**really (25)**
16:6;17:18;24:15;
27:6;28:2;34:4;36:20;
47:9;55:24;62:13,15;
66:9;74:19;76:14,16;
77:15;80:21;82:2;83:3;
95:2,21;96:12,12;
102:22;104:19
**reapply (7)**
47:15,21;49:1,20;
50:15;51:6,15
**reason (8)**
20:1,8;49:18;91:13;
92:1,11;93:22;94:14
**reasonable (1)**
28:13
**reasons (8)**
18:16;19:21,23;20:3;
65:18;83:17;92:24;
93:12
**recall (27)**
10:12;11:8,21;17:11;

18:19;24:23;33:5;
36:16;51:25;55:15;
60:5,8,11,13,14;63:13;
64:22;68:16,18;76:20,
22;77:4;78:13;79:20;
82:4;88:20;104:13
**receive (2)**
72:23,25
**receiving (5)**
67:7;76:20;78:13;
90:12;93:4
**reckless (1)**
84:25
**recognize (1)**
66:15
**recommendation (4)**
15:17;18:17,24;
21:11
**recommendations (4)**
19:1;20:12,21,25
**recommended (1)**
20:19
**record (17)**
5:4,17;54:24;55:1,4;
59:6,8,11;68:21,23,25;
69:3;83:11;102:8,10,
12;105:7
**recounting (2)**
98:10,10
**recourse (1)**
79:6
**recruit (4)**
14:20;26:22;27:4,16
**recruiting (2)**
26:5;27:9
**recruitment (3)**
14:20,21,23
**reduction (1)**
39:13
**reemployed (1)**
91:8
**reemployment (1)**
63:10
**referring (1)**
76:25
**refresh (1)**
63:18
**regard (3)**
28:18;29:2;101:6
**regarding (6)**
21:22;22:7;60:20;
68:13;79:13;83:12
**regards (5)**
10:1;23:10;46:22;
67:4;88:17
**registering (1)**
96:2
**Regular (3)**
27:21,25;28:3
**rehired (2)**
49:13;92:25
**rejected (1)**
21:1

**rejecting (1)**
20:12
**related (5)**
53:17;73:9;76:15;
77:14;80:9
**Relations (1)**
24:22
**relative (3)**
26:6,23;92:19
**relevant (1)**
23:9
**remember (12)**
10:9,15;16:4,6;
33:24;36:21;63:16;
79:18,19;104:20,21,24
**renew (1)**
55:5
**reoffered (1)**
64:7
**repeat (1)**
59:14
**repeatedly (1)**
83:19
**rephrase (1)**
91:23
**REPORTER (14)**
5:4,24;6:6,13;54:24;
55:4;59:6,10,19;68:23;
69:2;102:8,12;105:6
**Reporters (1)**
5:13
**represent (10)**
23:23;24:20;37:20,
22;39:11;42:21;72:9;
75:2;89:5;96:7
**representation (2)**
38:3,4
**representing (2)**
40:20;83:23
**Republican (6)**
72:15;73:20,20;75:4;
94:8,25
**Republicans (9)**
41:17,20;42:18;
93:25;96:14,14,15;
100:22,25
**request (16)**
46:25;47:20;50:23;
51:4;53:9;57:21,23;
58:11;60:20;61:2,3,7;
68:11;69:12;89:8,14
**requested (1)**
89:16
**requesting (1)**
58:1
**require (3)**
12:17;18:8;79:4
**required (4)**
27:4;48:14;50:13;
51:14
**requirement (1)**
29:23
**requirements (2)**

26:21;35:20
**requires (4)**
12:25;16:24;25:7;
50:8
**requiring (1)**
88:22
**reserve (1)**
7:24
**reserved (1)**
105:10
**resign (10)**
47:15,21;49:19;
50:14;51:5,15;58:2;
61:8;63:8;88:23
**resignation (20)**
52:8;53:9;57:22;
60:20;62:25;63:23;
64:14;65:19;66:19;
67:6;68:7,11;89:10,13,
15,19;90:11,18,24;
92:25
**resignations (7)**
47:1;52:4,13;60:1;
64:4;90:10,16
**resigned (1)**
63:9
**resources (3)**
11:4,10;72:5
**respond (1)**
98:24
**response (2)**
78:23;90:8
**responses (1)**
70:15
**responsive (1)**
38:23
**restrictive (1)**
80:24
**results (3)**
17:14;44:1,3
**retain (2)**
32:25;99:17
**retained (2)**
31:19;91:7
**retaining (1)**
49:12
**retaliation (1)**
23:2
**Retention (5)**
28:11;29:7;31:13;
34:13,19
**retirement (1)**
17:21
**returning (1)**
100:7
**reviewing (2)**
63:23,25
**revised (2)**
75:24;76:22
**rewarding (1)**
67:20
**rid (2)**
17:20;56:7

