# In The Matter Of:

*Bakalar v. Dunleavy, et al.*
*Case No. 3:19-cv-00025 JWS*

---

*Tuckerman Babcock*
*April 22, 2021*

---

*Glacier Stenographic Reporters Inc.*
*P.O. Box 32340*
*Juneau, Alaska 99803*
*www.glaciersteno.com*



Original File Tuckerman Babcock 4-22-2021.txt

**Min-U-Script® with Word Index**

Bakalar v. Dunleavy, et al.
Case No. 3:19-cv-00025 JWS

Tuckerman Babcock
April 22, 2021

Page 1

```
 1          IN THE UNITED STATES DISTRICT COURT

 2                    DISTRICT OF ALASKA

 3

 4   ELIZABETH BAKALAR,               )
                                      )
 5         Plaintiff,                 )
                                      )
 6   v.                               )
                                      )
 7   MICHAEL J. DUNLEAVY, IN HIS      )
     INDIVIDUAL AND OFFICIAL          )
 8   CAPACITIES; TUCKERMAN BABCOCK;   )
     AND THE STATE OF ALASKA,         )
 9                                    )
           Defendants.                )
10   _____ )

11   Case No. 3:19-cv-00025 JWS

12

13

14

15       VIDEO DEPOSITION OF TUCKERMAN BABCOCK

16            VIA ZOOM VIDEOCONFERENCE

17

18         Pages 1 through 172, Inclusive

19            Taken:  April 22, 2021

20

21

22

23

24

25
```

Page 2

```
 1   Zoom Videoconference Deposition of TUCKERMAN BABCOCK

 2

 3              INDEX OF EXAMINATIONS

 4                                        PAGE

 5   Examination by Mr. Choate  ...................7

 6

 7                INDEX OF EXHIBITS

 8   NO.                                   PAGE

 9   Exhibit 1 ...............................22
          Notice of Taking Individual and 30(b)(6)
10        Witness Depositions of Tuckerman Babcock

11   Exhibit 2 ...............................46
          "Update:  Reaction to Murkowski's No
12        Vote on GOP Health Care Bill"

13   Exhibit 3 ...............................49
          "Chair of Alaska Republican Party
14        'Shocked' Murkowski Voted Against
          Kavanaugh Confirmation"
15
     Exhibit 4 ...............................53
16        "Trump, Palin, and Babcock's Attacks
          Show Murkowski Made the Right Choice"
17
     Exhibit 5 ...............................54
18        "Alaska GOP Vows 'Significant Response'
          Against Murkowski"
19
     Exhibit 6 ...............................54
20        "Striking Out on His Own, State Rep.
          Gary Knopp, a Republican from Kenai,
21        Hopes to Charter a New Coalition in the
          Alaska House"
22
     Exhibit 7 ...............................58
23        "Alaskan Republican Officers Call on
          Party to Take Stand on Integrity of
24        Elections"

25
```

Page 3

```
 1              INDEX OF EXHIBITS, CONTINUED

 2   NO.                                   PAGE

 3   Exhibit 8 ...............................60
          Alaska Republican Party Resolution
 4        Regarding U.S. Senator Lisa Murkowski

 5   Exhibit 9 ...............................62
          "Alaska GOP Censures Murkowski, Looks
 6        for '22 Challenger"

 7   Exhibit 10 ..............................65
          "Tshibaka Makes Rounds on the
 8        Peninsula"

 9   Exhibit 11 ..............................69
          Alaska DOA Personnel and Labor Relations,
10        Frequently Asked Questions,
          Classification System and Method
11        Questions

12   Exhibit 12 ..............................73
          Excerpt from the Minutes of the Alaska
13        Constitutional Convention

14   Exhibit 13 .............................103
          Form sent to employees for use in
15        drafting their resignation letters

16   Exhibit 14 .............................109
          11/16/2018 Memorandum from Tuckerman
17        Babcock Re:  Request for Resignation

18   Exhibit 15 .............................118
          Excel spreadsheet - Resignation
19        Memo Sent List

20   Exhibit 16 .............................131
          Resignation letter from Elizabeth
21        Bakalar to AG Jahna Lindemuth

22   Exhibit 17 .............................141
          11/26/2018 e-mail from Nancy Stroup
23        Re:  Hiring Recommendations

24

25
```

Page 4

```
 1              INDEX OF EXHIBITS, CONTINUED

 2   NO.                                   PAGE

 3   Exhibit 18 .............................146
          11/28/2018 e-mail from Jeremy Price
 4        to Tuckerman Babcock Re:  Communication
          with Commissioners
 5
     Exhibit 19 .............................152
 6        3/20/2019 letter from Governor Dunleavy
          to the Alaska Judicial Council
 7
     Exhibit 20 .............................152
 8        Screenshot from the Recall Dunleavy
          website
 9
     Exhibit 21 .............................155
10        "Governor Dunleavy Announces Senior
          Staff Change"
11
     Exhibit 22 .............................157
12        8/22/2019 letter from Tuckerman Babcock
          to Governor Dunleavy
13
     Exhibit 23 .............................157
14        Posts from Facebook page "Tuckerman
          Babcock, Former Chair, Alaskan
15        Republican Party"

16

17

18

19

20

21

22

23

24

25
```

Min-U-Script®

Glacier Stenographic Reporters Inc.
www.glaciersteno.com

(1) Pages 1 - 4

Exhibit AP
Page 2 of 64

Bakalar v. Dunleavy, et al.
Case No. 3:19-cv-00025 JWS

Tuckerman Babcock
April 22, 2021

Page 5

```
1  A P P E A R A N C E S:
2
3    For the Plaintiff:
4      MARK CHOATE, ESQ.
       Choate Law Firm LLC
5      424 N. Franklin Street
       Juneau, Alaska  99801
6
7      AMANDA J. HARBER, ESQ.
       49th State Law LLC
8      P.O. Box 661
       Soldotna, Alaska  99669
9
     For the Defendants:
10
       MICHAEL B. BAYLOUS, ESQ.
11     Lane Powell LLC
       1600 A Street, Suite 304
12     Anchorage, Alaska  99501
13     DEVON McCURDY, ESQ.
       Lane Powell LLC
14     1420 5th Avenue, Suite 4200
       Seattle, Washington  98101
15
16     BE IT REMEMBERED, that pursuant to Notice of Taking
17  Individual and 30(b)(6) Witness Depositions of Tuckerman
18  Babcock, and beginning on Thursday, the 22nd day of April,
19  2021, commencing at the hour of 9:49 a.m. thereof, via Zoom
20  Videoconference, before me, LYNDA BARKER, Registered
21  Diplomate Reporter and Notary Public in and for the State
22  of Alaska, appeared via Zoom Videoconference:
23             TUCKERMAN BABCOCK
24  called as a witness by the plaintiff, who was
25  thereafter examined as hereinafter set forth.
```

Page 6

```
1         THURSDAY, APRIL 22, 2021
2              9:49 A.M.
3
4         THE REPORTER: We are on record.
5  Today is Thursday, April 22nd, 2021.  The time is
6  now 9:49 a.m.  We are here today to take the
7  deposition of Tuckerman Babcock on behalf of the
8  plaintiff in the case of Bakalar v. Dunleavy, et
9  al., Case No. 3:19-cv-00025 JWS.
10        We are conducting this deposition
11 via Zoom Videoconference.
12        My name is Lynda Barker, and I
13 work for Glacier Stenographic Reporters.  My
14 business address is P.O. Box 32340, Juneau, Alaska
15 99803.
16        Would counsel please identify
17 themselves for the record?
18        MR. CHOATE: My name is Mark
19 Choate.  I'm the attorney for Libby Bakalar.  With
20 me today is my co-counsel, Amanda Harber.
21        That's your guys' turn.
22        MR. BAYLOUS: There we go.  Mike
23 Baylous on behalf of the defendants, including
24 Mr. Babcock, and with me is Devon McCurdy.
25        THE REPORTER: Thank you.  I'll
```

Page 7

```
1  now place the witness under oath.
2         Mr. Babcock, can I have you raise
3  your right hand for me, please?
4         (Oath administered.)
5         THE WITNESS: Yes.
6         THE REPORTER: Thank you very
7  much.
8         The witness has been sworn.  You
9  may proceed.
10        MR. CHOATE: Thank you.
11
12        TUCKERMAN BABCOCK
13
14 having been first duly sworn by the court reporter to
15 tell the truth, the whole truth, and nothing but the
16 truth, testified via Zoom Videoconference as follows:
17
18        EXAMINATION
19
20 BY MR. CHOATE:
21   Q.   Good morning, Mr. Babcock.
22   A.   Good morning.
23   Q.   This is the time set for the taking of
24 your deposition in the matter known as Bakalar v.
25 Dunleavy, Michael Dunleavy in his individual and
```

Page 8

```
1  official capacities; Tuckerman Babcock; and the
2  State of Alaska.  It's a case in the United States
3  District Court for the District Alaska, Case
4  No. 3:19-cv-00025 JWS, and it's before the
5  Honorable John W. Sedwick.
6         Have you ever had your deposition
7  taken before?
8    A.   Yes.
9    Q.   How many times?
10   A.   Two or three times.
11   Q.   Okay.  Can you just tell me when those
12 were and what the subject matter of those
13 depositions was?
14   A.   Well, I don't remember the dates of all
15 of them.  The subject matter --
16   Q.   Approximately?
17   A.   Yeah.  The subject matter was related
18 to redistricting in the early 1990s, redistricting
19 in the 1980s, personnel matters at Matanuska
20 Electric between 1999 and 2009.  And then --
21 deposition taken?  I can't remember whether I had a
22 deposition taken or not in my suit against
23 Matanuska Electric.
24   Q.   Have you -- so let me just make sure I
25 have it right.  You were deposed in the
```

Exhibit AP
Page 3 of 64

Case 3:19-cv-00025-JWS   Document 87-4   Filed 09/24/21   Page 3 of 64

Bakalar v. Dunleavy, et al.
Case No. 3:19-cv-00025 JWS

Tuckerman Babcock
April 22, 2021

Page 9

1  redistricting issues in both the '90s and early
2  '80s, while working for Matanuska Electric
3  Association, and then in a personal lawsuit you had
4  against the -- maybe in a personal lawsuit you had
5  against the MEA; is that right?
6      A.    That's to the best of my recollection,
7  yeah.
8      Q.    Okay.  And we'll talk a little bit more
9  about the MEA in a minute, but you left them in --
10  was it 2009?
11      A.    Yes.
12      Q.    Okay.  And so your lawsuit would have
13  followed that, after 2009?
14      A.    Correct.
15      Q.    Other than that lawsuit which you may
16  have been deposed in, have you had your deposition
17  taken since then?
18      A.    I don't think so.
19      Q.    Okay.  Have you provided sworn
20  testimony in court in the last 10 years since,
21  let's say, 2010?
22      A.    What do you mean by "sworn testimony in
23  court"?
24      Q.    Meaning you went to a courtroom and you
25  were placed under oath and gave testimony in the

Page 10

1  courtroom.
2      A.    Oh, yes.  I did that out in Palmer in a
3  case involving MEA and their general manager.
4      Q.    Would that have been while you were
5  working for MEA?
6      A.    No.
7      Q.    Was that after you left MEA?
8      A.    Correct.
9      Q.    And who was the general manager?
10      A.    Wayne Carmony.
11      Q.    How do you spell that last name?
12      A.    C-A-R-M-O-N-Y.
13      Q.    And was that lawsuit between
14  Mr. Carmony and MEA?
15      A.    That's my memory of it, yes.
16      Q.    Okay.  All right.  Do you recall any
17  other -- how about -- I understand you probably
18  testified in the redistricting litigation back in
19  the '80s and '90s in court?
20      A.    I did not testify in court in the
21  1980s.  I did -- I think I did in the 1990s.
22      Q.    And you've had a chance to talk with
23  Mr. Baylous about your deposition today, and you
24  understand that you're under oath; is that correct?
25      A.    Yes.

Page 11

1      Q.    You understand that this is -- your
2  testimony will be treated just as if you were
3  testifying in the court itself, so it's not
4  different.  Anything that you say in this
5  deposition could be potentially presented to the
6  judge or the jury in subsequent filings and at
7  trial.  Do you understand that?
8      A.    I'll take your word for it.
9      Q.    Okay.  Any reasons why you're not able
10  today to give your best testimony?  Your health,
11  other things going on that would prevent you from
12  being able to concentrate and answer my questions?
13      A.    That's very kind of you, but, no, I'm
14  fine.
15      Q.    I'd like to get some background from
16  you first.  Where were you born?
17      A.    Caracas, Venezuela.
18      Q.    And what were your parents doing down
19  there?
20      A.    My father was working for the YMCA, and
21  my mother was a homemaker.
22      Q.    When did you first come to Alaska?
23      A.    I think it was January 1966.
24      Q.    And how old were you at that time?
25      A.    Five.

Page 12

1      Q.    And what brought your family to Alaska?
2      A.    Well, I don't know as a five-year-old
3  what brought them.
4      Q.    Uh-huh.
5      A.    Subsequently it was primarily the
6  opportunity to climb mountains.
7      Q.    Was your father a climber?
8      A.    Yes.  My father was a dedicated
9  mountain climber.
10      Q.    What type of work did your father do
11  once he came to Alaska?
12      A.    He did a lot of different types of
13  work.
14      Q.    What types?
15      A.    I don't know them all, but he worked
16  for the City of Anchorage.  He worked for the state
17  in their welfare department.  He worked as a --
18  some sort of professor of sociology, and then
19  directed the -- a mountaineering and wilderness
20  survival program at the Anchorage Community
21  College.
22      Q.    Listening to that, would it be correct
23  to say that basically he worked for government in
24  some capacity?  And by "government" I also mean
25  education, community colleges?

Exhibit AP
Page 4 of 64

Bakalar v. Dunleavy, et al.
Case No. 3:19-cv-00025 JWS

Tuckerman Babcock
April 22, 2021

Page 13

1    A.    I think so.
2    Q.    And he did that for the time period
3  that you're aware that he was employed here in
4  Alaska?
5    A.    Yes.
6    Q.    Okay.  Did your mother continue in her
7  work as a homemaker?
8    A.    She did.  She also worked for the
9  United States Postal Service.
10    Q.    And what did she do for them?
11    A.    She was a letter carrier.
12    Q.    Okay.  And was that in the Anchorage
13  area?
14    A.    Yes, it was.
15    Q.    You attended -- did you go to high
16  school in Anchorage?
17    A.    Yes.
18    Q.    And I understand that that was Steller
19  Alternative High School?
20    A.    Correct.
21    Q.    Okay.  And what years did you go there?
22    A.    Ninth grade through twelfth grade and
23  graduated in '78.  Yeah.
24    Q.    All right.  And Steller's -- do you
25  recall what its motto is?

Page 14

1    A.    No.
2    Q.    "Only the educated are free."
3    A.    Well, I don't know when that motto was
4  adopted, but I have no reason to doubt you.
5    Q.    Okay.  Was Mark Begich in school when
6  you were there?
7    A.    Yes, he was.
8    Q.    Okay.  The same class, or how far apart
9  were you two?
10    A.    No.  No, I was in the same class as his
11  older brother Tom.
12    Q.    Okay.  After graduating from Steller in
13  '78, what did you do next in terms of education?
14    A.    I worked for the Division of Elections,
15  and I attended some classes at the University of
16  Alaska Anchorage, and then I went to Wesleyan
17  University in Connecticut.
18    Q.    How long did you work for the Division
19  of Elections?
20    A.    Well, I think I was a volunteer part of
21  my senior year, and then I worked as a clerk for
22  the Division of Elections for some months in either
23  '78 or '79.
24    Q.    So your actual paid work for the
25  Division of Elections would have just been a period

Page 15

1  of some months?
2    A.    I think so.  It's hard to remember.  I
3  was 18 or 19.
4    Q.    Okay.  Were you a Tier I?
5    A.    I am a Tier I, yes.
6    Q.    So how many classes did you attend at
7  UAA before transferring to Wesleyan?
8    A.    Well, I can only vaguely recall two.  I
9  don't know if I even completed either one.
10    Q.    Okay.  Did you pretty much enter
11  Wesleyan then as a new student, as a freshman?
12    A.    Yes.
13    Q.    Okay.  And what year would that have
14  been?
15    A.    Let's see.  I think the fall of '79.
16    Q.    What caused you to choose Wesleyan as
17  the place to go to school?
18    A.    It was in a smaller town, and it was
19  close to my grandparents.
20    Q.    And where did your grandparents live?
21    A.    They lived in New Haven -- or in
22  Branford, Connecticut, just outside of New Haven,
23  and in Clinton, Connecticut.
24    Q.    What were your grandparents' names?
25    A.    What were my grandparents' names?

Page 16

1    Q.    Uh-huh.
2    A.    Reginald and Connie Babcock, and
3  Alexander and Shirley Murphy.
4    Q.    Okay.  At Wesleyan, did you go there
5  for four years straight?
6    A.    No.  I went there for two years and
7  then transferred to Lewis and Clark College.
8    Q.    And what caused you to make the
9  decision to transfer there?
10    A.    Just to go experience something new on
11  the West Coast.  I'd experienced a lot on the East
12  Coast.
13    Q.    Did you graduate from Lewis and Clark?
14    A.    I spent my junior and senior year
15  there, but my degree is from Wesleyan.
16    Q.    How did that work?
17    A.    I'm not sure what kind of question that
18  is.
19    Q.    I'm sorry.  So you didn't transfer to
20  Lewis and Clark, you just simply took classes there
21  while still enrolled in Wesleyan?
22    A.    No, I transferred to Lewis and Clark,
23  but Wesleyan -- as long as you spent at least two
24  years there, Wesleyan offered the opportunity to
25  graduate from them, so I did.

Exhibit AP
Page 5 of 64

Case 3:19-cv-00025-JWS   Document 87-4   Filed 09/24/21   Page 5 of 64

Bakalar v. Dunleavy, et al.
Case No. 3:19-cv-00025 JWS

Tuckerman Babcock
April 22, 2021

Page 17

1   Q.   Do you have a degree also from Lewis
2  and Clark?
3     A.   No, just from Wesleyan.
4     Q.   And what is your degree in?
5     A.   Government.
6     Q.   A government degree and you did not
7  become a lawyer?
8     A.   No.  No, I was spared that exciting
9  life.
10    Q.   Okay.  And am I correct that your major
11 classes, which would have been in government, would
12 have primarily been at Lewis and Clark?
13    A.   I don't know.  I took history and
14 government classes at Wesleyan and also at Lewis
15 and Clark.
16    Q.   All right.  What year did you
17 officially graduate from Wesleyan?
18    A.   19 -- I think it was 1983, or was it
19 '82?
20    Q.   Well, you started in the fall of '79,
21 so that would be '81, '82 -- I think it would be
22 '83.  Well, it could be -- it would be probably
23 '83.
24    A.   I think it was '83.
25    Q.   Okay.  And was that a Bachelor of Arts

Page 18

1  or a Bachelor of Science?
2     A.   A Bachelor of Arts.
3     Q.   Since graduating from Wesleyan, my
4  understanding is you also went to William & Mary?
5     A.   Yes.  I went to the College of William
6  & Mary in Virginia.
7     Q.   Okay.  And when did you go to William &
8  Mary?
9     A.   I think that was '85, '86.
10    Q.   And what did you study at William &
11 Mary?
12    A.   International relations, the master's
13 program.
14    Q.   And was that a one- or two-year
15 program?
16    A.   I think it was a two-year program.
17    Q.   And did you complete it?
18    A.   Part of it.  I completed the academic
19 portion and the oral master's exam, but I did not
20 complete the written master's thesis until the
21 deadline had passed.
22    Q.   And how long did you have to complete
23 the written master's thesis?
24    A.   They gave me -- they gave me a few
25 years, but I didn't get it done until after the

Page 19

1  timeline had elapsed.
2     Q.   Okay.  And what was your master's
3  thesis on?
4     A.   It was on redistricting.
5     Q.   And specifically, or maybe in more
6  detail, what was the topic of your thesis on about
7  redistricting?
8     A.   Predictably -- predictably
9  unpredictable Alaska Supreme Court.
10    Q.   Okay.  After finishing at Wesleyan, did
11 you return to Alaska for work before you went to
12 William & Mary?
13    A.   Yes.
14    Q.   And what did you return to Alaska and
15 do?
16    A.   Well, for a while I did some -- I think
17 some odd jobs, and then I went to work for the
18 Alaska Legislature.
19    Q.   And who did you work for in the
20 legislature?
21    A.   I was first hired by Senator Joe
22 Josephson, but before I actually started working
23 with him, Representative Mae Tischer offered me a
24 job and I accepted her offer.  And then I worked
25 for Senator Edna DeVries, I think, before returning

Page 20

1  to schooling.
2     Q.   And what would have been your job
3  titles back then, if you recall?
4     A.   I think just legislative aide.
5     Q.   Okay.  And were those jobs Tier I jobs,
6  and they fell within the state Tier I system?  They
7  were classified, or not?  I don't know.
8     A.   Well, Tier I has nothing to do with
9  being classified.
10    Q.   Right.
11    A.   So once you're established as Tier I,
12 which I already was, I assumed that working in the
13 legislature also was Tier I.  And since I've
14 retired I learned that it was.
15    Q.   At some point did you provide expert
16 testimony regarding reapportionment in the 1980s?
17    A.   Yes.  That's the deposition I referred
18 to.
19    Q.   And would that have been after you
20 completed your -- or after you'd been at the
21 College of William & Mary?
22    A.   I don't remember the timing.
23    Q.   All right.  Was that a case that was
24 before Judge Brian Shortell?
25    A.   Yes, I think so.

Exhibit AP
Page 6 of 64

Bakalar v. Dunleavy, et al.
Case No. 3:19-cv-00025 JWS

Tuckerman Babcock
April 22, 2021

1    Q.    And on whose behalf did you provide
2 expert testimony?
3    **A.    Well, I know it was with Cheri and Ken**
4 **Jacobus, but I don't remember who they were**
5 **representing.**
6    Q.    Do you recall Judge Shortell saying
7 that in cutting attorney's fees by three-quarters,
8 that your testimony was "singularly unpersuasive,
9 unduly lengthened the trial, and contributed not at
10 all to any favorable result"?
11    **A.    I do remember that from Judge Shortell.**
12    Q.    What were your thoughts about that?
13    **A.    That the judge did not understand**
14 **redistricting.**
15    Q.    Okay.  At that time what was your view
16 of redistricting, the purposes for it?
17    **A.    The purpose of redistricting?**
18    Q.    Yes.
19    **A.    Is to equalize the population among the**
20 **legislative districts.**
21    Q.    Can redistricting, in your experience,
22 be used to favor one political party over another
23 by the choices as to what geographical areas and
24 populations to include in a district?
25    **A.    Yet, it can, or it can seem to, or it's**

1 **sometimes just a matter of the reality of changes**
2 **over the last -- previous 10 years.**
3    Q.    I'm going to quickly here -- I'm going
4 to mark your notice, just to get it on the record
5 here, as our Exhibit 1.  I'm going to show it to
6 you and just confirm that you've seen this, and
7 then we'll deal with it more later.
8         (Exhibit 1 duly marked.)
9 BY MR. CHOATE:
10    Q.    Can you see that?
11    **A.    Yeah.  This is a notice of the**
12 **deposition?**
13    Q.    Yes.
14    **A.    I see it.**
15    Q.    Okay.  Now, the -- let me pull it up
16 here.  The court ultimately -- the Supreme Court
17 decided a case called Hickel v. Southeast
18 Conference.  Do you recall that?
19    **A.    This is the case in the '90s?**
20    Q.    Yes.  Subsequently, right, in the '90s.
21    **A.    I do recall.**
22    Q.    Was the redistricting that happened in
23 the 1980s, was that challenged in court -- well, it
24 was challenged before Judge Shortell.  Do you
25 recall whether that went to the Supreme Court?

1    **A.    I don't remember specifically, but I**
2 **don't know of any redistricting plan that did not**
3 **go to the Supreme Court.**
4    Q.    Okay.  All right.  You worked for
5 Senator DeVries and Representative Tischer?
6    **A.    Tischer (enunciating).**
7    Q.    Tischer.  Sorry.  And then went back to
8 William & Mary, the College of William & Mary.
9 When you returned, did you return from Virginia
10 back to Alaska?
11    **A.    Yes.**
12    Q.    And when you returned, what kind of
13 work did you do?
14    **A.    Let's see.  I worked as a legislative**
15 **aide.**
16    Q.    And who was that for?
17    **A.    I think that was for Curt Menard.**
18    Q.    And Curt was a Representative?
19    **A.    Yes.**
20    Q.    Okay.  And how long did you work for
21 Curt Menard?
22    **A.    Approximately two years.**
23    Q.    And you would have been about 26 years
24 old when you started working for Curt?
25    **A.    Yes, I think so.**

1    Q.    And then did you subsequently run
2 against Representative Menard when you were
3 approximately 28 years old?
4    **A.    Yeah.  Representative Menard went down**
5 **10 minutes before the filing deadline, switched**
6 **parties from Republican to Democrat to prevent any**
7 **Republican from being on the ballot.  And I**
8 **resigned immediately from working for him, and**
9 **sometime after that was recruited by the local**
10 **Republicans to put my name forward as a candidate.**
11    Q.    Okay.  And why did you run against
12 Representative Menard, who was your boss -- had
13 been your boss?
14    **A.    Well, it had nothing to do with that.**
15 **It had to do with his behavior regarding trying to**
16 **deprive the voters of an option in the reelection**
17 **and prevent any Republican from being on the**
18 **ballot.**
19    Q.    Okay.  And is that your -- is it your
20 belief that he switched parties in order to do
21 that?
22    **A.    That's why he waited -- well, that's**
23 **why he said he waited until 10 minutes before the**
24 **deadline for filing, to exactly accomplish that.**
25 **But it was an awkward campaign because I didn't**

Bakalar v. Dunleavy, et al.
Case No. 3:19-cv-00025 JWS

Tuckerman Babcock
April 22, 2021

Page 25

1 feel it was appropriate to campaign on any of the
2 information I had acquired while working for him as
3 his legislative aide, so it was a difficult
4 campaign. I could only -- I only felt comfortable
5 talking about what he might do in the future.
6   Q.   Okay.  Did you consider him at that
7 time to be disloyal to the Republican party when he
8 switched parties like that?
9   A.   Oh, I wouldn't have thought about it
10 that way.  I would have thought about it just as a
11 lack of integrity on his part.
12   Q.   At that time were you an active member
13 of the Republican party?
14   A.   I don't know what you mean by "active."
15   Q.   Did you hold any kinds of positions
16 within the party at the time that he made that
17 switch?
18   A.   I don't recall whether I was or not.
19 If I was, it was like a precinct officer or
20 something, but I don't know if I was at that point.
21   Q.   Now, as I understand it, when you
22 decided -- when you put your hat in the ring to run
23 against your former employer, Representative
24 Menard, you were too late to file as a Republican;
25 right?

Page 26

1   A.   Well, that's an interesting way to put
2 it since he's the one who made sure no Republicans
3 could run.
4   Q.   Well, I'm not criticizing you; I'm just
5 asking --
6   A.   No, no.  I'm just --
7   Q.   -- was it too late?
8   A.   -- I'm just amused by that.
9   Q.   Was it too late?  Because he had waited
10 till the last minute, you couldn't put your name on
11 the ballot as a Republican; right?
12   A.   That's correct.
13   Q.   Okay.  So at that time did you call
14 yourself a member of the Bull Moose Party?
15   A.   Well, there was actually a long series
16 of interactions with the court system to establish
17 whether or not Mr. Menard had violated state
18 statute in failing to withdraw a declaration of
19 candidacy, something like that.  There were several
20 different judges involved, and a local attorney
21 volunteered to try to make an argument.  And I
22 forget which judge in the end said first it was
23 going to be as a write-in candidate, and then one
24 of the judges said, "You could file as a third
25 party or some other party, and we'll put you on the

Page 27

1 ballot that way."
2         So that -- based on the
3 recommendation from the judge, I think the
4 designation was Bull Moose in honor of Teddy
5 Roosevelt's Bull Moose Party, but it wasn't an
6 official party.
7   Q.   Okay.  Is Teddy Roosevelt one of your
8 heroes?
9   A.   I admire him.
10   Q.   What do you admire about Teddy
11 Roosevelt?
12   A.   Well, there are a great many things.
13 His tenure as a police commissioner in New York,
14 his standing up for different issues of the day
15 that mattered, working on the first national parks,
16 and after being president going down the Amazon in
17 the River of Doubt.
18   Q.   Have you ever had the opportunity to --
19 in your work in history and government to examine
20 Teddy Roosevelt's beliefs about race?
21   A.   Teddy Roosevelt's beliefs about race?
22   Q.   About race and about the superiority of
23 the Anglo-Saxon race?
24   A.   No.  That would have been a caricature
25 of the times, I suppose.

Page 28

1   Q.   What happened with your electoral
2 contest with Representative Menard?
3   A.   I lost the election.
4   Q.   Okay.  After losing, what did you do
5 next?
6   A.   I went to work for Representative Loren
7 Leman.
8   Q.   And, again, that would have been as a
9 legislative aide?
10   A.   Yes.
11   Q.   And how long did you do that?
12   A.   I did that for two sessions.
13   Q.   Did you then run against Pat Carney?
14   A.   Well, I ran for the state house in
15 1990.
16   Q.   Uh-huh.
17   A.   And had a Republican primary with Jim
18 Herman, and then the general election contest with
19 Pat Carney.
20   Q.   And did you win the primary?
21   A.   I did win the primary, and I lost the
22 general election.
23   Q.   Do you recall at that time the
24 Anchorage Daily News describing yourself as a
25 "former legislative aide who aspires to be a

Exhibit AP
Page 8 of 64

Bakalar v. Dunleavy, et al.
Case No. 3:19-cv-00025 JWS

Tuckerman Babcock
April 22, 2021

Page 29

1 professional politician"?
2    **A.   No.**
3    Q.   After losing the election to
4 Representative Carney -- and he would have been a
5 Democrat? I'm sorry. I should know that, but I
6 just don't know. I assume so.
7    **A.   Yes. He was a Democrat.**
8    Q.   Okay. What did you do next?
9    **A.   I went to work for the Office of the**
10 **Governor.**
11    Q.   And would that have been Governor
12 Hickel?
13    **A.   That's correct.**
14    Q.   And what did you do for Governor
15 Hickel?
16    **A.   I was executive director of the**
17 **Reapportionment Board, I was director of**
18 **Constituent Services, and director of Boards and**
19 **Commissions.**
20    Q.   Were those all appointed positions?
21    **A.   Yes.**
22    Q.   Okay. And in your work as the
23 executive director of the governor's
24 Reapportionment Board, did you oversee
25 redistricting in 1991 and 1992?

Page 30

1    **A.   Yes, I did. At least I was involved**
2 **with it.**
3    Q.   Okay. Did you oversee the plan that
4 was submitted by the governor for redistricting?
5    **A.   Well, the board oversaw the plan that**
6 **was submitted. I was the executive director for**
7 **the board.**
8    Q.   Did you help set policy in those
9 decisions?
10    **A.   I don't know what you mean by "set**
11 **policy."**
12    Q.   Well, I guess my understanding is that
13 plan favored Republicans. Do you recall that?
14    **A.   That's certainly how Democrats saw it.**
15    Q.   Okay. And was that plan rejected by
16 the courts?
17    **A.   Parts of it were, as every other**
18 **redistricting plan has been.**
19    Q.   Right. Do you recall complaining about
20 the Supreme Court's handling of the matter
21 publicly?
22    **A.   I don't recall that particularly, but I**
23 **certainly have not been shy to do so.**
24    Q.   Okay. Do you recall Senator Jay
25 Kerttula at that time saying, "Tuckerman has owned

Page 31

1 the method of deviousness"?
2    **A.   I always admired Jay Kerttula.**
3    Q.   He was an admirable guy. Do you recall
4 him saying that to you? I'm not saying -- I mean,
5 it's politics. People say lots of stuff. I'm just
6 asking do you recall him saying that?
7    **A.   No. Not specifically, no.**
8    Q.   Is that the redistricting plan that
9 ended up going to the Supreme Court, that resulted
10 in the decision in Hickel v. Southeast Conference?
11    **A.   Well, I worked on the initial plan and**
12 **the subsequent plan.**
13    Q.   Okay. At that time you were in your
14 early 30s?
15    **A.   That's correct.**
16    Q.   Okay. Do you recall in that time
17 period, which would have been the early '90s,
18 calling for a new party named the Alaska
19 Independent Republican Party?
20    **A.   No. I think that -- I think that I**
21 **might have been involved in discussions regarding**
22 **changing the name of the Republican Party of Alaska**
23 **to that.**
24    Q.   And why would you have wanted to do
25 that, if you recall?

Page 32

1    **A.   I think I was impressed with the way**
2 **the Minnesota Republicans had described their**
3 **party, but I don't remember all my thought**
4 **processes at that time.**
5    Q.   Right. As far as Minnesota, what do
6 you recall about their change that impressed you?
7    **A.   Well, rather than the traditional**
8 **naming of their parties, the Democrats were the**
9 **Democratic-Farmer-Labor Party, and the Republicans**
10 **were the Independent Republican Party.**
11    Q.   Okay. It was during that time period
12 that Hickel joined the Alaskan Independence Party.
13 Do you recall that?
14    **A.   What do you mean "at that time"?**
15    Q.   I mean early '90s, when he won a
16 three-way race for governor.
17    **A.   Okay. That was in 1990.**
18    Q.   Right. Sorry.
19    **A.   He did join the Alaskan Independence**
20 **Party and was their candidate for governor.**
21    Q.   Okay. Did you have anything to do with
22 the Alaskan Independence Party in terms of joining
23 it or being a member?
24    **A.   No.**
25    Q.   Were you then appointed as the

Exhibit AP
Page 9 of 64

Bakalar v. Dunleavy, et al.
Case No. 3:19-cv-00025 JWS

Tuckerman Babcock
April 22, 2021

1  commissioner at the Alaska Oil and Gas Conservation
2  Commission?
3      A.   I was, I think, in 1993.
4      Q.   Okay.  Between -- did you work as
5  the -- let me make sure I say this correctly here.
6  Did you work as the executive director for the
7  governor's Reapportionment Board, the special
8  assistant on Constituent Relations, the director of
9  Boards and Commissions until the time that you were
10  appointed as the commissioner at the Alaska Oil and
11  Gas Conservation Commission?
12      A.   Those things were in succession, so
13  there was --
14      Q.   Oh, they were in succession?  Okay.
15      A.   So I left the director of Boards and
16  Commissions to become commissioner of the -- one of
17  the commissioners on the Oil and Gas Conservation
18  Commission.
19      Q.   So you -- so I didn't understand that.
20  So those positions were sequential, meaning first
21  you were the director of the governor's
22  Reapportionment Board, then you were the special
23  assistant on Constituent Relations, and then you
24  were the director of Boards and Commissions?
25      A.   That's correct.

1      Q.   Is that correct?
2      A.   That's correct.
3      Q.   Okay.  And then you became the
4  commissioner at the Alaska Oil and Gas Conservation
5  Commission; is that correct?
6      A.   That's correct.  Yup.
7      Q.   Okay.  And you worked there until --
8  from '93 to '96?
9      A.   Yes.
10      Q.   Do you know an ADN -- Alaska -- is it
11  Alaska Dispatch News? -- reporter named Mike
12  Doogan?
13      A.   I know of Mike Doogan when he was --
14      Q.   Can you --
15      A.   -- he was a reporter and a legislator.
16      Q.   Okay.  When you were appointed by
17  Governor Hickel as the commissioner at the Alaska
18  Oil and Gas Conservation Commission, Governor
19  Hickel said you had a "well-rounded public
20  perspective."  And Mike Doogan said, "If you're
21  wondering how a guy acquires a well-rounded public
22  perspective, here's Babcock's work experience.  Two
23  years as a state elections clerk, six years as a
24  legislative aide, two years working for the
25  governor's office.  Of course, that's not

1  everything on his resumé.  Babcock also went to
2  three colleges, got a degree in government, twice
3  run unsuccessfully for the legislature, all that
4  and he's only 32.  No wonder Hickel gave him a
5  $77,000-a-year job."
6              Do you recall him saying that
7  about you?
8      A.   No.
9      Q.   Okay.  After your -- what was your next
10  employment after leaving the job on the Alaska Oil
11  and Gas Conservation Commission?
12      A.   I went to work for Senator Lyda Green.
13      Q.   And did you know Senator Green before
14  you went to work for her through some --
15      A.   Yes.
16      Q.   I'm sorry.  That was an incomplete
17  question.  I asked if you knew her, and your answer
18  was yes; correct?
19      A.   Yes.
20      Q.   Okay.  And how did you know her?
21      A.   I got to know her several years
22  earlier.  She was a candidate for the state Senate
23  in 1994, and I encouraged her to run against my old
24  friend Jay Kerttula.
25      Q.   And why did you encourage her to run

1  against Jay Kerttula?
2      A.   Well, because I thought she would make
3  a superb legislator and a good candidate.
4      Q.   And was she successful?
5      A.   Yes, she was.
6      Q.   Okay.  And was that when you were hired
7  as a legislative aide for her?
8      A.   No.
9      Q.   Okay.  How long had she been -- so
10  she'd been in office a couple of years before you
11  went to work for her?
12      A.   Yeah, two or three years.
13      Q.   Okay.  And how long did you work for
14  Senator Green?
15      A.   One session.
16      Q.   And, again, was that as a legislative
17  aide?
18      A.   Yes.
19      Q.   Would that have been in '96?
20      A.   No, that would be the '97 session, I
21  think, just for one session.
22      Q.   Why did you leave her job -- why did
23  you leave that job?
24      A.   I don't remember why I left that job.
25      Q.   I know you married her daughter

Bakalar v. Dunleavy, et al.
Case No. 3:19-cv-00025 JWS

Tuckerman Babcock
April 22, 2021

Page 37

1 Kristie. I know you guys have eight children, and
2 that may be why -- I mean, two has been more than I
3 can handle, so I'm very impressed.
4            When were you married to your
5 wife? What year?
6     **A.    2005.**
7     Q.    Okay.  After leaving Senator Green's
8 office, what was your next employment, full-time
9 employment?
10    **A.    I worked independently as a political**
11 **consultant.**
12    Q.    That would have been in '96?
13    **A.    No, no.  This would have been at the**
14 **end of '97 and 1998.**
15    Q.    Okay.  I see in my notes it indicates
16 that you managed the Dole presidential campaign in
17 1996 with Frank Murkowski.  Is that -- do you
18 recall that?
19    **A.    I wouldn't use that language.**
20    Q.    Okay.
21    **A.    We were -- we were the state**
22 **co-chairmen of the Dole-Kemp campaign.**
23    Q.    And that would have been a -- that
24 wouldn't have been a paying position; right?
25    **A.    Correct.**

Page 38

1    Q.    Okay.  And Bob Dole ran as a
2 Republican; right?
3    **A.    Yes.**
4    Q.    Yes.  And then in the fall of '97, did
5 you -- you said you worked as a political
6 consultant.  For how long did you work as a
7 political consultant before --
8    **A.    A little bit less than --**
9    Q.    -- going to full-time employment?
10    **A.    A little bit less than a year.**
11    Q.    Okay.  And what type of political
12 consulting did you do?
13    **A.    Consulting related to campaigns**
14 **primarily for one candidate for governor.**
15    Q.    Who was that?
16    **A.    You're going to make me mention his**
17 **name, aren't you?  John Lindauer.  That's very**
18 **cruel -- that's very cruel of you.  (Laughter.)**
19    Q.    When we get off record I'll tell a
20 story I know about him.
21    **A.    Okay.**
22    Q.    My notes say that you actually ran his
23 campaign for governor until about a month and a
24 half before the election; is that correct?
25    **A.    I was -- I consulted with him for a**

Page 39

1 while.  Then he hired me as his campaign manager
2 **through the primary.  And after the primary, I**
3 **think sometime in September, I resigned and never**
4 **spoke to him again.**
5    Q.    Did he ever pay you?  That's my
6 question.
7    **A.    Our -- that's a good question.  Our**
8 **system -- the only system for the campaign is that**
9 **all the campaign employees got paid at the first of**
10 **every month for the month coming up.**
11    Q.    Okay.  All right.  And what caused the
12 break there?
13    **A.    Discovering that he had lied through**
14 **his teeth about his campaign financing.**
15    Q.    Okay.  After your stint of a little
16 less than a year of political consulting and your
17 experiences with Mr. Lindauer, did you then go to
18 work for the -- did you apply at some time in that
19 time period for a job with the Mat-Su Borough?
20    **A.    I did.  I applied to be borough**
21 **manager, but I don't remember which year.  But I**
22 **wouldn't be surprised if it was that year.**
23    Q.    I have it as '97, but I'm not sure.
24    **A.    Okay.  It was one of those years, yeah.**
25    Q.    All right.  Okay.  Did you also work on

Page 40

1 the Steve Forbes campaign in '96?
2    **A.    Yes, I did.**
3    Q.    And 2000?
4    **A.    Correct.**
5    Q.    And he was running as a Republican
6 also; right?
7    **A.    Yes, for the presidential nomination.**
8    Q.    Did you at some point then return to
9 Judge Green's office -- not judge, Senator Green's
10 office?
11    **A.    No.**
12    Q.    No?  Okay.  In your political
13 consulting work did you also consult with Sarah
14 Palin?
15    **A.    I did, but I don't know if -- it was**
16 **just -- I don't think it resulted in any kind of**
17 **contract for payment.  I think it was preliminary**
18 **only.**
19    Q.    Okay.  And would that have been in
20 multiple campaigns of hers?
21    **A.    Well, if you're referring to political**
22 **consultant as a living, that would just have been**
23 **that one year.**
24    Q.    Okay.
25    **A.    Otherwise, I pick and choose who I**

Exhibit AP
Page 11 of 64

Bakalar v. Dunleavy, et al.
Case No. 3:19-cv-00025 JWS

Tuckerman Babcock
April 22, 2021

Page 41

1 spend time supporting or advising as a volunteer.
2    Q.    In regards to your relationship with
3 former Governor Palin, my notes indicate that your
4 relationship with her stalled after she became the
5 national public figure; is that correct?
6    A.    My relationship stalled?
7    Q.    I'm thinking of a plane that's not
8 getting enough air underneath its wings.
9    A.    No, I think my -- I think my cordial
10 relationship with Sarah Palin began to stall when I
11 referenced that she -- it had to do more with
12 running for lieutenant governor or governor at that
13 point. I certainly was not supportive of her
14 nomination as vice-president.
15    Q.    Why not?
16    A.    I didn't think she was up for the job.
17    Q.    After your -- what was the first
18 full-time employment you took after your
19 approximately a year of being a political
20 consultant for a living?
21    A.    I was hired by Matanuska Electric.
22    Q.    And what did Matanuska Electric hire
23 you to do?
24    A.    Manager of government and strategic
25 affairs.