**rigged (1)**
99:11
**right (70)**
5:24;6:1;7:14,25;
11:15;13:17;18:1;
20:22;21:8;23:7;27:14;
28:8;30:10,11;31:23;
32:2,3,6,8,15,20;33:13;
34:9;38:15;45:5,6,13;
46:1;51:10;54:21;
56:15,22;59:18;61:17;
64:1,9;67:8;72:16;
74:3,14,21;75:1,9,11;
77:24;85:4,23,25;
86:11,24,25;87:1,3,6,7;
90:16;91:10;93:17;
98:9;99:15,24;100:20;
101:4,11,24;102:18;
104:5,18;105:3,6
**rights (3)**
76:7;104:15,16
**risk (2)**
84:12;85:11
**role (4)**
57:8;62:17;63:22;
64:3
**room (1)**
74:12
**round (2)**
15:6
**routine (1)**
18:12
**rules (1)**
96:9
**running (2)**
96:10;97:11
**Ruth (2)**
102:15;104:20

**S**

**Safety (1)**
77:12
**salaries (2)**
17:9,17
**salary (6)**
17:9,14;27:22,25;
28:3,10
**same (9)**
17:11;23:17;37:13;
45:11;50:17;65:15;
74:12;95:24;100:6
**saw (8)**
39:23;71:25;72:2;
79:21,22;88:8,14;
104:10
**saying (11)**
27:16;35:24;44:3,18;
48:25;52:21;71:17,22;
77:16;83:13;87:6
**School (1)**
9:3
**schools (1)**

Bakalar v. Dunleavy, et al.
Case No. 3:19-cv-00025 JWS

Joanne Grace
April 29, 2021

15:1
**scope (6)**
7:25;8:5;53:18,24;
65:5;101:13
**screen (1)**
56:7
**search (1)**
68:18
**second (14)**
6:25;15:15,16;59:3;
68:17,19,21;72:6;
73:16,24;74:22,22;
88:11;90:4
**secret (1)**
49:8
**secretaries (1)**
52:10
**section (14)**
7:3;11:4,9,11,19,20;
12:1;14:19;15:4;16:21;
21:22;23:18;67:13;
89:12
**sections (1)**
15:4
**secure (4)**
29:7,16,19;33:2
**seeing (6)**
24:23;51:25;55:15;
76:22;77:4;88:20
**seek (1)**
63:10
**seeking (3)**
49:13;61:18;90:9
**seem (2)**
76:10;90:19
**seemed (5)**
72:4;82:20;83:5;
85:10;96:8
**sees (1)**
85:17
**select (1)**
26:22
**selecting (1)**
26:5
**Selection (2)**
29:6;31:13
**self-destructive (1)**
83:4
**Senate (3)**
73:19,21;75:3
**send (3)**
13:23;14:25;15:12
**sending (1)**
53:1
**senior (1)**
66:4
**sense (2)**
43:3;99:25
**sent (15)**
45:8;48:6;60:20;
62:24;65:18;67:3;
68:12;69:18;70:11;
71:9,11,12;72:22;75:4;

88:22
**sentence (2)**
14:13;65:19
**separate (1)**
44:13
**separation (1)**
28:15
**serve (3)**
32:11;67:21,25
**service (1)**
25:11
**serving (2)**
68:6;89:17
**set (3)**
6:22;15:14;35:17
**seven (1)**
67:16
**several (3)**
15:10;32:17;83:17
**shake (1)**
97:4
**shall (1)**
23:19
**share (2)**
32:11;79:9
**Sheehan (1)**
83:23
**short (2)**
19:5,5
**shortly (1)**
91:20
**show (14)**
24:8;35:2;47:12;
51:17;55:13;66:14;
73:10;76:9;87:24;89:3;
99:8,8;103:12,17
**showed (2)**
17:14;88:25
**showing (1)**
62:20
**shown (2)**
69:6;88:11
**shows (1)**
99:4
**side (2)**
42:5;99:14
**sides (1)**
85:9
**Signature (1)**
105:10
**significant (1)**
44:5
**similarly (1)**
90:10
**situated (1)**
90:10
**situation (3)**
43:1;44:21;99:11
**skill (1)**
35:17
**skills (3)**
26:7,23;67:21
**small (1)**