Page 42

1    Q.    Is that a lobbying position?
2    A.    There were lobbying elements to it.
3    Q.    Okay. Did you have to register as a
4 lobbyist when you were in that position?
5    A.    I think so, but I don't remember.
6    Q.    All right. And how long did you hold
7 that position with MEA?
8    A.    I think until 2003 or 2004, when I was
9 promoted to director of human relations.
10    Q.    And what -- was that like the head of
11 their HR?
12    A.    Yes.
13    Q.    And how long did you do that?
14    A.    Well, I continued to do that, my tenure
15 at MEA, but later I was also designated as
16 assistant manager.
17    Q.    Approximately when -- do you recall
18 when you became the assistant manager?
19    A.    I think it was either 2007 or 2008.
20    Q.    And how did your -- how did that change
21 your job when they made you the assistant manager?
22 Change your job duties. How about that?
23    A.    Well, it changed it considerably to
24 supervising administration one year and operations
25 the next year, or the other way around. I can't

Page 43

1 remember.
2    Q.    All right. And how long were you --
3 did you hold those positions of assistant manager
4 and director of human relations?
5    A.    Jointly for about two years.
6    Q.    And then what happened?
7    A.    And then I was dismissed by the MEA
8 board of directors.
9    Q.    And what was the reason given for your
10 dismissal, if there was one?
11    A.    None.
12    Q.    No reason? And is that the decision
13 from which you took -- you decided to file or make
14 a claim against them?
15    A.    Yes. I had an employment contract with
16 the board of directors, and they did not honor
17 that, the contract.
18    Q.    And did you bring a lawsuit against
19 them?
20    A.    I did. Susan Orlansky was my attorney
21 and brought a lawsuit against MEA to fulfill the
22 terms of the contract.
23    Q.    And did that case go to trial?
24    A.    No. It was settled before trial.
25    Q.    And what was the settlement?

Page 44

1    A.    The settlement was --
2         MR. BAYLOUS: Hold on a second.
3 If that's -- if that was confidential, you don't
4 need to answer.
5    A.    I was just going to say it was mutually
6 acceptable to both parties.
7    Q.    Okay. After -- and how long did it
8 take, if you recall -- one second. We've got a
9 street cleaner coming by here. Just let's wait one
10 second here. (Pause.) For some reason in Juneau
11 they don't clean the streets at all during the
12 winter, and then once this late spring happens they
13 clean them every single day. And I just -- I'm
14 trying to understand what's the difference, you
15 know, between -- I mean, there's some snow in the
16 winter sometimes and rain, but every day. Every
17 day.
18         After leaving -- after ending your
19 work with MEA, what did you do next in terms of
20 work?
21    A.    I became a homemaker.
22    Q.    Okay. And for how long were you a
23 homemaker full-time?
24    A.    About six years.
25    Q.    Okay. And at that time where were you

Bakalar v. Dunleavy, et al.
Case No. 3:19-cv-00025 JWS

Tuckerman Babcock
April 22, 2021

1 living?
2    **A.   On the Kenai Peninsula.**
3    Q.   And my understanding is you married in
4 2005 --
5    **A.   Right.**
6    Q.   -- is that correct?  And was that your
7 first marriage?
8    **A.   No.**
9    Q.   Okay.  And you married Kristie who, as
10 I understand it, is the daughter of Lyda Green?
11    **A.   That's correct.**
12    Q.   And at the time you married, did she
13 have a business as a -- with an insurance agency
14 there in Kenai?
15    **A.   Yes.**
16    Q.   And what is that business called?
17    **A.   It's called Kristie Babcock State Farm.**
18          **MR. CHOATE:**  Okay.  We've been
19 going a little more than an hour.  Why don't we
20 take a break for five minutes.  Everyone can
21 stretch their legs.
22          Would that be all right, Lynda?
23          **THE REPORTER:**  Off the record.
24 10:49 AM
25        (Off record.)

1 11:00 AM
2          **THE REPORTER:**  Back on record.
3 **BY MR. CHOATE:**
4    Q.   Mr. Babcock, I want to ask you about
5 some political questions and political issues, and
6 they're going to center around a few people, mainly
7 around Senator Murkowski.  At some point in time do
8 you recall becoming unhappy with Senator Murkowski
9 regarding certain votes she was making?
10    **A.   I guess the basic answer to that is**
11 **yes.**
12    Q.   Okay.  And I'm going to show you here
13 what we'll mark as Exhibit 2.
14        (Exhibit 2 duly marked.)
15 **BY MR. CHOATE:**
16    Q.   Can you see this?  I'm going to go down
17 here a little bit.  Let me show --
18    **A.   Yes.**
19    Q.   -- show witness's page.
20    **A.   Yup.**
21    Q.   Okay.
22    **A.   I see it.**
23    Q.   Okay.  It says "Update."  This is the
24 Alaska's News Source.  "Reaction to Murkowski's No
25 vote on GOP healthcare bill," and this was

1 published back in July, late July of 2017.
2    **A.   Yes.**
3    Q.   Okay.  And she voted no on a Republican
4 proposal to repeal the Affordable Care Act.  Do you
5 recall that?
6    **A.   Yes.**
7    Q.   Okay.  And do you recall saying -- or
8 she said in defense of her vote, "I voted no on the
9 healthcare proposal last night because both sides
10 must do better on process and substance.  The
11 Affordable Care Act remains a flawed law that I'm
12 committed to reforming with a structure that works
13 better for all Americans.  But to do that, the
14 Senate must fully devote itself to an effort to
15 improve the healthcare system in this country,
16 reduce costs, increase access, and deliver the
17 quality of care that our families want and
18 deserve."
19          Do you recall saying that you were
20 "completely dismayed" by her vote?  "It's a
21 fundamental promise that the Republican party has
22 made nationwide.  It's been a promise made by our
23 senators and congressmen when they have asked
24 Americans and Alaskans for their vote and their
25 trust.  I hope that this is just stage one and that

1 she has a plan to repeal Obamacare in a different
2 fashion, but the repeal of Obamacare is a
3 nonnegotiable promise to the American people and it
4 must be kept."
5          Do you recall saying that?
6    **A.   No.**
7    Q.   Would that be the sort of thing you
8 would say?
9    **A.   Yes.**
10    Q.   Okay.  So you believe that the repeal
11 of Obamacare was a nonnegotiable promise to the
12 American people?
13    **A.   Yes, in general.  Yeah.**
14    Q.   Okay.
15    **A.   In that campaign cycle.**
16    Q.   One second, again.  I'm sorry.
17    **A.   In that campaign cycle.**
18    Q.   Okay.  One second.  (Pause.)
19          **MR. BAYLOUS:**  Do you have an
20 extra-special dirty street out there?
21          **MR. CHOATE:**  Well, the legislature
22 is still in session.  You never know what's going
23 on, you know.  No tourists yet.
24 **BY MR. CHOATE:**
25    Q.   Okay.  So, I'm sorry.  So you said

Exhibit AP
Page 13 of 64

Bakalar v. Dunleavy, et al.
Case No. 3:19-cv-00025 JWS

Tuckerman Babcock
April 22, 2021

1 that -- and when you say it was a "nonnegotiable
2 promise to the American people," do you believe
3 that the American people, meaning the majority of
4 Americans, wanted to repeal Obamacare?
5    **A.   I don't know.**
6    Q.   Isn't it true that the desire to repeal
7 Obamacare was a Republican priority and a
8 Republican interest, not an interest shared by all
9 Americans?
10    **A.   I doubt there's any interest shared by**
11 **all Americans.**
12    Q.   I'm now going to show you -- let's see
13 if you can see this one here. We'll mark this as
14 Exhibit 3.
15           (Exhibit 3 duly marked.)
16 **BY MR. CHOATE:**
17    Q.   Can you see this?
18    **A.   Yes, I can.**
19    Q.   Okay. And this is, again, the Alaska's
20 News Source. Do you know who -- are you familiar
21 with the Alaska's News Source? I simply am not.
22 Is that a blog, or is it a news -- do you know?
23    **A.   I don't know. I see on your article it**
24 **has a picture from KTUU, and it's by Rebecca**
25 **Palsha, who works with KTUU, but I --**

1    Q.   Okay. It might be their online
2 presence or something. This one says, "Chair of
3 Alaska Republican Party shocked Murkowski voted
4 against Kavanaugh confirmation." This has been
5 marked as Exhibit 3.
6        And, again, do you recall
7 saying -- well, first of all, the Alaska Federation
8 of Natives supported this -- the no vote on
9 Kavanaugh, and obviously the state director of
10 Planned Parenthood said, "We were excited to see
11 her decision this morning. Very thankful. I think
12 Murkowski listened to thousands of Alaskans who
13 have met with her, who have called her, and who
14 have stopped by her office over the past couple of
15 months."
16        And then you said -- and I'm just
17 making sure if you recall this -- you were
18 "surprised by Murkowski's decision, saying he heard
19 about it while he was making coffee at 5:30 Friday
20 morning when his phone started ringing.
21        "It's significant enough that I'm
22 going to convene the whole State Central Committee,
23 which is about 80 grassroots volunteers around the
24 state, and we'll start drafting what our response
25 should be."

1        Do you recall saying that?
2    **A.   Not specifically.**
3    Q.   Do you recall doing that?
4    **A.   Not -- not specifically, but I don't**
5 **have any -- I wouldn't argue if we did. I mean,**
6 **that makes sense.**
7    Q.   And why would you have called together
8 the whole State Central Committee for the
9 Republican party because Senator Murkowski voted no
10 on the Kavanaugh nomination to the Supreme Court?
11    **A.   Well, I believe it would be to allow**
12 **the volunteers representing the Republicans in**
13 **Alaska to express their opinions about that vote**
14 **that she cast on Justice Kavanaugh.**
15    Q.   Did you have concerns regarding her
16 vote?
17    **A.   I was opposed to the way she voted.**
18    Q.   And did you feel like, that because she
19 voted that way, it was appropriate to make a
20 political response to it by the Republican party?
21    **A.   I certainly felt it was appropriate for**
22 **the Republican party to get together and discuss**
23 **what they wanted to do.**
24    Q.   And what did you believe should be
25 done?

1    **A.   I don't -- I don't know what steps I**
2 **thought were appropriate at the time, other than in**
3 **general to express our shock that she would vote**
4 **that way.**
5    Q.   Well, you understand that there were
6 many, many women across Alaska who had contacted
7 Senator Murkowski, including many Native women, who
8 were concerned regarding the allegations about
9 judge -- Justice Kavanaugh; right?
10    **A.   Was I aware that was going on?**
11    Q.   Yes.
12    **A.   Yes.**
13    Q.   Okay. And Senator Murkowski made a
14 decision based on her view of what she thought was
15 correct; right?
16    **A.   I assume so.**
17    Q.   Yeah. You don't believe that she was
18 bought, that somebody paid her money or gave her
19 something for her decision regarding Justice
20 Kavanaugh, do you?
21    **A.   I have no reason to believe that.**
22    Q.   Okay. And that when she makes
23 decisions, it's based on what she believes is a
24 principled evaluation of both what she's heard and
25 what her obligations are as a senator for all

Bakalar v. Dunleavy, et al.
Case No. 3:19-cv-00025 JWS

Tuckerman Babcock
April 22, 2021

1  Alaskans?
2      **A.    It sounds like you're referring to**
3  **every vote she's ever cast, and that's --**
4      Q.    Well, I'm talking -- I'm talking about
5  the ones that you're unhappy with.
6      **A.    Well, I wouldn't characterize it that**
7  **way. I don't know what all the motivations might**
8  **have been.**
9      Q.    Okay. Let's look at what we'll mark as
10  Exhibit 4.
11          (Exhibit 4 duly marked.)
12  **BY MR. CHOATE:**
13      Q.    And this is -- I'll show it to you.
14  This is an article from the Anchorage Daily News,
15  and it says, "Trump, Palin, and Babcock's attacks
16  show Murkowski made the right choice." Do you
17  recall reading this article?
18      **A.    No, not specifically, but I usually**
19  **read Charles's articles.**
20      Q.    This article describes Senator
21  Murkowski's -- let's see. What's the best way to
22  describe it? Let me strike that question.
23          Why were you critical of Senator
24  Murkowski's decision regarding Justice Kavanaugh?
25  What were your reasons?

1      **A.    From what I knew, he was a qualified**
2  **nominee for the Supreme Court.**
3      Q.    And that was it? Did you feel like
4  Justice Kavanaugh was treated unfairly by the
5  press?
6      **A.    That is a feeling I generally have**
7  **about the press when they refer to any basically**
8  **conservative person.**
9      Q.    Let's look at Exhibit 5.
10          (Exhibit 5 duly marked.)
11  **BY MR. CHOATE:**
12      Q.    I'll ask if you can you see this. Can
13  you see this?
14      **A.    I do.**
15      Q.    And this says, "Alaska GOP vows
16  significant response against Murkowski." And then
17  it says, "Tuckerman Babcock said in a Facebook post
18  the party will have a significant response. We'll
19  leave it to the committee to decide what action
20  should be taken against Senator Murkowski for her
21  vote on Kavanaugh"; right?
22      **A.    Yes. That's what it says.**
23      Q.    Okay. I'm going to show you what we'll
24  mark as Exhibit 6.
25          (Exhibit 6 duly marked.)

1  **BY MR. CHOATE:**
2      Q.    And this is a tweet regarding
3  Representative Gary Knopp's decision to work with a
4  new coalition in the Alaska House. It's back in
5  December of 2018. Do you recall that occurring?
6      **A.    Yes, I recall the behavior of**
7  **Representative Knopp.**
8      Q.    And what was it about that behavior
9  that was concerning to you?
10      **A.    Running as a Republican candidate and**
11  **then joining the majority of Democrats to create a**
12  **Democrat majority in the state House.**
13      Q.    If he felt that would be best for his
14  constituents, everybody he represents, what's the
15  problem with that?
16      **A.    I don't know what he felt, if he felt**
17  **that was in the best interests of the constituents**
18  **or not. It's just not what he campaigned promising**
19  **to do.**
20      Q.    You had concerns also regarding some
21  other Republican legislators who joined that
22  coalition; right?
23      **A.    That particular coalition was -- my**
24  **concerns were focused on Gary Knopp.**
25      Q.    Okay. What about --

1      **A.    He cast -- go ahead.**
2      Q.    I'm sorry. Okay. That was on Gary
3  Knopp. What about Gabrielle LeDoux and -- is it
4  Stutes? Am I saying that right? Stutes?
5      **A.    You are. What about -- what about**
6  **those two?**
7      Q.    Do you recall being critical of them
8  and saying that you would run candidates against
9  them in primaries because they had -- were not
10  following the party line?
11      **A.    No, not because they -- no, not because**
12  **they didn't follow the party line. And that was**
13  **not related to the year Gary Knopp cast a vote to**
14  **put the Democrats in charge.**
15      Q.    Okay. What did you -- what actions did
16  you take in response to Gary Knopp's decision to
17  put the Democrats in charge? What did you do?
18      **A.    I didn't -- I don't think I did**
19  **anything. If you're talking about the time frame**
20  **around when he did that, I didn't -- I think you're**
21  **conflating -- mixing 2016 and 2018 election cycles.**
22      Q.    I could be. I could be. I'm sure
23  you're more familiar with it than I am. I'm an
24  observer.
25          Did you -- let me show you this.

Bakalar v. Dunleavy, et al.
Case No. 3:19-cv-00025 JWS

Tuckerman Babcock
April 22, 2021

Page 57

1  Did you have concerns in this last election, this
2  last presidential election, over the integrity of
3  the election?
4      A.   Did I have concerns?  Yes.
5              MR. BAYLOUS: Hold on.  Hold on a
6  second.
7              Mark, I'm getting a little
8  concerned with scope here.  We're talking about
9  something that happened in 2018 about Ms. Bakalar,
10 and now we're fast-forwarding to the presidential
11 election of today.  I'm struggling with how this is
12 reasonably calculated to lead to the discovery of
13 reasonable evidence.
14             MR. CHOATE: I think it all
15 goes -- it all goes to both his state of mind and
16 his beliefs in terms of loyalty and politics, so I
17 think it is --
18             MR. BAYLOUS: So the --
19             MR. CHOATE: -- relevant.
20             MR. BAYLOUS: -- functioning --
21 sorry.  The functioning of the 2020 election goes
22 to his beliefs in 2018 about Libby Bakalar?
23             MR. CHOATE: I think they
24 generally do go to that.
25

Page 58

1  BY MR. CHOATE:
2      Q.   So I'm going to show you what has been
3  marked as Exhibit 7.
4              (Exhibit 7 duly marked.)
5  BY MR. CHOATE:
6      Q.   And this is "Alaska Republican
7  Officers call on party to take stand on integrity
8  of elections."  Do you see this?
9      A.   No, it's not -- Document 7 is not
10 coming up on the screen.
11     Q.   Okay.  Let me try again.  How about
12 now?  It's a Must Read Alaska.
13     A.   Yes.
14     Q.   Okay.  And this one says, "Alaskan
15 Republican Officers call on party to take stand on
16 integrity of elections," and here it says, "Over 30
17 of them signed a letter requesting the party issue
18 the following statement or a similar statement:
19 Millions of Americans across the country are
20 concerned about the integrity of our elections.
21 They believe that significant voter fraud occurred
22 in the 2020 presidential election.  They have held
23 protests in states across the country as a result.
24 Thousands of Alaskans agree with them.  There are
25 too many allegations of fraud, too many affidavits,

Page 59

1  too many unanswered questions about legitimacy.
2  Congress should do their due diligence and conduct
3  their own review before approving disputed
4  electors.  The Alaska Republican party is concerned
5  that the fraud that has been exposed so far may
6  have influenced the presidential election."
7              Do you recall signing off on this
8  statement or something similar to it?
9      A.   Yes.
10     Q.   Okay.  Why did you do that?
11     A.   I care a great deal about integrity of
12 elections, and I thought that the concerns that
13 were being expressed would be resolved by Congress
14 taking that extra step just to demonstrate that the
15 election was legitimate.
16     Q.   Are you aware of any court decisions
17 that occurred after the election of Joe Biden where
18 a court found that fraud had been committed,
19 substantial fraud, enough to influence any vote?
20     A.   I'm not familiar with any court that
21 made that decision, nor does this statement make
22 that accusation.
23     Q.   But you believe that Congress should do
24 something to independently investigate the election
25 before certifying Joe Biden as the winner; correct?

Page 60

1      A.   No, it doesn't say anything about
2  before he's certified as the winner.  My concern
3  was that Americans be satisfied that a good
4  election had been held, and I was concerned about
5  lasting damage from not ensuring that people could
6  believe that.
7      Q.   I'm going to show you what has been
8  marked as Exhibit 8.
9              (Exhibit 8 duly marked.)
10 BY MR. CHOATE:
11     Q.   Can you see this?
12     A.   Yes.
13     Q.   Okay.  This is an Alaska Republican
14 Party resolution that I found on the party's
15 website, and this resolution is regarding
16 Senator Murkowski; correct?
17     A.   Yes.  This is from March 2021?
18     Q.   Yes.  Did you participate in any
19 fashion in this resolution, in voting on it or
20 supporting it?
21     A.   Yes.  I'm a member of the State Central
22 Committee as the immediate past chairman.
23     Q.   And this resolution has all of the
24 concerns where you believe that Senator Murkowski
25 has not acted consistently with the values the

Exhibit AP
Page 16 of 64

Bakalar v. Dunleavy, et al.
Case No. 3:19-cv-00025 JWS

Tuckerman Babcock
April 22, 2021

Page 61

1    Alaska Republican Party holds; am I correct?
2        A.    I don't know if I'd go so far as to say
3    it references everything, which you included in
4    your question, but I supported the resolution.
5        Q.    Okay.  Well, let's just -- let's just
6    run through it real quickly here.  "Senator
7    Murkowski has consistently opposed placing limits
8    on abortion."  Do you see that?
9        A.    Yes.
10       Q.    Would that be a reason to censure her?
11       A.    Not in and of itself.
12       Q.    "Voted against repeal of the Affordable
13   Care Act"?
14       A.    Since she had voted for it before she
15   campaigned for reelection and then did a 180 after
16   getting reelected, that one was particularly
17   obnoxious to me.
18       Q.    "Voiced opposition to the confirmation
19   of Justice Kavanaugh"?
20       A.    Yes.  I thought that was a very bad
21   decision.
22       Q.    "Spoken critically of President Trump
23   throughout his term in office"?
24       A.    That -- that particular clause did not
25   mean -- that didn't have much impact on me.

Page 62

1        Q.    "Demanded the resignation of President
2    Trump following the January 6, 2021, Capitol
3    Building riot"?
4        A.    Yeah.  I thought -- I thought that was
5    a rather extreme thing for her to do.
6        Q.    "Voted against a Senate resolution
7    asserting that a second impeachment trial against
8    President Trump was unconstitutional"?
9        A.    I think she was mistaken on that vote.
10       Q.    She "was the only Republican Senator
11   who voted nay on an amendment to the American
12   Rescue Plan Act of 2021 which, if passed, would
13   have prohibited the Act's funding of schools which
14   allow biological males to compete in girls'
15   sports."  Do you recall that?
16       A.    I recall it, yes.
17       Q.    Did that concern you?
18       A.    I think she made a mistake on that
19   vote.
20       Q.    "Supported the nomination of Deb
21   Haaland as Secretary of the Interior"?
22       A.    I think she made a mistake on that
23   vote.
24       Q.    Let me show you Exhibit 9.
25            (Exhibit 9 duly marked.)

Page 63

1    BY MR. CHOATE:
2        Q.    Can you see this one?
3        A.    Yes, I do.
4        Q.    Okay.  This is a Washington Times -- it
5    says "Reliable Reporting.  The Right Opinion."
6    Does that mean The Washington Times is
7    conservative, if you know?
8        A.    I generally think of The Washington
9    Post as liberal and The Washington Times as more
10   conservative.
11       Q.    It says here, "The Alaska Republican
12   Party has censured U.S. Senator Lisa Murkowski for
13   voting to convict President Donald Trump at his
14   impeachment trial and doesn't want her to identify
15   as a GOP candidate in next year's election."
16            Is that correct?  Is that what the
17   Alaska Republican Party did as part of that
18   censure?
19       A.    Well, as a part of it, yes.
20       Q.    Did you -- in carrying through with
21   that censure, did you offer to assist in finding
22   candidates who could run against Senator Murkowski?
23            MR. BAYLOUS: Objection.  Mark,
24   this is -- I mean, you appear to be inquiring into
25   current party politics and the agenda or plan for

Page 64

1    the 2022 Senate election, and this just does not
2    have anything to do with the termination or the
3    acceptance of resignation of Ms. Bakalar.
4            MR. CHOATE: I'm going to disagree
5    with you.  I have a method to my plan here as to
6    why I'm doing this.  I believe it is relevant to
7    his motivations and is an element of our case in
8    terms of Ms. Bakalar's --
9            MR. BAYLOUS: Whether Mr. Babcock
10   did or did not participate in identifying potential
11   candidates for 2022 --
12           MR. CHOATE: Whether Mr. --
13           MR. BAYLOUS: -- in 2021?
14           MR. CHOATE: No, whether
15   Mr. Babcock places party loyalty or political
16   loyalty as a very high premium in his -- the way he
17   works with the external world and whether he takes
18   action when he believes that somebody either is not
19   loyal or potentially does not -- you know, is
20   considered to be a political opponent.  I think
21   it's directly relevant.  I'm almost done with it.
22           MR. BAYLOUS: So I would suggest
23   to the degree that things have been publicly --
24   made public that it's a fine inquiry, but if we're
25   going to inquire into where the direction of the

Bakalar v. Dunleavy, et al.
Case No. 3:19-cv-00025 JWS

Tuckerman Babcock
April 22, 2021

1 party is or what government is doing with regard to
2 2022 --
3          MR. CHOATE: I'm just going to --
4          MR. BAYLOUS: -- I don't support
5 that.
6          MR. CHOATE: I'm just going to
7 deal with this last little section here. One
8 second.
9 BY MR. CHOATE:
10     Q.     I'm going to show you what we'll mark
11 as Exhibit 10.
12          (Exhibit 10 duly marked.)
13 BY MR. CHOATE:
14     Q.     And this is -- can you see that?
15     A.     Yes.
16     Q.     Okay. And this is an article from the
17 Homer News. Have you seen this picture in this
18 article?
19     A.     I have.
20     Q.     Okay. You and your wife, Kristie, have
21 actively been supporting and campaigning for Kelly
22 Tshibaka -- is it Tshibaka (enunciating)? Am I
23 saying that right?
24     A.     Tshibaka.
25     Q.     -- Tshibaka's candidacy against Lisa

1 Murkowski; is that correct?
2     A.     Yes, it is.
3     Q.     Okay. And one of the reasons that
4 you're doing that is because you believe that Lisa
5 Murkowski has not kept the promises she made in
6 running as a Republican; am I correct?
7     A.     That would refer specifically to the
8 reverse in her vote on repealing Obamacare?
9     Q.     It would refer to the reasons given for
10 her censure by the Alaska GOP and its request --
11     A.     Oh, I see.
12     Q.     -- that she not run as a Republican?
13     A.     Yeah. I think -- I think, in context,
14 Kristie was active in the 2004 primary supporting
15 Mike Miller against Lisa Murkowski, and I was
16 active in the Mat-Su Borough region, active on
17 behalf of Mike Miller against Lisa Murkowski's
18 nomination in 2004, so it's got nothing to do with
19 all these votes that are cited in the resolution.
20 She's always been a more liberal Republican, and
21 I'm a more conservative Republican, and that's the
22 heart and soul of it.
23          In 2016, when she ran for
24 reelection, I was chairman of the party. She was
25 nominated in the primary, and I stood hand in glove

1 with Lisa Murkowski, helping her in every way
2 getting reelected.
3     Q.     And now -- and you now are supporting a
4 political opponent --
5     A.     That's correct.
6     Q.     -- because you believe that she -- that
7 Lisa Murkowski was not conservative enough; right?
8          MR. BAYLOUS: Objection. Form.
9     A.     I prefer Kelly Tshibaka as a U.S.
10 Senator. Nothing particularly surprising about
11 that.
12     Q.     Getting back to my question about
13 LeDoux and Stutes, apparently Gabrielle LeDoux,
14 Paul Seaton, and Louise Stutes joined a new
15 coalition. I don't know exactly the year. Was
16 that 2016?
17     A.     Right.
18     Q.     Okay. And you wrote, "We are
19 disappointed that you pretend to be something that
20 you're not to your constituents as you sought their
21 votes"?
22     A.     That was 2000 -- was that 2018 or 2016?
23 But, anyway, yes, that's right.
24     Q.     Okay. And then you say, "We apologize
25 to your constituents for any role we played in

1 advancing that deception."
2     A.     Do you have that, the document to look
3 at?
4     Q.     You know, let me -- let me point it out
5 here. I actually don't have the document. I just
6 have some notes from that one. Do you recall
7 saying something like that?
8     A.     Not that specifically, but I certainly,
9 as chairman of the party, helped process a finding
10 that those three individuals were not to be -- not
11 going to be endorsed by the party and that we would
12 work to see that they were replaced.
13     Q.     And that was because they crossed over
14 to join a coalition of Democrats and independents;
15 is that right?
16     A.     They're politicians who joined the
17 Democrats to put them in charge of the state House
18 of Representatives in that political arena.
19     Q.     In your work in state government, have
20 you developed an understanding of what the merit
21 principles are?
22     A.     A basic understanding.
23     Q.     And what is your basic understanding of
24 the merit principles?
25     A.     That in the classified services for

Glacier Stenographic Reporters Inc.
www.glaciersteno.com

Bakalar v. Dunleavy, et al.
Case No. 3:19-cv-00025 JWS

Tuckerman Babcock
April 22, 2021

1 state employees, that there is a merit pay increase
2 guaranteed every year unless you get an employee
3 evaluation below a certain level.
4     Q.    Let me show you what we'll mark as 11.
5           (Exhibit 11 duly marked.)
6 BY MR. CHOATE:
7     Q.    Can you see this?
8     A.    Yes.
9     Q.    Okay.  Do you see here where it says,
10 "The merit principle is the foundation on which our
11 system of personnel administration is built.  At
12 its most basic, the merit principle requires
13 standards for hiring and promoting based on
14 specific, objective qualifications, so that persons
15 best qualified to perform the functions of the
16 state will be employed, and that an effective
17 career service will be encouraged, developed, and
18 maintained."
19           Do you understand that?
20     A.    I understand that language, yes.
21     Q.    Okay.  Do you understand that Article
22 XII, Section 6 of the Alaska Constitution provides
23 that "The legislature shall establish a system
24 under which the merit principle will govern the
25 employment of persons by the state"?

1     A.    No.
2     Q.    Okay.  So you were unaware of that?
3     A.    No.
4     Q.    Maybe I didn't understand you.
5     A.    No, I think I was the one that didn't
6 understand you.
7     Q.    Okay.  I apologize, then.  Always
8 correct me if my questions are bad.
9     A.    Oh, I'm not saying it's bad.  I just
10 didn't understand what you were asking.
11     Q.    Did you understand -- do you know --
12 are you aware that Article XII, Section 6 of the
13 Alaska Constitution provides that "The legislature
14 shall establish a system under which the merit
15 principle will govern the employment of persons by
16 the state"?
17     A.    I've read the Alaska Constitution, but
18 I don't know if that sentence jumped out at me.
19     Q.    Are you aware of -- let me go back
20 here.  Are you generally aware, beyond the fact
21 that there is a merit principle, as to what it
22 means in terms of securing employees' positions
23 from political influence?
24           MR. BAYLOUS: Objection.
25 Misstates the law.

1     Q.    You can still answer.
2     A.    I don't really know how to answer that.
3     Q.    Okay.  Well, let's look here at
4 Exhibit 11.  It says here "AS 39.25.010(b) defines
5 the merit principle of employment as including,"
6 and it has various things here, but I want to look
7 at No. 5 on this list, which is on the state
8 website by the Division of Personnel.  It says,
9 "Selection and retention of an employee's position
10 secure from political influences."
11           Do you agree that employees in the
12 classified and partially exempt positions -- their
13 positions should be secure from political
14 influences?
15     A.    Well, to answer that question
16 appropriately, I'd have to look at what AS -- which
17 employees and classifications are covered under
18 39.25.010(b) and whether or not that applies to and
19 to what degree and how it's defined when applied to
20 any at-will position and what is meant by
21 "political influences."
22     Q.    Is it your position that at-will
23 employees for the State of Alaska -- I'm not
24 talking about people who are appointed by the
25 governor as commissioners or deputy commissioners

1 or on boards, but rather just the workforce of
2 partially exempt employees, that they do not need
3 to be secure from political influences?
4     A.    No.  My position is at-will employees
5 are at-will employees.
6     Q.    And so they can be fired for political
7 reasons?
8     A.    Well, I don't know what you mean by --
9           MR. BAYLOUS: Objection.  Form.
10     A.    -- yeah, political -- "political
11 reasons."  You mean --
12     Q.    Can they be fired because of their
13 political beliefs?
14           MR. BAYLOUS: Object to form.
15     A.    No.
16     Q.    They can't; right?
17     A.    I do not think that they should be
18 fired because of -- because of their political
19 beliefs.
20     Q.    What about their statements about their
21 political beliefs in their private -- in their
22 communications outside of work?
23     A.    People should be retained or not
24 retained based on whether or not they can
25 professionally function.

Bakalar v. Dunleavy, et al.
Case No. 3:19-cv-00025 JWS

Tuckerman Babcock
April 22, 2021

1    Q.   It shouldn't matter what their
2 political beliefs are; right?
3    A.   It shouldn't.
4    Q.   I'm going to show you what we'll mark
5 as Exhibit 12.
6         (Exhibit 12 duly marked.)
7 BY MR. CHOATE:
8    Q.   I'm going to represent to you that this
9 is a portion of the minutes of the Alaska
10 Constitutional Convention where there was a
11 discussion by the individuals who wrote the
12 Constitution as to whether to have a merit system
13 for state employment. I'm just going to ask you if
14 you ever have read or understood that the drafters
15 of our Constitution specifically considered whether
16 to have a merit versus a spoils-based system and
17 chose to have a merit system.
18    A.   I can read that discussion.
19    Q.   You don't recall ever talking about or
20 hearing about it from anybody else; right?
21    A.   I don't know. I don't have any
22 specific memory of it.
23    Q.   Well, I'm just looking at the second
24 page -- here, let me show this to you -- where it
25 says, "The converse of the merit principle is the

1 spoils system, and anyone who doesn't want to have
2 a merit principle incorporated in our state
3 government system must, I think, be in favor of a
4 spoils system. I agree with Mr. Fischer that if we
5 are going to say 'may' we may as well drop that
6 section entirely from the Constitution because it
7 is meaningless if the legislature already has the
8 power to provide if it desires to do so. I would
9 hope that instead of that we will direct through
10 the Constitution that the legislature 'shall'
11 provide such a system so that the state government
12 in Alaska will be one in which all of the people
13 who are working are people with ability and people
14 who are entitled to hold the positions they may
15 have on the basis of their merits rather than on
16 the basis of their politics."
17         Do you see that?
18    A.   Yes.
19    Q.   Do you agree with that, that statement,
20 that individuals working for state government, I
21 mean, the vast majority of them, should hold their
22 positions based on their merits rather than on the
23 basis of their politics?
24    A.   Well, the legislature has implemented a
25 great many classifications for state employees.

1 Some are classified and some are at-will. And
2 there's a reason the legislature did that, I'm
3 sure.
4    Q.   Is it your position that individuals --
5 is it your understanding or belief that individuals
6 who are partially exempt are subject to political
7 considerations as to whether they hold or keep
8 their jobs?
9    A.   I don't know what you mean by
10 "political considerations."
11    Q.   By whether they have the right
12 politics?
13    A.   I've already answered the question that
14 I don't think their opinion about politics should
15 be relevant.
16    Q.   What about their opinions as to whether
17 they support the governor's political -- whether
18 they agree with the governor's politics?
19    A.   It doesn't matter whether they agree,
20 but you did hit on it when you said it matters
21 whether or not they can support.
22    Q.   And what does "support" mean to you?
23    A.   It just means that in your professional
24 capacity that you can do the job that you're
25 expected to do to implement the policies of the

1 people elected by the people of Alaska. It really
2 doesn't matter what your personal politics are.
3    Q.   Well, what does "support" mean to you?
4 Does that mean that you have to agree that the
5 governor's policies are correct or the governor's
6 politics are correct?
7    A.   No. It means -- no. It means you have
8 to perform in your professional capacity to the
9 best of your ability to implement policies, whether
10 you agree with them or not.
11    Q.   Okay. When did you first learn that
12 you might become -- you might be involved in the
13 transition for the Dunleavy administration?
14    A.   When did I learn when I might -- when
15 did I first learn that I might be involved in the
16 transition?
17    Q.   Yes.
18    A.   Oh, about -- I'm trying to think of
19 levels of -- your question is very vague. I mean,
20 an answer to it would be vague. I mean, when I
21 first met Mike Dunleavy when he was running for the
22 state Senate and he wondered whether he might run
23 for governor some day, then he'd need a good
24 transition team -- so that's six years before 2018.
25    Q.   Okay. So maybe 2012?