24:11
**smaller (2)**
16:10;17:4
**Sniffen (4)**
45:8,16;78:2;79:13
**social (23)**
41:16;68:13;69:13;
72:5;75:25;76:1,2,12,
23;77:4,5,11,16,19,20;
80:16;81:1,15;86:9,12,
18;93:20,24
**sole (1)**
91:13
**somebody (13)**
16:14,18,24;18:18;
36:24;37:2,3;41:9,15;
69:20;71:12;84:17;
97:9
**somebody's (1)**
31:1
**somehow (2)**
65:2,12
**someone (9)**
13:24;14:15;21:12;
22:6;31:6,19;35:15;
80:3;88:25
**sometime (1)**
11:13;60:2,2;72:24
**sometimes (6)**
14:24,25;16:17;
29:22;55:23;95:12
**sooner (1)**
78:8
**sorry (20)**
10:11;12:10;13:6;
14:12;18:3,4,7;31:4;
36:9;57:2;59:17;61:1;
63:18;68:4,17;74:10,
21;91:9;100:13;104:20
**sort (6)**
8:12;18:12;41:7;
61:2;81:6;83:11
**sought (3)**
59:25;62:4,9
**source (1)**
71:10
**speak (1)**
85:2
**speaking (1)**
53:15
**special (7)**
30:1,4,8,9;32:22;
63:13,15
**specialized (1)**
11:4
**specific (4)**
25:8;50:11;61:7;
62:7
**specifically (2)**
42:17;89:7
**speech (27)**
23:3,4;39:17;41:11,
12,13,14;42:19;73:22;

78:6,20;79:15,23;80:4,
8,15,16,16;82:11;
83:13,16;84:14;86:4;
87:3,7,13;94:3
**speed (1)**
104:2
**spent (1)**
7:1
**spoke (1)**
57:20
**spreadsheet (8)**
88:1,3,6,6,8,11,14,20
**staff (3)**
52:7,10;67:16
**stakes (1)**
95:2
**stances (1)**
99:7
**stand (1)**
41:3
**standards (1)**
25:7
**start (3)**
7:1;10:2;40:7
**started (1)**
96:10
**state (63)**
8:6;11:7;13:10;17:3;
22:1;23:21;24:4;25:10;
29:11;33:6;38:5;39:12,
14;40:13,17;42:21;
44:22;45:22;46:10,25;
47:14,21;48:7,13,24;
49:2,11;50:4;51:5;
52:14,15,22;58:1;
60:21;61:8;62:8,24;
63:9;65:14;68:1,6;
77:10,10;83:9;85:22;
86:2,10,10;89:12,17;
90:10,25;91:8;93:3;
96:19;102:20,20;
103:16
**statehood (1)**
11:5
**statement (4)**
25:13,15;50:23;86:6
**statements (2)**
53:16;86:14
**States (2)**
45:13,24
**state's (2)**
41:23;51:1
**statewide (1)**
77:20
**status (1)**
28:12
**statute (1)**
26:12
**statutory (3)**
28:8,9,10
**stay (1)**
32:22

**staying (2)**
53:1;56:19
**Stenographic (1)**
5:13
**step (5)**
16:14,23;28:6;59:2;
84:5
**stickers (1)**
96:5
**still (4)**
11:21;22:11;37:19,
19
**stipulate (1)**
103:21
**stipulation (1)**
7:4
**stop (3)**
83:20;84:6,21
**stormed (1)**
99:10
**straight (1)**
9:11
**strike (8)**
13:9;38:8;39:1;
42:25;63:6;78:16;82:7;
99:25
**stringent (1)**
95:21
**strong (2)**
37:19;76:9;99:22
**Stroup (8)**
70:15;71:11,15,16,
21;72:8,15;73:8
**structure (1)**
28:5
**struggling (1)**
53:14
**studies (1)**
9:2
**study (2)**
17:9,14
**subgroup (3)**
11:3,9,17
**submit (2)**
46:25;89:15
**submitting (1)**
65:20;67:4;90:7
**subsection (2)**
11:9,12
**substance (1)**
92:8
**successful (1)**
80:11
**suggested (2)**
62:25;64:15
**summarize (2)**
8:23;9:19
**summary (1)**
97:2
**superior (1)**
12:20
**supervise (1)**
32:25