Exhibit AP
Page 20 of 64

Bakalar v. Dunleavy, et al.
Case No. 3:19-cv-00025 JWS

Tuckerman Babcock
April 22, 2021

Page 77

1     A.    Maybe, but I didn't have -- there is no
2  significance to that conversation, and nothing came
3  of that conversation, so that's why -- that's why
4  your question is kind of hard to answer.
5     Q.    Sure. I'll be happy to make it a
6  little narrower.
7           When did you -- when did you learn
8  that you would have a role or a part to play in the
9  transition?
10    A.    Okay. That, I can answer. It was
11 about -- about six weeks before the election.
12    Q.    So that would have --
13    A.    Maybe eight weeks.
14    Q.    So that would have been in September
15 sometime?
16    A.    Maybe, September or October of 2018.
17    Q.    Okay. And how did you learn about it?
18    A.    Just in a conversation with the
19 candidate.
20    Q.    Were you working on his campaign at
21 that time?
22    A.    I was working on all the Republican
23 candidates' campaign as chairman of the Republican
24 party.
25    Q.    And in your work as chairman of the

Page 78

1  Republican party, did you help campaign -- help or
2  participate in Mike Dunleavy's campaign?
3     A.    Well, yes and no. I mean, my focus was
4  on all the Republican candidates, and part of the
5  role of the Republican party is to participate in a
6  fundraising element to try to raise enough money to
7  donate to the candidate and to set the stage as
8  often as possible for a positive result in the
9  election for the Republican candidate. But you are
10 kind of implying the day-to-day operations of his
11 campaign, which I didn't have anything to do with.
12    Q.    All right. Where were you when you
13 first learned that you might be part of the
14 transition or involved in the transition?
15    A.    I don't know.
16    Q.    Okay. Did Governor Dunleavy discuss
17 with you what role you would play in the
18 transition?
19    A.    No, not at -- not at that time.
20    Q.    Okay. When did you learn that he was
21 going to ask you to become his chief of staff?
22    A.    When he asked me.
23    Q.    Okay. And when would that have been,
24 approximately?
25    A.    Within a few days of him winning the

Page 79

1  election.
2     Q.    And -- strike that.
3           When he asked you to be his chief
4  of staff, was there a discussion as to what he
5  wanted from you?
6     A.    Not when he asked me, no.
7     Q.    Was there a discussion as to what he
8  wanted to accomplish in the transition?
9     A.    Are you still talking about when he
10 first asked me --
11    Q.    Yes.
12    A.    -- to be his chief of staff?
13    Q.    Right.
14    A.    No.
15    Q.    When he offered or asked you to be his
16 chief of staff, did you accept?
17    A.    Yes.
18    Q.    Okay. And what were your hopes to
19 accomplish -- what did you intend to accomplish by
20 becoming his -- by agreeing to be his chief of
21 staff?
22    A.    Oh, just to help -- my hopes were to
23 help him accomplish his policies and what he
24 campaigned on and whatever -- whatever it was that
25 he wanted to accomplish.

Page 80

1     Q.    And what were his policies? I mean,
2  what were the policies -- if you were going to
3  summarize the basic policies of Mike Dunleavy that
4  you believed were going -- were something that you
5  as his chief of staff would help advance, what were
6  those?
7     A.    Well, in general, they were to pay out
8  a statutory dividend, repeal Senate Bill 91, move
9  toward a balanced budgeted, establish
10 constitutional amendments that would set a
11 framework for responsible budgeting going forward,
12 and reviewing management of different departments
13 to ensure efficient delivery of state services, and
14 to investigate a couple of departments to see if
15 issues that had been identified in the past had
16 been resolved. And that was the broad scope of
17 what he was looking at.
18    Q.    And was it your understanding that
19 those were the reasons why -- those were the basic
20 reasons why he was elected?
21    A.    Yes.
22    Q.    Or that was his platform?
23    A.    Yes.
24    Q.    Did his platform in running for
25 election differ from that -- the platform of the

Exhibit AP
Page 21 of 64

Bakalar v. Dunleavy, et al.
Case No. 3:19-cv-00025 JWS

Tuckerman Babcock
April 22, 2021

Page 81

1  Republican party?
2  **A.  Yes.**
3  **Q.  How did it differ?**
4  **A.  I can't really answer that question.**
5  **You'd have to compare his campaign with the**
6  **specifics of the state platform.**
7  **MR. CHOATE:** Why don't we take
8  another quick break?  Is that okay, Mike?
9  **MR. BAYLOUS:** Yeah.  What are we
10  thinking timewise?  I'm just --
11  **MR. CHOATE:** I'd say --
12  **MR. BAYLOUS:** -- if we're going to
13  go --
14  **MR. CHOATE:** Well, we can -- we
15  can take lunch now, or we can go another half hour
16  and then have lunch.
17  **MR. BAYLOUS:** Yeah.  Let's go --
18  let's take a little break, go a bit, and then
19  figure lunch out.
20  **MR. CHOATE:** Okay.  Sounds good.
21  **THE REPORTER:** Off the record.
22  11:54 AM
23  (Off record.)
24  12:03 PM
25  **THE REPORTER:** We're back on

Page 82

1  record.
2  **BY MR. CHOATE:**
3  **Q.  I'm going to just break out the**
4  policies that you said were the Dunleavy
5  administration's policies that you believe state
6  employees, especially, if I understand it, your
7  at-will employees had an obligation to carry out.
8  And can you go through those policies again for me
9  step by step so I get them straight?
10  **A.  Well, that wasn't -- that wasn't the**
11  **answer to the question.  Your question had to do**
12  **with what his -- what his policies were, what he**
13  **campaigned on.**
14  **Q.  Okay.  What were the policies that --**
15  what were his policies that he campaigned on that
16  you believed state employees had an obligation to
17  follow and support?
18  **A.  No, just in general --**
19  **MR. BAYLOUS:** Objection.
20  Misstates his testimony.
21  **A.  I'd answer it this way.  The employees**
22  **have an obligation to implement the policies of the**
23  **governor as long as they are legal policies.**
24  **Q.  And what were the -- were there any**
25  specific policies that you believe this governor

Page 83

1  brought with him into office that you needed to
2  make sure state employees understood and would
3  agree to implement?
4  **A.  Not in particular, no.**
5  **Q.  Any, any specifics as to what policies**
6  you believe state employees needed to understand it
7  was their obligation to implement and agree to
8  implement on behalf of the governor?
9  **A.  Well, just a general -- the general**
10  **outline of the campaign, which we discussed.**
11  **Q.  And that's what I need you to break --**
12  if you could break those out again.  You went
13  through them pretty quickly, so if you could just
14  give me the general outline of the campaign.
15  **A.  Right, but I don't want to mix up the**
16  **answer with your question.  So the question was**
17  **what did he campaign on, and I answered that.  And**
18  **now you're asking which policies that -- why don't**
19  **you state it again for me.**
20  **Q.  Yeah.  Which policies did this governor**
21  bring with him into office that he wanted to
22  implement that you believed it was state employees'
23  obligation -- that state employees needed to
24  understand that they needed to agree to implement
25  those policies?

Page 84

1  **A.  I can't answer that question because I**
2  **didn't ever think along those lines.**
3  **Q.  So you can't identify any policy that**
4  you felt state employees -- any specific policy
5  that you had a concern state employees would not
6  implement unless they -- let me just strike that,
7  and I'll get to the question here in a minute.
8  **A.  Okay.**
9  **Q.  In terms of the Republican platform,**
10  was there any elements of that platform that were
11  part of the governor's policies that you believed
12  state employees had a duty to implement?
13  **A.  No, I never thought about anything in**
14  **those terms.  So I expected the governor to try to**
15  **implement his policies that he outlined in the**
16  **campaign and that, but I really don't know what the**
17  **connection -- what the nexus was with the state**
18  **Republican party platform.**
19  **Q.  Okay.  So I want to just go through**
20  those again carefully.  What were the policies the
21  governor outlined in his campaign that you believed
22  he was going to implement as governor?  And let's
23  just go through them one by one.
24  **A.  That, I can answer.**
25  **Q.  Okay.**

Exhibit AP
Page 22 of 64

Bakalar v. Dunleavy, et al.
Case No. 3:19-cv-00025 JWS

Tuckerman Babcock
April 22, 2021

Page 85

1   A.   Basic repeal of Senate Bill 91.
2   Q.   That's the criminal -- the criminal
3   bill?
4   A.   Yes.  A full statutory PFD.
5   Q.   And what did that mean?
6   A.   I can't describe it any better than
7   that.
8   Q.   Okay.
9   A.   That means what it means.
10  Q.   Okay.  What else?
11  A.   The constitutional amendments that
12  would help structure, going forward, a more likely
13  outcome of a balanced budget; voter approval of new
14  taxation, one mechanism or another, maybe along the
15  Colorado plan, a tapered plan; and moving toward a
16  balanced budget.
17  Q.   And that means -- would that mean
18  making cuts in spending?
19  A.   He had campaigned on not initiating any
20  tax increases, so I guess the only alternative
21  would be to reduce spending.
22  Q.   Okay.  Would that be it?
23  A.   No.  He campaigned on reviewing
24  department operations to look for efficiencies that
25  would increase the delivery of services and lower

Page 86

1   the cost.
2   Q.   Anything else?
3   A.   There were a couple of departments he
4   wanted to have a thorough examination of to make
5   sure that issues that he'd been aware of got
6   resolved.
7   Q.   What were those departments?
8   A.   They were Health and Social Services,
9   Department of Military and Veterans Affairs, and
10  the Division of Elections.
11  Q.   Okay.  What were the issues with Health
12  and Social Services?
13  A.   I don't know the specifics of the
14  issues of Health and Social Services.
15  Q.   Okay.  How about Military and Veterans
16  Affairs?
17  A.   That had to do with lingering concerns
18  about whether or not the issues that arose in the
19  Parnell administration had been properly resolved.
20  Q.   All right.  And what about the Division
21  of Elections?
22  A.   That had something to do with a
23  conversation that he had with Joe Miller and how
24  the Division of Elections operated in the 2010
25  cycle.

Page 87

1   Q.   When you began to work on the
2   transition, were these policy issues identified in
3   writing in any way?  And by that I mean did you put
4   down as part of the transition, "These are the
5   things that are our goals in this new
6   administration, and we want everyone to keep these
7   front and center"?
8   A.   I don't recall doing that during the
9   transition.  And there was a group of volunteers --
10  maybe a couple of paid people, maybe they were all
11  volunteers -- doing work on policy and issuing a
12  report on the transition and policy issues.  But I
13  was mainly focused on filling out the commissioner
14  positions during the transition.
15  Q.   During the transition, at some point
16  did discussion come up as to whether to request the
17  resignation of state employees --
18  A.   Yes.
19  Q.   -- a wholesale resignation?
20  A.   Yes.
21  Q.   When did that -- do you recall how that
22  came up?
23  A.   I don't remember how or when it came
24  up.  I do remember conversations with the governor
25  regarding that.

Page 88

1   Q.   And at that time, that would have been
2   probably in November of 2018?
3   A.   Probably.
4   Q.   Okay.  Have you ever seen incoming
5   governors request resignation letters from state
6   employees en masse, sort of a large group?
7   A.   You just asked me if I'd ever seen the
8   letter or whether I --
9   Q.   Had you ever -- were you familiar with
10  that being a practice in Alaska?
11  A.   Yes.
12  Q.   Okay.  And in the past --
13  A.   But not to the -- sorry.  But not to
14  the degree that all at-will employees were asked to
15  submit resignation letters.
16  Q.   Okay.  So in prior administrations, who
17  would be the group that would be requested to
18  resign?
19  A.   Well, it differed with different
20  administrations.  The most extensive one that I was
21  vaguely familiar with was Tony Knowles, when he
22  came in and replaced a very large number of people.
23  Q.   Do you remember how many he replaced?
24  A.   No, I don't.
25  Q.   Was it as many as you requested

Glacier Stenographic Reporters Inc.
www.glaciersteno.com

Exhibit AP
Page 23 of 64

Case 3:19-cv-00025-JWS   Document 87-4   Filed 09/24/21   Page 23 of 64

Bakalar v. Dunleavy, et al.
Case No. 3:19-cv-00025 JWS

Tuckerman Babcock
April 22, 2021

1  resignations from?
2  **A.    Well, that's quite a distinction.  He**
3  **replaced far more than we did.  We asked for**
4  **resignations from far more than he did.**
5  Q.    Okay.  He replaced more.  You asked for
6  more resignations; is that correct?
7  **A.    Right.**
8  Q.    Whose idea -- to your recollection, who
9  first suggested having all at-will employees
10  resign?
11  **A.    I just don't remember.**
12  Q.    What was the reason for asking -- what
13  was your understanding of the reason to ask all
14  at-will employees to resign?
15  **A.    Well, part of it is just to establish,**
16  **as a new governor, all at-will employees should**
17  **submit a letter of resignation, and the governor**
18  **will consider whether or not to accept them.  And**
19  **that's important just as a general matter of**
20  **principle.**
21  Q.    Had it ever been -- to your knowledge,
22  though, had any governor ever requested all -- and
23  by "at-will," we're basically talking exempt and
24  partially exempt employees.  I don't like to use
25  the words "at-will" because I'm not sure I think

1  that's correct, but --
2  **A.    Well, and I'm not sure your question is**
3  **correct, so I couldn't answer that.**
4  **          My question, and the governor and**
5  **I -- the question that we gave to Governor Walker**
6  **was all at-will employees, and Governor Walker**
7  **created the list and provided it to the transition**
8  **team.  And all those people were sent a request for**
9  **resignation.**
10  Q.    Okay.  Of that list, how many of them
11  were political appointees, meaning they'd been
12  appointed by the Walker administration?
13  **A.    I'm not sure how you differentiate**
14  **appointed from hiring.**
15  Q.    Well, let's -- certain employees are
16  hired through the personnel system, meaning that
17  they -- there's a job with a -- that's open that
18  falls within the classification scheme, and they
19  have to demonstrate certain qualifications to be
20  eligible to apply for that, to get that job.  And
21  if they have those qualifications, then they are
22  hired.  It may be called an appointment, but
23  they're effectively -- it's just through the
24  personnel system.  The governor doesn't make a
25  decision to say, "I want Judy versus Joe."  Do you

1  understand that's the way most partially exempt
2  employees are employed?
3  **A.    Well, that might depend on the**
4  **administration.**
5  Q.    Are you aware of any administration
6  where all of the lawyers that work for the State of
7  Alaska, other than the top -- you know, the people
8  at the top of the department, are individually
9  hired by a governor?
10  **A.    No, I'm not aware of where -- a**
11  **situation where all lawyers being hired.  I am**
12  **familiar how with Tony Knowles dealt with my first**
13  **wife being hired as a classified State Trooper, and**
14  **the Commissioner of Public Safety and his deputy**
15  **and the head of the State Troopers approved her**
16  **hire.  And when it was discovered by Governor**
17  **Knowles' office and his chief of staff, he called**
18  **them all into his office and said, "You should not**
19  **proceed with this hiring of this State Trooper."**
20  **And to their credit, they said, "We've already made**
21  **the offer, and this is a classified position, so it**
22  **doesn't really have anything to do with what you**
23  **all think."**
24  Q.    And your wife got -- your first wife
25  got her job?

1  **A.    Yes.**
2  Q.    Or kept her job?
3  **A.    Well, got a job.  She was hired.  She**
4  **got a job as a classified employee.**
5  Q.    In regards to the decision to identify
6  or require all at-will employees to resign, is it
7  your understanding that those employees are --
8  strike that question.
9          What was the reason for asking all
10  at-will employees to resign?
11  **A.    You just asked me that question, and I**
12  **answered it.**
13  Q.    And I'm going to ask it one more time
14  because I'm trying to -- I want to make sure I
15  understand.
16  **A.    Okay.**
17  Q.    Other than you thinking it would be
18  useful to have them all resign, what's the value?
19  What benefit did the governor get in asking all of
20  these -- the employees partially exempt and a lot
21  of the exempt employees to resign?  What was the
22  benefit?
23  **A.    That's partly asking why the**
24  **legislature created a system of classified and**
25  **exempt and partially exempt employees and the issue**

Bakalar v. Dunleavy, et al.
Case No. 3:19-cv-00025 JWS

Tuckerman Babcock
April 22, 2021

Page 93

1  of whether employees are at-will or not, and it
2  seems reasonable that all at-will employees should
3  offer a letter of resignation to an incoming
4  administration and allow the administration the
5  mechanism for deciding whether or not to retain
6  them.
7      Q.    You understand that these employees you
8  call at-will are all career government workers;
9  right?
10     A.    No, I don't --
11     Q.    Generally speaking.
12     A.    I don't understand that.
13     Q.    Okay.  Generally speaking, though, the
14  vast majority of the individuals that you wanted to
15  ask to resign had worked -- were in government
16  service.  They weren't brought in because of an
17  administration.  They weren't brought in because
18  they were political appointees.  They qualified for
19  employment, let's say, for example, as attorneys.
20          MR. BAYLOUS: Objection.
21  Foundation.  Vague.
22     Q.    Are you aware of that or not?
23     A.    I think -- I don't think it's really --
24  that you've substantiated the truth of what you're
25  asking me, so it's hard to answer that.

Page 94

1      Q.    Okay.  Well, let me keep at it, then.
2  I'll get there.
3      A.    Okay.
4      Q.    Is it your understanding that attorneys
5  who work for the Department of Law, like
6  Ms. Bakalar, are normally hired because of their
7  connections to an administration, to a political --
8  to a political administration?
9      A.    Is it my understanding that they are
10  normally hired that way?
11     Q.    Yeah, or ever hired that way.  Other
12  than people at the top of the department, are
13  attorneys hired as an Attorney I, II, III, IV, or V
14  hired because of their political connections to an
15  incoming administration?
16     A.    I'm sure that -- I'm sure that
17  everything under the sun has occurred as to why
18  someone is hired or not hired even in the
19  Department of Law.  So I'm sure that there are
20  examples one way or another of people who are
21  connected or have connections and people who don't
22  have connections.  So what's your question?
23     Q.    I guess my question is:  Is it your
24  position that individuals who are hired through the
25  merit principles in the classification structure

Page 95

1  that exists, even if they're partially exempt, are
2  not being hired based upon merit and ability, as
3  opposed to some political connection with an
4  incoming administration?
5      A.    I think there's a reason that the
6  legislature has designated certain employees as
7  at-will employees, and the reason for that is that
8  there's a lot of dependence on the policy and
9  support of those people for what can be a very
10  truncated opportunity to pursue policies.  And
11  you'd have to ask the legislature why they haven't
12  changed the classification of at-will employees,
13  but I think an at-will employee means just that.
14  They're at-will employees.
15     Q.    Have you ever heard the partially
16  exempt service described as at-will employees
17  instead of partially exempt?
18     A.    Yes.
19     Q.    In a writing by the legislature where,
20  instead of saying we have classified employees,
21  partially exempt, and exempt employees, instead
22  there is a job classification or a group called
23  at-will employees?
24     A.    The at-will employees are those
25  employees on the list that we got from the Walker

Page 96

1  administration, and I have no doubt to -- no reason
2  to doubt that Attorney General Lindemuth and the
3  Office of Governor did anything but their duty in
4  providing that list.
5      Q.    In asking at-will employees -- in
6  asking the employees that you sent the e-mail to to
7  resign, what did you expect them to do as a result
8  of your request?
9      A.    I expected them to offer a letter of
10  resignation and express an interest in continuing
11  to work for the state.
12     Q.    So you asked them to resign, but you
13  also said, "Tell me whether you want to keep
14  working, and we'll consider whether to rehire you";
15  is that correct?
16     A.    I think that's a fair assessment.
17     Q.    Okay.  And what was your intent in
18  asking this group of state employees to quit or to
19  resign their jobs and then ask to have the same
20  jobs back?  What did you expect them to do?
21     A.    I expected them to acknowledge they
22  were at-will employees, offer a letter of
23  resignation, and express an interest in working in
24  the next administration.
25     Q.    And why would working in the Dunleavy

Exhibit AP
Page 25 of 64

Bakalar v. Dunleavy, et al.
Case No. 3:19-cv-00025 JWS

Tuckerman Babcock
April 22, 2021

Page 97

1 administration for the majority, the vast majority
2 of these employees -- why would their job duties be
3 any different than they were in the Walker
4 administration?
5     MR. BAYLOUS: Object to form.
6   Q.   Were they? I mean, was there any
7 difference in what they would be expected to do for
8 the Dunleavy administration than what they did in
9 their jobs for the Walker administration?
10    A.   Well, I guess that's something that
11 they would have to answer, and that's -- they would
12 have to answer that by expressing, "Yes, we'd like
13 to -- here's our letter of resignation, and we'd
14 like to keep working in the Dunleavy
15 administration." So that's something the employee
16 would have to answer for themselves.
17    Q.   For the line attorney, the attorney
18 working for the State of Alaska, prosecuting cases,
19 defending them, the Office of Public Advocacy,
20 performing all the daily tasks that lawyers do, why
21 does it matter for them whether or not the governor
22 is Walker or Dunleavy?
23    A.   I don't know. They'd have to -- they'd
24 have come to that conclusion themselves.
25    Q.   And what was the -- and in being

Page 98

1 rehired, what were the considerations that you
2 identified in determining whether to rehire someone
3 who had just requested to resign?
4   A.   There might be --
5     MR. BAYLOUS: Object to form.
6   A.   -- there might be a -- go ahead.
7 Sorry.
8     MR. BAYLOUS: Just object to form.
9 Vague and generalized.
10    MR. CHOATE: Lynda, can you read
11 that question again?
12   A.   Thank you.
13    THE REPORTER: Pending question:
14 And in being rehired, what were the considerations
15 that you identified in determining whether to
16 rehire someone who had just requested to resign?
17   Q.   Not the greatest question, but I think
18 you get the gist of it.
19   A.   I think so. I think it would be --
20 depend on a number of factors, and one of them
21 would be whether or not the administration believed
22 this individual could acknowledge that they had to
23 resign, so submitting a letter of resignation, and
24 what sort of attitude might be expressed in a
25 letter of resignation that might lead you to think,

Page 99

1 "Well, this is probably not likely to be a
2 productive working relationship." It could be any
3 number of reasons, and that's basically how at-will
4 positions work. Any number of reasons could come
5 into play.
6   Q.   So you were looking at the attitude by
7 the employee as to how they responded to the
8 request for resignation. And if they did what you
9 told them to do, then that would be different than
10 if someone says, "I have some issues with being
11 requested to resign because I think I'm doing my
12 job perfectly well"?
13   A.   It would depend.
14   Q.   In making the decision or reaching the
15 decision to ask all of these employees to resign,
16 did you obtain any legal advice?
17   A.   I did have conversations --
18    MR. BAYLOUS: Let me interject
19 real quick. Sorry. The concept of obtaining legal
20 advice is good, but we aren't going to go into what
21 legal advice was obtained.
22   Q.   Right. I'm just going to ask you if
23 you talked to someone to ask them about the legality of
24 demanding the resignation of this chunk of Alaska's
25 workforce.

Page 100

1   A.   I think so.
2   Q.   Okay. Who was that?
3   A.   Well, it would be as long ago as
4 Charlie Cole as Attorney General when I worked in
5 the Hickel administration.
6   Q.   In November of 2018, after you became a
7 member of the transition plan, transition team, did
8 you talk to any lawyer to get legal advice as to
9 the legality of you asking this group of state
10 employees -- or requiring them to resign?
11   A.   The attorney for the transition team
12 was Stacey Stone-Semmler.
13   Q.   Did you seek legal advice from Stacey
14 Stone-Semmler on the legality of requesting this
15 group of state employees -- requiring them to
16 resign?
17   A.   I did discuss these sorts of issues
18 with Stacey.
19   Q.   Were there any communications with her
20 that were in writing regarding this?
21   A.   I don't think so.
22   Q.   As I understand it, Ms. -- is it
23 Stone-Semmler? Is that -- am I saying that --
24   A.   Stone-Semmler.
25   Q.   Semmler?

Bakalar v. Dunleavy, et al.
Case No. 3:19-cv-00025 JWS

Tuckerman Babcock
April 22, 2021

Page 101

1    A.    Semmler (enunciating).
2    Q.    Semmler.  I think I've totally lost it.
3   Stacey Stone-Semmler?
4    A.    Yes.
5    Q.    Okay.
6          MR. BAYLOUS: For simplicity, can
7   we just say Stacey Stone?
8          MR. CHOATE: I'll vote for that.
9    A.    That's her maiden name, but sure.
10   BY MR. CHOATE:
11   Q.    Okay.  Then we better not do that.
12   Okay.  Stacey Stone-Semmler.  She was the
13   transition team's attorney.  Who decided to hire
14   her as the transition team's attorney?
15   A.    Either I did or the governor did.
16   Q.    Okay.  You didn't seek -- you didn't
17   seek to use anybody that was working for the state
18   in the Department of Law?
19   A.    I don't remember whether we sought to
20   or not, or when the decision was made to rely on
21   Stacey Semmler.
22         MR. BAYLOUS: Mark, I'm going to
23   object.  You're getting a little too into the
24   attorney- client privilege about --
25         MR. CHOATE: I'm just asking --

Page 102

1          MR. BAYLOUS: -- who they
2   considered or --
3          MR. CHOATE: I'm not asking what
4   the opinions are.  I'm asking who he talked to, and
5   I think that could be potentially subject for
6   discovery, so that's why.
7          MR. BAYLOUS: So -- yeah.  Yeah.
8   So maybe the question is to ask who he talked to,
9   not whether he talked to specific people.
10         MR. CHOATE: I'm asking whether he
11   talked to anybody at the Department of Law
12   regarding this issue of terminating or requiring
13   the resignation of this group of state employees.
14   A.    I don't remember when in the process,
15   but I did have discussions also with the Attorney
16   General.
17   BY MR. CHOATE:
18   Q.    And who was the Attorney General at
19   that time?
20   A.    Jahna Lindemuth.
21   Q.    And Stacey -- as I understand it,
22   Stacey is also somebody that's very active in the
23   Alaska Republican Party?
24   A.    She has been.
25   Q.    She's held offices within the party or

Page 103

1   the women's organization, Alaska Republican Women;
2   is that correct?
3    A.    Yes, that's correct.
4    Q.    Okay.  We've been going -- it's a
5   little after -- so it's just about 12:30.  Do you
6   want to take our lunch break?
7          MR. BAYLOUS: Sure.
8          MR. CHOATE: How long do you need?
9          MR. BAYLOUS: I don't know if the
10   sandwiches are here yet.
11         MR. CHOATE: 45 minutes?
12         MR. BAYLOUS: Yeah, let's go 45.
13         THE REPORTER: Okay.  So 1:15
14   we'll be back.  Okay?
15         MR. BAYLOUS: All right.
16         THE REPORTER: Off the record.
17   12:32 PM
18         (Off record.)
19   1:14 PM
20         THE REPORTER: We are back on
21   record.
22   BY MR. CHOATE:
23   Q.    Mr. Babcock, I'm going to show you a
24   letter which we will mark as Exhibit 13.
25         (Exhibit 13 duly marked.)

Page 104

1   BY MR. CHOATE:
2    Q.    Can you see this?
3    A.    Yes.
4    Q.    All right.  Can you tell me -- do you
5   recognize this letter?
6    A.    No.
7    Q.    Okay.  I'll represent to you that this
8   is a letter that -- a format that was sent out to
9   all of those employees you identified as ones that
10   you could require them to resign or be fired, and
11   you sent this as a form for them to utilize in
12   drafting their resignation letters.  Does that
13   refresh your recollection?
14   A.    No, it does not.
15   Q.    Okay.  Do you know who drafted this
16   letter?
17   A.    No.
18   Q.    And do you know if it was shown or
19   vetted with an attorney before it was sent out?
20   A.    I do not.
21   Q.    Would you have been familiar with this
22   letter -- I mean, if it was something sent to over
23   800 state employees, would you have been familiar
24   with it back then in November of 2018?
25   A.    I just don't remember this letter.

Bakalar v. Dunleavy, et al.
Case No. 3:19-cv-00025 JWS

Tuckerman Babcock
April 22, 2021

Page 105

1    Q.    Okay.  Well, let me just go through it.
2  It says, "Governor-Elect Mike Dunleavy,
3  Team2018@alaska.gov.  Dear Governor-Elect Dunleavy,
4  please accept this letter as notice of my
5  resignation from my position as [Insert Title].  I
6  understand that my resignation shall be effective
7  upon receiving notice from your administration.  I
8  [have] [have not] submitted my name for
9  consideration for my current position to continue
10 with the new administration."
11           Is this language that, had you --
12 if you did recall it, would you have approved it as
13 being an adequate -- as being the resignation
14 letter you expected from these employees?
15   A.    I can't really answer that question,
16 and I don't -- I'm not familiar with this letter.
17   Q.    Okay.  Do you know whether the
18 employees who were told they had to resign or they
19 would be fired, whether they were provided any
20 description of what the Dunleavy administration's
21 policy goals were that they were expected to
22 implement?
23   A.    Other than that which you might have
24 picked up from the campaign, nothing in particular.
25   Q.    Okay.  You don't recall sending to

Page 106

1  these more than 800 state employees, "Dear State
2  Employee, we want to make sure you're on board with
3  the Dunleavy administration's policies.  Here they
4  are so that you can understand them.  You're going
5  to be asked to resign, and only reapply if you are
6  willing to support these policies in your job"?
7  Was anything like that ever sent, to your
8  knowledge?
9    A.    Not to my knowledge, no.
10   Q.    Well, this letter, on its face,
11 basically does two things.  It says, one, "I
12 resign," and, two, "I'd like to be considered for
13 my new position -- be considered for my current
14 position to continue with the new administration."
15 What information would you have had in the
16 transition that this employee understood what
17 policies you wanted them to follow or implement?
18   A.    Again, I've never -- I don't have any
19 recollection of this letter.
20   Q.    Okay.  And you don't recall -- and you
21 have no memory or recollection of ever identifying
22 for this group of employees that were required to
23 resign what they would be required -- what
24 different set of policies, other than being good
25 state workers, they would be required to follow in

Page 107

1  order to be rehired by the Dunleavy administration?
2    A.    In order to be rehired?
3    Q.    Yeah, to be rehired; right.
4    A.    Well, the process was a letter of
5  resignation and whether it would be accepted or
6  not.  But it's hard to answer your question.  You'd
7  have to -- it was a long question, and I'm not sure
8  which -- what was the --
9    Q.    Okay.  Well, let me break it down here.
10           In regards to the information --
11 strike that.
12           What was it that state employees
13 who were required to resign were expected to do
14 to -- what were they expected to do differently for
15 the Dunleavy administration than they had done for
16 the Walker administration?
17   A.    I don't think there was an expectation
18 they would do things differently.
19   Q.    What was the expectation, then, as to,
20 if they were rehired --
21   A.    That in their -- well, that in their
22 own -- first that they recognize they're at-will
23 employees and submit a letter of resignation; and,
24 secondly, make a statement that they wished to
25 continue working in the Dunleavy administration.

Page 108

1  So it's really a reflection of the employees'
2  assessment of their own ability to be
3  professionals.
4    Q.    And by that, by being "professional,"
5  you mean being able to accept a demand that they
6  resign from their job in order to then be rehired
7  for the same job, doing the same work?  That's
8  being professional, in your mind?
9          MR. BAYLOUS: Objection.
10 Misstates testimony.
11   A.    You've mixed the two answers together
12 in just the first part of your question.
13   Q.    What was professional about requiring
14 more than 800 people to resign from their jobs?
15 What's the professional component that they were
16 supposed to do?
17   A.    The professionalism had to do with the
18 second part of your previous question.  But
19 requesting a letter of resignation was legitimate
20 under the law, and all the at-will employees were
21 asked to submit a letter of resignation.
22   Q.    Well, and your basis for saying it was
23 legitimate is what?  I mean, I disagree with you.
24 I want to know what your basis is for saying that.
25   A.    Well, your disagreement is with the

Exhibit AP
Page 28 of 64

Bakalar v. Dunleavy, et al.
Case No. 3:19-cv-00025 JWS

Tuckerman Babcock
April 22, 2021

Page 109

1  Walker administration. They're the ones who
2  provided -- created and provided the list of all
3  at-will employees.
4      Q.   Well, the Walker administration didn't
5  require these employees to resign, did it?
6      A.   No. That was a decision made by the
7  incoming administration; but, again, the list of
8  who was -- who that applied to was created by the
9  Walker administration.
10     Q.   Other than the formality of resigning
11 and requesting to be rehired, was there anything
12 else that you expected from this group of employees
13 in terms of demonstrating their interest in keeping
14 their jobs or continuing their jobs?
15     A.   Well, I'd have to look at the -- look
16 again at the letter that was sent to all the
17 employees.
18     Q.   Let me show it to you here. I'm going
19 to show you what's been marked -- we'll mark as
20 Exhibit 14.
21          (Exhibit 14 duly marked.)
22 BY MR. CHOATE:
23     Q.   Can you see this?
24     A.   Yes.
25     Q.   Okay. So let me -- let's just start

Page 110

1  out here. Do you recall writing this memo?
2      A.   Well, I'm going to read it quickly, and
3  then I'll --
4      Q.   Sure.
5      A.   -- answer your question.
6      Q.   Take your time.
7      A.   (Reading.) Okay. Yes, this does
8  appear to be a memo from me.
9      Q.   Did you write this memo, or did
10 somebody write it for you?
11     A.   Well, I don't remember whether I
12 drafted the initial or edited it or someone else
13 edited it. I can't remember that.
14     Q.   Do you know whether this memo was shown
15 to an attorney before you sent it out?
16         MR. BAYLOUS: Objection. You keep
17 flirting with attorney-client privilege questions
18 about --
19         MR. CHOATE: I get to ask the
20 question of whether or not he showed -- he got
21 legal advice, and that's all I'm doing.
22         MR. BAYLOUS: You can ask a
23 question about the topic of legal advice --
24         MR. CHOATE: No, I can ask whether
25 he --

Page 111

1          MR. BAYLOUS: -- about whether the
2  topic --
3          MR. CHOATE: I asked whether he
4  showed this memo to a lawyer, and that's a
5  legitimate question.
6          MR. BAYLOUS: You can ask for the
7  topic of advice he received, not whether every
8  single document or e-mail was in coordination with
9  a lawyer.
10         MR. CHOATE: Are you going to tell
11 him not to answer?
12         MR. BAYLOUS: He's not going to
13 answer who drafted it.
14         MR. CHOATE: I didn't --
15         MR. BAYLOUS: He's not going to
16 talk to you about --
17         MR. CHOATE: I asked him whether
18 or not he showed it to an attorney, or whether an
19 attorney reviewed it. That's all I've asked.
20         MR. BAYLOUS: If you want to ask
21 the question was attorney guidance provided in
22 regard to the resignation request, that's an
23 appropriate topic. To get into every single piece
24 of paper related to it is too far.
25         MR. CHOATE: I'm going to put

Page 112

1  that -- I'm going to put the question on the
2  record, and you can decide how you want to deal
3  with it.
4  BY MR. CHOATE:
5      Q.   Mr. Babcock, this memorandum dated
6  November 16, 2018, was it shown to an attorney that
7  worked for you or for the transition before it was
8  sent out?
9      A.   I don't remember.
10         MR. BAYLOUS: Objection.
11 Attorney-client.
12     Q.   Okay. Let's go through it, then, and
13 we'll deal with that. Over the next -- and let me
14 just refresh here. If an attorney had seen this or
15 participated in this, the drafting of this
16 document, that would have been Ms. Stacey Stone --
17 I still get the last name off.
18     A.   Semmler.
19     Q.   Semmler.
20     A.   S-E-M-M-L-E-R.
21     Q.   Stacey Stone-Semmler. Would it have
22 been her?
23         MR. BAYLOUS: Objection. Calls
24 for speculation.
25     Q.   Don't guess. I'm just asking do you

Exhibit AP
Page 29 of 64

Bakalar v. Dunleavy, et al.
Case No. 3:19-cv-00025 JWS

Tuckerman Babcock
April 22, 2021

Page 113

1  recall.
2      A.    Well, I don't know which draft of
3  this -- of the letter that was produced this is,
4  and I don't know whether -- I know there were
5  several drafts.  Some involved working with Scott
6  Kendall in the Walker administration, and some
7  involved interaction with attorneys or an attorney,
8  but I don't know which one this is and whether that
9  specifically happened with this specific version.
10     Q.    Okay.  Well, let's go through it.  On
11 the first paragraph it says, "Over the next several
12 weeks the outgoing and incoming administration are
13 working together to make the transition from
14 Governor Walker to Governor-Elect Dunleavy as
15 seamless as possible.  Both administrations greatly
16 appreciate the dedication and service of all
17 employees who served the State of Alaska.  We
18 understand that transitions can be difficult, both
19 personally and professionally.  Therefore, we are
20 working to provide you with information to make the
21 transition process as smooth as possible."
22            When you wrote here, "We
23 understand that transitions can be difficult, both
24 personally and professionally," what did you mean
25 by that?

Page 114

1      A.    I meant exactly what it says.
2      Q.    If someone is working as an attorney
3  for the State of Alaska in the many different
4  attorney positions there are, why would the
5  transition from one administration to another be
6  difficult unless they were required to resign?
7      A.    Well, if it doesn't apply to somebody,
8  they can read that and say, "Oh, that doesn't apply
9  to me.  I'm not -- it's not difficult for me."
10     Q.    Other than the requirement to resign
11 that your transition team required of the state
12 employees, what else would have been difficult,
13 personally and professionally, about the change in
14 administrations?
15     A.    Well, a number of things could
16 potentially be at issue.  One would be there's a
17 new governor.  Another would be there's likely to
18 be a new commissioner or deputy commissioner.  That
19 could create stress and uncertainty.  The new
20 administration might have campaigned on balancing
21 the budget, which could lead to a number of major
22 changes within different departments, which also
23 could be stressful.  There could -- I mean, there
24 are lots of different issues.
25     Q.    It says here in the second paragraph,

Page 115

1  "As you aware" -- I think it's "As you are aware,
2  Governor-Elect Dunleavy will be sworn into office
3  on Monday, December 3, 2018.  In the coming weeks,
4  the incoming administration will be making numerous
5  personnel decisions."  Was that correct?
6      A.    That he was going to be sworn in on
7  December 3rd and making a number of personnel
8  decisions?  Yes.
9      Q.    What were the personnel decisions that
10 the Dunleavy transition was going to be making in
11 the next couple of weeks?
12     A.    Lots of vacancies to fill and lots of
13 resignations to consider.
14     Q.    Well, let's take those in two separate
15 categories.  What were the vacancies that would
16 have to be filled by the new administration?
17     A.    Well, I couldn't list them all for you.
18 Some would be department heads and division
19 directors.  Others would just be vacancies.  There
20 were a hundred different boards and commissions
21 that needed to be filled.  Who knows how many
22 people would not submit letters of resignation and
23 have no interest in continuing to work in the
24 Dunleavy administration?  Lots of personnel
25 decisions at issue.