Min-U-Script®

Glacier Stenographic Reporters Inc.
www.glaciersteno.com

(11) scope - supervise

Exhibit AM
Page 39 of 41

Case 3:19-cv-00025-JWS   Document 87-1   Filed 09/24/21   Page 39 of 41

Bakalar v. Dunleavy, et al.
Case No. 3:19-cv-00025 JWS

Joanne Grace
April 29, 2021

**supervised (1)**
64:13
**supervisor (11)**
11:25;12:21;13:3,5,
7;15:3,8;16:13;20:18;
70:17;104:8
**supervisors (2)**
12:2;21:11
**supervisors' (1)**
20:20
**support (4)**
48:14;49:2,12;67:16
**supposed (1)**
43:5
**Supreme (6)**
9:17;40:14,15;
104:11,11,12
**Sure (29)**
8:17;17:18;18:25,25;
20:5,16;24:15;25:14;
27:2,15;28:2;29:16,20;
34:16;36:14;42:5;44:6;
49:20;58:14;59:4,17,
24;69:22;73:24;85:17;
86:3;95:21;99:2;104:6
**surprise (1)**
105:1
**surrounding (1)**
79:2
**switch (1)**
34:10
**sworn (2)**
6:8,13
**system (8)**
17:21;21:23;23:18,
19;25:2,5;94:16;98:16

**T**

**talk (10)**
23:9;26:2;39:21,22;
45:15;55:23;58:22;
70:2,6;90:22
**talked (6)**
20:22,23;44:7;70:20;
91:1;93:8
**talking (4)**
40:5,5;51:8;102:20
**target (1)**
15:1
**targeted (1)**
71:16
**task (2)**
60:14;80:20
**taxation (1)**
9:4
**team (5)**
38:22;62:16;95:8,14,
18
**technical (2)**
74:14,18
**telling (2)**
53:24;76:4

**template (6)**
62:23;63:3;64:16,24,
24;65:9
**temporary (1)**
28:14
**ten (2)**
54:17,18
**tend (1)**
54:14
**tendency (1)**
76:5
**terminate (1)**
92:13
**terminated (4)**
28:25;89:16;92:12;
103:3
**terms (3)**
16:2;44:7,9
**terrible (2)**
42:24;55:25
**testified (3)**
6:15;91:25;92:11
**testify (2)**
7:7,20
**testimony (6)**
7:5;8:6;22:12;50:1;
92:5,8
**Texas (1)**
45:9
**Thanks (1)**
78:3
**theoretically (1)**
79:5
**thereafter (1)**
91:21
**therefore (1)**
17:17
**though (2)**
33:1;79:3
**thought (4)**
85:21;87:1;92:12;
99:10
**thoughts (1)**
79:9
**threat (1)**
88:23
**threatened (1)**
97:8
**three (4)**
9:22;13:16;18:20;
83:22
**throughout (1)**
98:8
**THURSDAY (2)**
5:1,5
**times (3)**
19:16;36:4;91:18
**timing (2)**
59:25;62:6
**title (1)**
10:13
**Today (4)**
5:5,6;6:24;8:2