Page 116

1      Q.    So there's department directors and I
2  think what are classically the top-level
3  administrative personnel.  There's boards and
4  commissions.  And then what you're saying is there
5  are people that would choose to not continue with
6  the new administration; is that right?
7            MR. BAYLOUS: Objection.
8  Misstates what he said and testifies.
9      A.    And all those at-will employees would
10 be individually considered.
11     Q.    Okay.  Well, we're going to -- we're
12 going to get to that secondarily.  But as to the
13 first category, do you know how many employees who
14 worked in the Walker administration who were not --
15 elected not to continue with the Dunleavy
16 administration?
17     A.    No.
18     Q.    Was it -- do you have an idea whether
19 it's 10 or 100?
20     A.    No, I don't.
21     Q.    Okay.  Now, as to the individuals who
22 were providing resignations, you anticipated that
23 one of the personnel decisions was you had created
24 an issue by requiring this group of over 800,
25 approximately 825 people to resign.  Was the

Exhibit AP
Page 30 of 64

Case 3:19-cv-00025-JWS   Document 87-4   Filed 09/24/21   Page 30 of 64

Bakalar v. Dunleavy, et al.
Case No. 3:19-cv-00025 JWS

Tuckerman Babcock
April 22, 2021

Page 117

1  personnel decision then going to be deciding which
2  of them would stay on?
3      **A.    That's correct.**
4      Q.    That the resignations would not be
5  accepted?
6      **A.    Yes.**
7      Q.    Okay.  And how were you going to
8  determine in that group which ones would be
9  accepted versus which ones would be rejected, in
10  general?
11      **A.    It's an impossible question to answer**
12  **in general.**
13      Q.    Well, then, when you got the
14  resignations, what did you do with those
15  resignations in determining whether or not to
16  rehire or keep on those state employees who had
17  been required to resign?
18      **A.    Well, there are lots of different**
19  **factors that come into play with resignation**
20  **letters, those that we did receive, on what we**
21  **could discern from the resignation letter itself**
22  **about attitude of a potential at-will employee**
23  **continuing or accepting the resignation letter.**
24      Q.    So is it -- so am I correct that there
25  was no -- what you looked at was not whether this

Page 118

1  person was best -- was capable of doing the work,
2  but rather their attitude in the way they wrote
3  their resignation letter?
4      **A.    That's an unfair dichotomy.  The two**
5  **often go hand in hand.**
6      Q.    Well, how many of -- how many of the
7  employees -- I'll just show you the list here real
8  quick.  Let me pull it up, if I can find it.  Just
9  a second.  There we go.  That's 18-11-19.  We'll
10  mark this as Exhibit 15.
11          (Exhibit 15 duly marked.)
12  **BY MR. CHOATE:**
13      Q.    And do you recognize this list?
14      **A.    No, I don't really recognize the list,**
15  **but I don't see anything about it that makes me**
16  **doubt it's a list.**
17      Q.    Okay.  Well, let me suggest that this
18  says this reflects e-mails sent to these state
19  employees as of 11-19, and I assume that the
20  e-mails are the requests for resignation.
21          My question is --
22      **A.    Okay.**
23      Q.    Okay.  My first question is:  Do you
24  know why some of these are in yellow and some are
25  in red?

Page 119

1      **A.    No.**
2      Q.    Do you recall ever actually seeing this
3  spreadsheet before?
4      **A.    This one?  No.**
5      Q.    Was there another one that you did use
6  or look at?
7      **A.    A spreadsheet?**
8      Q.    Like this.  This is an Excel
9  spreadsheet.  I'm sorry.
10      **A.    Well, I think there was some record of**
11  **who all got an e-mail.**
12      Q.    Okay.  So let me -- let me make sure I
13  understand it.  So you send out these e-mails to
14  this group of employees, and I can go to the end of
15  the list and it shows there's 805 on this list.
16      **A.    Okay.**
17      Q.    Okay.  And they're required to resign
18  and indicate whether they want to return to their
19  current job or look for a different job in the
20  state?
21      **A.    Right.**
22      Q.    Once their resignations were received,
23  what was done to determine whether or not they
24  would keep their job or their job would end?  They
25  would no longer work for the state?

Page 120

1      **A.    Well, it would just be a case-by-case**
2  **assessment by --**
3      Q.    Well, who made -- I'm sorry.  Excuse
4  me.
5      **A.    Go ahead.**
6      Q.    I apologize for interrupting.  There's
7  a case-by-case assessment?
8      **A.    Correct.**
9      Q.    So was there a case-by-case assessment
10  for these 805 individuals?
11      **A.    Well, as much as I could fit into the**
12  **very short transition time.**
13      Q.    And did you know these 805 people?
14      **A.    No.**
15      Q.    How would you make a case-by-case
16  assessment of each one's resignation?  How did you
17  do that?
18      **A.    Oh, I think that advice and counsel was**
19  **sought from a great number of people.  I couldn't**
20  **possibly recall who all was involved.**
21      Q.    Okay.  When you sought advice and
22  counsel from a great number of people, how did you
23  seek that counsel?  Was it in writing?
24      **A.    No.**
25      Q.    So you've got 805 names here.  How do

Bakalar v. Dunleavy, et al.
Case No. 3:19-cv-00025 JWS

Tuckerman Babcock
April 22, 2021

Page 121

1   you obtain information on these 805 people as to
2   whether they should be retained or kept by the
3   state?
4       A.   Well, it was a mixture -- a mixture of
5   personal knowledge and a mixture of incoming
6   commissioners' desire for their departments, a mix
7   of resignation letters or lack thereof, style.  A
8   lot of different -- a lot of different factors came
9   into play on whether to accept the resignation of a
10  particular employee.
11      Q.   Okay.  So as I understand it, there
12  wasn't any formal procedure for each of these
13  employees, where you would go through a decision
14  matrix to sort of say what's their job evaluation
15  look like, what's their performance like, what's
16  their resignation letter like, what do other people
17  say about them.  Was there anything like that done
18  on an individual basis, one by one?
19      A.   A formal process?
20      Q.   Right.
21      A.   No.  The best process that could be
22  done within that couple of weeks time frame.
23      Q.   So who made the decision as to whether
24  these -- which of these 805 people who submitted
25  resignation letters would keep their jobs or not?

Page 122

1   Was that you?
2       A.   The governor assigned me the
3   responsibility, the ultimate responsibility for
4   making that determination.
5       Q.   So let's just pick somebody here.  If
6   we look down the line here to -- let's try -- why
7   don't we just pick the first person.  Did you know
8   John Boucher, the chief information technology
9   officer?
10      A.   Did I know him personally?
11      Q.   Yes.
12      A.   No.
13      Q.   So how would you have determined with
14  John Boucher whether or not he should -- assuming
15  he sent a resignation letter in, whether he would
16  keep his job as the chief information technology
17  officer?
18      A.   My answer would be exactly the same as
19  the one I just gave you.
20      Q.   You just would talk to people and look
21  at their resignation letter?
22      A.   That's correct.
23      Q.   And did you review these 805
24  resignation letters?
25      A.   No.  I was not able to review all of

Page 123

1   them.
2       Q.   How many did you review?
3       A.   I don't remember.
4       Q.   How much time did you spend on this
5   process of reviewing these 805 people to determine
6   who would keep their jobs?
7       A.   I couldn't pinpoint that very well for
8   you either.  There was a lot packed into a couple
9   of weeks.
10      Q.   More than an hour?
11      A.   Yes, more than an hour.
12      Q.   More than five hours?
13      A.   I don't know.  It took place over the
14  three-week period.
15      Q.   So how would you go about getting
16  information from outside sources, from third
17  parties, as to which of these individuals should be
18  kept and which should be let go, their resignations
19  accepted and not rehired?
20      A.   When you say "third party," what do you
21  mean?
22      Q.   Somebody outside of yourself and the
23  governor and your immediate staff.
24      A.   Oh, I didn't seek -- I didn't seek
25  advice and counsel from outside that group.

Page 124

1       Q.   All right.
2       A.   If you -- if by "immediate staff" you
3   mean the incoming commissioners.
4       Q.   All right.  So the incoming
5   commissioners didn't participate in looking at this
6   group to determine whether or not these individuals
7   should stay -- should remain in state employment or
8   leave; am I correct?
9       A.   I couldn't tell whether that was
10  phrased in the positive or the negative.
11      Q.   That's a great -- a great response.
12  Were commissioners provided this list and asked for
13  input as to which of these individuals they wanted
14  to retain?
15      A.   I'm sure some were.
16      Q.   Okay.  When you say "I'm sure some
17  were," which ones would that have been?
18      A.   I'm about to be signed out here.
19      Q.   Is that in -- I don't know what that
20  would be.
21      A.   It has to do with applications of
22  software updates.
23      Q.   Let's not update the software right
24  now.  Say no.
25      A.   I'll put it in snooze here.

Exhibit AP
Page 32 of 64

Bakalar v. Dunleavy, et al.
Case No. 3:19-cv-00025 JWS

Tuckerman Babcock
April 22, 2021

```
 1    Q.    Okay.
 2          MR. BAYLOUS: So that will --
 3    well, whenever we get to a break, let me
 4    double-check that.  It hasn't affected --
 5    A.    My only -- my only options are restart
 6    or snooze.
 7    Q.    Okay.
 8          MR. BAYLOUS: Do you want to take
 9    a second so I can look at --
10          MR. CHOATE: Sure.  Why don't we
11    just take a quick second to fix that.
12          THE REPORTER: Off the record.
13    1:47 PM
14          (Off record.)
15    2:02 PM
16          THE REPORTER: Back on record.
17    BY MR. CHOATE:
18    Q.    Looking again at this exhibit, this
19    spreadsheet with all of the names on it, you said
20    it was probably more than an hour, but you couldn't
21    say it was five hours.  Can you give any estimate
22    as to how much time you personally spent vetting or
23    going through these 805 resignations?
24    A.    No, I couldn't tell you how much time I
25    spent vetting all the information with each of
```

```
 1    these, each of the 800 people who got the letter.
 2    So I know that a lot of the -- some of the
 3    potential commissioners or nominated commissioners
 4    went through and looked through the list related to
 5    their departments, and then other people working on
 6    the transition team might have looked at it and
 7    given me some advice.  And then I looked at a great
 8    number as well.
 9          You know, one of the key
10    demarcations is whether people were -- whether they
11    responded and said, "Here's my letter of
12    resignation, and, yes, I'd like to keep working."
13    That was a -- that's kind of a threshold decision.
14    And then as many of them as I could, I reviewed
15    and, as I said, the potential commissioners went
16    through and weighed in and other people working on
17    the transition team weighed in.  And --
18    Q.    And was any of that -- I'm sorry.  Was
19    any of that process in writing, the evaluation
20    process?
21    A.    I don't think so.  I think that one of
22    the things to consider is the -- I realize for
23    these 800 people that this is a very important
24    process and that their resignation letters were
25    very important, and -- but it was one part of a
```

```
 1    great deal that was going on in those three and a
 2    half weeks, including preparation of potential
 3    legislation, the agenda, the staff -- as the
 4    incoming chief of staff, the staff I might put into
 5    the governor's office.  There was the legislature
 6    and their machinations, and then how the budget
 7    might be rolled out and when, and then -- I'm just
 8    trying to put in context some of the focus when you
 9    asked how many hours on this particular project.
10          And the OMB director and the
11    consolidation of administrative directors in OMB to
12    prepare a new budget -- there was a lot going on in
13    a very brief period of time, all complicated even
14    further on Friday before December 3rd by the
15    earthquake.  So that's why it's a little hard to
16    give you an exact amount of time I spent on
17    reviewing further detail on each of these names,
18    besides the fact about whether or not they actually
19    submitted a letter of resignation and expressed an
20    interest in continuing to work.
21    Q.    In terms of letters of resignation, did
22    you have a separate list where you kept track of
23    whether these individuals submitted a resignation
24    letter?
25    A.    I did not maintain that list.
```

```
 1    Q.    Okay.  So --
 2    A.    I'm --
 3    Q.    I'm sorry.  Continue.  So if you didn't
 4    maintain a list, did somebody?
 5    A.    Well, I think somebody must have.  At
 6    some point somebody let me know who it was that had
 7    not submitted a resignation letter.
 8    Q.    And of this group of 805 people, how
 9    many didn't submit resignation letters?
10    A.    How many did not?
11    Q.    Right.
12    A.    I don't remember how many, but I don't
13    think it was a great number.
14    Q.    Was it less than 10?
15    A.    I don't remember.  It seems like it was
16    somewhere between 5 and 20.
17    Q.    So for that group who didn't submit
18    letters, they were not eligible to be considered --
19    they were considered -- they were terminated;
20    right?
21    A.    I don't know if they were all
22    terminated, but that was a very strong indication
23    that they should be.
24    Q.    Okay.  Of the group that didn't submit
25    letters, do you know how many were actually
```

Bakalar v. Dunleavy, et al.
Case No. 3:19-cv-00025 JWS

Tuckerman Babcock
April 22, 2021

Page 129

1  terminated?
2      A.   I don't.
3      Q.   It would be less than the 5 to -- it
4  would be less than the range you gave me, though,
5  since you said some were probably kept on; right?
6      A.   I don't know.  I don't remember whether
7  some were kept on or not.  I'm just saying if they
8  were, there would be some other factors brought
9  into play.  Like I said, you're asking me to
10  remember two years ago on something that was part
11  of a great deal that I was working on.  It was not
12  my focus for three weeks.
13      Q.   So in terms of the individuals who did
14  submit resignation letters, let's say -- I work
15  frequently against a lawyer with the state,
16  Margaret Paton-Walsh on a number of cases.  I
17  assume that she submitted a resignation letter.  I
18  assume that you got notice that she had submitted a
19  resignation letter.  How would you determine
20  whether or not she should be kept on or not kept on
21  by the state?
22      A.   Along the process I've just outlined.
23      Q.   So once you -- once you have a list of
24  everybody who has submitted a resignation letter,
25  what resources were available to you to look at

Page 130

1  each of those individuals to determine whether or
2  not they should be retained by the state or keep
3  state employment?
4      A.   Same -- same answer.
5      Q.   Is it just basically what people in
6  your office knew about this person?
7      A.   Well, as I said, it starts with the
8  very important fact of whether they have responded.
9  So you -- we've assumed that they've responded with
10  a resignation letter.  And if there's nothing about
11  the resignation letter that raises any questions,
12  then it would be up to anyone on the transition
13  team or the incoming commissioner to raise any
14  questions or issues.  Are there any that I know
15  about personally or the governor knows about
16  personally or the lieutenant governor knows about
17  personally?  And if not, then we tended to accept
18  people at their word, filing their -- submitting
19  their letter of resignation and their interest in
20  continuing to serve.
21      Q.   And what would be the factors that
22  would -- or what factors did you consider in
23  determining whether to retain somebody if they
24  provided a resignation letter that was acceptable
25  to you?  What are the concerns -- what would be the

Page 131

1  reasons you would keep them versus not keep them?
2      A.   Well, ultimately -- ultimately you are
3  looking at whether or not that person is someone
4  that will work with a new commissioner or
5  perform -- be able to perform professionally in the
6  Dunleavy administration, whether or not there's any
7  other issues at stake or whether there's an
8  attitude of uncooperativeness reflected in any --
9  in the resignation letter itself, that sort of
10  thing.
11      Q.   Other than -- I mean, you've mentioned
12  the tone of the resignation letter a number of
13  times.  Other than the tone of the resignation
14  letter, do you recall for any of these 805
15  employees where someone said, "This person should
16  not be kept on.  Their letter is fine, but there's
17  some other reasons why they shouldn't be kept"?
18      A.   Let me think.  I may have -- it may
19  have happened, but I don't have any -- any specific
20  memory of any particular person.
21      Q.   Okay.  I'm going to show you what we
22  will mark as Exhibit 16.
23           (Exhibit 16 duly marked.)
24  BY MR. CHOATE:
25      Q.   Can you see this?

Page 132

1      A.   Yup.  I've got it.
2      Q.   Okay.  Exhibit 16 is a letter.  It
3  consists of two pages.  It's from Elizabeth Bakalar
4  to Attorney General Jahna Lindemuth.  And it
5  appears to have been written -- sent to her address
6  at the AG's in Anchorage.
7           Do you recall reviewing this
8  letter in November of 2018?
9      A.   Yes.  This is one of the letters I
10  reviewed.
11      Q.   And this letter indicates that she is
12  resigning?
13           MR. BAYLOUS: Mark, can he have a
14  second to just thoroughly read the thing?
15           MR. CHOATE: Sure.
16  BY MR. CHOATE:
17      Q.   Take your time.  Take your time.
18      A.   (Reading.)  Okay.
19      Q.   So does this refresh your recollection
20  that you've seen this letter before?
21      A.   Yes.
22      Q.   Okay.  This letter is different than
23  the form that was sent out, isn't it?  That we
24  discussed earlier, which was Exhibit No. -- the
25  form letter that you didn't recall seeing.  It's

Exhibit AP
Page 34 of 64

Bakalar v. Dunleavy, et al.
Case No. 3:19-cv-00025 JWS

Tuckerman Babcock
April 22, 2021

Page 133

1  much lengthier; right?
2      A.    Yes.
3      Q.    Okay.  Would you agree that this letter
4  says that Ms. Bakalar is resigning pursuant to your
5  request?
6      A.    Yes, it does say that.
7      Q.    Okay.  And you understand that
8  Ms. Bakalar says, "I'm resigning because if I don't
9  I'll be terminated."  That's my understanding --
10 that's her understanding, is that she'll be
11 terminated if she doesn't resign; right?
12     A.    Well, it says a little bit more than
13 that.
14     Q.    Well, what does it -- what does it say
15 to you that had any importance to you in your
16 decisions regarding her?
17     A.    Well, when I look over this letter, it
18 looks to me like it's just a poke in the eye and a
19 very grumbling "I don't want to do this, but I'm
20 only going to do it because Mr. Babcock has told me
21 I have to do it or I'm going to be terminated."
22 It's not a -- it doesn't reflect a good attitude
23 about a good, productive, professional working
24 relationship.
25     Q.    Well, were you expecting to be working

Page 134

1  with her?  Whether she liked you or not, did you
2  anticipate that you would be working with
3  Ms. Bakalar as an attorney?
4      A.    I've worked -- ended up working with a
5  great number of the Department of Law attorneys.
6      Q.    Was it your belief that you'd be
7  working directly with her such that your
8  relationship would be negatively affected because
9  she was unhappy with being forced to resign?
10     A.    That was a possibility.
11     Q.    Is there anything in this letter that
12 you deemed to be unprofessional?
13     A.    Yes.  I think going out of your way to
14 object to the request for resignation is
15 unprofessional.
16     Q.    What if she felt that the request for
17 resignation was not proper, that she was doing her
18 job and intended to keep doing her job?  Isn't that
19 what she said here?  Strike that.  Let me rephrase
20 that.
21           She says in her letter that she's
22 worked for the department for over 12 years, and
23 then she describes the different agencies she's
24 worked with and some of the work that she's done.
25 Do you see that?

Page 135

1      A.    Yes.
2      Q.    Were you aware at the time that you
3  reviewed this letter as to whether there were any
4  criticisms of Ms. Bakalar's work performance while
5  as an attorney general?
6      A.    No.
7      Q.    Do you see here that she hoped her
8  resignation was not accepted?  Did you consider
9  that to be -- that tone to be bad?
10     A.    Not that sentence, no.
11     Q.    Okay.  Is it the sentence above which
12 says, "My resignation is not voluntary but is
13 instead being made at the request of Mr. Babcock,
14 who has indicated that if I do not submit my
15 resignation as requested, my employment will be
16 terminated"?  Is that what you disliked?
17     A.    That is the -- that is a sentence that
18 I found to be somewhat unprofessional, and then to
19 reiterate it at the conclusion of her memo.
20     Q.    When she says, "Because I am not
21 interested in a different position in the new
22 administration"?
23     A.    No, no.  Two paragraphs above.
24     Q.    I'm sorry.
25     A.    "To clarify."

Page 136

1      Q.    And it's your position that by her
2  saying, "I am resigning because you've told me I
3  have to or I'll be fired," that that's
4  unprofessional on her part, that she shouldn't
5  express that in this letter?
6      A.    I'd say the way it was expressed was a
7  poke in the eye, and it was -- can only be
8  interpreted as quite intentional by me.
9      Q.    Did you consider how your -- your
10 letter to the state employees was the first time
11 800-plus state employees had been asked to resign
12 when a new administration came into power.  Did you
13 consider how that letter affected those 800
14 employees?
15     A.    I don't think that's a true statement.
16     Q.    Okay.  Can you identify another
17 administration where basically everyone who was
18 partially exempt and exempt was told they had to
19 resign?
20     A.    No, not all, that I'm aware of, but a
21 great number or a good percentage of that 800 have
22 received such a request in the past.
23     Q.    And would that, again, be from the
24 Knowles administration?
25     A.    Well, the Knowles administration among

Exhibit AP
Page 35 of 64

Case 3:19-cv-00025-JWS    Document 87-4    Filed 09/24/21    Page 35 of 64

Bakalar v. Dunleavy, et al.
Case No. 3:19-cv-00025 JWS

Tuckerman Babcock
April 22, 2021

Page 137

1  others.  I think that, if my memory is correct, the
2  Walker administration sent that same request to
3  about 250 employees.
4      Q.    Well, 250, wouldn't that be basically
5  the political -- the truly political appointees,
6  board members, commission members, commissioners,
7  deputies, and their assistants?
8          MR. BAYLOUS: Objection.
9  Foundation.
10     A.    I don't understand what your definition
11 of "truly political" is.
12     Q.    Well, meaning that they're not hired
13 through the -- they're not hired through the
14 personnel division but instead are directly
15 appointed by the governor.
16     A.    Well, I don't --
17     Q.    Other than those --
18     A.    -- know --
19     Q.    Please continue.  I'm sorry.
20     A.    That just -- your characterization is
21 just not accurate, but go ahead and ask another
22 question.
23     Q.    Other than those sentences which you
24 felt were a poke in the eye because she identified
25 you as being the one who was requiring her to

Page 138

1  resign, was there anything else about this letter
2  that you felt to be offensive or unprofessional?
3      A.    (Reading.)  No.
4      Q.    Was this letter the reason -- what you
5  considered to be offensive in this letter, was
6  this -- strike that.
7          Was this letter the reason why you
8  decided to terminate Ms. Bakalar?
9      A.    Yes.
10     Q.    Were there any other reasons?
11     A.    I would say that there were some doubts
12 among various people that she could separate her --
13 separate her professionalism from her strong
14 opinions.
15     Q.    And who held those opinions about her?
16     A.    Oh, I can't really think of anybody in
17 particular who held those opinions.  It was just
18 something I was generally aware of and was
19 confirmed later by -- by others.  But this letter
20 really was what was the deciding point.  This
21 resignation letter was the pivotal point for me in
22 accepting her letter of resignation.
23     Q.    What other factors were there besides
24 this resignation letter?
25     A.    The other factors really did not come

Page 139

1  into play because they were just comments -- I
2  can't even remember.  There were so many different
3  comments about each of these -- many of these 800
4  people, but in this case -- in this case, when
5  Ms. Bakalar wrote a letter like this, a resignation
6  letter, it just demonstrated her unwillingness to
7  me to treat this new administration professionally,
8  and, therefore, I determined to accept the
9  resignation letter.
10         It wasn't that major an issue to
11 me, and there were a lot of decisions to be made.
12 And this one, reading this letter, was the pivotal
13 point in time to say, "All right.  We'll accept
14 this letter of resignation."
15     Q.    Did you have concerns -- strike that.
16         When you said that other people
17 had concerns that she wouldn't be able to separate
18 her personal political beliefs from her work, what
19 personal political beliefs were you aware that she
20 had that could impact her ability to represent the
21 state as an assistant attorney general?
22     A.    Actually, I'm not very familiar with
23 her political beliefs.  I have -- I know people who
24 have talked about a blog that she had.  I know
25 people that have talked about what she says to

Page 140

1  other people about her political opponents, but
2  that doesn't mean she can't do a professional job.
3  And that's why this resignation letter was so
4  pivotal.
5      Q.    In regards to her work during -- let's
6  say during the prior administrations, had you ever
7  received or did you ever receive any information
8  that would indicate that her work for the state was
9  compromised or affected in any way by her personal
10 political beliefs?
11     A.    I would say nothing concrete.
12     Q.    Were you aware, at the time that you
13 made the decision to accept her resignation and not
14 keep her on, as to whether she had ever said
15 anything negative about Governor Dunleavy in her
16 blogs or Twitter?
17     A.    I'm not.
18     Q.    Okay.  Or that she'd ever said anything
19 negative about you prior to her termination?
20     A.    No, I'm not aware of that.
21     Q.    Are you aware of her ever criticizing
22 any policies of the State of Alaska while she was
23 employed by the State of Alaska?
24     A.    No, but I'm not a follower of her blog,
25 so --

Exhibit AP
Page 36 of 64

Bakalar v. Dunleavy, et al.
Case No. 3:19-cv-00025 JWS

Tuckerman Babcock
April 22, 2021

Page 141

1   Q.   Okay.
2   A.   I mean, so, no.  The answer is, no, I'm
3   not aware of anybody.
4   Q.   Did you receive information from
5   anybody as to whether or not Ms. Bakalar was highly
6   critical of President Trump?
7   A.   No.
8   Q.   I'm going to ask you if you can -- I'll
9   show you another document here.  I'm going to show
10  you what's been marked as Exhibit 17.
11          (Exhibit 17 duly marked.)
12  BY MR. CHOATE:
13  Q.   This is a document produced by your
14  attorneys.  It is to hiring@dunleavytransition.com.
15  It's from -- it says "siteadmin," but I think the
16  subject is -- the e-mail is from a Nancy -- is it
17  Stroup?
18  A.   I don't know.  It looks like it.
19  Q.   Okay.  Do you know who Nancy Stroup is?
20  A.   No.
21  Q.   So you're unaware of Nancy Stroup, an
22  attorney in the Mat-Su Valley?
23  A.   I am -- I am unaware.  I think I've
24  seen the name on Facebook or something, but I don't
25  know who she is.

Page 142

1   Q.   Okay.  In the message here she says,
2   "Please keep this note confidential.  The Dunleavy
3   administration should carefully vet the assistant
4   attorney generals in these sections:  Labor and
5   State Affairs, Ethics and Opinions, and Special
6   Litigation.  Maybe also the environmental sections.
7   The vast majority of the state attorneys in these
8   sections are liberal Democrats.  Many of them are
9   political activists."
10          Do you recall ever reading this?
11  A.   Well, not from November of 2018.
12  Q.   Since then?
13  A.   I said not from November of 2018.
14  Q.   Okay.  What about afterwards or before?
15  A.   Well, the first time I remember seeing
16  this when my attorney showed it to me.
17  Q.   Okay.  Ms. Stroup goes on to say, "I
18  don't know any of them personally, but from
19  checking out their social media accounts I do not
20  believe they would be able to fairly implement any
21  conservative policies.  Many of them consider
22  themselves 'the resistance.'"
23          Did you have concerns that
24  individuals who worked in the Walker administration
25  as attorneys would be unable to implement

Page 143

1   conservative policies?
2   A.   Well, that's always something to be
3   concerned about.  I didn't have any concern about a
4   particular individual as an end point.  So there
5   was -- during the process of requesting letters of
6   resignation, we gave everyone an opportunity to
7   submit their letter and let them express of their
8   own free will what it is that they wanted to do
9   next.  And I took a lot from that letter.
10  Q.   But all the letter, the form letter,
11  provided was, "I'm resigning.  I'd like to have my
12  job back"; right?  That's all it said.
13  A.   No, that's not correct.
14  Q.   Okay.  What else did it say?
15  A.   We've already gone over that.
16  Q.   Okay.  But did it say anything else?
17  It didn't say, "I support the Dunleavy
18  administration's conservative policies" or "I agree
19  to implement them," did it?
20  A.   I have no intention of arguing with you
21  about what it said.  We went over it line by line,
22  and I expressed how it had impacted me and the
23  conclusion I drew from it.
24  Q.   Okay.
25          MR. BAYLOUS:  I'd suggest that you

Page 144

1   guys are talking about two different letters.
2   Q.   Yeah.  We're talking about two
3   different letters.  I'm sorry.  I was talking about
4   the original letter, the form letter that went out
5   that you didn't recognize.  And all it said was, "I
6   resign.  I'd like to either keep my" -- "I'd like
7   to be considered to keep my job" or "I don't."
8   That's what I was talking about.
9   A.   Oh, I see.  Okay.
10  Q.   Do you see here in Ms. Stroup's message
11  in Exhibit 17, "In fact, I think the Dunleavy
12  administration should carefully vet all civil
13  attorneys for the state"?  Did you ever get -- ever
14  talk to anybody else who suggested the same thing,
15  that the attorneys working in the Attorney
16  General's office should be vetted to make sure they
17  would be able to carry out and serve or implement
18  conservative policies?
19  A.   Well, that isn't exactly what Stroup
20  says.  But you're asking me a separate question, if
21  I have ever talked to anyone about whether the
22  attorneys --
23  Q.   Right.
24  A.   -- the attorneys should be carefully
25  vetted --

Exhibit AP
Page 37 of 64

Bakalar v. Dunleavy, et al.
Case No. 3:19-cv-00025 JWS

Tuckerman Babcock
April 22, 2021

Page 145

1   Q.   Vetted.  Uh-huh.
2   A.   -- to see if they're capable of
3   carrying out conservative policies?
4   Q.   Right.
5   A.   No.
6   Q.   She then says, "My recommendation:
7   Hire some well-known conservative, experienced
8   attorneys to run these three important sections.
9   Check with the Federalist society."
10       Would you agree that she appears
11  to believe that the Attorney General's office
12  should -- that people leading these important
13  sections should have certain conservative political
14  credentials in order to do their jobs?
15  A.   Would I -- would I say that's what
16  Nancy Stroup believes --
17  Q.   Yes.
18  A.   -- based on this e-mail?
19  Q.   Uh-huh.
20  A.   That seems like a fair assessment of
21  what she thinks.
22  Q.   Do you believe that?
23  A.   Do I believe that's what she thinks?
24  Yes.
25  Q.   Okay.  Do you personally believe that

Page 146

1   you should, if possible, have attorneys in
2   positions like the heads of these sections for the
3   state be conservative, experienced attorneys?
4   A.   No, that's not a requirement.
5   Q.   Let me show you the next exhibit.  I'm
6   going to show what we'll mark as Exhibit 18.
7        (Exhibit 18 duly marked.)
8   BY MR. CHOATE:
9   Q.   Okay.  This is an e-mail with lots of
10  redactions, so we'll just talk about --
11       MR. BAYLOUS:  Mark, I mean, I'll
12  formalize this, but the redactions relate to other
13  departments and other employment decisions.  We
14  tried to give you things relevant to the Department
15  of Law.
16       MR. CHOATE:  Okay.
17  BY MR. CHOATE:
18  Q.   It says here to
19  tuckerman@dunleavytransition.com from Jeff Turner.
20  Who is -- or, no.  CC Jeff Turner.  Who is Jeff
21  Turner?
22  A.   He's the -- in the press office of the
23  governor.
24  Q.   Was he --
25  A.   At the time -- at the time in the

Page 147

1   transition, Jeff was tagged with notifying
2   commissioners and deputy commissioners that they
3   were being replaced.
4   Q.   Okay.  And then who is Jeremy Price?
5   A.   He ended up -- let's see.  During
6   transition he was a volunteer, helping keep track
7   of records and things.  And he ended up, after
8   transition, being deputy chief of staff.
9   Q.   And that would be with which -- with
10  the governor?
11  A.   Yes.
12  Q.   Okay.  So he was working for you, then,
13  after the transition?
14  A.   Yes.
15  Q.   Okay.  And there's a question.  It says
16  here on the first page, "What will we do with the
17  at-will employees who don't submit resignations?
18  My thought is that if we start the new
19  administration on day one without providing
20  consequences we'll be viewed as a paper tiger."
21       Now, that was Mr. Price's
22  language; right?
23  A.   (Reading.)
24  Q.   This is --
25  A.   Yes.

Page 148

1   Q.   This is what Mr. Price said?
2   A.   Yes.
3   Q.   I understand you've explained that you
4   wanted people to resign, but I guess I'm curious as
5   to -- was it a test of these 805 people by your new
6   incoming administration to see if they would
7   concede or accede to the fact that they -- their
8   job security was reliant upon your decision as to
9   whether to keep them or not?  Was that the test?
10  A.   I don't think that's a fair
11  characterization.
12  Q.   Well, when he says there's a paper
13  tiger, it basically -- a paper tiger, would you
14  agree, is something in which there's a threat but
15  there's really no enforcement, is fake?
16  A.   Yes, I would agree with that.
17  Q.   Okay.  And what purpose would there be
18  in terminating employees who did not believe they
19  could be dismissed at-will?  What would be the
20  purpose for that?
21  A.   You'll have to repeat that question.
22  Q.   I'm just going to strike that.
23       MR. BAYLOUS:  I think even Mark is
24  getting tired.
25       MR. CHOATE:  Yeah.

Exhibit AP
Page 38 of 64

Bakalar v. Dunleavy, et al.
Case No. 3:19-cv-00025 JWS

Tuckerman Babcock
April 22, 2021

Page 149

BY MR. CHOATE:

1  BY MR. CHOATE:
2      Q.   Now, looking down below here, it
3  says -- you wrote to him, and you say, "December 3
4  removal of deputy directors, directors, on up to
5  commissioners."  And you write, "I would like you
6  to contact each commissioner and go over the list
7  of Walker appointees we have identified for removal
8  (accept their letter of resignation or terminate
9  them if they have not submitted a resignation)."
10         Is this regarding deputy
11 directors, directors, on up to commissioners?
12     A.   You'll have to let me find this.
13     Q.   Sure.  It's the bottom of the first
14 page there.
15     A.   (Reading.)  That's all that's
16 referenced right there.  Yup.
17     Q.   Okay.  Then at the end of that list, it
18 says, "DOL Kevin Clarkson (deputy AG civil Treg
19 Taylor)."  Do you know why their names are on this
20 list?  Were they expected also to be submitting
21 resignations?
22     A.   Of course not.
23     Q.   I don't think Kevin Clarkson -- Kevin
24 Clarkson wasn't working for the administration --
25 wasn't working for the AG's at that time, was he?

Page 150

1      A.   These -- those were two people that the
2  governor intended to nominate or already had
3  nominated.  I can't remember the status.
4      Q.   Oh, I see.  Okay.  Then it goes, "1,
5  just let him know we will remove AG, Deputy AG
6  Civil, and Elections lawyer Libby Bakalar."
7         Is this the only employee that you
8  identified should be removed?
9      A.   In this e-mail to Clarkson and Taylor,
10 yes.
11     Q.   Was there another e-mail where you
12 identified others of this 805-member group who
13 should be removed?
14     A.   I don't know if there was an e-mail,
15 but there was the final determination on my part.
16     Q.   Is Libby Bakalar's name the only one in
17 writing?
18     A.   Well, there are a lot of redacted
19 issues here that I'm not addressing.  So, as I
20 said, in this e-mail directed to Clarkson and
21 Taylor for review are the AG, Deputy AG Civil, and
22 Elections lawyer Libby Bakalar.
23     Q.   And the AG and the Deputy AG Civil,
24 those are high-level -- those are the top positions
25 in the Attorney General's office; right?

Page 151

1      A.   They are some of them, that's right.
2      Q.   Right.  Well, the Attorney General was
3  the top person in the department; right?
4      A.   Oh, yes.  Of course.
5      Q.   And the Deputy AG is, depending on
6  which structure you're dealing with, which time
7  you're dealing with the state, was the number two
8  person?
9      A.   That's right.  That's why they're some
10 of them.  Yeah.
11     Q.   Right.  So beyond those two, the AG and
12 the Deputy AG, the only other lawyer that's
13 identified there is Libby Bakalar; right?
14     A.   That's -- that's correct.
15         MR. CHOATE:  Okay.  Why don't we
16 take another break?  We've been going -- take
17 another 10-minute break?
18         THE REPORTER:  Off the record.
19 2:43 PM
20         (Off record.)
21 3:03 PM
22         THE REPORTER:  We are back on
23 record.
24 BY MR. CHOATE:
25     Q.   I'm going to show you another exhibit.

Page 152

1  It's going to be Exhibit 19.
2         (Exhibit 19 duly marked.)
3  BY MR. CHOATE:
4      Q.   I'll ask if you recall this letter.
5  This is a letter from Governor Dunleavy to the
6  judicial council members regarding filling a
7  position with the Palmer Superior Court.
8      A.   (Reading.)  Yes.
9      Q.   Okay.  Did you participate in the
10 drafting of this letter?
11     A.   Well, the answer would be yes.  I
12 looked it over before it was finalized, so in that
13 sense I participated in it.
14     Q.   Okay.  And would you agree that this
15 decision by Governor Dunleavy, while you were his
16 chief of staff, has created some political unrest
17 in the state of Alaska?
18     A.   Political unrest?  There are certainly
19 people who don't concur with this reasoning.
20     Q.   Right.  Well, isn't it true that one of
21 the -- let me pull it up here.  I will mark this
22 as -- 21-04-22.  I'll mark this as Exhibit 20.
23         (Exhibit 20 duly marked.)
24 BY MR. CHOATE:
25     Q.   And I'll represent to you this is a

Exhibit AP
Page 39 of 64

Bakalar v. Dunleavy, et al.
Case No. 3:19-cv-00025 JWS

Tuckerman Babcock
April 22, 2021

Page 153

1　screenshot from the Recall Dunleavy website. And
2　on the left-hand column, the very first item they
3　identify is "Violated the Alaska Constitution by
4　refusing to appoint a judge," and that's the same
5　judge that's discussed in Exhibit 19. Is it your
6　understanding that that's one of the reasons for
7　the recall, is this decision regarding the Palmer
8　judge?
9　　　　MR. BAYLOUS: Mark, just a second
10　here. Where are we going with this? This is, you
11　know, well after Libby's termination.
12　　　　MR. CHOATE: I think it goes to a
13　number of the issues we have in our case, and I
14　want to just ask him whether or not he participated
15　in that decision and whether he understands that's
16　one of the reasons for the recall.
17　　　　MR. BAYLOUS: I think the people
18　involved with making decisions that went into that
19　letter -- I think we're getting into executive
20　privilege or deliberative process. I just -- this
21　is kind of unexpected, so --
22　　　　MR. CHOATE: That's fine. I'm
23　still going to ask him the question.
24　BY MR. CHOATE:
25　　Q.　Is it your understanding, Mr. Babcock,

Page 154

1　that literally the first reason for the recall
2　after -- regarding Governor Dunleavy is the
3　decision to not appoint one of the individuals
4　nominated by the Alaska Judicial Council for the
5　Palmer court?
6　　A.　No. My understanding is the recall is
7　motivated almost entirely by the fact that the
8　governor submitted a balanced budget.
9　　Q.　And by that you mean that people were
10　unhappy with his cuts in state services?
11　　A.　The proposed cuts, yes, and that's what
12　drives the recall.
13　　Q.　Okay. And some of that is -- in
14　looking at Exhibit 20 here, down below there you
15　see this "Hired outside consultant, Donna Arduin at
16　$195,000 per year to slash Alaska budget." That is
17　one of the reasons for the recall; right?
18　　A.　I'd say that's the preeminent reason,
19　not that he hired Donna Arduin but that he
20　submitted a balanced budget.
21　　Q.　Okay. And that included a 40 percent
22　cut to the university of Alaska system?
23　　A.　No. It included a 17 percent cut to
24　the system. But, anyway, I don't know if I'm going
25　to remember all -- if you want to go through the

Page 155

1　details of each of the budget cuts, I'm not going
2　to be prepared to respond.
3　　Q.　That's fine. But this -- the recall
4　effort does deal in large part with the concerns
5　regarding the cuts by Governor Dunleavy; correct?
6　　A.　I would say that's my impression of
7　what drives the recall, yes.
8　　Q.　Let's go to the next one here. I'd
9　like to show you what we'll mark as Exhibit 21.
10　　　　(Exhibit 21 duly marked.)
11　BY MR. CHOATE:
12　　Q.　And let's see if you can see this one.
13　　A.　Yes.
14　　Q.　Okay. That's you there on the left?
15　　A.　It is.
16　　Q.　Okay. And everyone is smiling, and it
17　says, "Governor Dunleavy Announces Senior Staff
18　Change."
19　　A.　Correct.
20　　Q.　What were the reasons for you leaving
21　the position as the governor's chief of staff?
22　　A.　I'm not sure that I'm going to respond
23　to the conversation that the governor and I had
24　regarding the chief of staff role.
25　　Q.　Well, I think it's -- did your chief of

Page 156

1　staff role -- was it changed because of concerns in
2　the way in which the public responded to the
3　governor's changes or budget decisions and similar
4　activities when he came into office?
5　　　　MR. BAYLOUS: I'm going to object.
6　This is deliberative process, executive privilege,
7　what went into the governor's decision to make
8　senior personnel changes.
9　　Q.　Well, let me ask this. Did you ask to
10　be -- to leave the position as the new chief -- as
11　the chief of staff?
12　　A.　Yes.
13　　　　MR. BAYLOUS: I --
14　　　　MR. CHOATE: I think he can answer
15　that.
16　　A.　I can answer that yes, but that's as
17　far as I'll go.
18　BY MR. CHOATE:
19　　Q.　Okay. And then it said here that you
20　were going to become a senior policy advisor for
21　Strategic Affairs; is that correct?
22　　A.　That's correct.
23　　Q.　And that was dated July 31.
24　　　　Let me show to you what's been
25　marked as Exhibit 22.