**together (4)**
15:5;37:14;103:23;
104:5
**told (8)**
42:23;47:19;51:14;
69:18;70:1,12;75:9;
95:17
**took (1)**
73:5
**top (3)**
15:10;56:20;72:12
**topic (3)**
53:14;62:9;70:4
**topics (2)**
7:20,21
**toward (1)**
99:14
**town (1)**
37:13
**trackpad (1)**
24:13
**transition (11)**
46:23,23;62:16;
66:12;67:5;88:21;89:9;
91:4,20;92:23;103:4
**treatment (2)**
28:17;29:1
**trial (1)**
40:14
**tried (1)**
80:2
**trouble (1)**
83:25
**true (5)**
29:10,13,15;55:9;
98:6
**Trump (5)**
72:8,11;84:14;96:10,
16
**trust (5)**
43:24,25;44:3;98:3;
99:5
**trusts (1)**
94:18
**truth (3)**
6:14,14,15
**try (4)**
15:1;55:16,21;56:22
**trying (3)**
46:6;82:2;84:8
**Tuckerman (7)**
67:5;89:9;90:23;
91:1,5,12,24
**turn (3)**
35:3;80:13;81:8
**turned (1)**
80:12
**two (10)**
6:23;11:24;32:21;
72:3;73:7;83:21;84:18;
85:9;86:22;95:6
**type (1)**
79:7

**types (1)**
45:11

**U**

**unaware (2)**
58:16;59:21
**unbiased (1)**
98:4
**under (3)**
5:25;22:2;23:19
**undermine (2)**
31:1;41:18
**undermines (2)**
31:11;41:2
**underneath (1)**
90:5
**understands (1)**
50:2
**understood (7)**
7:13;48:2;49:11;
50:10;65:21;84:18,24;
85:5;95:25
**unfair (2)**
41:20;98:8
**uninformed (1)**
85:13
**United (2)**
45:12,24
**University (1)**
9:1
**unless (1)**
49:2
**unpack (1)**
20:15
**unpacking (1)**
46:4
**Unprecedented (4)**
51:11,12;52:7,18
**unprofessional (3)**
89:23;90:1,20
**unquote (1)**
86:25
**unusual (2)**
51:10;90:19
**up (22)**
15:15;17:24;20:17;
24:7;41:3;48:21;53:13,
19;56:3;59:1;62:8;
65:5;69:21;70:6;76:10;
81:11;95:10;101:13,
23;103:12,17;104:2
**upon (4)**
31:8;33:9;67:7;
90:12
**upper (3)**
16:13;57:17,20
**upset (2)**
70:5,9
**use (6)**
76:1,2,2,12;77:15;
81:10
**used (2)**

16:1,11
**using (3)**
72:4;77:10;81:15
**utilize (1)**
14:14

**V**

**vacancy (2)**
14:19,20
**values (2)**
32:11;96:22
**various (6)**
15:9;41:15;60:16,17;
67:24;90:6
**VI (4)**
11:23;12:2,4,16
**via (2)**
5:11;6:15
**Videoconference (2)**
5:11;6:15
**view (8)**
17:22,22;41:9;45:19;
56:13;98:19,20,21
**viewed (1)**
76:6
**views (5)**
41:16;65:6;72:19;
85:24;86:19
**VII (1)**
12:10
**VIII (1)**
12:9
**VIs (1)**
12:3
**vision (1)**
68:2
**voluntarily (1)**
63:9
**voluntary (1)**
89:13
**voted (2)**
72:8,10
**Voting (2)**
104:15,16
**vulgar (2)**
85:4;98:2

**W**

**wait (1)**
88:10
**Walker (1)**
52:12
**wants (2)**
52:22;87:8
**warm (1)**
39:5
**warn (1)**
83:14
**way (20)**
8:9;14:18,22;20:20;
23:12;41:9;44:20;