Exhibit AP
Page 40 of 64

Bakalar v. Dunleavy, et al.
Case No. 3:19-cv-00025 JWS

Tuckerman Babcock
April 22, 2021

Page 157

1           (Exhibit 22 duly marked.)
2   BY MR. CHOATE:
3       Q.    Do you recognize this letter?
4       A.    Yes, I do.
5       Q.    So you went from chief of staff to
6   senior policy advisor to resigning in a three-week
7   period; am I correct?
8       A.    No.
9       Q.    Okay.
10      A.    I don't know whether the date -- is it
11  three weeks or four weeks?  Does that matter?
12      Q.    Three weeks and a day.  How's that?
13      A.    Okay.  That's fine.
14      Q.    So in three weeks and a day --
15      A.    Whatever it was.
16      Q.    -- you went from chief of staff to
17  senior policy advisor to deciding to resign; is
18  that correct?
19      A.    Yes, that is correct.
20      Q.    I'm going to show you what we're going
21  to mark as Exhibit 23.
22          (Exhibit 23 duly marked.)
23  BY MR. CHOATE:
24      Q.    Can you see this?
25      A.    Yes, I do.

Page 158

1       Q.    Okay.  And do you recognize it?
2       A.    Yes.
3       Q.    And what is this, Exhibit 23?
4       A.    This appears to be the cover page on a
5   Facebook group, a Facebook group that I run.
6       Q.    And it's called "Tuckerman Babcock,
7   Former Chair, Alaskan Republican Party."  And it
8   has below there "Public Figure."  Are you a public
9   figure, sir?
10      A.    That's up to Facebook's designation.
11      Q.    Oh, okay.
12      A.    I don't know what you're trying to get
13  at.
14      Q.    Okay.  It's not something you put down
15  yourself, it's what they refer you as -- refer to
16  you as?
17      A.    Right.
18      Q.    Okay.  And then what do you use this
19  Facebook group for?
20      A.    Oh, I just comment on political issues
21  of the day.
22      Q.    Okay.  Does this Facebook site reflect
23  your political opinions about various issues when
24  it shows something and it shows you including it on
25  the site?

Page 159

1       A.    Not always.
2       Q.    Well, let me show you here the most
3   recent -- I guess the top of the list is -- it
4   shows a -- I'm not sure.  I think that might be
5   some kind of an advertisement for Kelly Tshibaka.
6   That's a pinned post, so I think that's an
7   advertisement.  But below there, the first entry
8   which appears to be like even maybe today or in the
9   last day or so, it says, "Rampant hate towards
10  Christian students."  Do you see that?
11      A.    Yes, I do.
12      Q.    And you post an article by the ACLJ.org
13  regarding "Woke Public School Teachers are
14  Targeting Christian Students," and that's the
15  American Center for Law and Justice; right?
16      A.    I think it is.
17      Q.    Is that a political concern of yours,
18  that the schools are treating children who are --
19  Christian children unfairly?
20          MR. BAYLOUS: Mark, I've got to
21  kind of understand what this has to do with what
22  Libby did two years ago.
23          MR. CHOATE: One of the issues in
24  this case, which is briefed in your motion for
25  summary judgment, is were Libby's activities

Page 160

1   political and punished as political speech.  And
2   for various reasons, including the covenant of good
3   faith and fair dealing, one of the issues, should
4   we get to trial, will be whether or not she was
5   dismissed or terminated because of her political
6   speech.  And Mr. Babcock, since he's the one that
7   said he made that decision -- his politics become
8   relevant as to his motivations, whether it's under
9   the objective prong of the covenant test or the
10  subjective prong.  So that's why I want to ask some
11  questions about this.
12          MR. BAYLOUS: So we're asking him
13  about his, you know, current political activities
14  as a non-state employee, as a private citizen?
15          MR. CHOATE: I am because his
16  political beliefs are his political beliefs.  I can
17  ask him that one question to refer it.  Let me do
18  that.
19  BY MR. CHOATE:
20      Q.    Mr. Babcock, have you -- you would
21  describe your political beliefs as conservative
22  Republican; is that correct?
23      A.    My political beliefs?
24      Q.    Yes.
25      A.    Yes, I would be comfortable with that

Exhibit AP
Page 41 of 64

Bakalar v. Dunleavy, et al.
Case No. 3:19-cv-00025 JWS

Tuckerman Babcock
April 22, 2021

Page 161

1  description in general.
2  Q.   Okay.  Have your political beliefs
3  changed in the last three years, between November
4  of 2018 to 2021, or are they generally the same?
5  A.   They're generally the same.  There's
6  other -- certain issues have come to the forefront
7  that are concerning me more.
8  Q.   Okay.  But your basic philosophy hasn't
9  changed, has it?
10  A.   No.  My basic philosophy has not
11  changed.
12  Q.   So I'm just going to go through a
13  little bit of this, and then we'll be done.
14        Now, I see below here, looking at
15  an entry with a young woman and a swab getting
16  ready to go up her nose, it says, "State Athletic
17  Board bans Alaska students from competing unless
18  they submit to weekly COVID tests."  And you write
19  "Other nonsense."  That's one of your beliefs,
20  right, isn't it true, is that students don't need
21  COVID testing?
22  A.   In that manner and frequency for those
23  particular activities, yes.
24  Q.   And then you have an article below here
25  regarding Colin -- I think it's Colin (enunciating)

Page 162

1  or "Colin Kahl's loose lips sink ships."  And this
2  is an article critical about one of the Biden
3  administration's appointees in the National
4  Security apparatus, isn't it?
5  A.   Yes.
6  Q.   Okay.
7  A.   I think that's who that is.
8  Q.   All right.  And then you have something
9  about --
10  A.   That particular one, I'm not -- I'm not
11  particularly familiar with Colin Kahl, but I am
12  familiar with Ted Cruz, and so I shared Ted Cruz's
13  post.
14  Q.   I see.  Okay.  Good.  Well, you -- at
15  one point Ted Cruz was the state's -- the
16  Republican party's -- the state's decision to go to
17  the Republican convention; right?  He was the top
18  vote-getter in the 2016 election; right?
19  A.   He was, and I went to that, the
20  national convention, as a Rubio delegate --
21  Q.   Oh.
22  A.   -- but it was my first convention I've
23  ever been to.
24  Q.   Oh, okay.  Well, great.  Well, your
25  wife went too; right?

Page 163

1  A.   Yes, she did.  She went as a Trump
2  delegate.
3  Q.   Okay.  Good.  Then below there you have
4  one with a picture of Joe Biden and Lisa Murkowski,
5  and it says, "Murkowski sides with Biden over
6  Alaskans."  And, again, this appears to be
7  something from Kelly Tshibaka's campaign?
8  A.   Yes.
9  Q.   Okay.  Then let's keep going down here.
10  You've got here Tuckerman Babcock again with a
11  picture of Vanita Gupta.  "Murkowski casts lone GOP
12  vote to confirm Vanita Gupta, a radical choice at
13  the Justice Department."  This was just bringing
14  something over from Must Read Alaska?
15  A.   That's correct.
16  Q.   Did you agree that -- do you agree that
17  Vanita Gupta is a radical choice for the Justice
18  Department?
19  A.   From what I know, which is limited, I
20  would say so.  That has some relevance.
21  Q.   Then you have a number of posts in
22  connection with this Candace Owens.  Do you see
23  that?
24  A.   Well, of course.
25  Q.   And who is she?

Page 164

1  A.   She's a political commentator.
2  Q.   Do you know if she finished college?
3  A.   I'm not going to answer.
4  Q.   Do you know?  Do you know?
5  A.   I don't know, and I don't care.  But,
6  no, I don't know.
7  Q.   Okay.  And what is it about Candace
8  Owens' political commentary that gets her posted
9  repeatedly on your Facebook site?
10  A.   I think, like Rush Limbaugh, she has a
11  very interesting take on a great number of issues,
12  at least --
13  Q.   Isn't one of her --
14  A.   Huh?
15  Q.   I'm sorry.
16  A.   No, go ahead.
17  Q.   No.  I interrupted.  I apologize.  I am
18  tired.
19  A.   That's all right.  That's all right.
20  Q.   Isn't one of the things that Candace
21  Owens -- one of the things she does is she
22  encourages African Americans to leave the
23  Democratic party because she considers the
24  Democratic party to support a sense of victimhood
25  and entitlement on the part of African Americans?

Exhibit AP
Page 42 of 64

Bakalar v. Dunleavy, et al.
Case No. 3:19-cv-00025 JWS

Tuckerman Babcock
April 22, 2021

Page 165

1    A.    I think that's a pretty fair assessment
2  of Candace Owens' views.
3    Q.    Let me just show you this.  One second
4  here.  And Candace Owens --
5        MR. BAYLOUS: Hold on a second,
6  Mark.  My exhibits are doing something funky.  Are
7  you moving us around or --
8        MR. CHOATE: I am.  Sorry.
9        MR. BAYLOUS: -- where should we
10  be?
11        MR. CHOATE: Sorry.  I'm moving
12  things around here.
13        MR. BAYLOUS: Okay.  I think I'm
14  screwing it up, then.  I'll be hands off.
15        MR. CHOATE: Well, I think I'm
16  going to not do any more of that.  Let's return to
17  that last exhibit.  I'm going to go back to 23 and
18  just go through a few more of these here.
19  BY MR. CHOATE:
20    Q.    Down here below -- I'll show you this
21  page -- there's a picture of a -- it looks like
22  somebody in some kind of riot gear, military gear,
23  a crowd past them.  And it says, "Mayoral runoff
24  election may determine whether Anchorage becomes a
25  leftist utopia."  That's something you also posted

Page 166

1  on your Facebook site?
2    A.    Yeah.  I shared that article from the
3  Alaska Watchman.
4    Q.    Right.
5    A.    Yes, I did share that article.
6    Q.    And you have a number of articles on
7  your Facebook site -- one second.  Sorry.  You have
8  a number of articles on your Facebook site that are
9  highly critical of what's called critical race
10  theory; is that correct?
11    A.    Yes, that's correct.
12    Q.    Okay.  And it's your belief that
13  critical race theory is bad for America; would that
14  be correct?
15    A.    Yes.
16    Q.    And why is that?
17    A.    That has -- that has no relevance to
18  this case.
19    Q.    It does reflect some of your political
20  views, though; right?
21    A.    I think it does reflect my political
22  views, which has nothing to do with this case.
23        MR. BAYLOUS: Again, Mark, if you
24  want to maybe --
25        MR. CHOATE: I'm almost done.  I'm

Page 167

1  almost done.
2  BY MR. CHOATE:
3    Q.    Okay.  Here's one final one, and then
4  I'm going to just conclude here.
5    A.    Okay.
6    Q.    I'm looking at an entry on your
7  Facebook site, and it has a picture of an African-
8  American woman.  And it says, "Racist radicals
9  ruining America."  And it says, "BLM activist
10  defends and encourages looting and rioting."  And
11  you posted that on your Facebook site too; right?
12    A.    That's correct.
13    Q.    And you have a belief that's kind of
14  throughout your site that portions of Black Lives
15  Matter are either directly related to Antifa or are
16  in themselves dangerous to the foundations of our
17  country and society; isn't that correct?
18        MR. BAYLOUS: All right.  Hold on,
19  Mark.  I mean, critical race theory, Antifa --
20  these are all -- these all postdate, really,
21  anything to do with Libby's termination.
22        MR. CHOATE: And they do.  They
23  do.  But they reflect his --
24        MR. BAYLOUS: So --
25        MR. CHOATE: -- his political

Page 168

1  views.
2        MR. BAYLOUS: -- those concepts
3  weren't even in existence when the decision about
4  Libby was made.  I mean, race theory was, but this
5  specific aspect of it is kind of a new thing.
6  BY MR. CHOATE:
7    Q.    And finally, I'll just finish up with
8  one more here.  You have here this -- I believe
9  this is Exhibit 23; right?  I don't think I can
10  even get to the end of it to confirm that, but I
11  think it's 23.  Right.
12        This is, again, called -- there's
13  an image, a little graphic from the Babylon Bee.
14  "Trans activist lovingly forces everyone to
15  agree -- or else.  Imagine, if you will, a world in
16  which you must agree with a trans activist or he'll
17  use his powers," whatever.  Again, this is
18  something that's on your website and something that
19  you think is important for people who follow you to
20  pay attention to; is that correct?
21    A.    No.  This is -- this was satire from
22  the Babylon Bee that was kind of a clever satire on
23  The Twilight Zone.  That's why that was shared.
24    Q.    Okay.  I think I'm just about done
25  here.

Exhibit AP
Page 43 of 64

Bakalar v. Dunleavy, et al.
Case No. 3:19-cv-00025 JWS

Tuckerman Babcock
April 22, 2021

Page 169

1    Do you have any opinions as to
2  whether or not Libby Bakalar was a policymaker in
3  her position with the Attorney General's office?
4    **MR. BAYLOUS:** I'm sorry. I missed
5  that question, Mark. Could you --
6    **MR. CHOATE:** Sure.
7    **MR. BAYLOUS:** -- maybe have
8  someone repeat it?
9  **BY MR. CHOATE:**
10   Q.   Mr. Babcock, do you have any opinions
11  as to whether or not Libby Bakalar was a
12  policymaker in her position at the Attorney
13  General's office?
14    **MR. BAYLOUS:** Objection to the
15  degree that it calls for a legal conclusion.
16    **MR. CHOATE:** I'm just asking if he
17  has an opinion.
18   **A.   My general opinion is -- after 30 years**
19  **of working on and off in the state, is that most of**
20  **the attorneys, if not all, are to one degree or**
21  **another policymakers in the Department of Law.**
22  **BY MR. CHOATE:**
23   Q.   Okay. Then I believe that's all I
24  have. Let's just take about two minutes for me to
25  go through my notes.

Page 170

1   A.   All right.
2    **THE REPORTER:** Off the record.
3  3:31 PM
4    (Off record.)
5  3:33 PM
6    **THE REPORTER:** Back on record.
7    **MR. CHOATE:** I think that's all I
8  have. I will -- with the exception that if we get
9  any more discovery that we should have gotten
10  earlier, that may require this to be reopened.
11  Otherwise, I believe I'm done.
12    **MR. BAYLOUS:** Alrighty, then.
13    **MR. CHOATE:** Thank you very much,
14  Mr. Babcock.
15    **THE WITNESS:** Thank you, Mark.
16    **THE REPORTER:** Off the record.
17
18   (Deposition concluded at 3:33 p.m.)
19   (Signature reserved.)
20
21
22
23
24
25

Page 171

1    WITNESS CERTIFICATE
2  Re: Bakalar v. Dunleavy, et al.
3  Case No.: 3:19-cv-00025 JWS
   Deposition of: Tuckerman Babcock
4  Date Taken: April 22, 2021
5    I hereby certify that I have read the foregoing
   deposition and accept it as true and correct, with
6  the following exceptions:
7  Page   Line        Description/Reason for Change
8  ____  ____    _____
9  ____  ____    _____
10  ____  ____    _____
11  ____  ____    _____
12  ____  ____    _____
13  ____  ____    _____
14  ____  ____    _____
15  ____  ____    _____
16  ____  ____    _____
17  ____  ____    _____
18  ____  ____    _____
19  ____  ____    _____
20
21  _____       _____
22  SIGNATURE                         DATE
23  Please sign your name and date it on the above line.
   As needed, use additional paper to note corrections,
24  dating and signing each page. If you have no
   corrections, please write the word "None" above and
25  sign, date, and return this page.

Page 172

1    C E R T I F I C A T E
2
3  S T A T E   O F   A L A S K A   )
                                    ) ss.
4  FIRST  JUDICIAL  DISTRICT        )
5
6    I, LYNDA BARKER, Registered Diplomate Reporter
   and Notary Public duly commissioned and qualified in
7  and for the State of Alaska, do hereby certify that
   the foregoing deposition was reported stenographically
8  and thereafter reduced to typewriting by me or at my
   direction;
9
   That the deponent, before examination, was first
10  duly sworn by me to testify truthfully; and that the
   foregoing transcript is a full, true, and correct
11  transcript of the deposition, including questions,
   answers, objections, statements, motions, and exceptions
12  made and taken at the time of this deposition;
13    That all documents and/or things marked for
   identification as exhibits to the deposition have been
14  annexed to and included with the deposition, unless
   waived by the witness and the respective counsel;
15    That I am not a relative or employee or attorney
   or counsel of any of the parties in this case, nor
16  a relative or employee of such attorney or counsel;
   and that I am not financially interested in this
17  case or the outcome thereof.
18    IN WITNESS WHEREOF, I have set my hand and
   affixed my Notarial Seal this 30th day of April, 2021.
19
20
21
22
23  _____
   LYNDA BARKER, RDR
24    Notary Public for Alaska
   My commission expires: 5/6/2024
25

Exhibit AP
Page 44 of 64

Bakalar v. Dunleavy, et al.
Case No. 3:19-cv-00025 JWS

Tuckerman Babcock
April 22, 2021

**$**

$195,000 (1)
154:16
$77,000-a-year (1)
35:5

**[**

[have (1)
105:8
[have] (1)
105:8
[Insert (1)
105:5

**A**

ability (5)
74:3;76:9;95:2;
108:2;139:20
able (8)
11:9,12;108:5;
122:25;131:5;139:17;
142:20;144:17
abortion (1)
61:8
above (2)
135:11,23
academic (1)
18:18
accede (1)
148:7
accept (10)
79:16;89:18;105:4;
108:5;121:9;130:17;
139:8,13;140:13;149:8
acceptable (2)
44:6;130:24
acceptance (1)
64:3
accepted (6)
19:24;107:5;117:5,9;
123:19;135:8
accepting (2)
117:23;138:22
access (1)
47:16
accomplish (6)
24:24;79:8,19,19,23,
25
accounts (1)
142:19
accurate (1)
137:21
accusation (1)
59:22
acknowledge (2)
96:21;98:22
ACLJorg (1)
159:12
acquired (1)

25:2
acquires (1)
34:21
across (3)
52:6;58:19,23
Act (4)
47:4,11;61:13;62:12
acted (1)
60:25
action (2)
54:19;64:18
actions (1)
56:15
active (6)
25:12,14;66:14,16,
16;102:22
actively (1)
65:21
activist (3)
167:9;168:14,16
activists (1)
142:9
activities (4)
156:4;159:25;
160:13;161:23
Act's (1)
62:13
actual (1)
14:24
actually (8)
19:22;26:15;38:22;
68:5;119:2;127:18;
128:25;139:22
address (2)
6:14;132:5
addressing (1)
150:19
adequate (1)
105:13
administered (1)
7:4
administration (59)
42:24;69:11;76:13;
86:19;87:6;90:12;91:4,
5;93:4,4,4,17;94:7,8,15;
95:4;96:1,24;97:1,4,8,
9,15;98:21;100:5;
105:7,10;106:14;
107:1,15,16,25;109:1,
4,7,9;113:6,12;114:5,
20;115:4,16,24;116:6,
14,16;131:6;135:22;
136:12,17,24,25;137:2;
139:7;142:3,24;
144:12;147:19;148:6;
149:24
administrations (5)
88:16,20;113:15;
114:14;140:6
administration's (5)
82:5;105:20;106:3;
143:18;162:3
administrative (1)

116:3;127:11
admirable (1)
31:3
admire (2)
27:9,10
admired (1)
31:2
ADN (1)
34:10
adopted (1)
14:4
advance (1)
80:5
advancing (1)
68:1
advertisement (2)
159:5,7
advice (12)
99:16,20,21;100:8,
13;110:21,23;111:7;
120:18,21;123:25;
126:7
advising (1)
41:1
advisor (3)
156:20;157:6,17
Advocacy (1)
97:19
affairs (5)
41:25;86:9,16;142:5;
156:21
affected (4)
125:4;134:8;136:13;
140:9
affidavits (1)
58:25
Affordable (3)
47:4,11;61:12
African (2)
164:22,25
African- (1)
167:7
afterwards (1)
142:14
AG (10)
149:18;150:5,5,21,
21,23,23;151:5,11,12
again (22)
28:8;36:16;39:4;
48:16;49:19;50:6;
58:11;82:8;83:12,19;
84:20;98:11;106:18;
109:7,16;125:18;
136:23;163:6,10;
166:23;168:12,17
against (24)
8:22;9:4,5;24:2,11;
25:23;28:13;35:23;
36:1;43:14,18,21;50:4;
54:16,20;56:8;61:12;
62:6,7;63:22;65:25;
66:15,17;129:15
agencies (1)

134:23
agency (1)
45:13
agenda (2)
63:25;127:3
ago (3)
100:3;129:10;159:22
agree (21)
58:24;71:11;74:4,19;
75:18,19;76:4,10;83:3,
7,24;133:3;143:18;
145:10;148:14,16;
152:14;163:16,16;
168:15,16
agreeing (1)
79:20
AG's (2)
132:6;149:25
ahead (5)
56:1;98:6;120:5;
137:21;164:16
aide (8)
20:4;23:15;25:3;
28:9,25;34:24;36:7,17
air (1)
41:8
al (1)
6:9
Alaska (60)
6:14;8:2,3;11:22;
12:1,11;13:4;14:16;
19:9,11,14,18;23:10;
31:18,22;33:1,10;34:4,
10,11,17;35:10;50:3,7;
51:13;52:6;54:15;55:4;
58:6,12;59:4;60:13;
61:1;63:11,17;66:10;
69:22;70:13,17;71:23;
73:9;74:12;76:1;88:10;
91:7;97:18;102:23;
103:1;113:17;114:3;
140:22,23;152:17;
153:3;154:4,16,22;
161:17;163:14;166:3
Alaskan (5)
32:12,19,22;58:14;
158:7
Alaskans (5)
47:24;50:12;53:1;
58:24;163:6
Alaska's (4)
46:24;49:19,21;
99:24
Alexander (1)
16:3
allegations (2)
52:8;58:25
allow (3)
51:11;62:14;93:4
almost (4)
64:21;154:7;166:25;
167:1
along (3)

84:2;85:14;129:22
Alrighty (1)
170:12
Alternative (2)
13:19;85:20
always (5)
31:2;66:20;70:7;
143:2;159:1
Amanda (1)
6:20
Amazon (1)
27:16
amendment (1)
62:11
amendments (2)
80:10;85:11
America (2)
166:13;167:9
American (7)
48:3,12;49:2,3;
62:11;159:15;167:8
Americans (7)
47:13,24;49:4,9,11;
58:19;60:3;164:22,25
among (3)
21:19;136:25;138:12
amount (1)
127:16
amused (1)
26:8
Anchorage (9)
12:16,20;13:12,16;
14:16;28:24;53:14;
132:6;165:24
Anglo-Saxon (1)
27:23
Announces (1)
155:17
answered (3)
75:13;83:17;92:12
anticipate (1)
134:2
anticipated (1)
116:22
Antifa (2)
167:15,19
apart (1)
14:8
apologize (4)
67:24;70:7;120:6;
164:17
apparatus (1)
162:4
apparently (1)
67:13
appear (2)
63:24;110:8
appears (5)
132:5;145:10;158:4;
159:8;163:6
applications (1)
124:21
applied (3)

Exhibit AP
Page 45 of 64

Bakalar v. Dunleavy, et al.
Case No. 3:19-cv-00025 JWS

Tuckerman Babcock
April 22, 2021

39:20;71:19;109:8
**applies (1)**
71:18
**apply (4)**
39:18;90:20;114:7,8
**appoint (2)**
153:4;154:3
**appointed (8)**
29:20;32:25;33:10;
34:16;71:24;90:12,14;
137:15
**appointees (5)**
90:11;93:18;137:5;
149:7;162:3
**appointment (1)**
90:22
**appreciate (1)**
113:16
**appropriate (5)**
25:1;51:19,21;52:2;
111:23
**appropriately (1)**
71:16
**approval (1)**
85:13
**approved (2)**
91:15;105:12
**approving (1)**
59:3
**Approximately (7)**
8:16;23:22;24:3;
41:19;42:17;78:24;
116:25
**APRIL (2)**
6:1,5
**Arduin (2)**
154:15,19
**area (1)**
13:13
**areas (1)**
21:23
**arena (1)**
68:18
**argue (1)**
51:5
**arguing (1)**
143:20
**argument (1)**
26:21
**arose (1)**
86:18
**around (7)**
42:25;46:6,7;50:23;
56:20;165:7,12
**article (13)**
49:23;53:14,17,20;
65:16,18;69:21;70:12;
159:12;161:24;162:2;
166:2,5
**articles (3)**
53:19;166:6,8
**Arts (2)**
17:25;18:2

**aspect (1)**
168:5
**aspires (1)**
28:25
**asserting (1)**
62:7
**assessment (8)**
96:16;108:2;120:2,7,
9,16;145:20;165:1
**assigned (1)**
122:2
**assist (1)**
63:21
**assistant (8)**
33:8,23;42:16,18,21;
43:3;139:21;142:3
**assistants (1)**
137:7
**Association (1)**
9:3
**assume (5)**
29:6;52:16;118:19;
129:17,18
**assumed (2)**
20:12;130:9
**assuming (1)**
122:14
**Athletic (1)**
161:16
**attacks (1)**
53:15
**attend (1)**
15:6
**attended (2)**
13:15;14:15
**attention (1)**
168:20
**attitude (6)**
98:24;99:6;117:22;
118:2;131:8;133:22
**attorney (36)**
6:19;26:20;43:20;
94:13;96:2;97:17,17;
100:4,11;101:13,14;
102:15,18;104:19;
110:15;111:18,19,21;
112:6,14;113:7;114:2,
4;132:4;134:3;135:5;
139:21;141:22;142:4,
16;144:15;145:11;
150:25;151:2;169:3,12
**attorney- (1)**
101:24
**attorney-client (2)**
110:17;112:11
**attorneys (16)**
93:19;94:4,13;113:7;
134:5;141:14;142:7,
25;144:13,15,22,24;
145:8;146:1,3;169:20
**attorney's (1)**
21:7
**at-will (35)**

71:20,22;72:4,5;
75:1;82:7;88:14;89:9,
14,16,23,25;90:6;92:6,
10;93:1,2,8;95:7,12,13,
14,16,23,24;96:5,22;
99:3;107:22;108:20;
109:3;116:9;117:22;
147:17;148:19
**available (1)**
129:25
**aware (20)**
13:3;52:10;59:16;
70:12,19,20;86:5;91:5,
10;93:22;115:1,1;
135:2;136:20;138:18;
139:19;140:12,20,21;
141:3
**awkward (1)**
24:25

**B**

**Babcock (24)**
6:7,24;7:2,12,21;8:1;
16:2;35:1;45:17;46:4;
54:17;64:9,15;103:23;
112:5;133:20;135:13;
153:25;158:6;160:6,
20;163:10;169:10;
170:14
**Babcock's (2)**
34:22;53:15
**Babylon (2)**
168:13,22
**Bachelor (3)**
17:25;18:1,2
**back (19)**
10:18;20:3;23:7,10;
46:2;47:1;55:4;67:12;
70:19;81:25;96:20;
103:14,20;104:24;
125:16;143:12;151:22;
165:17;170:6
**background (1)**
11:15
**bad (5)**
61:20;70:8,9;135:9;
166:13
**Bakalar (19)**
6:8,19;7:24;57:9,22;
64:3;94:6;132:3;133:4,
8;134:3;138:8;139:5;
141:5;150:6,22;
151:13;169:2,11
**Bakalar's (2)**
64:8;135:4;150:16
**balanced (5)**
80:9;85:13,16;154:8,
20
**balancing (1)**
114:20
**ballot (4)**
24:7,18;26:11;27:1

**bans (1)**
161:17
**Barker (1)**
6:12
**based (8)**
27:2;52:14,23;69:13;
72:24;74:22;95:2;
145:18
**basic (9)**
46:10;68:22,23;
69:12;80:3,19;85:1;
161:8,10
**basically (9)**
12:23;54:7;89:23;
99:3;106:11;130:5;
136:17;137:4;148:13
**basis (6)**
74:15,16,23;108:22,
24;121:18
**BAYLOUS (69)**
6:22,23;10:23;44:2;
48:19;57:5,18,20;
63:23;64:9,13,22;65:4;
67:8;70:24;72:9,14;
93:20;97:5;98:5,8;
99:18;101:6,22;102:1,
7;103:7,9,12,15;108:9;
110:16,22;111:1,6,12,
15,20;112:10,23;
116:7;125:2,8;132:13;
137:8;143:25;146:11;
148:23;153:9,17;
156:5,13;159:20;
160:12;165:5,9,13;
166:23;167:18,24;
168:2;169:4,7,14;
170:12
**became (5)**
34:3;41:4;42:18;
44:21;100:6
**become (6)**
17:7;33:16;76:12;
78:21;156:20;160:7
**becomes (1)**
165:24
**becoming (2)**
46:8;79:20
**Bee (2)**
168:13,22
**began (2)**
41:10;87:1
**Begich (1)**
14:5
**behalf (5)**
6:7,23;21:1;66:17;
83:8
**behavior (3)**
24:15;55:6,8
**belief (5)**
24:20;75:5;134:6;
166:12;167:13
**beliefs (18)**

27:20,21;57:16,22;
72:13,19,21;73:2;
139:18,19,23;140:10;
160:16,16,21,23;161:2,
19
**believes (3)**
52:23;64:18;145:16
**below (9)**
69:3;149:2;154:14;
158:8;159:7;161:14,
24;163:3;165:20
**benefit (2)**
92:19,22
**besides (2)**
127:18;138:23
**best (9)**
9:6;11:10;53:21;
55:13,17;69:15;76:9;
118:1;121:21
**better (4)**
47:10,13;85:6;
101:11
**beyond (2)**
70:20;151:11
**Biden (5)**
59:17,25;162:2;
163:4,5
**bill (4)**
46:25;80:8;85:1,3
**biological (1)**
62:14
**bit (7)**
9:8;38:8,10;46:17;
81:18;133:12;161:13
**Black (1)**
167:14
**BLM (1)**
167:9
**blog (3)**
49:22;139:24;140:24
**blogs (1)**
140:16
**Board (11)**
29:17,24;30:5,7;
33:7,22;43:8,16;106:2;
137:6;161:17
**Boards (7)**
29:18;33:9,15,24;
72:1;115:20;116:3
**Bob (1)**
38:1
**born (1)**
11:16
**Borough (3)**
39:19,20;66:16
**boss (2)**
24:12,13
**both (8)**
9:1;44:6;47:9;52:24;
57:15;113:15,18,23
**bottom (1)**
149:13
**Boucher (2)**

Min-U-Script®

Glacier Stenographic Reporters Inc.
www.glaciersteno.com

(2) applies - Boucher

Exhibit AP
Page 46 of 64

Bakalar v. Dunleavy, et al.
Case No. 3:19-cv-00025 JWS

Tuckerman Babcock
April 22, 2021

122:8,14
**bought (1)**
  52:18
**Box (1)**
  6:14
**Branford (1)**
  15:22
**break (12)**
  39:12;45:20;81:8,18;
  82:3;83:11,12;103:6;
  107:9;125:3;151:16,17
**Brian (1)**
  20:24
**brief (1)**
  127:13
**briefed (1)**
  159:24
**bring (2)**
  43:18;83:21
**bringing (1)**
  163:13
**broad (1)**
  80:16
**brother (1)**
  14:11
**brought (7)**
  12:1,3;43:21;83:1;
  93:16,17;129:8
**budget (10)**
  85:13,16;114:21;
  127:6,12;154:8,16,20;
  155:1;156:3
**budgeted (1)**
  80:9
**budgeting (1)**
  80:11
**Building (1)**
  62:3
**built (1)**
  69:11
**Bull (3)**
  26:14;27:4,5
**business (3)**
  6:14;45:13,16

**C**

**calculated (1)**
  57:12
**call (4)**
  26:13;58:7,15;93:8
**called (11)**
  22:17;45:16,17;
  50:13;51:7;90:22;
  91:17;95:22;158:6;
  166:9;168:12
**calling (1)**
  31:18
**Calls (2)**
  112:23;169:15
**came (8)**
  12:11;77:2;87:22,23;
  88:22;121:8;136:12;

156:4
**campaign (26)**
  24:25;25:1,4;37:16,
  22;38:23;39:1,8,9,14;
  40:1;48:15,17;77:20,
  23;78:1,2,11;81:5;
  83:10,14,17;84:16,21;
  105:24;163:7
**campaigned (8)**
  55:18;61:15;79:24;
  82:13,15;85:19,23;
  114:20
**campaigning (1)**
  65:21
**campaigns (2)**
  38:13;40:20
**can (62)**
  7:2;8:11;15:8;21:21,
  25,25;22:10;34:14;
  37:3;45:20;46:16;
  49:13,17,18;54:12,12;
  60:11;63:2;65:14;69:7;
  71:1;72:6,12,24;73:18;
  75:21,24;77:10;81:14,
  15,15;82:8;84:24;95:9;
  98:10;101:6;104:2,4;
  106:4;109:23;110:22,
  24;111:6;112:2;
  113:18,23;114:8;
  118:8;119:14;125:9,
  21;131:25;132:13;
  136:7,16;141:8;
  155:12;156:14,16;
  157:24;160:16;168:9
**Candace (5)**
  163:22;164:7,20;
  165:2,4
**candidacy (2)**
  26:19;65:25
**candidate (11)**
  24:10;26:23;32:20;
  35:22;36:3;38:14;
  55:10;63:15;77:19;
  78:7,9
**candidates (4)**
  56:8;63:22;64:11;
  78:4
**candidates' (1)**
  77:23
**capable (2)**
  118:1;145:2
**capacities (1)**
  8:1
**capacity (3)**
  12:24;75:24;76:8
**Capitol (1)**
  62:2
**Caracas (1)**
  11:17
**Care (6)**
  47:4,11,17;59:11;
  61:13;164:5
**career (2)**

69:17;93:8
**carefully (4)**
  84:20;142:3;144:12,
  24
**caricature (1)**
  27:24
**Carmony (2)**
  10:10,14
**C-A-R-M-O-N-Y (1)**
  10:12
**Carney (3)**
  28:13,19;29:4
**carrier (1)**
  13:11
**carry (2)**
  82:7;144:17
**carrying (2)**
  63:20;145:3
**case (16)**
  6:8,9;8:2,3;10:3;
  20:23;22:17,19;43:23;
  64:7;139:4,4;153:13;
  159:24;166:18,22
**case-by-case (4)**
  120:1,7,9,15
**cases (2)**
  97:18;129:16
**cast (4)**
  51:14;53:3;56:1,13
**casts (1)**
  163:11
**categories (1)**
  115:15
**category (1)**
  116:13
**caused (3)**
  15:16;16:8;39:11
**CC (1)**
  146:20
**censure (4)**
  61:10;63:18,21;
  66:10
**censured (1)**
  63:12
**center (3)**
  46:6;87:7;159:15
**Central (3)**
  50:22;51:8;60:21
**certain (7)**
  46:9;69:3;90:15,19;
  95:6;145:13;161:6
**certainly (6)**
  30:14,23;41:13;
  51:21;68:8;152:18
**certified (1)**
  60:2
**certifying (1)**
  59:25
**Chair (2)**
  50:2;158:7
**chairman (5)**
  60:22;66:24;68:9;
  77:23,25

**challenged (2)**
  22:23,24
**chance (1)**
  10:22
**change (5)**
  32:6;42:20,22;
  114:13;155:18
**changed (6)**
  42:23;95:12;156:1;
  161:3,9,11
**changes (4)**
  22:1;114:22;156:3,8
**changing (1)**
  31:22
**characterization (2)**
  137:20;148:11
**characterize (1)**
  53:6
**charge (3)**
  56:14,17;68:17
**Charles's (1)**
  53:19
**Charlie (1)**
  100:4
**Check (1)**
  145:9
**checking (1)**
  142:19
**Cheri (1)**
  21:3
**chief (19)**
  78:21;79:3,12,16,20;
  80:5;91:17;122:8,16;
  127:4;147:8;152:16;
  155:21,24,25;156:10,
  11;157:5,16
**children (3)**
  37:1;159:18,19
**CHOATE (97)**
  6:18,19;7:10,20;
  22:9;45:18;46:3,15;
  48:21,24;49:16;53:12;
  54:11;55:1;57:14,19,
  23;58:1,5;60:10;63:1;
  64:4,12,14;65:3,6,9,13;
  69:6;73:7;81:7,11,14,
  20;82:2;98:10;101:8,
  10,25;102:3,10,17;
  103:8,11,22;104:1;
  109:22;110:19,24;
  111:3,10,14,17,25;
  112:4;118:12;125:10,
  17;131:24;132:15,16;
  141:12;146:8,16,17;
  148:25;149:1;151:15,
  24;152:3,24;153:12,22,
  24;155:11;156:14,18;
  157:2,23;159:23;
  160:15,19;165:8,11,15,
  19;166:25;167:2,22,
  25;168:6;169:6,9,16,
  22;170:7,13
**choice (2)**

53:16;163:12,17
**choices (1)**
  21:23
**choose (3)**
  15:16;40:25;116:5
**chose (1)**
  73:17
**Christian (3)**
  159:10,14,19
**chunk (1)**
  99:24
**cited (1)**
  66:19
**citizen (1)**
  160:14
**City (1)**
  12:16
**civil (5)**
  144:12;149:18;
  150:6,21,23
**claim (1)**
  43:14
**clarify (1)**
  135:25
**Clark (7)**
  16:7,13,20,22;17:2,
  12,15
**Clarkson (5)**
  149:18,23,24;150:9,
  20
**class (2)**
  14:8,10
**classes (5)**
  14:15;15:6;16:20;
  17:11,14
**classically (1)**
  116:2
**classification (4)**
  90:18;94:25;95:12,
  22
**classifications (2)**
  71:17;74:25
**classified (10)**
  20:7,9;68:25;71:12;
  75:1;91:13,21;92:4,24;
  95:20
**clause (1)**
  61:24
**clean (2)**
  44:11,13
**cleaner (1)**
  44:9
**clerk (2)**
  14:21;34:23
**clever (1)**
  168:22
**client (1)**
  101:24
**climb (1)**
  12:6
**climber (2)**
  12:7,9
**Clinton (1)**