Min-U-Script®

Glacier Stenographic Reporters Inc.
www.glaciersteno.com

(12) supervised - way

Exhibit AM
Page 40 of 41

Bakalar v. Dunleavy, et al.
Case No. 3:19-cv-00025 JWS

Joanne Grace
April 29, 2021

64:25;65:13;72:13;
79:10;80:5;85:3;94:14;
95:2;97:8,15;99:6,8;
104:2
**website (2)**
14:24;24:21
**week (2)**
91:25;92:8
**weighing (1)**
80:19
**weren't (3)**
20:8;70:22;80:11
**what's (2)**
87:24;89:3
**whole (1)**
6:14
**whose (2)**
31:11;85:15
**William (1)**
69:8
**willing (1)**
48:3
**willingness (1)**
65:1
**wishes (1)**
50:6
**within (10)**
20:13,25;21:15,17;
28:19;29:3,13;53:18;
58:15;59:20
**without (3)**
19:10;23:12;58:20
**witness (37)**
5:21,25;6:3,5,8;7:13,
16,22;8:13;19:8;21:8;
42:11;44:15;46:9,11;
50:20;53:13,13,19;
54:2;55:18;56:2,5,8,10,
15,22;58:21;59:2,5;
62:6,8;74:3,6,9;
101:25;102:5
**wiz (2)**
74:14,18
**woman (2)**
13:4,4
**wonder (1)**
64:10
**wondering (1)**
76:17
**word (2)**
16:1;93:18
**words (1)**
77:11
**work (50)**
5:13;9:18,19;10:1;
13:10,20,24;14:2;
16:20,21;27:23;31:16;
32:24;36:6;37:9;38:6,
9,25;39:23,24;40:3,3;
43:2,3;44:9,22,23;
45:1;48:3;49:1;50:8;
52:25;53:2,3;55:10;
65:12,22;67:15;76:9;

78:6,20;79:16,24;
94:11,17;95:7,16,19,
23;96:1
**worked (15)**
9:21,22,24;13:12;
24:18,18;51:3;65:13;
90:6;103:6,22;104:4,6,
17,19
**workers (3)**
47:14,21;49:12
**workforce (2)**
51:5;52:16
**working (9)**
34:13;36:17;37:23;
53:8,9;71:17;76:11;
82:2;93:3
**Workplace (1)**
35:8
**works (2)**
21:3,5
**worry (1)**
85:8
**write (2)**
15:8;84:17
**writing (16)**
31:5;48:6,12,23;
49:6;57:8,12,15;76:4;
79:21;81:13,21;83:10;
84:11,15,16
**writings (1)**
72:18
**wrong (2)**
23:7;101:17
**wrote (5)**
40:6;70:12;71:25;
75:23;83:10

## X

**XII (1)**
21:22

## Y

**year (2)**
9:21;10:2
**years (14)**
9:22,24;11:8,24;
16:7,7;18:21;33:6;
51:3;86:2;95:7,17,18,
18
**yup (1)**
65:22

## Z

**Zoom (2)**
5:11;6:15

## 1

**1 (5)**
26:5;75:16,18,18;

77:24
**1,200 (12)**
46:25;47:14,20;48:7,
24;49:11,19;50:14;
51:8;58:1;61:8;88:2
**1,454 (1)**
52:14
**10 (1)**
52:15
**11 (2)**
24:9,20
**12 (1)**
23:18
**12:28 (1)**
105:9
**13 (2)**
13:14;62:21
**14 (2)**
55:14,21
**15 (1)**
87:25
**16 (6)**
13:14;55:17;69:7;
89:4,8;90:8
**16th (1)**
47:13
**18 (1)**
51:22
**1981 (1)**
9:6
**1985 (1)**
9:8
**1987 (1)**
9:10
**1991 (2)**
10:3;11:11

## 2

**2 (4)**
27:21;73:17;74:10;
90:5
**2003 (2)**
11:11,13
**2005 (1)**
11:25
**2017 (3)**
69:7,14;72:24
**2018 (10)**
12:5,6;51:22;55:17;
89:8;90:8,14;93:14,16;
103:4
**2020 (3)**
94:19;97:6;98:7
**2021 (2)**
5:1,5
**24 (2)**
35:4,5
**25 (1)**
47:16
**250 (1)**
52:13
**26 (2)**

51:18,19
**27 (3)**
12:15;66:1,2
**27-year (1)**
67:12
**28 (2)**
66:16,18
**29 (5)**
5:1,5;69:4,7;73:1

## 3

**3 (3)**
28:11,21;90:14
**3:19-cv-00025 (1)**
5:9
**30 (9)**
9:24;33:6;51:3;
73:11,12,17;75:19;
77:25;86:2
**30b6 (15)**
6:24;7:1,3,6,12,22;
8:4,5,13;22:12;46:11;
53:13,19;54:2;93:9
**31 (1)**
103:19
**32340 (1)**
5:14
**39.25.010b (1)**
26:3

## 4

**4 (1)**
28:17

## 5

**5 (1)**
29:6

## 6

**6 (2)**
21:22;23:18

## 8

**805 (1)**
88:2
**8th (1)**
75:23

## 9

**9:39 (2)**
5:2,6
**99803 (1)**
5:15