Bakalar v. Dunleavy, et al.
Case No. 3:19-cv-00025 JWS

Tuckerman Babcock
April 22, 2021

15:23
close (1)
15:19
coalition (5)
55:4,22,23;67:15;
68:14
Coast (2)
16:11,12
co-chairmen (1)
37:22
co-counsel (1)
6:20
coffee (1)
50:19
Cole (1)
100:4
Colin (4)
161:25;25;162:1,11
College (6)
12:21;16:7;18:5;
20:21;23:8;164:2
colleges (2)
12:25;35:2
Colorado (1)
85:15
column (1)
153:2
comfortable (2)
25:4;160:25
coming (4)
39:10;44:9;58:10;
115:3
comment (1)
158:20
commentary (1)
164:8
commentator (1)
164:1
comments (2)
139:1,3
Commission (7)
33:2,11,18;34:5,18;
35:11;137:6
commissioner (13)
27:13;33:1,10,16;
34:4,17;87:13;91:14;
114:18,18;130:13;
131:4;149:6
commissioners (14)
33:17;71:25,25;
124:3,5,12;126:3,3,15;
137:6;147:2,2;149:5,
11
commissioners' (1)
121:6
Commissions (6)
29:19;33:9,16,24;
115:20;116:4
committed (2)
47:12;59:18
Committee (4)
50:22;51:8;54:19;
60:22

communications (2)
72:22;100:19
Community (2)
12:20,25
compare (1)
81:5
compete (1)
62:14
competing (1)
161:17
complaining (1)
30:19
complete (3)
18:17,20,22
completed (3)
15:9;18:18;20:20
completely (1)
47:20
complicated (1)
127:13
component (1)
108:15
compromised (1)
140:9
concede (1)
148:7
concentrate (1)
11:12
concept (1)
99:19
concepts (1)
168:2
concern (5)
60:2;62:17;84:5;
143:3;159:17
concerned (6)
52:8;57:8;58:20;
59:4;60:4;143:3
concerning (2)
55:9;161:7
concerns (14)
51:15;55:20,24;57:1,
4;59:12;60:24;86:17;
130:25;139:15,17;
142:23;155:4;156:1
conclude (1)
167:4
concluded (1)
170:18
conclusion (4)
97:24;135:19;
143:23;169:15
concrete (1)
140:11
concur (1)
152:19
conduct (1)
59:2
conducting (1)
6:10
Conference (2)
22:18;31:10
confidential (2)

44:3;142:2
confirm (3)
22:6;163:12;168:10
confirmation (2)
50:4;61:18
confirmed (1)
138:19
conflating (1)
56:21
Congress (3)
59:2,13,23
congressmen (1)
47:23
connected (1)
94:21
Connecticut (3)
14:17;15:22,23
connection (3)
84:17;95:3;163:22
connections (4)
94:7,14,21,22
Connie (1)
16:2
consequences (1)
147:20
Conservation (6)
33:1,11,17;34:4,18;
35:11
conservative (14)
54:8;63:7,10;66:21;
67:7;142:21;143:1,18;
144:18;145:3,7,13;
146:3;160:21
consider (10)
25:6;89:18;96:14;
115:13;126:22;130:22;
135:8;136:9,13;142:21
considerably (1)
42:23
consideration (1)
105:9
considerations (4)
75:7,10;98:1,14
considered (10)
64:20;73:15;102:2;
106:12,13;116:10;
128:18,19;138:5;144:7
considers (1)
164:23
consistently (2)
60:25;61:7
consists (1)
132:3
consolidation (1)
127:11
Constituent (3)
29:18;33:8,23
constituents (4)
55:14,17;67:20,25
Constitution (8)
69:22;70:13,17;
73:12,15;74:6,10;
153:3

Constitutional (3)
73:10;80:10;85:11
consult (1)
40:13
consultant (6)
37:11;38:6,7;40:22;
41:20;154:15
consulted (1)
38:25
consulting (4)
38:12,13;39:16;
40:13
contact (1)
149:6
contacted (1)
52:6
contest (2)
28:2,18
context (2)
66:13;127:8
continue (8)
13:6;105:9;106:14;
107:25;116:5,15;
128:3;137:19
continued (1)
42:14
continuing (6)
96:10;109:14;
115:23;117:23;127:20;
130:20
contract (4)
40:17;43:15,17,22
contributed (1)
21:9
convene (1)
50:22
Convention (4)
73:10;162:17,20,22
conversation (5)
77:2,3,18;86:23;
155:23
conversations (2)
87:24;99:17
converse (1)
73:25
convict (1)
63:13
coordination (1)
111:8
cordial (1)
41:9
correctly (1)
33:5
cost (1)
86:1
costs (1)
47:16
council (2)
152:6;154:4
counsel (5)
6:16;120:18,22,23;
123:25
country (4)

47:15;58:19,23;
167:17
couple (8)
36:10;50:14;80:14;
86:3;87:10;115:11;
121:22;123:8
course (3)
34:25;149:22;151:4;
163:24
court (22)
7:14;8:3;9:20,23;
10:19,20;11:3;19:9;
22:16,16,23,25;23:3;
26:16;31:9;51:10;54:2;
59:16,18,20;152:7;
154:5
courtroom (2)
9:24;10:1
courts (1)
30:16
Court's (1)
30:20
covenant (2)
160:2,9
cover (1)
158:4
covered (1)
71:17
COVID (2)
161:18,21
create (2)
55:11;114:19
created (6)
90:7;92:24;109:2,8;
116:23;152:16
credentials (1)
145:14
credit (1)
91:20
criminal (2)
85:2,2
critical (8)
53:23;56:7;141:6;
162:2;166:9,9,13;
167:19
critically (1)
61:22
criticisms (1)
135:4
criticizing (2)
26:4;140:21
crossed (1)
68:13
crowd (1)
165:23
cruel (2)
38:18,18
Cruz (2)
162:12,15
Cruz's (1)
162:12
curious (1)
148:4

Min-U-Script®

Glacier Stenographic Reporters Inc.
www.glaciersteno.com

(4) close - curious

Exhibit AP
Page 48 of 64

Case 3:19-cv-00025-JWS   Document 87-4   Filed 09/24/21   Page 48 of 64

Bakalar v. Dunleavy, et al.
Case No. 3:19-cv-00025 JWS

Tuckerman Babcock
April 22, 2021

**current (5)**
63:25;105:9;106:13;
119:19;160:13
**Curt (4)**
23:17,18,21,24
**cut (2)**
154:22,23
**cuts (5)**
85:18;154:10,11;
155:1,5
**cutting (1)**
21:7
**cycle (3)**
48:15,17;86:25
**cycles (1)**
56:21

**D**

**Daily (3)**
28:24;53:14;97:20
**damage (1)**
60:5
**dangerous (1)**
167:16
**date (1)**
157:10
**dated (2)**
112:5;156:23
**dates (1)**
8:14
**daughter (2)**
36:25;45:10
**day (10)**
27:14;44:13,16,17;
76:23;147:19;157:12,
14;158:21;159:9
**days (1)**
78:25
**day-to-day (1)**
78:10
**deadline (3)**
18:21;24:5,24
**deal (8)**
22:7;59:11;65:7;
112:2,13;127:1;
129:11;155:4
**dealing (3)**
151:6,7;160:3
**dealt (1)**
91:12
**Dear (2)**
105:3;106:1
**Deb (1)**
62:20
**December (5)**
55:5;115:3,7;127:14;
149:3
**deception (1)**
68:1
**decide (2)**
54:19;112:2
**decided (5)**

22:17;25:22;43:13;
101:13;138:8
**deciding (4)**
93:5;117:1;138:20;
157:17
**decision (32)**
16:9;31:10;43:12;
50:11,18;52:14,19;
53:24;55:3;56:16;
59:21;61:21;90:25;
92:5;99:14,15;101:20;
109:6;117:1;121:13,
23;126:13;140:13;
148:8;152:15;153:7,
15;154:3;156:7;160:7;
162:16;168:3
**decisions (13)**
30:9;52:23;59:16;
115:5,8,9,25;116:23;
133:16;139:11;146:13;
153:18;156:3
**declaration (1)**
26:18
**dedicated (1)**
12:8
**dedication (1)**
113:16
**deemed (1)**
134:12
**defendants (1)**
6:23
**defending (1)**
97:19
**defends (1)**
167:10
**defense (1)**
47:8
**defined (1)**
71:19
**defines (1)**
71:4
**definition (1)**
137:10
**degree (10)**
16:15;17:1,4,6;35:2;
64:23;71:19;88:14;
169:15,20
**delegate (2)**
162:20;163:2
**deliberative (2)**
153:20;156:6
**deliver (1)**
47:16
**delivery (2)**
80:13;85:25
**demand (1)**
108:5
**Demanded (1)**
62:1
**demanding (1)**
99:24
**demarcations (1)**
126:10

**Democrat (4)**
24:6;29:5,7;55:12
**Democratic (2)**
164:23,24
**Democratic-Farmer-Labor (1)**
32:9
**Democrats (8)**
30:14;32:8;55:11;
56:14,17;68:14,17;
142:8
**demonstrate (2)**
59:14;90:19
**demonstrated (1)**
139:6
**demonstrating (1)**
109:13
**department (18)**
12:17;85:24;86:9;
91:8;94:5,12,19;
101:18;102:11;115:18;
116:1;134:5,22;
146:14;151:3;163:13,
18;169:21
**departments (8)**
80:12,14;86:3,7;
114:22;121:6;126:5;
146:13
**depend (3)**
91:3;98:20;99:13
**dependence (1)**
95:8
**depending (1)**
151:5
**deposed (2)**
8:25;9:16
**deposition (12)**
6:7,10;7:24;8:6,21,
22;9:16;10:23;11:5;
20:17;22:12;170:18
**depositions (1)**
8:13
**deprive (1)**
24:16
**deputies (1)**
137:7
**deputy (13)**
71:25;91:14;114:18;
147:2,8;149:4,10,18;
150:5,21,23;151:5,12
**describe (3)**
53:22;85:6;160:21
**described (2)**
32:2;95:16
**describes (2)**
53:20;134:23
**describing (1)**
28:24
**description (2)**
105:20;161:1
**deserve (1)**
47:18
**designated (2)**
42:15;95:6

**designation (2)**
27:4;158:10
**desire (2)**
49:6;121:6
**desires (1)**
74:8
**detail (2)**
19:6;127:17
**details (1)**
155:1
**determination (2)**
122:4;150:15
**determine (7)**
117:8;119:23;123:5;
124:6;129:19;130:1;
165:24
**determined (2)**
122:13;139:8
**determining (4)**
98:2,15;117:15;
130:23
**developed (2)**
68:20;69:17
**deviousness (1)**
31:1
**Devon (1)**
6:24
**devote (1)**
47:14
**DeVries (2)**
19:25;23:5
**dichotomy (1)**
118:4
**differ (2)**
80:25;81:3
**differed (1)**
88:19
**difference (2)**
44:14;97:7
**different (24)**
11:4;12:12;26:20;
27:14;48:1;80:12;
88:19;97:3;99:9;
106:24;114:3,22,24;
115:20;117:18;119:19;
121:8,8;132:22;
134:23;135:21;139:2;
144:1,3
**differentiate (1)**
90:13
**differently (2)**
107:14,18
**difficult (6)**
25:3;113:18,23;
114:6,9,12
**diligence (1)**
59:2
**direct (1)**
74:9
**directed (2)**
12:19;150:20
**direction (1)**
64:25

**directly (4)**
64:21;134:7;137:14;
167:15
**director (14)**
29:16,17,18,23;30:6;
33:6,8,15,21,24;42:9;
43:4;50:9;127:10
**directors (9)**
43:8,16;115:19;
116:1;127:11;149:4,4,
11,11
**dirty (1)**
48:20
**disagree (2)**
64:4;108:23
**disagreement (1)**
108:25
**disappointed (1)**
67:19
**discern (1)**
117:21
**discovered (1)**
91:16
**Discovering (1)**
39:13
**discovery (3)**
57:12;102:6;170:9
**discuss (3)**
51:22;78:16;100:17
**discussed (3)**
83:10;132:24;153:5
**discussion (5)**
73:11,18;79:4,7;
87:16
**discussions (2)**
31:21;102:15
**disliked (1)**
135:16
**disloyal (1)**
25:7
**dismayed (1)**
47:20
**dismissal (1)**
43:10
**dismissed (3)**
43:7;148:19;160:5
**Dispatch (1)**
34:11
**disputed (1)**
59:3
**distinction (1)**
89:2
**District (3)**
8:3,3;21:24
**districts (1)**
21:20
**dividend (1)**
80:8
**Division (10)**
14:14,18,22,25;71:8;
86:10,20,24;115:18;
137:14
**Document (7)**

Min-U-Script®

Glacier Stenographic Reporters Inc.
www.glaciersteno.com

(5) current - Document

Exhibit AP
Page 49 of 64

Case 3:19-cv-00025-JWS   Document 87-4   Filed 09/24/21   Page 49 of 64

Bakalar v. Dunleavy, et al.
Case No. 3:19-cv-00025 JWS

Tuckerman Babcock
April 22, 2021

58:9;68:2,5;111:8;
112:16;141:9,13
**DOL (1)**
149:18
**Dole (2)**
37:16;38:1
**Dole-Kemp (1)**
37:22
**Donald (1)**
63:13
**donate (1)**
78:7
**done (13)**
18:25;51:25;64:21;
107:15;119:23;121:17,
22;134:24;161:13;
166:25;167:1;168:24;
170:11
**Donna (2)**
154:15,19
**Doogan (3)**
34:12,13,20
**double-check (1)**
125:4
**doubt (6)**
14:4;27:17;49:10;
96:1,2;118:16
**doubts (1)**
138:11
**down (12)**
11:18;24:4;27:16;
46:16;87:4;107:9;
122:6;149:2;154:14;
158:14;163:9;165:20
**draft (1)**
113:2
**drafted (3)**
104:15;110:12;
111:13
**drafters (1)**
73:14
**drafting (4)**
50:24;104:12;
112:15;152:10
**drafts (1)**
113:5
**drew (1)**
143:23
**drives (2)**
154:12;155:7
**drop (1)**
74:5
**due (1)**
59:2
**duly (24)**
7:14;22:8;46:14;
49:15;53:11;54:10,25;
58:4;60:9;62:25;65:12;
69:5;73:6;103:25;
109:21;118:11;131:23;
141:11;146:7;152:2,
23;155:10;157:1,22
**Dunleavy (35)**

6:8;7:25,25;76:13,
21;78:16;80:3;82:4;
96:25;97:8,14,22;
105:2,3,20;106:3;
107:1,15,25;113:14;
115:2,10,24;116:15;
131:6;140:15;142:2;
143:17;144:11;152:5,
15;153:1;154:2;155:5,
17
**Dunleavy's (1)**
78:2
**during (9)**
32:11;44:11;87:8,14,
15;140:5,6;143:5;
147:5
**duties (2)**
42:22;97:2
**duty (2)**
84:12;96:3

## E

**earlier (3)**
35:22;132:24;170:10
**early (5)**
8:18;9:1;31:14,17;
32:15
**earthquake (1)**
127:15
**East (1)**
16:11
**edited (2)**
110:12,13
**Edna (1)**
19:25
**educated (1)**
14:2
**education (2)**
12:25;14:13
**effective (2)**
69:16;105:6
**effectively (1)**
90:23
**efficiencies (1)**
85:24
**efficient (1)**
80:13
**effort (2)**
47:14;155:4
**eight (2)**
37:1;77:13
**either (8)**
14:22;15:9;42:19;
64:18;101:15;123:8;
144:6;167:15
**elapsed (1)**
19:1
**elected (3)**
76:1;80:20;116:15
**election (25)**
28:3,18,22;29:3;
38:24;56:21;57:1,2,3,

11,21;58:22;59:6,15,
17,24;60:4;63:15;64:1;
77:11;78:9;79:1;80:25;
162:18;165:24
**Elections (14)**
14:14,19,22,25;
34:23;58:8,16,20;
59:12;86:10,21,24;
150:6,22
**electoral (1)**
28:1
**electors (1)**
59:4
**Electric (5)**
8:20,23;9:2;41:21,22
**element (2)**
64:7;78:6
**elements (2)**
42:2;84:10
**eligible (2)**
90:20;128:18
**Elizabeth (1)**
132:3
**else (11)**
73:20;85:10;86:2;
109:12;110:12;114:12;
138:1;143:14,16;
144:14;168:15
**e-mail (10)**
96:6;111:8;119:11;
141:16;145:18;146:9;
150:9,11,14,20
**e-mails (3)**
118:18,20;119:13
**employed (4)**
13:3;69:16;91:2;
140:23
**employee (11)**
69:2;92:4;95:13;
97:15;99:7;106:2,16;
117:22;121:10;150:7;
160:14
**employees (86)**
39:9;69:1;71:11,17,
23;72:2,4,5;74:25;
82:6,7,16,21;83:2,6,23;
84:4,5,12;87:17;88:6,
14;89:9,14,16,24;90:6,
15;91:2;92:6,7,10,20,
21,25;93:1,2,7;95:6,7,
12,14,16,20,21,23,24,
25;96:5,6,18,22;97:2;
99:15;100:10,15;
102:13;104:9,23;
105:14,18;106:1,22;
107:12,23;108:20;
109:3,5,12,17;113:17;
114:12;116:9,13;
117:16;118:7,19;
119:14;121:13;131:15;
136:10,11,14;137:3;
147:17;148:18
**employees' (3)**

70:22;83:22;108:1
**employee's (1)**
71:9
**employer (1)**
25:23
**employment (15)**
35:10;37:8,9;38:9;
41:18;43:15;69:25;
70:15;71:5;73:13;
93:19;124:7;130:3;
135:15;146:13
**en (1)**
88:6
**encourage (1)**
35:25
**encouraged (2)**
35:23;69:17
**encourages (2)**
164:22;167:10
**end (7)**
26:22;37:14;119:14,
24;143:4;149:17;
168:10
**ended (4)**
31:9;134:4;147:5,7
**ending (1)**
44:18
**endorsed (1)**
68:11
**enforcement (1)**
148:15
**enough (5)**
41:8;50:21;59:19;
67:7;78:6
**enrolled (1)**
16:21
**ensure (1)**
80:13
**ensuring (1)**
60:5
**enter (1)**
15:10
**entirely (2)**
74:6;154:7
**entitled (1)**
74:14
**entitlement (1)**
164:25
**entry (3)**
159:7;161:15;167:6
**enunciating (4)**
23:6;65:22;101:1;
161:25
**environmental (1)**
142:6
**equalize (1)**
21:19
**especially (1)**
82:6
**establish (5)**
26:16;69:23;70:14;
80:9;89:15
**established (1)**

20:11
**estimate (1)**
125:21
**et (1)**
6:8
**Ethics (1)**
142:5
**evaluation (4)**
52:24;69:3;121:14;
126:19
**even (9)**
15:9;94:18;95:1;
127:13;139:2;148:23;
159:8;168:3,10
**everybody (2)**
55:14;129:24
**Everyone (6)**
45:20;87:6;136:17;
143:6;155:16;168:14
**evidence (1)**
57:13
**exact (1)**
127:16
**exactly (5)**
24:24;67:15;114:1;
122:18;144:19
**exam (1)**
18:19
**EXAMINATION (2)**
7:18;86:4
**examine (1)**
27:19
**example (1)**
93:19
**examples (1)**
94:20
**Excel (1)**
119:8
**exception (2)**
170:8
**excited (1)**
50:10
**exciting (1)**
17:8
**Excuse (1)**
120:3
**executive (6)**
29:16,23;30:6;33:6;
153:19;156:6
**exempt (17)**
71:12;72:2;75:6;
89:23,24;91:1;92:20,
21,25;29:5;71:4;
21,21;136:18,18
**Exhibit (58)**
22:5,8;46:13,14;
49:14,15;50:5;53:10,
11;54:9,10,24,25;58:3,
4;60:8,9;62:24,25;
65:11,12;69:5;71:4;
73:5,6;103:24,25;
109:20,21;118:10,11;
125:18;131:22,23;

Min-U-Script®

Glacier Stenographic Reporters Inc.
www.glaciersteno.com

(6) DOL - Exhibit

Exhibit AP
Page 50 of 64

Bakalar v. Dunleavy, et al.
Case No. 3:19-cv-00025 JWS

Tuckerman Babcock
April 22, 2021

132:2,24;141:10,11;
144:11;146:5,6,7;
151:25;152:1,2,22,23;
153:5;154:14;155:9,
10;156:25;157:1,21,
22;158:3;165:17;168:9
**exhibits (1)**
  165:6
**existence (1)**
  168:3
**exists (1)**
  95:1
**expect (2)**
  96:7,20
**expectation (2)**
  107:17,19
**expected (11)**
  75:25;84:14;96:9,21;
  97:7;105:14,21;
  107:13,14;109:12;
  149:20
**expecting (1)**
  133:25
**experience (3)**
  16:10;21:21;34:22
**experienced (3)**
  16:11;145:7;146:3
**experiences (1)**
  39:17
**expert (2)**
  20:15;21:2
**explained (1)**
  148:3
**exposed (1)**
  59:5
**express (6)**
  51:13;52:3;96:10,23;
  136:5;143:7
**expressed (5)**
  59:13;98:24;127:19;
  136:6;143:22
**expressing (1)**
  97:12
**extensive (1)**
  88:20
**external (1)**
  64:17
**extra (1)**
  59:14
**extra-special (1)**
  48:20
**extreme (1)**
  62:5
**eye (3)**
  133:18;136:7;137:24

## F

**face (1)**
  106:10
**Facebook (12)**
  54:17;141:24;158:5,
  5,19,22;164:9;166:1,7,

8;167:7,11
**Facebook's (1)**
  158:10
**fact (6)**
  70:20;127:18;130:8;
  144:11;148:7;154:7
**factors (8)**
  98:20;117:19;121:8;
  129:8;130:21,22;
  138:23,25
**failing (1)**
  26:18
**fair (5)**
  96:16;145:20;
  148:10;160:3;165:1
**fairly (1)**
  142:20
**faith (1)**
  160:3
**fake (1)**
  148:15
**fall (3)**
  15:15;17:20;38:4
**falls (1)**
  90:18
**familiar (12)**
  49:20;56:23;59:20;
  88:9,21;91:12;104:21,
  23;105:16;139:22;
  162:11,12
**families (1)**
  47:17
**family (1)**
  12:1
**far (8)**
  14:8;32:5;59:5;61:2;
  89:3,4;111:24;156:17
**Farm (1)**
  45:17
**fashion (2)**
  48:2;60:19
**fast-forwarding (1)**
  57:10
**father (4)**
  11:20;12:7,8,10
**favor (2)**
  21:22;74:3
**favorable (1)**
  21:10
**favored (1)**
  30:13
**Federalist (1)**
  145:9
**Federation (1)**
  50:7
**feel (3)**
  25:1;51:18;54:3
**feeling (1)**
  54:6
**fees (1)**
  21:7
**fell (1)**
  20:6

**felt (9)**
  25:4;51:21;55:13,16,
  16;84:4;134:16;
  137:24;138:2
**few (4)**
  18:24;46:6;78:25;
  165:18
**figure (4)**
  41:5;81:19;158:8,9
**file (3)**
  25:24;26:24;43:13
**filing (3)**
  24:5,24;130:18
**filings (1)**
  11:6
**fill (1)**
  115:12
**filled (2)**
  115:16,21
**filling (2)**
  87:13;152:6
**final (2)**
  150:15;167:3
**finalized (1)**
  152:12
**finally (1)**
  168:7
**financing (1)**
  39:14
**find (2)**
  118:8;149:12
**finding (2)**
  63:21;68:9
**fine (6)**
  11:14;64:24;131:16;
  153:22;155:3;157:13
**finish (1)**
  168:7
**finished (1)**
  164:2
**finishing (1)**
  19:10
**fired (6)**
  72:6,12,18;104:10;
  105:19;136:3
**first (33)**
  7:14;11:16,22;19:21;
  26:22;27:15;33:20;
  39:9;41:17;45:7;50:7;
  76:11,15,21;78:13;
  79:10;89:9;91:12,24;
  107:22;108:12;113:11;
  116:13;118:23;122:7;
  136:10;142:15;147:16;
  149:13;153:2;154:1;
  159:7;162:22
**Fischer (1)**
  74:4
**fit (1)**
  120:11
**Five (4)**
  11:25;45:20;123:12;
  125:21

**five-year-old (1)**
  12:2
**fix (1)**
  125:11
**flawed (1)**
  47:11
**flirting (1)**
  110:17
**focus (3)**
  78:3;127:8;129:12
**focused (2)**
  55:24;87:13
**follow (5)**
  56:12;82:17;106:17,
  25;168:19
**followed (1)**
  9:13
**follower (1)**
  140:24
**following (3)**
  56:10;58:18;62:2
**follows (1)**
  7:16
**Forbes (1)**
  40:1
**forced (1)**
  134:9
**forces (1)**
  168:14
**forefront (1)**
  161:6
**forget (1)**
  26:22
**Form (11)**
  67:8;72:9,14;97:5;
  98:5,8;104:11;132:23,
  25;143:10;144:4
**formal (2)**
  121:12,19
**formality (1)**
  109:10
**formalize (1)**
  146:12
**format (1)**
  104:8
**former (4)**
  25:23;28:25;41:3;
  158:7
**forward (3)**
  24:10;80:11;85:12
**found (3)**
  59:18;60:14;135:18
**foundation (3)**
  69:10;93:21;137:9
**foundations (1)**
  167:16
**four (2)**
  16:5;157:11
**frame (2)**
  56:19;121:22
**framework (1)**
  80:11
**Frank (1)**

37:17
**fraud (5)**
  58:21,25;59:5,18,19
**free (2)**
  14:2;143:8
**frequency (1)**
  161:22
**frequently (1)**
  129:15
**freshman (1)**
  15:11
**Friday (2)**
  50:19;127:14
**friend (1)**
  35:24
**front (1)**
  87:7
**fulfill (1)**
  43:21
**full (1)**
  85:4
**full-time (4)**
  37:8;38:9;41:18;
  44:23
**fully (1)**
  47:14
**function (1)**
  72:25
**functioning (2)**
  57:20,21
**functions (1)**
  69:15
**fundamental (1)**
  47:21
**funding (1)**
  62:13
**fundraising (1)**
  78:6
**funky (1)**
  165:6
**further (2)**
  127:14,17
**future (1)**
  25:5

## G

**Gabrielle (2)**
  56:3;67:13
**Gary (5)**
  55:3,24;56:2,13,16
**Gas (6)**
  33:1,11,17;34:4,18;
  35:11
**gave (9)**
  9:25;18:24,24;35:4;
  52:18;90:5;122:19;
  129:4;143:6
**gear (2)**
  165:22,22
**general (24)**
  10:3,9;28:18,22;
  48:13;52:3;80:7;82:18;

Bakalar v. Dunleavy, et al.
Case No. 3:19-cv-00025 JWS

Tuckerman Babcock
April 22, 2021

83:9,9,14;89:19;96:2;
100:4;102:16,18;
117:10,12;132:4;
135:5;139:21;151:2;
161:1;169:18
**generalized (1)**
　98:9
**generally (9)**
　54:6;57:24;63:8;
　70:20;93:11,13;
　138:18;161:4,5
**generals (1)**
　142:4
**General's (5)**
　144:16;145:11;
　150:25;169:3,13
**geographical (1)**
　21:23
**gets (1)**
　164:8
**girls' (1)**
　62:14
**gist (1)**
　98:18
**given (3)**
　43:9;66:9;126:7
**Glacier (1)**
　6:13
**glove (1)**
　66:25
**goals (2)**
　87:5;105:21
**goes (6)**
　57:15,15,21;142:17;
　150:4;153:12
**Good (15)**
　7:21,22;36:3;39:7;
　60:3;76:23;81:20;
　99:20;106:24;133:22,
　23;136:21;160:2;
　162:14;163:3
**GOP (5)**
　46:25;54:15;63:15;
　66:10;163:11
**govern (2)**
　69:24;70:15
**government (16)**
　12:23,24;17:5,6,11,
　14;27:19;35:2;41:24;
　65:1;68:19;74:3,11,20;
　93:8,15
**Governor (55)**
　29:10,11,14;30:4;
　32:16,20;34:17,18;
　38:14,23;41:3,12,12;
　71:25;76:23;78:16;
　82:23,25;83:8,20;
　84:14,21,22;87:24;
　89:16,17,22;90:4,5,6,
　24;91:9,16;92:19;96:3;
　97:21;101:15;113:14;
　114:17;122:2;123:23;
　130:15,16;137:15;

140:15;146:23;147:10;
150:2;152:5,15;154:2,
8;155:5,17,23
**Governor-Elect (4)**
　105:2,3;113:14;
　115:2
**governors (1)**
　88:5
**governor's (13)**
　29:23;33:7,21;34:25;
　75:17,18;76:5,5;84:11;
　127:5;155:21;156:3,7
**grade (2)**
　13:22,22
**graduate (3)**
　16:13,25;17:17
**graduated (1)**
　13:23
**graduating (2)**
　14:12;18:3
**grandparents (2)**
　15:19,20
**grandparents' (2)**
　15:24,25
**graphic (1)**
　168:13
**grassroots (1)**
　50:23
**great (15)**
　27:12;59:11;74:25;
　120:19,22;124:11,11;
　126:7;127:1;128:13;
　129:11;134:5;136:21;
　162:24;164:11
**greatest (1)**
　98:17
**greatly (1)**
　113:15
**Green (4)**
　35:12,13;36:14;
　45:10
**Green's (3)**
　37:7;40:9,9
**group (22)**
　87:9;88:6,17;95:22;
　96:18;100:9,15;
　102:13;106:22;109:12;
　116:24;117:8;119:14;
　123:25;124:6;128:8,
　17,24;150:12;158:5,5,
　19
**grumbling (1)**
　133:19
**guaranteed (1)**
　69:2
**guess (8)**
　30:12;46:10;85:20;
　94:23;97:10;112:25;
　148:4;159:3
**guidance (1)**
　111:21
**Gupta (3)**
　163:11,12,17

**guy (2)**
　31:3;34:21
**guys (2)**
　37:1;144:1
**guys' (1)**
　6:21

---

# H

**Haaland (1)**
　62:21
**half (3)**
　38:24;81:15;127:2
**hand (4)**
　7:3;66:25;118:5,5
**handle (1)**
　37:3
**handling (1)**
　30:20
**hands (1)**
　165:14
**happened (6)**
　22:22;28:1;43:6;
　57:9;113:9;131:19
**happens (1)**
　44:12
**happy (1)**
　77:5
**Harber (1)**
　6:20
**hard (5)**
　15:2;77:4;93:25;
　107:6;127:15
**hat (1)**
　25:22
**hate (1)**
　159:9
**Haven (2)**
　15:21,22
**head (2)**
　42:10;91:15
**heads (2)**
　115:18;146:2
**health (4)**
　11:10;86:8,11,14
**healthcare (3)**
　46:25;47:9,15
**heard (3)**
　50:18;52:24;95:15
**hearing (1)**
　73:20
**heart (1)**
　66:22
**held (5)**
　58:22;60:4;102:25;
　138:15,17
**help (7)**
　30:8;78:1,1;79:22,
　23;80:5;85:12
**helped (1)**
　68:9
**helping (2)**
　67:1;147:6

**here's (4)**
　34:22;97:13;126:11;
　167:3
**Herman (1)**
　28:18
**heroes (1)**
　27:8
**Hickel (9)**
　22:17;29:12,15;
　31:10;32:12;34:17,19;
　35:4;100:5
**high (3)**
　13:15,19;64:16
**high-level (1)**
　150:24
**highly (2)**
　141:5;166:9
**hire (4)**
　41:22;91:16;101:13;
　145:7
**hired (23)**
　19:21;36:6;39:1;
　41:21;90:16,22;91:9,
　11,13;92:3;94:6,10,11,
　13,14,18,18,24;95:2;
　137:12,13;154:15,19
**hiring (3)**
　69:13;90:14;91:19
hiring@dunleavytransitioncom (1)
　141:14
**history (2)**
　17:13;27:19
**hit (1)**
　75:20
**hold (11)**
　25:15;42:6;43:3;
　44:2;57:5,5;74:14,21;
　75:7;165:5;167:18
**holds (1)**
　61:1
**homemaker (4)**
　11:21;13:7;44:21,23
**Homer (1)**
　65:17
**honor (2)**
　27:4;43:16
**Honorable (1)**
　8:5
**hope (2)**
　47:25;74:9
**hoped (1)**
　135:7
**hopes (2)**
　79:18,22
**hour (5)**
　45:19;81:15;123:10,
　11;125:20
**hours (3)**
　123:12;125:21;127:9
**house (4)**
　28:14;55:4,12;68:17
**How's (1)**
　157:12

**HR (1)**
　42:11
**Huh (1)**
　164:14
**human (2)**
　42:9;43:4
**hundred (1)**
　115:20

---

# I

**idea (2)**
　89:8;116:18
**identified (10)**
　80:15;87:2;98:2,15;
　104:9;137:24;149:7;
　150:8,12;151:13
**identify (6)**
　6:16;63:14;84:3;
　92:5;136:16;153:3
**identifying (2)**
　64:10;106:21
**II (1)**
　94:13
**III (1)**
　94:13
**image (1)**
　168:13
**Imagine (1)**
　168:15
**immediate (3)**
　60:22;123:23;124:2
**immediately (1)**
　24:8
**impact (2)**
　61:25;139:20
**impacted (1)**
　143:22
**impeachment (2)**
　62:7;63:14
**implement (18)**
　75:25;76:9;82:22;
　83:3,7,8,22,24;84:6,12,
　15,22;105:22;106:17;
　142:20,25;143:19;
　144:17
**implemented (1)**
　74:24
**implying (1)**
　78:10
**importance (1)**
　133:15
**important (7)**
　89:19;126:23,25;
　130:8;145:8,12;168:19
**impossible (1)**
　117:11
**impressed (3)**
　32:1,6;37:3
**impression (1)**
　155:6
**improve (1)**
　47:15

Exhibit AP
Page 52 of 64

Bakalar v. Dunleavy, et al.
Case No. 3:19-cv-00025 JWS

Tuckerman Babcock
April 22, 2021

**include (1)**
21:24
**included (3)**
61:3;154:21,23
**including (6)**
6:23;52:7;71:5;
127:2;158:24;160:2
**incoming (13)**
88:4;93:3;94:15;
95:4;109:7;113:12;
115:4;121:5;124:3,4;
127:4;130:13;148:6
**incomplete (1)**
35:16
**incorporated (1)**
74:2
**increase (3)**
47:16;69:1;85:25
**increases (1)**
85:20
**Independence (3)**
32:12,19,22
**Independent (2)**
31:19;32:10
**independently (2)**
37:10;59:24
**independents (1)**
68:14
**indicate (3)**
41:3;119:18;140:8
**indicated (1)**
135:14
**indicates (2)**
37:15;132:11
**indication (1)**
128:22
**individual (4)**
7:25;98:22;121:18;
143:4
**individually (2)**
91:8;116:10
**individuals (17)**
68:10;73:11;74:20;
75:4,5;93:14;94:24;
116:21;120:10;123:17;
124:6,13;127:23;
129:13;130:1;142:24;
154:3
**influence (2)**
59:19;70:23
**influenced (1)**
59:6
**influences (4)**
71:10,14,21;72:3
**information (11)**
25:2;106:15;107:10;
113:20;121:1;122:8,
16;123:16;125:25;
140:7;141:4
**initial (2)**
31:11;110:12
**initiating (1)**
85:19

**input (1)**
124:13
**inquire (1)**
64:25
**inquiring (1)**
63:24
**inquiry (1)**
64:24
**instead (6)**
74:9;95:17,20,21;
135:13;137:14
**insurance (1)**
45:13
**integrity (6)**
25:11;57:2;58:7,16,
20;59:11
**intend (1)**
79:19
**intended (2)**
134:18;150:2
**intent (1)**
96:17
**intention (1)**
143:20
**intentional (1)**
136:8
**interaction (1)**
113:7
**interactions (1)**
26:16
**interest (9)**
49:8,8,10;96:10,23;
109:13;115:23;127:20;
130:19
**interested (1)**
135:21
**interesting (2)**
26:1;164:11
**interests (1)**
55:17
**Interior (1)**
62:21
**interject (1)**
99:18
**International (1)**
18:12
**interpreted (1)**
136:8
**interrupted (1)**
164:17
**interrupting (1)**
120:6
**into (22)**
63:24;64:25;83:1,21;
91:18;99:5,20;101:23;
111:23;115:2;117:19;
120:11;121:9;123:8;
127:4;129:9;136:12;
139:1;153:18,19;
156:4,7
**investigate (2)**
59:24;80:14
**involved (10)**

26:20;30:1;31:21;
76:12,15;78:14;113:5,
7;120:20;153:18
**involving (1)**
10:3
**issue (7)**
58:17;92:25;102:12;
114:16;115:25;116:24;
139:10
**issues (23)**
9:1;27:14;46:5;
80:15;86:5,11,14,18;
87:2,12;99:10;100:17;
114:24;130:14;131:7;
150:19;153:13;158:20,
23;159:23;160:3;
161:6;164:11
**issuing (1)**
87:11
**item (1)**
153:2
**IV (1)**
94:13

---

# J

**Jacobus (1)**
21:4
**Jahna (1)**
102:20;132:4
**January (2)**
11:23;62:2
**Jay (4)**
30:24;31:2;35:24;
36:1
**Jeff (4)**
146:19,20,20;147:1
**Jeremy (1)**
147:4
**Jim (1)**
28:17
**job (36)**
19:24;20:2;35:5,10;
36:22,23,24;39:19;
41:16;42:21,22;75:24;
90:17,20;91:25;92:2,3,
4;95:22;97:2;99:12;
106:6;108:6,7;119:19,
19,24,24;121:14;
122:16;134:18,18;
140:2;143:12;144:7;
148:8
**jobs (13)**
19:17;20:5,5;75:8;
96:19,20;97:9;108:14;
109:14,14;121:25;
123:6;145:14
**Joe (6)**
19:21;59:17,25;
86:23;90:25;163:4
**John (4)**
8:5;38:17;122:8,14
**join (2)**

32:19;68:14
**joined (4)**
32:12;55:21;67:14;
68:16
**joining (2)**
32:22;55:11
**Jointly (1)**
43:5
**Josephson (1)**
19:22
**judge (14)**
11:6;20:24;21:6,11,
13;22:24;26:22;27:3;
40:9,9;52:9;153:4,5,8
**judges (2)**
26:20,24
**judgment (1)**
159:25
**judicial (2)**
152:6;154:4
**Judy (1)**
90:25
**July (3)**
47:1,1;156:23
**jumped (1)**
70:18
**Juneau (2)**
6:14;44:10
**junior (1)**
16:14
**jury (1)**
11:6
**Justice (9)**
51:14;52:9,19;53:24;
54:4;61:19;159:15;
163:13,17
**JWS (2)**
6:9;8:4

---

# K

**Kahl (1)**
162:11
**Kahl's (1)**
162:1
**Kavanaugh (10)**
50:4,9;51:10,14;
52:9,20;53:24;54:4,21;
61:19
**keep (23)**
75:7;87:6;94:1;
96:13;97:14;110:16;
117:16;119:24;121:25;
122:16;123:6;126:12;
130:2;131:1,1;134:18;
140:14;142:2;144:6,7;
147:6;148:9;163:9
**keeping (1)**
109:13
**Kelly (4)**
65:21;67:9;159:5;
163:7
**Ken (1)**

21:3
**Kenai (2)**
45:2,14
**Kendall (1)**
113:6
**kept (12)**
48:4;66:5;92:2;
121:2;123:18;127:22;
129:5,7,20,20;131:16,
17
**Kerttula (4)**
30:25;31:2;35:24;
36:1
**Kevin (3)**
149:18,23,23
**key (1)**
126:9
**kind (14)**
11:13;16:17;23:12;
40:16;77:4;78:10;
126:13;153:21;159:5,
21;165:22;167:13;
168:5,22
**kinds (1)**
25:15
**knew (3)**
35:17;54:1;130:6
**Knopp (4)**
55:7,24;56:3,13
**Knopp's (1)**
55:3;56:16
**knowledge (4)**
89:21;106:8,9;121:5
**Knowles (4)**
88:21;91:12;136:24,
25
**Knowles' (1)**
91:17
**known (1)**
7:24
**knows (3)**
115:21;130:15,16
**Kristie (5)**
37:1;45:9,17;65:20;
66:14
**KTUU (2)**
49:24,25

---

# L

**Labor (1)**
142:4
**lack (2)**
25:11;121:7
**language (4)**
37:19;69:20;105:11;
147:22
**large (3)**
88:6,22;155:4
**last (12)**
9:20;10:11;22:2;
26:10;47:9;57:1,2;
65:7;112:17;159:9;

Min-U-Script®

Glacier Stenographic Reporters Inc.
www.glaciersteno.com

(9) include - last

Exhibit AP
Page 53 of 64

Case 3:19-cv-00025-JWS   Document 87-4   Filed 09/24/21   Page 53 of 64

Bakalar v. Dunleavy, et al.
Case No. 3:19-cv-00025 JWS

Tuckerman Babcock
April 22, 2021

161:3;165:17
**lasting (1)**
   60:5
**late (5)**
   25:24;26:7,9;44:12;
   47:1
**later (3)**
   22:7;42:15;138:19
**Laughter (1)**
   38:18
**law (11)**
   47:11;70:25;94:5,19;
   101:18;102:11;108:20;
   134:5;146:15;159:15;
   169:21
**lawsuit (7)**
   9:3,4,12,15;10:13;
   43:18,21
**lawyer (8)**
   17:7;100:8;111:4,9;
   129:15;150:6,22;
   151:12
**lawyers (3)**
   91:6,11;97:20
**lead (3)**
   57:12;98:25;114:21
**leading (1)**
   145:12
**learn (6)**
   76:11,14,15;77:7,17;
   78:20
**learned (2)**
   20:14;78:13
**least (3)**
   16:23;30:1;164:12
**leave (6)**
   36:22,23;54:19;
   124:8;156:10;164:22
**leaving (4)**
   35:10;37:7;44:18;
   155:20
**LeDoux (3)**
   56:3;67:13,13
**left (5)**
   9:9;10:7;33:15;
   36:24;155:14
**left-hand (1)**
   153:2
**leftist (1)**
   165:25
**legal (9)**
   82:23;99:16,19,21;
   100:8,13;110:21,23;
   169:15
**legality (3)**
   99:23;100:9,14
**legislation (1)**
   127:3
**legislative (9)**
   20:4;21:20;23:14;
   25:3;28:9,25;34:24;
   36:7,16
**legislator (2)**

34:15;36:3
**legislators (1)**
   55:21
**Legislature (16)**
   19:18,20;20:13;35:3;
   48:21;69:23;70:13;
   74:7,10,24;75:2;92:24;
   95:6,11,19;127:5
**legitimacy (1)**
   59:1
**legitimate (4)**
   59:15;108:19,23;
   111:5
**legs (1)**
   45:21
**Leman (1)**
   28:7
**lengthened (1)**
   21:9
**lengthier (1)**
   133:1
**less (6)**
   38:8,10;39:16;
   128:14;129:3,4
**letter (89)**
   13:11;58:17;88:8;
   89:17;93:3;96:9,22;
   97:13;98:23,25;
   103:24;104:5,8,16,22,
   25;105:4,14,16;106:10,
   19;107:4,23;108:19,
   21;109:16;113:3;
   117:21,23;118:3;
   121:16;122:15,21;
   126:1,11;127:19,24;
   128:7;129:17,19,24;
   130:10,11,19,24;131:9,
   20,22,25;133:3,17;
   134:11,21;135:3;
   136:5,10,13;138:1,4,5,
   7,19,21,22,24;139:5,6,
   9,12,14;140:3;143:7,9,
   10,10;144:4,4;149:8;
   152:4,5,10;153:19;
   157:3
**letters (18)**
   88:5,15;104:12;
   115:22;117:20;121:7,
   25;122:24;126:24;
   127:21;128:9,18,25;
   129:14;132:9;143:5;
   144:1,3
**level (1)**
   69:3
**levels (1)**
   76:19
**Lewis (7)**
   16:7,13,20,22;17:1,
   12,14
**Libby (10)**
   6:19;57:22;150:6,16,
   22;151:13;159:22;

168:4;169:2,11
**Libby's (3)**
   153:11;159:25;
   167:21
**liberal (3)**
   63:9;66:20;142:8
**lied (1)**
   39:13
**lieutenant (2)**
   41:12;130:16
**life (1)**
   17:9
**liked (1)**
   134:1
**likely (3)**
   85:12;99:1;114:17
**Limbaugh (1)**
   164:10
**limited (1)**
   163:19
**limits (1)**
   61:7
**Lindauer (2)**
   38:17;39:17
**Lindemuth (3)**
   96:2;102:20;132:4
**line (6)**
   56:10,12;97:17;
   122:6;143:21,21
**lines (1)**
   84:2
**lingering (1)**
   86:17
**lips (1)**
   162:1
**Lisa (8)**
   63:12;65:25;66:4,15,
   17;67:1,7;163:4
**list (24)**
   71:7;90:7,10;95:25;
   96:4;109:2,7;115:17;
   118:7,13,14,16;119:15,
   15;124:12;126:4;
   127:22,25;128:4;
   129:23;149:6,17,20;
   159:3
**listened (1)**
   50:12
**Listening (1)**
   12:22
**literally (1)**
   154:1
**litigation (2)**
   10:18;142:6
**little (16)**
   9:8;38:8,10;39:15;
   45:19;46:17;57:7;65:7;
   77:6;81:18;101:23;
   103:5;127:15;133:12;
   161:13;168:13
**live (1)**
   15:20
**lived (1)**

15:21
**Lives (1)**
   167:14
**living (3)**
   40:22;41:20;45:1
**lobbying (2)**
   42:1,2
**lobbyist (1)**
   42:4
**local (2)**
   24:9;26:20
**lone (1)**
   163:11
**long (18)**
   14:18;16:23;18:22;
   23:20;26:15;28:11;
   36:9,13;38:6;42:6,13;
   43:2;44:7,22;82:23;
   100:3;103:8;107:7
**longer (1)**
   119:25
**look (17)**
   53:9;54:9;68:2;71:3,
   6,16;85:24;109:15,15;
   119:6,19;121:15;
   122:6,20;125:9;
   129:25;133:17
**looked (5)**
   117:25;126:4,6,7;
   152:12
**looking (10)**
   73:23;80:17;99:6;
   124:5;125:18;131:3;
   149:2;154:14;161:14;
   167:6
**looks (3)**
   133:18;141:18;
   165:21
**loose (1)**
   162:1
**looting (1)**
   167:10
**Loren (1)**
   28:6
**losing (2)**
   28:4;29:3
**lost (3)**
   28:3,21;101:2
**lot (12)**
   12:12;16:11;92:20;
   95:8;121:8,8;123:8;
   126:2;127:12;139:11;
   143:9;150:18
**lots (7)**
   31:5;114:24;115:12,
   12,24;117:18;146:9
**Louise (1)**
   67:14
**lovingly (1)**
   168:14
**lower (1)**
   85:25
**loyal (1)**

64:19
**loyalty (3)**
   57:16;64:15,16
**lunch (4)**
   81:15,16,19;103:6
**Lyda (2)**
   35:12;45:10
**Lynda (3)**
   6:12;45:22;98:10**

**M**

**machinations (1)**
   127:6
**Mae (1)**
   19:23
**maiden (1)**
   101:9
**mainly (2)**
   46:6;87:13
**maintain (2)**
   127:25;128:4
**maintained (1)**
   69:18
**major (3)**
   17:10;114:21;139:10
**majority (8)**
   49:3;55:11,12;74:21;
   93:14;97:1,1;142:7
**makes (3)**
   51:6;52:22;118:15
**making (10)**
   46:9;50:17,19;85:18;
   99:14;115:4,7,10;
   122:4;153:18
**males (1)**
   62:14
**managed (1)**
   37:16
**management (1)**
   80:12
**manager (9)**
   10:3,9;39:1,21;
   41:24;42:16,18,21;
   43:3
**manner (1)**
   161:22
**many (29)**
   8:9;15:6;27:12;52:6,
   6,7;58:25,25;59:1;
   74:25;88:23,25;90:10;
   114:3;115:21;116:13;
   118:6,6;123:2;126:14;
   127:9;128:9,10,12,25;
   139:2,3;142:8,21
**March (1)**
   60:17
**Margaret (1)**
   129:16
**Mark (32)**
   6:18;14:5;22:4;
   46:13;49:13;53:9;
   54:24;57:7;63:23;

Min-U-Script®

Glacier Stenographic Reporters Inc.
www.glaciersteno.com

(10) lasting - Mark

Exhibit AP
Page 54 of 64

Case 3:19-cv-00025-JWS   Document 87-4   Filed 09/24/21   Page 54 of 64

Bakalar v. Dunleavy, et al.
Case No. 3:19-cv-00025 JWS

Tuckerman Babcock
April 22, 2021

65:10;69:4;73:4;
101:22;103:24;109:19;
118:10;131:22;132:13;
146:6,11;148:23;
152:21,22;153:9;
155:9;157:21;159:20;
165:6;166:23;167:19;
169:5;170:15
**marked (29)**
22:8;46:14;49:15;
50:5;53:11;54:10,25;
58:3,4;60:8,9;62:25;
65:12;69:5;73:6;
103:25;109:19,21;
118:11;131:23;141:10,
11;146:7;152:2,23;
155:10;156:25;157:1,
22
**marriage (1)**
45:7
**married (5)**
36:25;37:4;45:3,9,12
**Mary (8)**
18:4,6,8,11;19:12;
20:21;23:8,8
**masse (1)**
88:6
**master's (5)**
18:12,19,20,23;19:2
**Matanuska (5)**
8:19,23;9:2;41:21,22
**matrix (1)**
121:14
**Mat-Su (3)**
39:19;66:16;141:22
**matter (8)**
7:24;8:12,15,17;
22:1;30:20;73:1;75:19;
76:2;89:19;97:21;
157:11;167:15
**mattered (1)**
27:15
**matters (2)**
8:19;75:20
**may (11)**
7:9;9:15;37:2;59:5;
74:5,14;90:22;131:18,
18;165:24;170:10
**may' (1)**
74:5
**maybe (15)**
9:4;19:5;70:4;76:25;
77:1,13,16;85:14;
87:10,10;102:8;142:6;
159:8;166:24;169:7
**Mayoral (1)**
165:23
**McCurdy (1)**
6:24
**MEA (11)**
9:5,9;10:3,5,7,14;
42:7,15;43:7,21;44:19
**mean (42)**

9:22;12:24;25:14;
30:10;31:4;32:14,15;
37:2;44:15;51:5;61:25;
63:6,24;72:8,11;74:21;
75:9,22;76:3,4,19,20;
78:3;80:1;85:5,17;
87:3;97:6;104:22;
108:5,23;113:24;
114:23;123:21;124:3;
131:11;140:2;141:2;
146:11;154:9;167:19;
168:4
**Meaning (6)**
9:24;33:20;49:3;
90:11,16;137:12
**meaningless (1)**
74:7
**means (8)**
70:22;75:23;76:7,7;
85:9,9,17;95:13
**meant (2)**
71:20;114:1
**mechanism (2)**
85:14;93:5
**media (1)**
142:19
**member (5)**
25:12;26:14;32:23;
60:21;100:7
**members (3)**
137:6,6;152:6
**memo (6)**
110:1,8,9,14;111:4;
135:19
**memorandum (1)**
112:5
**memory (5)**
10:15;73:22;106:21;
131:20;137:1
**Menard (8)**
23:17,21;24:2,4,12;
25:24;26:17;28:2
**mention (1)**
38:16
**mentioned (1)**
131:11
**merit (16)**
68:20,24;69:1,10,12,
24;70:14,21;71:5;
73:12,16,17,25;74:2;
94:25;95:2
**merits (2)**
74:15,22
**message (2)**
142:1;144:10
**met (2)**
50:13;76:21
**method (2)**
31:1;64:5
**Michael (1)**
7:25
**might (21)**
25:5;31:21;50:1;

53:7;76:12,12,14,15,
22;78:13;91:3;98:4,6,
24,25;105:23;114:20;
126:6;127:4,7;159:4
**Mike (11)**
6:22;34:11,13,20;
66:15,17;76:21;78:2;
80:3;81:8;105:2
**Military (3)**
86:9,15;165:22
**Miller (3)**
66:15,17;86:23
**Millions (1)**
58:19
**mind (2)**
57:15;108:8
**Minnesota (2)**
32:2,5
**minute (3)**
9:9;26:10;84:7
**minutes (6)**
24:5,23;45:20;73:9;
103:11;169:24
**missed (1)**
169:4
**Misstates (4)**
70:25;82:20;108:10;
116:8
**mistake (2)**
62:18,22
**mistaken (1)**
62:9
**mix (2)**
83:15;121:6
**mixed (1)**
108:11
**mixing (1)**
56:21
**mixture (3)**
121:4,4,5
**Monday (1)**
115:3
**money (2)**
52:18;78:6
**month (3)**
38:23;39:10,10
**months (3)**
14:22;15:1;50:15
**Moose (3)**
26:14;27:4,5
**more (28)**
9:8;19:5;22:7;37:2;
41:11;45:19;56:23;
63:9;66:20,21;85:12;
89:3,4,5,6;92:13;
106:1;108:14;123:10,
11,12;125:20;133:12;
161:7;165:16,18;
168:8;170:9
**morning (4)**
7:21,22;50:11,20
**most (5)**
69:12;88:20;91:1;

159:2;169:19
**mother (2)**
11:21;13:6
**motion (1)**
159:24
**motivated (1)**
154:7
**motivations (3)**
53:7;64:7;160:8
**motto (2)**
13:25;14:3
**mountain (1)**
12:9
**mountaineering (1)**
12:19
**mountains (1)**
12:6
**move (1)**
80:8
**moving (3)**
85:15;165:7,11
**much (9)**
7:7;15:10;61:25;
120:11;123:4;125:22,
24;133:1;170:13
**multiple (1)**
40:20
**Murkowski (24)**
37:17;46:7,8;50:3,
12;51:9;52:7,13;53:16;
54:16,20;60:16,24;
61:7;63:12,22;66:1,5,
15;67:1,7;163:4,5,11
**Murkowski's (5)**
46:24;50:18;53:21,
24;66:17
**Murphy (1)**
16:3
**must (8)**
47:10,14;48:4;58:12;
74:3;128:5;163:14;
168:16
**mutually (1)**
44:5

## N

**name (12)**
6:12,18;10:11;24:10;
26:10;31:22;38:17;
101:9;105:8;112:17;
141:24;150:16
**named (2)**
31:18;34:11
**names (6)**
15:24,25;120:25;
125:19;127:17;149:19
**naming (1)**
32:8
**Nancy (4)**
141:16,19,21;145:16
**narrower (1)**
77:6

**national (4)**
27:15;41:5;162:3,20
**nationwide (1)**
47:22
**Native (1)**
52:7
**Natives (2)**
50:8
**nay (1)**
62:11
**need (6)**
44:4;72:2;76:23;
83:11;103:8;161:20
**needed (5)**
83:1,6,23,24;115:21
**negative (3)**
124:10;140:15,19
**negatively (1)**
134:8
**new (28)**
15:11,21,22;16:10;
27:13;31:18;55:4;
67:14;85:13;87:5;
89:16;105:10;106:13,
14;114:17,18,19;
115:16;116:6;127:12;
131:4;135:21;136:12;
139:7;147:18;148:5;
156:10;168:5
**News (8)**
28:24;34:11;46:24;
49:20,21,22;53:14;
65:17
**next (15)**
14:13;28:5;29:8;
35:9;37:8;42:25;44:19;
63:15;96:24;112:13;
113:11;115:11;143:9;
146:5;155:8
**nexus (1)**
84:17
**night (1)**
47:9
**Ninth (1)**
13:22
**nominate (1)**
150:2
**nominated (4)**
66:25;126:3;150:3;
154:4
**nomination (5)**
40:7;41:14;51:10;
62:20;66:18
**nominee (1)**
54:2
**None (1)**
43:11
**nonnegotiable (3)**
48:3,11;49:1
**nonsense (1)**
161:19
**non-state (1)**
160:14

Min-U-Script®
Glacier Stenographic Reporters Inc.
www.glaciersteno.com
(11) marked - non-state

Exhibit AP
Page 55 of 64

Case 3:19-cv-00025-JWS   Document 87-4   Filed 09/24/21   Page 55 of 64

Bakalar v. Dunleavy, et al.
Case No. 3:19-cv-00025 JWS

Tuckerman Babcock
April 22, 2021

nor (1)
59:21
normally (2)
94:6,10
nose (1)
161:16
not] (1)
105:8
note (1)
142:2
notes (5)
37:15;38:22;41:3;
68:6;169:25
notice (5)
22:4,11;105:4,7;
129:18
notifying (1)
147:1
November (8)
88:2;100:6;104:24;
112:6;132:8;142:11,
13;161:3
number (21)
88:22;98:20;99:3,4;
114:15,21;115:7;
120:19,22;126:8;
128:13;129:16;131:12;
134:5;136:21;151:7;
153:13;163:21;164:11;
166:6,8
numerous (1)
115:4

**O**

oath (4)
7:1,4;9:25;10:24
Obamacare (6)
48:1,2,11;49:4,7;
66:8
Object (7)
72:14;97:5;98:5,8;
101:23;134:14;156:5
Objection (13)
63:23;67:8;70:24;
72:9;82:19;93:20;
108:9;110:16;112:10,
23;116:7;137:8;169:14
objective (2)
69:14;160:9
obligation (5)
82:7,16,22;83:7,23
obligations (1)
52:25
obnoxious (1)
61:17
observer (1)
56:24
obtain (2)
99:16;121:1
obtained (1)
99:21
obtaining (1)

99:19
obviously (1)
50:9
occurred (3)
58:21;59:17;94:17
occurring (1)
55:5
October (1)
77:16
odd (1)
19:17
off (18)
38:19;45:23,25;59:7;
81:21,23;103:16,18;
112:17;125:12,14;
151:18,20;165:14;
169:19;170:2,4,16
offensive (2)
138:2,5
offer (6)
19:24;63:21;91:21;
93:3;96:9,22
offered (3)
16:24;19:23;79:15
Office (24)
29:9;34:25;36:10;
37:8;40:9,10;50:14;
61:23;83:1,21;91:17,
18;96:3;97:19;115:2;
127:5;130:6;144:16;
145:11;146:22;150:25;
156:4;169:3,13
officer (3)
25:19;122:9,17
Officers (2)
58:7,15
offices (1)
102:25
official (2)
8:1;27:6
officially (1)
17:17
often (2)
78:8;118:5
Oil (6)
33:1,10,17;34:4,18;
35:10
old (4)
11:24;23:24;24:3;
35:23
older (1)
14:11
OMB (2)
127:10,11
once (6)
12:11;20:11;44:12;
119:22;129:23,23
one (78)
15:9;21:22;26:2,23;
27:7;33:16;36:15,21;
38:14;39:24;40:23;
42:24;43:10;44:8,9;
47:25;48:16,18;49:13;

50:2;58:14;61:16;63:2;
65:7;66:3;68:6;70:5;
74:12;84:23,23;85:14;
88:20;92:13;94:20;
98:20;106:11;113:8;
114:5,16;116:23;
119:4,5;121:18,18;
122:19;126:9,21,25;
132:9;137:25;139:12;
147:19;150:16;152:20;
153:6,16;154:3,17;
155:8,12;159:23;
160:3,6,17;161:19;
162:2,10,15;163:4;
164:13,20,21;165:3;
166:7;167:3,3;168:8;
169:20
one- (1)
18:14
ones (5)
53:5;104:9;109:1;
117:8,9;124:17
one's (1)
120:16
online (1)
50:1
Only (17)
14:2;15:8;25:4,4;
35:4;39:8;40:18;62:10;
85:20;106:5;125:5,5;
133:20;136:7;150:7,
16;151:12
open (1)
90:17
operated (1)
86:24
operations (3)
42:24;78:10;85:24
Opinion (4)
63:5;75:14;169:17,
18
opinions (10)
51:13;75:16;102:4;
138:14,15,17;142:5;
158:23;169:1,10
opponent (2)
64:20;67:4
opponents (1)
140:1
opportunity (5)
12:6;16:24;27:18;
95:10;143:6
opposed (3)
51:17;61:7;95:3
opposition (1)
61:18
option (1)
24:16
options (1)
125:5
oral (1)
18:19
order (5)

24:20;107:1,2;108:6;
145:14
organization (1)
103:1
original (1)
144:4
Orlansky (1)
43:20
Others (4)
115:19;137:1;
138:19;150:12
Otherwise (2)
40:25;170:11
out (24)
10:2;48:20;68:4;
70:18;80:7;81:19;82:3,
7;83:12;87:13;104:8,
19;110:1,15;112:8;
119:13;124:18;127:7;
132:23;134:13;142:19;
144:4,17;145:3
outcome (1)
85:13
outgoing (1)
113:12
outline (2)
83:10,14
outlined (3)
84:15,21;129:22
outside (6)
15:22;72:22;123:16,
22,25;154:15
over (19)
21:22;22:2;50:14;
57:2;58:16;68:13;
104:22;112:13;113:11;
116:24;123:13;133:17;
134:22;143:15,21;
149:6;152:12;163:5,14
oversaw (1)
30:5
oversee (1)
29:24;30:3
Owens (3)
163:22;164:21;165:4
Owens' (2)
164:8;165:2
own (4)
59:3;107:22;108:2;
143:8
owned (1)
30:25

**P**

packed (1)
123:8
page (4)
46:19;73:24;147:16;
149:14;158:4;165:21
pages (1)
132:3
paid (4)

14:24;39:9;52:18;
87:10
Palin (4)
40:14;41:3,10;53:15
Palmer (4)
10:2;152:7;153:7;
154:5
Palsha (1)
49:25
paper (4)
111:24;147:20;
148:12,13
paragraph (2)
113:11;114:25
paragraphs (1)
135:23
Parenthood (1)
50:10
parents (1)
11:18
parks (1)
27:15
Parnell (1)
86:19
part (19)
14:20;18:18;25:11;
63:17,19;77:8;78:4,13;
84:11;87:4;89:15;
108:12,18;126:25;
129:10;136:4;150:15;
155:4;164:25
partially (12)
71:12;72:2;75:6;
89:24;91:1;92:20,25;
95:1,15,17,21;136:18
participate (6)
60:18;64:10;78:2,5;
124:5;152:9
participated (3)
112:15;152:13;
153:14
particular (11)
55:23;61:24;83:4;
105:24;121:10;127:9;
131:20;138:17;143:4;
161:23;162:10
particularly (4)
30:22;61:16;67:10;
162:11
parties (6)
24:6,20;25:8;32:8;
44:6;123:17
partly (1)
92:23
Parts (1)
30:17
party (51)
21:22;25:7,13,16;
26:14,25,25;27:5,6;
31:18,19,22;32:3,9,10,
12,20,22;47:21;50:3;
51:9,20,22;54:18;
56:10,12;58:7,15,17;

Exhibit AP
Page 56 of 64

Bakalar v. Dunleavy, et al.
Case No. 3:19-cv-00025 JWS

Tuckerman Babcock
April 22, 2021

59:4;60:14;61:1;63:12,
17,25;64:15;65:1;
66:24;68:9,11;77:24;
78:1,5;81:1;84:18;
102:23,25;123:20;
158:7;164:23,24
**party's (2)**
60:14;162:16
**passed (2)**
18:21;62:12
**past (6)**
50:14;60:22;80:15;
88:12;136:22;165:23
**Pat (2)**
28:13,19
**Paton-Walsh (1)**
129:16
**Paul (1)**
67:14
**Pause (2)**
44:10;48:18
**pay (4)**
39:5;69:1;80:7;
168:20
**paying (1)**
37:24
**payment (1)**
40:17
**Pending (1)**
98:13
**Peninsula (1)**
45:2
**People (57)**
31:5;46:6;48:3,12;
49:2,3;60:5;71:24;
72:23;74:12,13,13;
76:1,1;87:10;88:22;
90:8;91:7;94:12,20,21;
95:9;102:9;108:14;
115:22;116:5,25;
120:13,19,22;121:1,16,
24;122:20;123:5;
126:1,5,10,16,23;
128:8;130:5,18;
138:12;139:4,16,23,25;
140:1;145:12;148:4,5;
150:1;152:19;153:17;
154:9;168:19
**per (1)**
154:16
**percent (2)**
154:21,23
**percentage (1)**
136:21
**perfectly (1)**
99:12
**perform (4)**
69:15;76:8;131:5,5
**performance (2)**
121:15;135:4
**performing (1)**
97:20
**period (8)**

13:2;14:25;31:17;
32:11;39:19;123:14;
127:13;157:7
**person (9)**
54:8;118:1;122:7;
130:6;131:3,15,20;
151:3,8
**personal (7)**
9:3,4;76:2;121:5;
139:18,19;140:9
**personally (10)**
113:19,24;114:13;
122:10;125:22;130:15,
16,17;142:18;145:25
**personnel (14)**
8:19;69:11;71:8;
90:16,24;115:5,7,9,24;
116:3,23;117:1;
137:14;156:8
**persons (3)**
69:14,25;70:15
**perspective (2)**
34:20,22
**PFD (1)**
85:4
**philosophy (2)**
161:8,10
**phone (1)**
50:20
**phrased (1)**
124:10
**pick (3)**
40:25;122:5,7
**picked (1)**
105:24
**picture (6)**
49:24;65:17;163:4,
11;165:21;167:7
**piece (1)**
111:23
**pinned (1)**
159:6
**pinpoint (1)**
123:7
**pivotal (3)**
138:21;139:12;140:4
**place (3)**
7:1;15:17;123:13
**placed (1)**
9:25
**places (1)**
64:15
**placing (1)**
61:7
**plaintiff (1)**
6:8
**plan (16)**
23:2;30:3,5,13,15,
18;31:8,11,12;48:1;
62:12;63:25;64:5;
85:15,15;100:7
**plane (1)**
41:7

**Planned (1)**
50:10
**platform (7)**
80:22,24,25;81:6;
84:9,10,18
**play (7)**
77:8;78:17;99:5;
117:19;121:9;129:9;
139:1
**played (1)**
67:25
**please (5)**
6:16;7:3;105:4;
137:19;142:2
**PM (8)**
103:19;125:13,15;
151:19,21;170:3,5,18
**PO (1)**
6:14
**point (13)**
20:15;25:20;40:8;
41:13;46:7;68:4;87:15;
128:6;138:20,21;
139:13;143:4;162:15
**poke (3)**
133:18;136:7;137:24
**police (1)**
27:13
**policies (34)**
75:25;76:5,9;79:23;
80:1,2,3;82:4,5,8,12,
14,15,22,23,25;83:5,
18,20,25;84:11,15,20;
95:10;106:3,6,17,24;
140:22;142:21;143:1,
18;144:18;145:3
**policy (12)**
30:8,11;84:3,4;87:2,
11,12;95:8;105:21;
156:20;157:6,17
**policymaker (2)**
169:2,12
**policymakers (1)**
169:21
**political (66)**
21:22;37:10;38:5,7,
11;39:16;40:12,21;
41:19;46:5,5;51:20;
64:15,20;67:4;68:18;
70:23;71:10,13,21;
72:3,6,10,10,13,18,21;
73:2;75:6,10,17;90:11;
93:18;94:7,8,14;95:3;
137:5,5,11;139:18,19,
23;140:1,10;142:9;
145:13;152:16,18;
158:20,23;159:17;
160:1,1,5,13,16,16,21,
23;161:2;164:1,8;
166:19,21;167:25
**politician (1)**
29:1
**politicians (1)**

68:16
**politics (11)**
31:5;57:16;63:25;
74:16,23;75:12,14,18;
76:2,6;160:7
**population (1)**
21:19
**populations (1)**
21:24
**portion (2)**
18:19;73:9
**portions (1)**
167:14
**position (22)**
37:24;42:1,4,7;71:9,
20,22;72:4;75:4;91:21;
94:24;105:5,9;106:13,
14;135:21;136:1;
152:7;155:21;156:10;
169:3,12
**positions (14)**
25:15;29:20;33:20;
43:3;70:22;71:12,13;
74:14,22;87:14;99:4;
114:4;146:2;150:24
**positive (2)**
78:8;124:10
**possibility (1)**
134:10
**possible (4)**
78:8;113:15,21;
146:1
**possibly (1)**
120:20
**post (5)**
54:17;63:9;159:6,12;
162:13
**Postal (1)**
13:9
**postdate (1)**
167:20
**posted (3)**
164:8;165:25;167:11
**posts (1)**
163:21
**potential (5)**
64:10;117:22;126:3,
15;127:2
**potentially (4)**
11:5;64:19;102:5;
114:16
**power (2)**
74:8;136:12
**powers (1)**
168:17
**practice (1)**
88:10
**precinct (1)**
25:19
**Predictably (2)**
19:8,8
**preeminent (1)**
154:18

**prefer (1)**
67:9
**preliminary (1)**
40:17
**premium (1)**
64:16
**preparation (1)**
127:2
**prepare (1)**
127:12
**prepared (1)**
155:2
**presence (1)**
50:2
**presented (1)**
11:5
**president (6)**
27:16;61:22;62:1,8;
63:13;141:6
**presidential (6)**
37:16;40:7;57:2,10;
58:22;59:6
**press (3)**
54:5,7;146:22
**pretend (1)**
67:19
**pretty (5)**
15:10;83:13;165:1
**prevent (3)**
11:11;24:6,17
**previous (2)**
22:2;108:18
**Price (2)**
147:4;148:1
**Price's (1)**
147:21
**primaries (1)**
56:9
**primarily (3)**
12:5;17:12;38:14
**primary (7)**
28:17,20,21;39:2,2;
66:14,25
**principle (9)**
69:10,12,24;70:15,
21;71:5;73:25;74:2;
89:20
**principled (1)**
52:24
**principles (3)**
68:21,24;94:25
**prior (3)**
88:16;140:6,19
**priority (1)**
49:7
**private (2)**
72:21;160:14
**privilege (4)**
101:24;110:17;
153:20;156:6
**probably (7)**
10:17;17:22;88:2,3;
99:1;125:20;129:5

Min-U-Script®
Glacier Stenographic Reporters Inc.
www.glacriersteno.com
(13) party's - probably

Exhibit AP
Page 57 of 64

Bakalar v. Dunleavy, et al.
Case No. 3:19-cv-00025 JWS

Tuckerman Babcock
April 22, 2021

**problem (1)**
55:15
**procedure (1)**
121:12
**proceed (2)**
7:9;91:19
**process (15)**
47:10;68:9;102:14;
107:4;113:21;121:19,
21;123:5;126:19,20,
24;129:22;143:5;
153:20;156:6
**processes (1)**
32:4
**produced (2)**
113:3;141:13
**productive (2)**
99:2;133:23
**professional (9)**
29:1;75:23;76:8;
108:4,8,13,15;133:23;
140:2
**professionalism (2)**
108:17;138:13
**professionally (6)**
72:25;113:19,24;
114:13;131:5;139:7
**professionals (1)**
108:3
**professor (1)**
12:18
**program (4)**
12:20;18:13,15,16
**prohibited (1)**
62:13
**project (1)**
127:9
**promise (5)**
47:21,22;48:3,11;
49:2
**promises (1)**
66:5
**promising (1)**
55:18
**promoted (1)**
42:9
**promoting (1)**
69:13
**prong (2)**
160:9,10
**proper (1)**
134:17
**properly (1)**
86:19
**proposal (2)**
47:4,9
**proposed (1)**
154:11
**prosecuting (1)**
97:18
**protests (1)**
58:23
**provide (5)**

20:15;21:1;74:8,11;
113:20
**provided (9)**
9:19;90:7;105:19;
109:2,2;111:21;
124:12;130:24;143:11
**provides (1)**
69:22;70:13
**providing (3)**
96:4;116:22;147:19
**public (10)**
34:19,21;41:5;64:24;
91:14;97:19;156:2;
158:8,8;159:13
**publicly (2)**
30:21;64:23
**published (1)**
47:1
**pull (3)**
22:15;118:8;152:21
**punished (1)**
160:1
**purpose (3)**
21:17;148:17,20
**purposes (1)**
21:16
**pursuant (1)**
133:4
**pursue (1)**
95:10
**put (15)**
24:10;25:22;26:1,10,
25;56:14,17;68:17;
87:3;111:25;112:1;
124:25;127:4,8;158:14

---

## Q

**qualifications (3)**
69:14;90:19,21
**qualified (3)**
54:1;69:15;93:18
**quality (1)**
47:17
**quick (4)**
81:8;99:19;118:8;
125:11
**quickly (4)**
22:3;61:6;83:13;
110:2
**quit (1)**
96:18
**quite (2)**
89:2;136:8

---

## R

**race (9)**
27:20,21,22,23;
32:16;166:9,13;
167:19;168:4
**Racist (1)**
167:8

**radical (2)**
163:12,17
**radicals (1)**
167:8
**rain (1)**
44:16
**raise (3)**
7:2;78:6;130:13
**raises (1)**
130:11
**Rampant (1)**
159:9
**ran (4)**
28:14;38:1,22;66:23
**range (1)**
129:4
**rather (6)**
32:7;62:5;72:1;
74:15,22;118:2
**reaching (1)**
99:14
**Reaction (1)**
46:24
**read (10)**
53:19;58:12;70:17;
73:14,18;98:10;110:2;
114:8;132:14;163:14
**reading (9)**
53:17;110:7;132:18;
138:3;139:12;142:10;
147:23;149:15;152:8
**ready (1)**
161:16
**real (3)**
61:6;99:19;118:7
**reality (1)**
22:1
**realize (1)**
126:22
**really (14)**
71:2;76:1;81:4;
84:16;91:22;93:23;
105:15;108:1;118:14;
138:16,20,25;148:15;
167:20
**reapply (1)**
106:5
**reapportionment (5)**
20:16;29:17,24;33:7,
22
**reason (17)**
14:4;43:9,12;44:10;
52:21;61:10;75:2;
89:12,13;92:9;95:5,7;
96:1;138:4,7;154:1,18
**reasonable (2)**
57:13;93:2
**reasonably (1)**
57:12
**reasoning (1)**
152:19
**reasons (18)**
11:9;53:25;66:3,9;

72:7,11;80:19,20;99:3,
4;131:1,17;138:10;
153:6,16;154:17;
155:20;160:2
**Rebecca (1)**
49:24
**recall (65)**
10:16;13:25;15:8;
20:3;21:6;22:18,21,25;
25:18;28:23;30:13,19,
22,24;31:3,6,16,25;
32:6,13;35:6;37:18;
42:17;44:8;46:8;47:5,
7,19;48:5;50:6,17;
51:1,3;53:17;55:5,6;
56:7;59:7;62:15,16;
68:6;73:19;87:8,21;
105:12,25;106:20;
110:1;113:1;119:2;
120:20;131:14;132:7,
25;142:10;152:4;
153:1,7,16;154:1,6,12,
17;155:3,7
**receive (3)**
117:20;140:7;141:4
**received (4)**
111:7;119:22;
136:22;140:7
**receiving (1)**
105:7
**recent (1)**
159:3
**recognize (7)**
104:5;107:22;
118:13,14;144:5;
157:3;158:1
**recollection (6)**
9:6;89:8;104:13;
106:19,21;132:19
**recommendation (2)**
27:3;145:6
**record (25)**
6:4,17;22:4;38:19;
45:23,25;46:2;81:21,
23;82:1;103:16,18,21;
112:2;119:10;125:12,
14,16;151:18,20,23;
170:2,4,6,16
**records (1)**
147:7
**recruited (1)**
24:9
**red (1)**
118:25
**redacted (1)**
150:18
**redactions (2)**
146:10,12
**redistricting (16)**
8:18,18;9:1;10:18;
19:4,7;21:14,16,17,21;
22:22;23:2;29:25;30:4,
18;31:8

**reduce (2)**
47:16;85:21
**reelected (2)**
61:16;67:2
**reelection (2)**
24:16;61:15;66:24
**refer (6)**
54:7;66:7,9;158:15,
15;160:17
**referenced (2)**
41:11;149:16
**references (1)**
61:3
**referred (1)**
20:17
**referring (2)**
40:21;53:2
**reflect (5)**
133:22;158:22;
166:19,21;167:23
**reflected (1)**
131:8
**reflection (1)**
108:1
**reflects (1)**
118:18
**reforming (1)**
47:12
**refresh (3)**
104:13;112:14;
132:19
**refusing (1)**
153:4
**regard (2)**
65:1;111:22
**regarding (23)**
20:16;24:15;31:21;
46:9;51:15;52:8,19;
53:24;55:2,2,20;60:15;
87:25;100:20;102:12;
133:16;149:10;152:6;
153:7;154:2;155:5,24;
159:13;161:25
**regards (4)**
41:2;92:5;107:10;
140:5
**Reginald (1)**
16:2
**region (1)**
66:16
**register (1)**
42:3
**rehire (4)**
96:14;98:2,16;
117:16
**rehired (9)**
98:1,14;107:1,2,3,
20;108:6;109:11;
123:19
**reiterate (1)**
135:19
**rejected (2)**
30:15;117:9

Bakalar v. Dunleavy, et al.
Case No. 3:19-cv-00025 JWS

Tuckerman Babcock
April 22, 2021

**relate (1)**
146:12
**related (6)**
8:17;38:13;56:13;
111:24;126:4;167:15
**relations (5)**
18:12;33:8,23;42:9;
43:4
**relationship (7)**
41:2,4,6,10;99:2;
133:24;134:8
**relevance (2)**
163:20;166:17
**relevant (6)**
57:19;64:6,21;75:15;
146:14;160:8
**Reliable (1)**
63:5
**reliant (1)**
148:8
**rely (1)**
101:20
**remain (1)**
124:7
**remains (1)**
47:11
**remember (31)**
8:14,21;15:2;20:22;
21:4,11;23:1;32:3;
36:24;39:21;42:5;43:1;
87:23,24;88:23;89:11;
101:19;102:14;104:25;
110:11,13;112:9;
123:3;128:12,15;
129:6,10;139:2;
142:15;150:3;154:25
**removal (2)**
149:4,7
**remove (1)**
150:5
**removed (2)**
150:8,13
**reopened (1)**
170:10
**repeal (9)**
47:4;48:1,2,10;49:4,
6;61:12;80:8;85:1
**repealing (1)**
66:8
**repeat (2)**
148:21;169:8
**repeatedly (1)**
164:9
**rephrase (1)**
134:19
**replaced (6)**
68:12;88:22,23;89:3,
5;147:3
**report (1)**
87:12
**REPORTER (21)**
6:4,25;7:6,14;34:11,
15;45:23;46:2;81:21,

25;98:13;103:13,16,
20;125:12,16;151:18,
22;170:2,6,16
**Reporters (1)**
6:13
**Reporting (1)**
63:5
**represent (4)**
73:8;104:7;139:20;
152:25
**Representative (12)**
19:23;23:5,18;24:2,
4,12;25:23;28:2,6;
29:4;55:3,7
**Representatives (1)**
68:18
**representing (2)**
21:5;51:12
**represents (1)**
55:14
**Republican (50)**
24:6,7,17;25:7,13,
24;26:11;28:17;31:19,
22;32:10;38:2;40:5;
47:3,21;49:7,8;50:3;
51:9,20,22;55:10,21;
58:6,15;59:4;60:13;
61:1;62:10;63:11,17;
66:6,12,20,21;77:22,
23;78:1,4,5,9;81:1;
84:9,18;102:23;103:1;
158:7;160:22;162:16,
17
**Republicans (6)**
24:10;26:2;30:13;
32:2,9;51:12
**request (13)**
66:10;87:16;88:5;
90:8;96:8;99:8;111:22;
133:5;134:14,16;
135:13;136:22;137:2
**requested (7)**
88:17,25;89:22;98:3,
16;99:11;135:15
**requesting (5)**
58:17;100:14;
108:19;109:11;143:5
**requests (1)**
118:20
**require (4)**
92:6;104:10;109:5;
170:10
**required (8)**
106:22,23,25;
107:13;114:6,11;
117:17;119:17
**requirement (2)**
114:10;146:4
**requires (1)**
69:12
**requiring (6)**
100:10,15;102:12;
108:13;116:24;137:25

**Rescue (1)**
62:12
**reserved (1)**
170:19
**resign (40)**
88:18;89:10,14;92:6,
10,18,21;93:15;96:7,
12,19;98:3,16,23;
99:11,15;100:10,16;
104:10;105:18;106:5,
12,23;107:13;108:6,
14;109:5;114:6,10;
116:25;117:17;119:17;
133:11;134:9;136:11,
19;138:1;144:6;148:4;
157:17
**resignation (74)**
62:1;64:3;87:17,19;
88:5,15;89:17;90:9;
93:3;96:10,23;97:13;
98:23,25;99:8,24;
102:13;104:12;105:5,
6,13;107:5,23;108:19,
21;111:22;115:22;
117:19,21,23;118:3,20;
120:16;121:7,9,16,25;
122:15,21,24;126:12,
24;127:19,21,23;128:7,
9;129:14,17,19,24;
130:10,11,19,24;131:9,
12,13;134:14,17;135:8,
12,15;138:21,22,24;
139:5,9,14;140:3,13;
143:6;149:8,9
**resignations (13)**
89:1,4,6;115:13;
116:22;117:4,14,15;
119:22;123:18;125:23;
147:17;149:21
**resigned (2)**
24:8;39:3
**resigning (7)**
109:10;132:12;
133:4,8;136:2;143:11;
157:6
**resistance' (1)**
142:22
**resolution (7)**
60:14,15,19,23;61:4;
62:6;66:19
**resolved (4)**
59:13;80:16;86:6,19
**resources (1)**
129:25
**respond (2)**
155:2,22
**responded (5)**
99:7;126:11;130:8,9;
156:2
**response (6)**
50:24;51:20;54:16,
18;56:16;124:11
**responsibility (2)**

122:3,3
**responsible (1)**
80:11
**restart (1)**
125:5
**result (4)**
21:10;58:23;78:8;
96:7
**resulted (2)**
31:9;40:16
**resumé (1)**
35:1
**retain (3)**
93:5;124:14;130:23
**retained (4)**
72:23,24;121:2;
130:2
**retention (1)**
71:9
**retired (1)**
20:14
**return (6)**
19:11,14;23:9;40:8;
119:18;165:16
**returned (2)**
23:9,12
**returning (1)**
19:25
**reverse (1)**
66:8
**review (5)**
59:3;122:23,25;
123:2;150:21
**reviewed (4)**
111:19;126:14;
132:10;135:3
**reviewing (5)**
80:12;85:23;123:5;
127:17;132:7
**right (92)**
7:3;8:25;9:5;10:16;
13:24;17:16;20:10,23;
22:20;23:4;25:25;
26:11;30:19;32:5,18;
37:24;38:2;39:11,25;
40:6;42:6;43:2;45:5,
22;52:9,15;53:16;
54:21;55:22;56:4;63:5;
65:23;67:7,17,23;
68:15;72:16;73:2,20;
75:11;78:12;79:13;
83:15;86:20;89:7;93:9;
99:22;103:15;104:4;
107:3;116:6;119:21;
121:20;124:1,4,23;
128:11,20;129:5;
133:1,11;139:13;
143:12;144:23;145:4;
147:22;149:16;150:25;
151:1,2,3,9,11,13;
152:20;154:17;158:17;
159:15;161:20;162:8,
17,18,25;164:19,19;

166:4,20;167:11,18;
168:9,11;170:1
**ring (1)**
25:22
**ringing (1)**
50:20
**riot (2)**
62:3;165:22
**rioting (1)**
167:10
**River (1)**
27:17
**role (6)**
67:25;77:8;78:5,17;
155:24;156:1
**rolled (1)**
127:7
**Roosevelt (2)**
27:7,11
**Roosevelt's (3)**
27:5,20,21
**Rubio (1)**
162:20
**ruining (1)**
167:9
**run (15)**
24:1,11;25:22;26:3;
28:13;35:3,23,25;56:8;
61:6;63:22;66:12;
76:22;145:8;158:5
**running (6)**
40:5;41:12;55:10;
66:6;76:21;80:24
**runoff (1)**
165:23
**Rush (1)**
164:10

---

**S**

**Safety (1)**
91:14
**same (13)**
14:8,10;96:19;108:7,
7;122:18;130:4,4;
137:2;144:14;153:4;
161:4,5
**sandwiches (1)**
103:10
**Sarah (2)**
40:13;41:10
**satire (2)**
168:21,22
**satisfied (1)**
60:3
**saw (1)**
30:14
**saying (24)**
21:6;30:25;31:4,4,6;
35:6;47:7,19;48:5;
50:7,18;51:1;56:4,8;
65:23;68:7;70:9;95:20;
100:23;108:22,24;

Bakalar v. Dunleavy, et al.
Case No. 3:19-cv-00025 JWS

Tuckerman Babcock
April 22, 2021

116:4;129:7;136:2
**scheme (1)**
  90:18
**school (5)**
  13:16,19;14:5;15:17;
  159:13
**schooling (1)**
  20:1
**schools (2)**
  62:13;159:18
**Science (1)**
  18:1
**scope (2)**
  57:8;80:16
**Scott (1)**
  113:5
**screen (1)**
  58:10
**screenshot (1)**
  153:1
**screwing (1)**
  165:14
**seamless (1)**
  113:15
**Seaton (1)**
  67:14
**second (19)**
  44:2,8,10;48:16,18;
  57:6;62:7;65:8;73:23;
  108:18;114:25;118:9;
  125:9,11;132:14;
  153:9;165:3,5;166:7
**secondarily (1)**
  116:12
**secondly (1)**
  107:24
**Secretary (1)**
  62:21
**section (4)**
  65:7;69:22;70:12;
  74:6
**sections (6)**
  142:4,6,8;145:8,13;
  146:2
**secure (3)**
  71:10,13;72:3
**securing (1)**
  70:22
**security (2)**
  148:8;162:4
**Sedwick (1)**
  8:5
**seeing (3)**
  119:2;132:25;142:15
**seek (6)**
  100:13;101:16,17;
  120:23;123:24,24
**seem (1)**
  21:25
**seems (3)**
  93:2;128:15;145:20
**Selection (1)**
  71:9

**Semmler (6)**
  100:25;101:1,2,21;
  112:18,19
**S-E-M-M-L-E-R (1)**
  112:20
**Senate (7)**
  35:22;47:14;62:6;
  64:1;76:22;80:8;85:1
**Senator (25)**
  19:21,23;23:5;30:24;
  35:12,13;36:14;37:7;
  40:9;46:7,8;51:9;52:7,
  13,25;53:20,23;54:20;
  60:16,24;61:6;62:10;
  63:12,22;67:10
**senators (1)**
  47:23
**send (1)**
  119:13
**sending (1)**
  105:25
**senior (7)**
  14:21;16:14;155:17;
  156:8,20;157:6,17
**sense (3)**
  51:6;152:13;164:24
**sent (15)**
  90:8;96:6;104:8,11,
  19,22;106:7;109:16;
  110:15;112:8;118:18;
  122:15;132:5,23;137:2
**sentence (4)**
  70:18;135:10,11,17
**sentences (1)**
  137:23
**separate (6)**
  115:14;127:22;
  138:12,13;139:17;
  144:20
**September (3)**
  39:3;77:14,16
**sequential (1)**
  33:20
**series (1)**
  26:15
**serve (2)**
  130:20;144:17
**served (1)**
  113:17
**Service (5)**
  13:9;69:17;93:16;
  95:16;113:16
**Services (8)**
  29:18;68:25;80:13;
  85:25;86:8,12,14;
  154:10
**session (4)**
  36:15,20,21;48:22
**sessions (1)**
  28:12
**set (6)**
  7:23;30:8,10;78:7;
  80:10;106:24

**settled (1)**
  43:24
**settlement (2)**
  43:25;44:1
**several (4)**
  26:19;35:21;113:5,
  11
**shall (3)**
  69:23;70:14;105:6
**shall' (1)**
  74:10
**share (1)**
  166:5
**shared (5)**
  49:8,10;162:12;
  166:2;168:23
**ships (1)**
  162:1
**Shirley (1)**
  16:3
**shock (1)**
  52:3
**shocked (1)**
  50:3
**short (1)**
  120:12
**Shortell (4)**
  20:24;21:6,11;22:24
**show (32)**
  22:5;46:12,17,19;
  49:12;53:13,16;54:23;
  56:25;58:2;60:7;62:24;
  65:10;69:4;73:4,24;
  103:23;109:18,19;
  118:7;131:21;141:9,9;
  146:5,6;151:25;155:9;
  156:24;157:20;159:2;
  165:3,20
**showed (4)**
  110:20;111:4,18;
  142:16
**shown (3)**
  104:18;110:14;112:6
**shows (4)**
  119:15;158:24,24;
  159:4
**shy (1)**
  30:23
**sides (2)**
  47:9;163:5
**Signature (1)**
  170:19
**signed (2)**
  58:17;124:18
**significance (1)**
  77:2
**significant (4)**
  50:21;54:16,18;
  58:21
**signing (1)**
  59:7
**similar (3)**
  58:18;59:8;156:3

**simplicity (1)**
  101:6
**simply (2)**
  16:20;49:21
**single (3)**
  44:13;111:8,23
**singularly (1)**
  21:8
**sink (1)**
  162:1
**site (9)**
  158:22,25;164:9;
  166:1,7,8;167:7,11,14
**siteadmin (1)**
  141:15
**situation (1)**
  91:11
**six (4)**
  34:23;44:24;76:24;
  77:11
**slash (1)**
  154:16
**smaller (1)**
  15:18
**smiling (1)**
  155:16
**smooth (1)**
  113:21
**snooze (2)**
  124:25;125:6
**snow (1)**
  44:15
**Social (4)**
  86:8,12,14;142:19
**society (2)**
  145:9;167:17
**sociology (1)**
  12:18
**software (2)**
  124:22,23
**somebody (12)**
  52:18;64:18;102:22;
  110:10;114:7;122:5;
  123:22;128:4,5,6;
  130:23;165:22
**someone (10)**
  94:18;98:2,16;99:10,
  23;110:12;114:2;
  131:3,15;169:8
**sometime (3)**
  24:9;39:3;77:15
**sometimes (2)**
  22:1;44:16
**somewhat (1)**
  135:18
**somewhere (1)**
  128:16
**sorry (24)**
  16:19;23:7;29:5;
  32:18;35:16;48:16,25;
  56:2;57:21;88:13;98:7;
  99:19;119:9;120:3;
  126:18;128:3;135:24;

**simplicity (1)**
  137:19;144:3;164:15;
  165:8,11;166:7;169:4
**sort (6)**
  12:18;48:7;88:6;
  98:24;121:14;131:9
**sorts (1)**
  100:17
**sought (4)**
  67:20;101:19;
  120:19,21
**soul (1)**
  66:22
**sounds (2)**
  53:2;81:20
**Source (3)**
  46:24;49:20,21
**sources (1)**
  123:16
**Southeast (2)**
  22:17;31:10
**spared (1)**
  17:8
**speaking (2)**
  93:11,13
**special (3)**
  33:7,22;142:5
**specific (8)**
  69:14;73:22;82:25;
  84:4;102:9;113:9;
  131:19;168:5
**specifically (10)**
  19:5;23:1;31:7;51:2,
  4;53:18;66:7;68:8;
  73:15;113:9
**specifics (3)**
  81:6;83:5;86:13
**speculation (1)**
  112:24
**speech (2)**
  160:1,6
**spell (1)**
  10:11
**spend (2)**
  41:1;123:4
**spending (2)**
  85:18,21
**spent (5)**
  16:14,23;125:22,25;
  127:16
**spoils (2)**
  74:1,4
**spoils-based (1)**
  73:16
**spoke (1)**
  39:4
**Spoken (1)**
  61:22
**sports (1)**
  62:15
**spreadsheet (4)**
  119:3,7,9;125:19
**spring (1)**
  44:12

Min-U-Script®

Glacier Stenographic Reporters Inc.
www.glaciersteno.com

(16) scheme - spring

Exhibit AP
Page 60 of 64

Case 3:19-cv-00025-JWS   Document 87-4   Filed 09/24/21   Page 60 of 64

Bakalar v. Dunleavy, et al.
Case No. 3:19-cv-00025 JWS

Tuckerman Babcock
April 22, 2021

**Stacey (11)**
  100:12,13,18;101:3,
  7,12,21;102:21,22;
  112:16,21
**staff (21)**
  78:21;79:4,12,16,21;
  80:5;91:17;123:23;
  124:2;127:3,4,4;147:8;
  152:16;155:17,21,24;
  156:1,11;157:5,16
**stage (2)**
  47:25;78:7
**stake (1)**
  131:7
**stall (1)**
  41:10
**stalled (2)**
  41:4,6
**stand (2)**
  58:7,15
**standards (1)**
  69:13
**standing (1)**
  27:14
**start (3)**
  50:24;109:25;147:18
**started (4)**
  17:20;19:22;23:24;
  50:20
**starts (1)**
  130:7
**State (89)**
  8:2;12:16;20:6;
  26:17;28:14;34:23;
  35:22;37:21;45:17;
  50:9,22,24;51:8;55:12;
  57:15;60:21;68:17,19;
  69:1,16,25;70:16;71:7,
  23;73:13;74:2,11,20,
  25;76:22;80:13;81:6;
  82:5,16;83:2,6,19,22,
  23;84:4,5,12,17;87:17;
  88:5;91:6,13,15,19;
  96:11,18;97:18;100:9,
  15;101:17;102:13;
  104:23;106:1,1,25;
  107:12;113:17;114:3,
  11;117:16;118:18;
  119:20,25;121:3;
  124:7;129:15,21;
  130:2,3;136:10,11;
  139:21;140:8,22,23;
  142:5,7;144:13;146:3;
  151:7;152:17;154:10;
  161:16;169:19
**statement (7)**
  58:18,18;59:8,21;
  74:19;107:24;136:15
**statements (1)**
  72:20
**States (3)**
  8:2;13:9;58:23
**state's (2)**

162:15,16
**status (1)**
  150:3
**statute (1)**
  26:18
**statutory (2)**
  80:8;85:4
**stay (2)**
  117:2;124:7
**Steller (2)**
  13:18;14:12
**Steller's (1)**
  13:24
**Stenographic (1)**
  6:13
**step (3)**
  59:14;82:9,9
**steps (1)**
  52:1
**Steve (1)**
  40:1
**still (6)**
  16:21;48:22;71:1;
  79:9;112:17;153:23
**stint (1)**
  39:15
**Stone (2)**
  101:7;112:16
**Stone-Semmler (3)**
  100:12,14,23,24;
  101:3,12;112:21
**stood (1)**
  66:25
**stopped (1)**
  50:14
**story (1)**
  38:20
**straight (2)**
  16:5;82:9
**strategic (2)**
  41:24;156:21
**street (2)**
  44:9;48:20
**streets (1)**
  44:11
**stress (1)**
  114:19
**stressful (1)**
  114:23
**stretch (1)**
  45:21
**strike (9)**
  53:22;79:2;84:6;
  92:8;107:11;134:19;
  138:6;139:15;148:22
**strong (2)**
  128:22;138:13
**Stroup (6)**
  141:17,19,21;
  142:17;144:19;145:16
**Stroup's (1)**
  144:10
**structure (4)**

47:12;85:12;94:25;
  151:6
**struggling (1)**
  57:11
**student (1)**
  15:11
**students (4)**
  159:10,14;161:17,20
**study (1)**
  18:10
**stuff (1)**
  31:5
**Stutes (4)**
  56:4,4;67:13,14
**style (1)**
  121:7
**subject (6)**
  8:12,15,17;75:6;
  102:5;141:16
**subjective (1)**
  160:10
**submit (13)**
  88:15;89:17;107:23;
  108:21;115:22;128:9,
  17,24;129:14;135:14;
  143:7;147:17;161:18
**submitted (13)**
  30:4,6;105:8;121:24;
  127:19,23;128:7;
  129:17,18,24;149:9;
  154:8,20
**submitting (3)**
  98:23;130:18;149:20
**subsequent (2)**
  11:6;31:12
**Subsequently (3)**
  12:5;22:20;24:1
**substance (1)**
  47:10
**substantial (1)**
  59:19
**substantiated (1)**
  93:24
**successful (1)**
  36:4
**succession (2)**
  33:12,14
**suggest (3)**
  64:22;118:17;143:25
**suggested (2)**
  89:9;144:14
**suit (1)**
  8:22
**summarize (1)**
  80:3
**summary (1)**
  159:25
**sun (1)**
  94:17
**superb (1)**
  36:3
**Superior (1)**
  152:7

**superiority (1)**
  27:22
**supervising (1)**
  42:24
**support (10)**
  65:4;75:17,21,22;
  76:3;82:17;95:9;106:6;
  143:17;164:24
**supported (3)**
  50:8;61:4;62:20
**supporting (5)**
  41:1;60:20;65:21;
  66:14;67:3
**supportive (1)**
  41:13
**suppose (1)**
  27:25
**supposed (1)**
  108:16
**Supreme (8)**
  19:9;22:16,25;23:3;
  30:20;31:9;51:10;54:2
**sure (33)**
  8:24;16:17;26:2;
  33:5;39:23;50:17;
  56:22;75:3;77:5;83:2;
  86:5;89:25;90:2,13;
  92:14;94:16,16,19;
  101:9;103:7;106:2;
  107:7;110:4;119:12;
  124:15,16;125:10;
  132:15;144:16;149:13;
  155:22;159:4;169:6
**surprised (2)**
  39:22;50:18
**surprising (1)**
  67:10
**survival (1)**
  12:20
**Susan (1)**
  43:20
**swab (1)**
  161:15
**switch (1)**
  25:17
**switched (3)**
  24:5,20;25:8
**sworn (6)**
  7:8,14;9:19,22;
  115:2,6
**system (20)**
  20:6;26:16;39:8,8;
  47:15;69:11,23;70:14;
  73:12,16,17;74:1,3,4,
  11;90:16,24;92:24;
  154:22,24

**T**

**tagged (1)**
  147:1
**talk (3)**
  9:8;10:22;100:8;

111:16;122:20;144:14;
  146:10
**talked (8)**
  99:23;102:4,8,9,11;
  139:24,25;144:21
**talking (13)**
  25:5;53:4,4;56:19;
  57:8;71:24;73:19;79:9;
  89:23;144:1,2,3,8
**tapered (1)**
  85:15
**Targeting (1)**
  159:14
**tasks (1)**
  97:20
**tax (1)**
  85:20
**taxation (1)**
  85:14
**Taylor (3)**
  149:19;150:9,21
**Teachers (1)**
  159:13
**team (8)**
  76:24;90:8;100:7,11;
  114:11;126:6,17;
  130:13
**Team2018@alaskagov (1)**
  105:3
**team's (2)**
  101:13,14
**technology (2)**
  122:8,16
**Ted (3)**
  162:12,12,15
**Teddy (5)**
  27:4,7,10,20,21
**teeth (1)**
  39:14
**tended (1)**
  130:17
**tenure (2)**
  27:13;42:14
**term (1)**
  61:23
**terminate (2)**
  138:8;149:8
**terminated (8)**
  128:19,22;129:1;
  133:9,11,21;135:16;
  160:5
**terminating (2)**
  102:12;148:18
**termination (4)**
  64:2;140:19;153:11;
  167:21
**terms (12)**
  14:13;32:22;43:22;
  44:19;57:16;64:8;
  70:22;84:9,14;109:13;
  127:21;129:13
**test (3)**
  148:5,9;160:9

**Exhibit AP**
**Page 61 of 64**

Bakalar v. Dunleavy, et al.
Case No. 3:19-cv-00025 JWS

Tuckerman Babcock
April 22, 2021

testified (2)
7:16;10:18
testifies (1)
116:8
testify (1)
10:20
testifying (1)
11:3
testimony (10)
9:20,22,25;11:2,10;
20:16;21:2,8;82:20;
108:10
testing (1)
161:21
tests (1)
161:18
thankful (1)
50:11
theory (4)
166:10,13;167:19;
168:4
Therefore (2)
113:19;139:8
thereof (1)
121:7
thesis (4)
18:20,23;19:3,6
thinking (3)
41:7;81:10;92:17
third (3)
26:24;123:16,20
thorough (1)
86:4
thoroughly (1)
132:14
though (4)
89:22;93:13;129:4;
166:20
thought (12)
25:9,10;32:3;36:2;
52:2,14;59:12;61:20;
62:4,4;84:13;147:18
thoughts (1)
21:12
thousands (2)
50:12;58:24
threat (1)
148:14
three (11)
8:10;35:2;36:12;
68:10;127:1;129:12;
145:8;157:11,12,14;
161:3
three-quarters (1)
21:7
three-way (1)
32:16
three-week (2)
123:14;157:6
threshold (1)
126:13
throughout (2)
61:23;167:14

THURSDAY (2)
6:1,5
Tier (7)
15:4,5;20:5,6,8,11,13
tiger (3)
147:20;148:13,13
till (1)
26:10
timeline (1)
19:1
times (7)
8:9,10;27:25;63:4,6,
9;131:13
timewise (1)
81:10
timing (1)
20:22
tired (2)
148:24;164:18
Tischer (4)
19:23;23:5,6,7
Title] (1)
105:5
titles (1)
20:3
Today (7)
6:5,6,20;10:23;
11:10;57:11;159:8
together (4)
51:7,22;108:11;
113:13
told (5)
99:9;105:18;133:20;
136:2,18
Tom (1)
14:11
tone (3)
131:12,13;135:9
Tony (2)
88:21;91:12
took (6)
16:20;17:13;41:18;
43:13;123:13;143:9
top (7)
91:7,8;94:12;150:24;
151:3;159:3;162:17
topic (5)
19:6;110:23;111:2,7,
23
top-level (1)
116:2
totally (1)
101:2
tourists (1)
48:23
toward (2)
80:9;85:15
towards (1)
159:9
town (1)
15:18
track (2)
127:22;147:6

traditional (1)
32:7
Trans (2)
168:14,16
transfer (2)
16:9,19
transferred (2)
16:7,22
transferring (1)
15:7
transition (35)
76:13,16,24;77:9;
78:14,14,18;79:8;87:2,
4,9,12,14,15;90:7;
100:7,7,11;101:13,14;
106:16;112:7;113:13,
21;114:5,11;115:10;
120:12;126:6,17;
130:12;147:1,6,8,13
transitions (2)
113:18,23
treat (1)
139:7
treated (2)
11:2;54:4
treating (1)
159:18
Treg (1)
149:18
trial (7)
11:7;21:9;43:23,24;
62:7;63:14;160:4
tried (1)
146:14
Trooper (2)
91:13,19
Troopers (1)
91:15
true (4)
49:6;136:15;152:20;
161:20
truly (2)
137:5,11
Trump (7)
53:15;61:22;62:2,8;
63:13;141:6;163:1
truncated (1)
95:10
trust (1)
47:25
truth (4)
7:15,15,16;93:24
try (5)
26:21;58:11;78:6;
84:14;122:6
trying (6)
24:15;44:14;76:18;
92:14;127:8;158:12
Tshibaka (5)
65:22,22,24;67:9;
159:5
Tshibaka's (2)
65:25;163:7

Tuckerman (7)
6:7;7:12;8:1;30:25;
54:17;158:6;163:10
tuckerman@dunleavytransitioncom (1)
146:19
turn (1)
6:21
Turner (3)
146:19,20,21
tweet (1)
55:2
twelfth (1)
13:22
twice (1)
35:2
Twilight (1)
168:23
Twitter (1)
140:16
Two (28)
8:10;14:9;15:8;16:6,
23;23:22;28:12;34:22,
24;36:12;37:2;43:5;
56:6;106:11,12;
108:11;115:14;118:4;
129:10;132:3;135:23;
144:1,2;150:1;151:7,
11;159:22;169:24
two-year (2)
18:14,16
type (2)
12:10;38:11
types (2)
12:12,14

**U**

UAA (1)
15:7
ultimate (1)
122:3
ultimately (3)
22:16;131:2,2
unable (1)
142:25
unanswered (1)
59:1
unaware (3)
70:2;141:21,23
uncertainty (1)
114:19
unconstitutional (1)
62:8
uncooperativeness (1)
131:8
under (9)
7:1;9:25;10:24;
69:24;70:14;71:17;
94:17;108:20;160:8
underneath (1)
41:8
understands (1)
153:15

understood (3)
73:14;83:2;106:16
unduly (1)
21:9
unexpected (1)
153:21
unfair (1)
118:4
unfairly (2)
54:4;159:19
unhappy (4)
46:8;53:5;134:9;
154:10
United (2)
8:2;13:9
University (3)
14:15,17;154:22
unless (4)
69:2;84:6;114:6;
161:17
unpersuasive (1)
21:8
unpredictable (1)
19:9
unprofessional (5)
134:12,15;135:18;
136:4;138:2
unrest (2)
152:16,18
unsuccessfully (1)
35:3
unwillingness (1)
139:6
up (23)
22:15;27:14;31:9;
39:10;41:16;58:10;
83:15;87:16,22,24;
105:24;118:8;130:12;
134:4;147:5,7;149:4,
11;152:21;158:10;
161:16;165:14;168:7
Update (2)
46:23;124:23
updates (1)
124:22
upon (3)
95:2;105:7;148:8
use (6)
37:19;89:24;101:17;
119:5;158:18;168:17
used (1)
21:22
useful (1)
92:18
usually (1)
53:18
utilize (1)
104:11
utopia (1)
165:25

**V**

Min-U-Script®

Glacier Stenographic Reporters Inc.
www.glaciersteno.com

(18) testified - utopia

Exhibit AP
Page 62 of 64

Bakalar v. Dunleavy, et al.
Case No. 3:19-cv-00025 JWS

Tuckerman Babcock
April 22, 2021

**vacancies (3)**
115:12,15,19
**vague (4)**
76:19,20;93:21;98:9
**vaguely (2)**
15:8;88:21
**Valley (1)**
141:22
**value (1)**
92:18
**values (1)**
60:25
**Vanita (3)**
163:11,12,17
**various (4)**
71:6;138:12;158:23;
160:2
**vast (4)**
74:21;93:14;97:1;
142:7
**Venezuela (1)**
11:17
**version (1)**
113:9
**versus (4)**
73:16;90:25;117:9;
131:1
**vet (2)**
142:3;144:12
**Veterans (2)**
86:9,15
**vetted (4)**
104:19;144:16,25;
145:1
**vetting (2)**
125:22,25
**via (2)**
6:11;7:16
**vice-president (1)**
41:14
**victimhood (1)**
164:24
**Videoconference (2)**
6:11;7:16
**view (2)**
21:15;52:14
**viewed (1)**
147:20
**views (4)**
165:2;166:20,22;
168:1
**violated (2)**
26:17;153:3
**Virginia (2)**
18:6;23:9
**Voiced (1)**
61:18
**voluntary (1)**
135:12
**volunteer (3)**
14:20;41:1;147:6
**volunteered (1)**
26:21

**volunteers (4)**
50:23;51:12;87:9,11
**vote (18)**
46:25;47:8,20,24;
50:8;51:13,16;52:3;
53:3;54:21;56:13;
59:19;62:9,19,23;66:8;
101:8;163:12
**voted (10)**
47:3,8;50:3;51:9,17,
19;61:12,14;62:6,11
**vote-getter (1)**
162:18
**voter (2)**
58:21;85:13
**voters (1)**
24:16
**votes (3)**
46:9;66:19;67:21
**voting (2)**
60:19;63:13
**vows (1)**
54:15

**W**

**wait (1)**
44:9
**waited (3)**
24:22,23;26:9
**Walker (17)**
90:5,6,12;95:25;
97:3,9,22;107:16;
109:1,4,9;113:6,14;
116:14;137:2;142:24;
149:7
**Washington (4)**
63:4,6,8,9
**Watchman (1)**
166:3
**way (23)**
25:10;26:1;27:1;
32:1;42:25;51:17,19;
52:4;53:7,21;64:16;
67:1;82:21;87:3;91:1;
94:10,11,20;118:2;
134:13;136:6;140:9;
156:2
**Wayne (1)**
10:10
**website (4)**
60:15;71:8;153:1;
168:18
**weekly (1)**
161:18
**weeks (13)**
77:11,13;113:12;
115:3,11;121:22;
123:9;127:2;129:12;
157:11,11,12,14
**weighed (2)**
126:16,17
**welfare (1)**

12:17
**well-known (1)**
145:7
**well-rounded (2)**
34:19,21
**weren't (3)**
93:16,17;168:3
**Wesleyan (14)**
14:16;15:7,11,16;
16:4,15,21,23,24;17:3,
14,17;18:3;19:10
**West (1)**
16:11
**what's (14)**
44:14;48:22;53:21;
55:14;92:18;94:22;
108:15;109:19;121:14,
15,15;141:10;156:24;
166:9
**whenever (1)**
125:3
**whole (3)**
7:15;50:22;51:8
**wholesale (1)**
87:19
**whose (2)**
21:1;89:8
**wife (6)**
37:5;65:20;91:13,24,
24;162:25
**wilderness (1)**
12:19
**William (8)**
18:4,5,7,10;19:12;
20:21;23:8,8
**willing (1)**
106:6
**win (2)**
28:20,21
**wings (1)**
41:8
**winner (2)**
59:25;60:2
**winning (1)**
78:25
**winter (2)**
44:12,16
**wished (1)**
107:24
**withdraw (1)**
26:18
**within (7)**
20:6;25:16;78:25;
90:18;102:25;114:22;
121:22
**without (1)**
147:19
**witness (4)**
7:1,5,8;170:15
**witness's (1)**
46:19
**Woke (1)**
159:13

**woman (2)**
161:15;167:8
**women (3)**
52:6,7;103:1
**women's (1)**
103:1
**won (1)**
32:15
**wonder (1)**
35:4
**wondered (1)**
76:22
**wondering (1)**
34:21
**word (2)**
11:8;130:18
**words (1)**
89:25
**work (52)**
6:13;12:10,13;13:7;
14:18,24;16:16;19:11,
17,19;23:13,20;27:19;
28:6;29:9,22;33:4,6;
34:22;35:12,14;36:11,
13;38:6;39:18,25;
40:13;44:19,20;55:3;
68:12,19;72:22;77:25;
87:1,11;91:6;94:5;
96:11;99:4;108:7;
115:23;118:1;119:25;
127:20;129:14;131:4;
134:24;135:4;139:18;
140:5,8
**worked (22)**
12:15,16,17,23;13:8;
14:14,21;19:24;23:4,
14;31:11;34:7;37:10;
38:5;93:15;100:4;
112:7;116:14;134:4,
22,24;142:24
**workers (2)**
93:8;106:25
**workforce (2)**
72:1;99:25
**working (40)**
9:2;10:5;11:20;
19:22;20:12;23:24;
24:8;25:2;27:15;34:24;
74:13,20;77:20,22;
96:14,23,25;97:14,18;
99:2;101:17;107:25;
113:5,13,20;114:2;
126:5,12,16;129:11;
133:23,25;134:2,4,7;
144:15;147:12;149:24,
25;169:19
**works (3)**
47:12;49:25;64:17
**world (2)**
64:17;168:15
**write (4)**
110:9,10;149:5;
161:18

**write-in (1)**
26:23
**writing (7)**
87:3;95:19;100:20;
110:1;120:23;126:19;
150:17
**written (3)**
18:20,23;132:5
**wrote (6)**
67:18;73:11;113:22;
118:2;139:5;149:3

**X**

**XII (2)**
69:22;70:12

**Y**

**year (17)**
14:21;15:13;16:14;
17:16;37:5;38:10;
39:16,21,22;40:23;
41:19;42:24,25;56:13;
67:15;69:2;154:16
**years (25)**
9:20;13:21;16:5,6,
24;18:25;22:2;23:22,
23;24:3;34:23,23,24;
35:21;36:10,12;39:24;
43:5;44:24;76:24;
129:10;134:22;159:22;
161:3;169:18
**year's (1)**
63:15
**yellow (1)**
118:24
**YMCA (1)**
11:20
**York (1)**
27:13
**young (1)**
161:15
**Yup (4)**
34:6;46:20;132:1;
149:16

**Z**

**Zone (1)**
168:23
**Zoom (2)**
6:11;7:16

**1**

**1 (3)**
22:5,8;150:4
**1:14 (1)**
103:19
**1:15 (1)**
103:13
**1:47 (1)**

Exhibit AP
Page 63 of 64

Bakalar v. Dunleavy, et al.
Case No. 3:19-cv-00025 JWS

Tuckerman Babcock
April 22, 2021

125:13
**10 (8)**
9:20;22:2;24:5,23;
65:11,12;116:19;
128:14
**100 (1)**
116:19
**10-minute (1)**
151:17
**11 (3)**
69:4,5;71:4
**11-19 (1)**
118:19
**12 (3)**
73:5,6;134:22
**12:30 (1)**
103:5
**13 (2)**
103:24,25
**14 (2)**
109:20,21
**15 (2)**
118:10,11
**16 (4)**
112:6;131:22,23;
132:2
**17 (4)**
141:10,11;144:11;
154:23
**18 (3)**
15:3;146:6,7
**180 (1)**
61:15
**18-11-19 (1)**
118:9
**19 (5)**
15:3;17:18;152:1,2;
153:5
**1966 (1)**
11:23
**1980s (4)**
8:19;10:21;20:16;
22:23
**1983 (1)**
17:18
**1990 (2)**
28:15;32:17
**1990s (2)**
8:18;10:21
**1991 (1)**
29:25
**1992 (1)**
29:25
**1993 (1)**
33:3
**1994 (1)**
35:23
**1996 (1)**
37:17
**1998 (1)**
37:14
**1999 (1)**
8:20

---

## 2

**2 (2)**
46:13,14
**2:02 (1)**
125:15
**2:43 (1)**
151:19
**20 (4)**
128:16;152:22,23;
154:14
**2000 (2)**
40:3;67:22
**2003 (1)**
42:8
**2004 (3)**
42:8;66:14,18
**2005 (2)**
37:6;45:4
**2007 (1)**
42:19
**2008 (1)**
42:19
**2009 (3)**
8:20;9:10,13
**2010 (2)**
9:21;86:24
**2012 (1)**
76:25
**2016 (5)**
56:21;66:23;67:16,
22;162:18
**2017 (1)**
47:1
**2018 (16)**
55:5;56:21;57:9,22;
67:22;76:24;77:16;
88:2;100:6;104:24;
112:6;115:3;132:8;
142:11,13;161:4
**2020 (2)**
57:21;58:22
**2021 (7)**
6:1,5;60:17;62:2,12;
64:13;161:4
**2022 (3)**
64:1,11;65:2
**21 (2)**
155:9,10
**21-04-22 (1)**
152:22
**22 (3)**
6:1;156:25;157:1
**22nd (1)**
6:5
**23 (6)**
157:21,22;158:3;
165:17;168:9,11
**250 (2)**
137:3,4
**26 (1)**
23:23

---

**28 (1)**
24:3

---

## 3

**3 (5)**
49:14,15;50:5;115:3;
149:3
**3:03 (1)**
151:21
**3:19-cv-00025 (2)**
6:9;8:4
**3:31 (1)**
170:3
**3:33 (2)**
170:5,18
**30 (2)**
58:16;169:18
**30s (1)**
31:14
**31 (1)**
156:23
**32 (1)**
35:4
**32340 (1)**
6:14
**39.25.010b (2)**
71:4,18
**3rd (2)**
115:7;127:14

---

## 4

**4 (2)**
53:10,11
**40 (1)**
154:21
**45 (2)**
103:11,12

---

## 5

**5 (5)**
54:9,10;71:7;128:16;
129:3
**5:30 (1)**
50:19

---

## 6

**6 (5)**
54:24,25;62:2;69:22;
70:12

---

## 7

**7 (3)**
58:3,4,9
**78 (3)**
13:23;14:13,23
**79 (3)**
14:23;15:15;17:20

---

## 8

**8 (2)**
60:8,9
**80 (1)**
50:23
**800 (9)**
104:23;106:1;
108:14;116:24;126:1,
23;136:13,21;139:3
**800-plus (1)**
136:11
**805 (12)**
119:15;120:10,13,
25;121:1,24;122:23;
123:5;125:23;128:8;
131:14;148:5
**805-member (1)**
150:12
**80s (2)**
9:2;10:19
**81 (1)**
17:21
**82 (2)**
17:19,21
**825 (1)**
116:25
**83 (3)**
17:22,23,24
**85 (1)**
18:9
**86 (1)**
18:9

---

## 9

**9 (2)**
62:24,25
**9:49 (2)**
6:2,6
**90s (6)**
9:1;10:19;22:19,20;
31:17;32:15
**91 (2)**
80:8;85:1
**93 (1)**
34:8
**96 (4)**
34:8;36:19;37:12;
40:1
**97 (4)**
36:20;37:14;38:4;
39:23
**99803 (1)**
6:15

Exhibit AP
Page 64 of 64