IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF ALASKA

ELIZABETH BAKALAR,

                Plaintiff,

    vs.

MICHAEL J. DUNLEAVY, in his
individual and official capacities;
TUCKERMAN BABCOCK; and the
STATE OF ALASKA.

                Defendants.

Case No. 3:19-cv-00025-JWS

**ORDER ON MOTIONS FOR
SUMMARY JUDGMENT
[Docs. 56, 76]**

## I.   MOTIONS PRESENTED

At docket 56 Defendants Governor Michael J. Dunleavy ("Governor Dunleavy"), Tuckerman Babcock ("Babcock"), and the State of Alaska (collectively "Defendants") filed a motion for summary judgment as to all claims asserted against them by Plaintiff Elizabeth Bakalar ("Plaintiff"), who alleges that Defendants terminated her employment as an assistant attorney general in violation of federal and state free speech rights, the Alaska Constitution's merit principle, and the implied covenant of good faith and fair dealing. At dockets 75 and 76, Plaintiff filed a response to Defendants' motion for summary judgment and a cross motion for summary judgment. Defendants filed their combined response and reply at docket 86. Plaintiff replied at docket 93. Oral argument would not be of assistance to the court's determination.

## II. BACKGROUND

On December 3, 2018, Plaintiff was notified that her employment as an assistant attorney general with the Alaska Department of Law had been terminated. At that time, Plaintiff had worked as an assistant attorney general for over 12 years under five administrations and seven Attorneys General.[1] She had been steadily promoted during her tenure with the Department of Law, and at the time of her firing she was classified as an expert-level "Attorney V" within the Labor and Affairs Section. As an attorney in the Labor and Affairs Section, Plaintiff was assigned to be primary counsel for the Lieutenant Governor and the Division of Elections. She handled voting rights cases, voter registration issues, ballot initiative certifications and referendum matters, and she drafted regulations and legislation.[2] She also was assigned to advise or represent other state agencies in high-profile or complex matters.[3] By all accounts, Plaintiff was a well-regarded attorney within the Department of Law, securing numerous favorable decisions from the Alaska Supreme Court and the Ninth Circuit and receiving praise for her proficient and efficient legal work.[4]

The criticism lodged against Plaintiff during her tenure with the Department of Law arose in connection to her personal blog, entitled "One Hot Mess," and its associated social media presence. She began the blog in 2014, primarily focusing on her lifestyle, parenting, and politics.[5] Her commentary was personal in

---

[1] Docket 75-3 at ¶ 3.
[2] *Id.* at ¶¶ 3–7; Docket 75-33; Docket 75-7; Docket 56-1.
[3] Docket 75-33.
[4] Docket 75-2 at ¶¶ 3, 7; Docket 75-7; Docket 75-3 at ¶ 7.
[5] Docket 75-3 at ¶ 15.

nature, discussing embarrassments, insights, and opinions, often in irreverent terms. Plaintiff described her blog as a way "[t]o explore and probe with authenticity and sometimes vulgarity, and hopefully some depth, the things we don't like to face" and the things people do not talk about.[6]

The blog was shared on Plaintiff's Facebook account and was intended to be public and widely shared.[7]  One post from 2015 about why Plaintiff chose to live, work, and raise kids in Alaska was read by over 20,000 people.[8]  Another post from 2016, a political one that opposed the candidacy of Donald Trump and criticized those who supported him, was republished by the Anchorage Daily News.[9]

After the 2016 presidential election, Plaintiff started blogging more about politics, and President Trump in particular.  As Plaintiff stated in one of her blog posts, "[b]efore Trump, I wrote a lot more about parenting.  Now I feel compelled to write about Trump so that . . . if the sh[**] hits the fan my kids will have a contemporaneous Handmaid's Tale-style record of What the F[**]k You Did to Us."[10]  Her commentary contained vitriolic criticism of the President and his associates.  For example, she stated in one early 2017 blog post as follows:

> Our POTUS is manifestly delusional, likely senile, sociopathic, treasonous, semi-literate, lecherous oligarch who is scissoring the Constitution into red white and blue confetti like Edward Cheeto-Hands with the help of Congress, all at the direction of a repellent, rheumy-eyed

---

[6] Docket 56-14 at 1.
[7] Docket 75-23 at 1 n.1, 6.
[8] Docket 56-7.
[9] Docket 56-8.
[10] Docket 56-23.

alcoholic who legit wants to destroy democracy and perpetuate the master race.[11]

Plaintiff also maintained a twitter account, entitled "One Hot Mess AK" with her name listed as the twitter handle, where she vented about the election of President Trump and those who voted for him.[12] While the exact number of Plaintiff's public comments mentioning President Trump is not in the record, it is undisputed that posts criticizing or mocking President Trump number in the hundreds. She acknowledged that she let go of any fears about "personal and/or professional reprisal borne of calling Donald Trump a fascist cantaloupe on the internet every day."[13]

In response to Plaintiff's blogging activities, another attorney in the state, Nancy Driscoll Stroup, started a blog of her own entitled "Ethics and One Hot Mess Alaska." The purpose of her blog was to "make[ ] the case that Blogger Libby Bakalar of 'One Hot Mess Alaska' fame should not be working as an Assistant Attorney General for the State of Alaska."[14] She criticized Plaintiff as follows:

> Alaskan Assistant Attorney General Libby Bakalar uses extremely profane and vulgar and mean language in her Blog. She makes fun of people based on their political affiliations (Trump supporters) and their religion (fundamental Christians) and lectures white people on how they need to behave . . . . Take a look at her blog.
>
> Is Ms. Bakalar the type of person we want working as an attorney in the Attorney General's office?
>
> My opinion: NO.[15]

---

[11] Docket 56-24.
[12] Docket 56-19.
[13] Docket 56-21.
[14] *See, e.g.*, Docket 75-9.
[15] Docket 75-10.

*Bakalar v. Dunleavey, et al.*                                     Case No. 3:19-cv-00025-JWS
Order on Motions for Summary Judgment                              Page 4
Case 3:19-cv-00025-JWS     Document 97     Filed 01/20/22     Page 4 of 39

In line with this critique, Stroup repeatedly called for Plaintiff's termination, arguing that she could not maintain a popular political blog and continue to maintain the necessary impartiality in her job as an attorney with the Labor and State Affairs Section.[16] She also accused Plaintiff of using state time and resources to conduct her personal blogging activities, in violation of Alaska's Executive Ethics Act.[17] She voiced these ethics complaints to state officials.[18]

Thereafter, the Department of Law initiated an investigation into Plaintiff's blogging activities. It hired an independent third-party attorney to conduct the investigation. As the investigator noted in his report, "[t]he primary impetus for the investigation were concerns raised about the partisan political nature of 'One Hot Mess Alaska' and the possible use by Ms. Bakalar of state resources or work time in the creation of articles posted on the blog."[19] The investigation, however, was limited to two questions: (1) whether Plaintiff posted or in any manner worked on her blog during work time or with the aid of state funds or resources; and (2) whether, if the answer to the first question was "yes," such activity violated any law or policy applicable to Plaintiff.[20] The inquiry did not consider whether Plaintiff's publishing of her political opinions during personal time was in any manner improper given Plaintiff's job as an assistant attorney general.[21]

---

[16] *See, e.g.*, Docket 75-12; Docket 75-14 at 5.
[17] Docket 75-13 at 2.
[18] Docket 75-14 at 5.
[19] Docket 75-23 at 1.
[20] *Id.* at 1–2.
[21] *Id.* at 2 n.3.

*Bakalar v. Dunleavey, et al.*                    Case No. 3:19-cv-00025-JWS
Order on Motions for Summary Judgment                                Page 5
Case 3:19-cv-00025-JWS    Document 97    Filed 01/20/22    Page 5 of 39

In March 2017, the investigator concluded that on occasion Plaintiff engaged in activities associated with her blog during her normal work hours and with her work computer but that any such time was de minimis and within commonly accepted limits.[22] He also found that any incidental work by Plaintiff on her blog during work hours did not violate the Ethics Act, which prohibits employees from using state resources for personal financial advancement or for partisan political purposes.[23] He noted that while Plaintiff's blog "can be interpreted to evince a liberal or progressive worldview, few posts actually meet the definition of having a partisan political purpose."[24] The only posts that could fit within this definition would be those critical of President Trump during his presidential candidacy, but there was "no evidence that any of these specific potentially partisan posts were ever worked on by [Plaintiff] during work hours or using state resources."[25]

In November 2018, after winning the election, Governor Dunleavy selected Babcock to serve as the chair of his transition team. On November 16, 2018, Babcock sent a memorandum to most of the state's at-will employees.[26] The memorandum required employees to submit a resignation, along with a statement of interest in remaining employed with the new administration. The memorandum stated in part as follows:

> In the coming weeks, the incoming administration will be making numerous personnel decisions. Governor-Elect

---

[22] *Id.* at 2, 12.
[23] *Id.* at 3, 12–14.
[24] *Id.* at 12–13.
[25] *Id.* at p. 13.
[26] Docket 75-30; Docket 75-31.

> Dunleavy is committed to bringing his own brand of energy and direction to state government. It is not Governor-Elect Dunleavy's intent to minimize the hard work and effort put forth by current employees, but rather to ensure that any Alaskan who wishes to serve is given proper and fair consideration.
>
> As is customary during the transition from one administration to the next, we hereby request that you submit your resignation in writing on or before November 30, 2018 to Team2018@alaska.gov. If you wish to remain in your current position, please make your resignation effective upon acceptance by the Dunleavy administration.
>
> Acceptance of your resignation will not be automatic, and consideration will be given to your statement of interest in continuing in your current or another appointment-based state position. Please also include your email address and phone contact so that you can be reached to discuss your status directly.
>
> Governor-Elect Dunleavy is encouraging you and all Alaskans to submit their names for consideration for service to our great state.[27]

The memorandum was accompanied by a resignation form, which included a sentence where employees had to choose whether or not they wanted to be considered for their position with the Dunleavy administration.[28]

The demand for the resignations of all at-will employees was reported in the local newspaper. In past transitions, incoming administrations requested resignations from only around 250 employees.[29] Governor Dunleavy explained his

---

[27] Docket 75-30.
[28] Docket 75-32.
[29] Docket 75-31.

decision to broaden the scope of this practice to a reporter: "We want to give people an opportunity to think about whether they want to remain with this administration and be able to have a conversation with us."[30] Babcock was reported as saying as follows:

> [Governor Dunleavy] just wants all of the state employee who are at-will . . to affirmatively say, "Yes, I want to work for the Dunleavy administration" . . . . Not just bureaucracy staying in place, but sending out the message, "Do you want to work on this agenda, do you want to work in this administration? Just let us know." . . . I do think this is something bold and different, and it's not meant to intimidate or scare anybody. It's meant to say, "Do you want to be a part of this?" . . . If you don't want to express a positive desire, just don't submit your letter of resignation . . . [a]nd then you've let us know you just wish to be terminated.[31]

To keep their jobs employees had to actually offer up a resignation with an accompanying statement of interest in continuing with the new administration and then hope that the incoming administration would reject the resignation.

Plaintiff received the resignation memorandum, along with all other lawyers in the Department of Law. Plaintiff submitted her resignation letter. She stated as follows:

> Per the November 16, 2018 request of Transition Chair, Tuckerman Babcock, please accept this letter as notice of my resignation from my position as Assistant Attorney General in the Labor & State Affairs Section of the Department of Law. My resignation is not voluntary, but is instead being made at the request of Mr. Babcock, who has indicated that if I do not submit my resignation as requested my employment will be terminated. I would like to continue serving the State of Alaska in the new

---

[30] *Id.*
[31] *Id.*

*Bakalar v. Dunleavey, et al.*
Order on Motions for Summary Judgment
Case No. 3:19-cv-00025-JWS
Page 8

Case 3:19-cv-00025-JWS   Document 97   Filed 01/20/22   Page 8 of 39

> Governor Dunleavy administration in my current position, and hope that my resignation is not accepted.
>
> I have been with the department over 12 years, and I am assigned to work primarily on elections matters on behalf of the Office of the Lieutenant Governor. In that capacity, I represent the Division of Elections in litigation; provide agency advice; testify on legislation; assist with federal compliance; and help draft legislation and regulations in the area of elections law.[32]

She also stated in her letter that when her election workload is light, she is assigned to represent other state agencies, such as the Office of the Governor, the Department of Health and Social Services, Department of Administration, and the Department of Public Safety.[33]

Governor Dunleavy was sworn in at 12:00 p.m. on December 3, 2018. Less than twenty minutes later, Plaintiff was notified that her resignation had been accepted and that her employment with the state had been terminated, and she was given less than two hours to clean out her office and leave the building.[34] Although every attorney in the Department of Law received Babcock's memorandum, only one other attorney's resignation letter was accepted. Like Plaintiff, this attorney had been publicly critical of President Trump in her Twitter postings during the month leading up to his inauguration.[35]

---

[32] Docket 75-33.
[33] *Id.*
[34] Docket 75-3 at ¶¶ 20, 21.
[35] Docket 75-3 at ¶ 23; Docket 75-14; Docket 75-23 at 17.

Babcock stated that he made the decision to terminate Plaintiff based primarily on the content of her resignation letter, explaining that he believed it demonstrated an unwillingness to work professionally with the new administration.[36]

This lawsuit followed. Plaintiff filed her complaint in state court and Defendants removed. Plaintiff asserts a 42 U.S.C. § 1983 claim against Defendants for violation of her First Amendment rights. She also alleges that her termination violated her free speech rights under Article I, § 5 of the Alaska Constitution, the Alaska Constitution's merit principle, and the implied covenant of good faith and fair dealing. She seeks damages, as well as injunctive and declaratory relief. Both parties now seek summary judgment on these claims.

## III.   STANDARD OF REVIEW

Summary judgment is appropriate where "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."[37] The materiality requirement ensures that "[o]nly disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment."[38] Ultimately, "summary judgment will not lie if the . . . evidence is such that a reasonable jury could return a verdict for the nonmoving party."[39] However, summary judgment is mandated "against a party who fails to make a

---

[36] Docket 87-4 at 36.
[37] Fed. R. Civ. P. 56(a).
[38] *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).
[39] *Id.*

showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial."[40]

The moving party has the burden of showing that there is no genuine dispute as to any material fact.[41] Where the nonmoving party will bear the burden of proof at trial on a dispositive issue, the moving party need not present evidence to show that summary judgment is warranted; it need only point out the lack of any genuine dispute as to material fact.[42] Once the moving party has met this burden, the nonmoving party must set forth evidence of specific facts showing the existence of a genuine issue for trial.[43] All evidence presented by the non-movant must be believed for purposes of summary judgment and all justifiable inferences must be drawn in favor of the non-movant.[44] However, the nonmoving party may not rest upon mere allegations or denials but must show that there is sufficient evidence supporting the claimed factual dispute to require a fact-finder to resolve the parties' differing versions of the truth at trial.[45] "[W]hen simultaneous cross-motions for summary judgment on the same claim are before the court, the court must consider the appropriate evidentiary material identified and submitted in support of both motions, and in opposition to both motions, before ruling on each of them."[46]

---

[40] *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986).
[41] *Id.* at 323.
[42] *Id.* at 323–25.
[43] *Anderson*, 477 U.S. at 248–49.
[44] *Id.* at 255.
[45] *Id.* at 248–49.
[46] *Fair Hous. Council of Riverside Cty., Inc. v. Riverside Two*, 249 F.3d 1132, 1134 (9th Cir. 2001).

# IV. DISCUSSION

## A. Plaintiff's § 1983 Claim Based on the First Amendment

Plaintiff asserts her First Amendment retaliation claim against Defendants pursuant to 42. U. S. C. § 1983. Section 1983 creates a private right of action for those plaintiffs seeking to redress and remedy constitutional wrongs caused by a "person" acting "under the color of state law."[47] "To state a claim under § 1983, a plaintiff must allege two essential elements: (1) that a right secured by the Constitution or laws of the United States was violated, and (2) that the alleged violation was committed by a person acting under the color of State law."[48] A state, its agencies, and officials acting in their official capacity are not considered "persons" for purposes of § 1983 and therefore cannot be sued thereunder.[49] An exception exists for § 1983 claims brought against state officials sued in their official capacity for prospective injunctive or declaratory relief.[50] These claims, however, must be brought against state officials with the ability to provide such relief in their official capacities.[51] Section 1983 claims seeking monetary damages may only be brought against a state official if the official is sued in his or her individual capacity, and such claims are

---

[47] 42 U.S.C. § 1983.
[48] *Long v. Cty. of L.A.*, 442 F.3d 1178, 1185 (9th Cir. 2006).
[49] *Will v. Mich. Dep't of State Police*, 491 U.S. 58, 71 (1989); *Wolfe v. Strankman*, 392 F.3d 358, 364 (9th Cir. 2004).
[50] *Will*, 491 U.S. at 71 n.10 ("Of course a state official in his or her official capacity, when sued for injunctive relief, would be a person under § 1983 because 'official-capacity actions for prospective relief are not treated as actions against the state.'" (quoting *Kentucky v. Graham*, 473 U.S. 159, 167 n.14 (1985))); *Flint v. Dennison*, 488 F.3d 816, 824–25 (9th Cir. 2007).
[51] *Hartmann v. Cal. Dep't of Corr. & Rehab.*, 707 F.3d 1114, 1127 (9th Cir. 2013).

subject to a possible qualified immunity defense.[52]  For these personal-capacity claims, Eleventh Amendment immunity issues are not implicated because the claim actually is against the individual and not the state.[53]

Under these principles, Plaintiff's § 1983 claim may be brought against Governor Dunleavy in his official capacity for prospective injunctive and declaratory relief and against the individual defendants in their personal capacities for damages.

### 1.    First Amendment in the public employment context

Plaintiff's § 1983 claim against Defendants falls within the ambit of case law governing First Amendment rights in relation to public employment.  "The Court has rejected for decades now the proposition that a public employee has no right to a government job and so cannot complain that termination violates First Amendment rights . . . ."[54]  Under the Supreme Court's "unconstitutional conditions" doctrine, "the government 'may not deny a benefit to a person on a basis that infringes his constitutionally protected . . . freedom of speech' even if he has no entitlement to that benefit."[55]  Based on this doctrine, "[i]t is by now black letter law that 'a state cannot condition public employment on a basis that infringes the employee's constitutionally protected interest in freedom of expression.'"[56]  This means that "[a]bsent some

---

[52] *Suever v. Connell*, 579 F.3d 1047, 1060–61 (9th Cir. 2009); *Kentucky v. Graham*, 473 U.S. 159, 166 (1985).

[53] *Suever*, 579 F.3d at 1060.

[54] *O'Hare Truck Serv., Inc. v. City of Northlake*, 518 U.S. 712, 716 (1996).

[55] *Bd. of Comm'rs, Wabaunsee Cty. v. Umbehr*, 518 U.S. 668, 674 (1996) (quoting *Perry v. Sindermann*, 408 U.S. 593, 597 (1972)).

[56] *Nichols v. Dancer*, 657 F.3d 929, 932 (9th Cir. 2011) (quoting *Connick v. Myers*, 461 U.S. 138, 142 (1983)).

*Bakalar v. Dunleavey, et al.*                                                   Case No. 3:19-cv-00025-JWS
Order on Motions for Summary Judgment                                                          Page 13
Case 3:19-cv-00025-JWS   Document 97   Filed 01/20/22   Page 13 of 39

reasonably appropriate requirement, government may not make public employment subject to the express condition of political beliefs or prescribed expression."[57]

Stemming from these principals are two types of cases—those falling under the *Elrod*/*Branti*[58] line of patronage cases and those under the *Pickering*[59] free speech retaliation cases. Under *Elrod*/*Branti*, as a general rule, public employees who do not occupy a policymaking position cannot be terminated based upon their political beliefs and associations.[60] Such patronage practices impermissibly infringe upon public employees' First Amendment associational rights. "The threat of dismissal for failure to provide [support for the favored political party] unquestionably inhibits protected belief and association, and dismissal for failure to provide support only penalizes its exercise."[61] Party membership of the employee is not, in and of itself, the determinative factor in these cases. That is, neither active campaigning or affiliation with a competing party nor vocal opposition to the favored political party by the employee is required to raise the issue of unconstitutional patronage. "[T]he right not to have allegiance to the official or party in power itself is protected under the First Amendment."[62] Consequently, to support a First Amendment claim under these patronage cases, it is sufficient for the employee to show "that they were fired for

---

[57] *O'Hare*, 518 U.S. at 717.
[58] *Elrod v. Burns*, 427 U.S. 347 (1976); *Branti v. Finkel*, 445 U.S. 507 (1980).
[59] *Pickering v. Bd. of Educ. of Twp. High Sch. Dist. 205, Will Cty., Ill.*, 391 U.S. 563 (1968).
[60] *Biggs v. Best, Best & Krieger*, 189 F.3d 989, 994 (9th Cir. 1999).
[61] *Elrod*, 427 U.S. at 359 (plurality opinion).
[62] *Galli v. N.J. Meadowlands Comm'n*, 490 F.3d 265, 272 (3d Cir. 2007).

failing to endorse or pledge allegiance to a particular political ideology."[63]  In cases involving patronage practices, no consideration of the government's interest is required, because such practices "unquestionably inhibit protected belief and association" and "are not narrowly tailored to serve vital government interests" when applied to employees in non-policymaking positions.[64]

*Pickering* retaliation cases involve situations where a government employer takes an adverse employment action against an employee in response to that employee's speech, rather than just political affiliation.  Under these cases, it is acknowledged that the government cannot unduly abridge employees' free speech rights, but it nonetheless has broader power to restrict the speech of its employees than the speech of its constituents given the management interests at play.[65]  As a result, unlike the *Elrod*/*Branti* cases "where the raw test of political affiliation suffice[s] to show a constitutional violation," these speech-related cases require the application of a balancing test developed in *Pickering* to determine whether the employee's speech is constitutionally protected.[66]  Under the balancing test, the court must consider "the interests of the [employee], as a citizen, in commenting upon matters of public concern, and the interest of the State, as an employer, in promoting the efficiency of the public services it performs through its employees."[67]  This balancing test is also applied in

---

[63]  *Gann v. Cline*, 519 F.3d 1090, 1094 (10th Cir. 2008) (quoting *Bass v. Richards*, 308 F.3d 1081, 1091 (10th Cir. 2002)).
[64]  *Rutan v. Republican Party of Ill.,* 497 U.S. 62, 69, 74 (1990).
[65]  *Pickering*, 391 U.S. at 568.
[66]  *O'Hare*, 518 U.S. at 719.
[67]  *Pickering*, 391 U.S. at 568.

"hybrid speech/association" claims, where speech is inextricably linked with associational activity.[68]

Under both types of cases—whether involving political affiliation or political speech—an exception is carved out for those employees holding policymaking or confidential positions; such employees may be fired for "purely political reasons."[69]  In the Ninth Circuit, "an employee's status as a policymaking or confidential employee [is] dispositive of *any* First Amendment retaliation claim."[70] This policymaker exception reflects the view that dissenting political affiliations and speech from a policymaker or confidential employee is disruptive enough to the government's interest in implementing policy to outweigh that employee's First Amendment rights.[71]  However, "the exception is 'narrow' and should be applied with caution."[72]  Whether an employee falls within this classification is not simply a matter of labels and titles; rather, "the question is whether the hiring authority can demonstrate that party affiliation is an appropriate requirement for the effective performance of the public office involved."[73]  Party affiliation is interpreted broadly to encompass

---

[68] *Hudson v. Craven*, 403 F.3d 691, 695–98 (9th Cir. 2005); *Candelaria v. City of Tolleson, Ariz.*, 721 Fed. Appx. 588, 590 n.1 (9th Cir. 2017).
[69] *Hobler v. Brueher*, 325 F.3d 1145, 1150 (9th Cir. 2003).
[70] *Biggs*, 189 F.3d at 994–95 (emphasis added).
[71] *See Hobler*, 325 F.3d at 1150 (noting that "some positions must be subject to patronage dismissals for the sake of effective governance and implementation of policy").
[72] *Hunt v. Cty. of Orange*, 672 F.3d 606, 611 (9th Cir. 2012) (quoting *DiRuzza v. Cty. of Tehama*, 206 F.3d 1304, 1308 (9th Cir. 2000)).
[73] *Branti*, 445 U.S. at 518.

*Bakalar v. Dunleavey, et al.*                                    Case No. 3:19-cv-00025-JWS
Order on Motions for Summary Judgment                                          Page 16
Case 3:19-cv-00025-JWS   Document 97   Filed 01/20/22   Page 16 of 39

political affiliation more generally, which "includes commonality of political purpose and support."[74]

## 2. Policymaker exception

As a threshold matter, Defendants argue that they cannot be liable to Plaintiff for any First Amendment violation because, as a level V assistant attorney general within the Department of Law's Labor and Affairs Section, Plaintiff occupied a confidential/policymaker role within state government and therefore could be fired for political reasons. Defendants bear the burden of establishing Plaintiff occupied such a position.[75] That is, they must show that political considerations were relevant to her job responsibilities. The nature and extent of Plaintiff's duties are not disputed, and therefore whether her job was a policymaking one is a question of law amenable to summary judgment.[76]

Defendants argue that almost all court decisions involving attorneys in government service, other than public defenders, who raise First Amendment retaliation claims against their government employers have held that these attorneys function as policymakers. The Ninth Circuit acknowledged as much in *Biggs v. Best, Best & Krieger*,[77] where it held that an associate in a private law firm, which had been contracted to perform the services of a city attorney, held a confidential policymaking position with the city and therefore could be terminated for political reasons. As the

---

[74] *Walker v. City of Lakewood*, 272 F.3d 1114, 1132 (2001) (quoting *Biggs*, 189 F.3d at 996).
[75] *DiRuzza v. Cnty. of Tehama*, 206 F.3d 1304, 1311 (9th Cir. 2000).
[76] *Walker*, 272 F.3d at 1132.
[77] 189 F.3d 989 (9th Cir. 1999).

court stated, "[a]ll circuit court decisions—and almost all other court decisions—involving attorneys in government service, other than public defenders, have held that *Elrod/Branti* do not protect these positions."[78] Despite the many courts that have assigned policymaker status to government attorney positions, the Ninth Circuit has not endorsed a categorical approach to the analysis. "[T]here is no per se rule in this circuit based solely on job title. The critical inquiry is the job actually performed."[79]

The Ninth Circuit has set forth nine factors that can be relevant when determining the nature of a position for purposes of applying the policymaking exception. These factors are as follows: (1) vague or broad responsibilities; (2) relative pay; (3) technical competence; (4) power to control others; (5) authority to speak in the name of policymakers; (6) public perception; (7) influence on programs; (8) contact with elected officials; and (9) responsiveness to partisan politics and political leaders.[80] These factors do not need to be applied mechanically but rather should act as a guide to the underlying purpose and intent of the exception.[81]

Defendants argue that these factors lean in their favor. They rely on the fact that Plaintiff, as a high-level attorney working with and for the Division of Elections and other agencies, had responsibilities that affected state policy. Plaintiff had wide-ranging job responsibilities. These included not only litigating elections-related cases, but also providing agency advice, testifying on legislation, drafting

---

[78] *Id.* at 997 (quoting *Fazio v. City & Cty. of San Francisco*, 125 F.3d 1328, 1333 (9th Cir. 1997)).

[79] *DiRuzza*, 206 F.3d at 1310.

[80] *Fazio v. City & Cty. of San Francisco*, 125 F.3d 1328, 1334 n.5 (9th Cir. 1997).

[81] *Hunt*, 672 F.3d at 611–12.

legislation and ballot summaries, and assisting with federal compliance. [82] Performance of these responsibilities necessarily involved contact with and being responsive to the Lieutenant Governor. [83] She also worked for numerous other state agencies, including the Officer of the Governor, on litigation matters, regulations, federal compliance, and legal advice. [84] She spoke on behalf of the Attorney General in some instances, authoring opinions from the attorney general that provided guidance to the Lieutenant Governor and the Director of the Division of Elections on election issues. [85] She reasonably could have been perceived by the public as speaking for the Attorney General because she worked on "highly politically-charged" elections issues that had "significant media interest" and provided comments to the media about these cases. [86]

While these factors favor a finding that Plaintiff occupied a confidential/policymaking role, they fail to adequately resolve the fundamental question of whether favorable political affiliation is a valid qualification for her position. As noted by the Supreme Court, the underlying purpose of the particular position is relevant to the inquiry. [87] If requiring allegiance to the favored political party "would undermine, rather than promote, the effective performance of [the employee's position]" then that position is not a policymaking one. [88] Here, Plaintiff's

---

[82] Docket 75-3 at ¶¶ 3–7; Docket 75-33; Docket 75-7; Docket 56-1; Docket 87-1 at 25–26.
[83] *See, e.g.*, Docket 87-2 at 1.
[84] Docket 75-33.
[85] *See* Docket 56 at 12–13 nn.57–58.
[86] Docket 87-2 at 1; Docket 56-2; Docket 56-3.
[87] *Walker*, 272 F.3d at 1132 (citing *Branti*, 445 U.S. at 519).
[88] *Branti*, 445 U.S. at 519.

*Bakalar v. Dunleavey, et al.*                                Case No. 3:19-cv-00025-JWS
Order on Motions for Summary Judgment                                    Page 19
Case 3:19-cv-00025-JWS   Document 97   Filed 01/20/22   Page 19 of 39

primary job responsibility was to handle election matters on behalf of the Lieutenant Governor and the Division of Elections. Alaska law explicitly designates the Division of Elections as a "nonpartisan" institution.[89] By statute it is "essential that the nonpartisan nature, integrity, credibility, and impartiality of the administration of elections be maintained."[90] Given this essential mission of impartiality, favorable partisan affiliation cannot be a valid qualification for an assistant attorney general serving as designated counsel for the Division of Elections. While Plaintiff holds a high-level job that involves elements of influence, trust, and visibility as identified by application of the factors listed above, it is primarily exercised within the politically impartial landscape of election law. Stated differently, "whatever policymaking occurs in [that] office" does not relate to "partisan political interests."[91] As noted by Plaintiff in her briefing, "accepting Defendants' argument that political loyalty was an appropriate requirement of Plaintiff's work advising the division of elections would only erode the nonpartisan nature of that institution."[92]

Given the court's conclusion that Plaintiff was not exempted from First Amendment protections in the workplace context under the policymaker exception, the court must consider whether she was in fact terminated for politically based reasons and, if so, whether that was improper given the circumstances.

---

[89] Alaska Stat. § 15.10.105(b).
[90] Id.
[91] Branti, 445 U.S. at 519.
[92] Docket 75 at 31.

### 3. Plaintiff's termination

This court recently addressed the constitutionality of terminations stemming from Defendants' resignation plan in *Blanford v. Dunleavy*.[93] In that case, Defendants fired the plaintiffs after they refused to submit their resignations. It was undisputed that the plaintiffs' refusal to submit resignations was the reason for their terminations. The court concluded that Defendants' resignation plan effectively was a patronage scheme in that it required employees to provide an ostensible commitment of support for the newly elected governor in return for continued employment, and their decision to fire the plaintiffs for refusing to comply violated the plaintiffs' associational rights under the First Amendment. The court concluded that their terminations also violated the plaintiffs' free speech rights under a *Pickering* analysis: the plaintiffs' publicized refusal to comply with Defendants' resignation plan was expressive conduct, and Defendants' decision to fire them because of that expressive conduct without an outweighing government interest was a violation of the plaintiffs' First Amendment free speech rights.

The facts are critically different here. While Plaintiff's termination occurred in conjunction with the resignation plan, unlike the plaintiffs in the *Blandford* case, Plaintiff complied with the resignation requirement. Consequently, the reason for her termination is not as clear cut as in the prior case, and its constitutionality is not predetermined by the court's ruling. Instead, the court must consider the record to

---

[93] Case No. 3:19-cv-00036-JWS, 2021 WL 4722948 (D. Alaska Nov. 8, 2021).

determine whether there is sufficient evidence to demonstrate that Plaintiff was fired for exercising her associational rights—such as not being associated with the favored political party or failing to endorse a particular political ideology—or for exercising her right to speak as a citizen on matters of public concern.

Babcock made the decision to fire Plaintiff. He claims that he fired Plaintiff because her resignation letter was unprofessional in its tone.[94] Specifically, he pointed to the portion of her letter that articulated the premise of the resignation plan: "My resignation is not voluntary, but is instead being made at the request of Mr. Babcock, who has indicated that if I do not submit my resignation as requested my employment will be terminated."[95] He testified that this statement felt like "a poke in the eye" and "very grumbling" as if she was only doing it because he told her too.[96] He believed that "going out of your way to object to the request for resignation is unprofessional."[97]

Babcock also testified that he was "generally aware" of her strong opinions and of the fact that she maintained a blog where she commented about "her political opponents."[98] He insisted that he did not consult with Stroup as to which attorneys' resignations should be accepted and was not aware of Stroup's opinion of Plaintiff at that time, but he was aware of "doubts among various people that she could

---

[94] Docket 87-4 at 35–36.
[95] Docket 75-33; Docket 87-4 at 35.
[96] Docket 87-4 at 35.
[97] *Id.*
[98] *Id.* at 36.

. . . separate her professionalism from her strong opinions."[99]  Plaintiff's letter confirmed these doubts to him because it "demonstrated her unwillingness . . . to treat this new administration professionally."[100]

He admitted that he did not have any formal process or criteria for reviewing the hundreds of resignation letters and determining which ones to accept. He explained if a letter did not raise any concerns about professionalism or attitude, then it was up to "anyone on the transition team or the incoming commissioners to raise any questions or issues."[101]  Despite Babcock's insistence that the content of each resignation letter provided the basis for his employment decisions, he did not accept the resignation of an assistant attorney general who had used the same wording that he had found objectionable when used by Plaintiff.[102]  Indeed, the only other attorney within the Department of Law whose resignation was accepted was Ruth Botstein, a well-regarded and experienced attorney who worked on high-profile cases.[103]  There is no evidence to explain what her resignation letter stated that made Babcock or others in Governor Dunleavy's transition team question her ability to work cooperatively or professionally.  The evidence does show, however, that, like Plaintiff, Botstein had been publicly critical of President Trump for a period of time and was the subject of

---

[99] *Id.* at 32, 36–37.
[100] *Id.* at 36.
[101] *Id.* at 32–34.
[102] Docket 75-39.
[103] Docket 75-3 at ¶¶ 22–25; Docket 75-2 at ¶ 26.

*Bakalar v. Dunleavey, et al.*                                    Case No. 3:19-cv-00025-JWS
Order on Motions for Summary Judgment                                      Page 23
Case 3:19-cv-00025-JWS   Document 97   Filed 01/20/22   Page 23 of 39

Stroup's social media postings about liberal attorneys within the Department of Law.[104]

Given this evidence, it is clear that Babcock's decision to terminate Plaintiff was motivated by reasons connected to her First Amendment rights. Although there was not a direct refusal on Plaintiff's part to comply with the resignation request as in *Blanford*, Babcock himself stated that he viewed her letter as voicing an objection to the request that was unacceptably defiant to the administration. That is, it failed to convey to him an adequate show of support or commitment to work for the Dunleavey Administration. As he explained, "it demonstrated her unwillingness to me to treat this new administration professionally."[105] Defendants argue that Babcock simply did not like the attitude she showed in the letter and that his dislike was devoid of political context. Taking Babcock's testimony that he was not "very familiar" with Plaintiff's political beliefs as true, he was nonetheless aware that she held strong opinions that might cause her to clash with the administration and that she wrote a blog where she criticized her political opponents.[106] Moreover, the letter itself cannot reasonably be deemed unprofessional for stating the factual premise of the resignation plan: she did not want to resign her job but had to in order to keep it. Therefore, Babcock's perceived defiance certainly was informed by his general knowledge of her opposing political views and blog, and, when taken together with evidence as to how other

---

[104] Docket 75-23; Docket 75-41.
[105] Docket 87-4 at 36.
[106] *Id.*

attorneys were treated, there is no reasonable dispute about the fact that some combination of Plaintiff's political beliefs and speech factored into Defendants' decision to terminate her employment. In such situations, the court must apply a *Pickering* analysis.

The Ninth Circuit has synthesized *Pickering* and its progeny into a five-factor evaluation:

> (1) whether the plaintiff spoke on a matter of public concern; (2) whether the plaintiff spoke as a private citizen or public employee; (3) whether the plaintiff's protected speech was a substantial or motivating factor in the adverse employment action; (4) whether the state had an adequate justification for treating the employee differently from other members of the general public; and (5) whether the state would have taken the adverse employment action even absent the protected speech.[107]

The plaintiff bears the burden at the first three steps of the inquiry. The fourth step of the analysis represents the *Pickering* balancing test, and it is at this step where the burden shifts to the government employer to show that there were legitimate administrative interests involved that outweigh the employee's right to comment as a private citizen about matters of public concern.

There is no dispute that Plaintiff acted as a private citizen when voicing her political opinions and that those opinions related to matters of public concern, and the court has concluded that these opinions were the motivating factor in her termination. The issue is whether Defendants had a countervailing management

---

[107] *Eng v. Cooley*, 552 F.3d 1062, 1070 (9th Cir. 2009).

interest at stake. They must show Plaintiff's public opinions affected the government's interest in providing services efficiently.[108] This burden is met with evidence of actual workplace disruption or evidence supporting a reasonable prediction of workplace disruption resulting from the speech.[109] Workplace disruption occurs when the employee's speech "impairs discipline by supervisors or harmony among co-workers, has a detrimental impact on close working relationships . . . or impedes the performance of the [employee's] duties or interferes with the regular operation of the enterprise" or is reasonably likely to do so.[110]

Disruption is not limited to internal workplace relationships and performance. Negative public perception stemming from an employee's speech or conduct can constitute workplace disruption when the employee holds a position where public trust and integrity are paramount to the government employer's mission. For example, in *Locurto v. Giuliani*,[111] the Second Circuit applied such reasoning to hold that the government lawfully fired police officers who participated in a parade with racist lampooning that was covered by local media. It stated that a police department's effectiveness "depends importantly on the respect and trust of the community and on the perception in the community that it enforces the law fairly, even-handedly, and without bias."[112] The Ninth Circuit similarly has reasoned that a government employer

---

[108] *Pickering*, 391 U.S. at 568.
[109] *Nichols*, 657 F.3d at 933–34.
[110] *Rankin v. McPherson*, 483 U.S. 378, 388 (1987); *Nichols*, 657 F.3d at 933.
[111] 447 F.3d 159 (2d Cir. 2006).
[112] *Id.* at 178.

*Bakalar v. Dunleavey, et al.*
Order on Motions for Summary Judgment
Case No. 3:19-cv-00025-JWS
Page 26

Case 3:19-cv-00025-JWS    Document 97    Filed 01/20/22    Page 26 of 39

can reasonably assume workplace disruption stemming from speech that when known to the public would harm the credibility of the employer's operations.[113]

Defendants argue that Plaintiff's position as counsel to the Division of Elections made her public blogging activities particularly disruptive. The Division of Elections is non-partisan in its mission. As the director of the civil division for the Department of Law, Joanne Grace, stated in her deposition, "it's a foundational principle of the Division of Elections that the administration of elections be nonpartisan, have credibility, integrity, and be impartial . . . ."[114] She noted that public perception is "the foundation of public trust in elections, and that public trust is essential to people accepting the results of an election."[115] Public trust in the Division's impartiality is central to its mission and operations.

Plaintiff's role as the division's attorney was not insignificant to this mission. As discussed above, her job required her to represent the division in litigation; provide the division legal advice; testify on relevant legislation; assist with federal compliance; and help draft legislation and regulations in the area of elections law. She had a hand in determining legal issues around which ballots to count, how initiatives and referendums should appear on ballots, and which summaries should go into the election pamphlets.[116] She authored many publicly available attorney general opinions providing guidance to the Lieutenant Governor on various initiatives and referenda

---

[113] *Dible v. City of Chandler*, 515 F.3d 918, 928 (9th Cir. 2008).
[114] Docket 87-1 at 11.
[115] *Id.* at 12.
[116] *Id.* at 25–26.

applications. She authored attorney general opinions providing guidance to the Director of the Division of Elections about applications seeking the recall of elected officials. Indeed, her work admittedly sometimes involved "highly politically-charged" elections issues that had "significant media interest."[117] Given these duties, the public's perception of her impartiality is a legitimate government concern. As Grace articulated in her deposition, "the more outspoken the elections attorney is, the more partisan and . . . the more public she becomes about partisan issues, the more that undermines her ability to stand up in court and argue that an action of the Division of Elections, which she probably advised them to take, was impartial and fair."[118] That is to say, frequent and widespread partisan commentary by an elections attorney is reasonably likely to undermine the public's trust in the integrity and credibility of elections.

Given Plaintiff's position and the public nature of her political commentary, it would not have been unreasonable for state officials to consider her speech a disruption to the Division of Election's operations, warranting adverse employment action. Indeed, this was a growing concern to her supervisors within Department of Law.[119] However, as the Supreme Court has noted, "[v]igilance is necessary to ensure that public employers do not use authority over employees to silence discourse not because it hampers public functions but simply because superiors

---

[117] Docket 87-2 at 1.
[118] Docket 87-1 at 11–12.
[119] *Id.* at 18–23.

disagree with the content of the employees' speech."[120]  Consequently, even though Plaintiff's blogging could reasonably be predicted to interfere with operations, the government must show that it in fact acted in response to that likely interference and not because of a disagreement with the content.[121]

This is where Defendants fall short.  Defendant Babcock did not mention any concerns he had about her blogging or public opinions affecting the integrity and credibility of the Division of Elections or even state government generally.  There is no evidence that he or members of the transition team were aware of any concerns raised by her supervisors within the Department of Law, legislators, or other Division of Elections employees.  Indeed, he maintained he did not seek advice from anyone outside of Governor Dunleavy and his immediate staff,[122] and he did not mention that these people raised concerns about how her conduct was affecting the non-partisan mission of the Division of Elections or the public's perception of the State's attorneys.

The only concern related to workplace disruption articulated by Babcock during his deposition was with regard to Plaintiff's professionalism.  The professionalism he was concerned about was personal in nature, limited to her ability to be respectful to a new administration with opposing political viewpoints.  He thought her comment that her resignation was not voluntary was "a poke in the eye" to him and confirmation that she was unwilling "to treat the new administration

---

[120] *Rankin*, 483 U.S. at 384.
[121] *See Locurto*, 447 F.3d at 175–76.
[122] Docket 87-4 at 32.

professionally."[123]  This concern that disruption would occur because Plaintiff would not be professional in the performance of her job is unsupported by evidence.  The letter itself is not objectively defiant; it simply states the convoluted premise of Defendants' resignation plan—employees were forced to resign their jobs to show they actually wanted to keep their jobs.[124]  There is no evidence that Plaintiff's work product had ever been biased or that she failed to thoroughly represent the State of Alaska's interests as defined by any of the previous five administrations or as directed by supervisors.  Indeed, she never publicly criticized any position taken by the State of Alaska related to her work.  There is no evidence that she acted unprofessionally at work under previous administrations.  While Defendants now rely on the unprofessional content of Plaintiff's blog, which contained irreverent and vulgar language, that concern was not mention by Babcock during his deposition.  Indeed, he specifically refrained from suggesting he knew anything specific or particular about her blog or its contents.  Rather, he maintained that he just generally was aware she had strong opinions and a blog.

With a more measured approach to staffing decisions, Defendants reasonably could have predicted that Plaintiff's political blogging activities would negatively affect the mission of the Division of Elections and relied on this reason to take adverse employment action against Plaintiff.  As noted above, concern about this type of disruption stemming from Plaintiff's increasingly political blog was a known

---

[123] *Id.* at 35–36.
[124] *See, e.g.*, Docket 87-1 at 24.

issue within the Department of Law. However, Defendants, who made the decision to fire Plaintiff without consultation, failed to show that they had any awareness of this particular concern, or that they acted in response to it rather than a dislike of her personal views.

Without an adequate showing that Defendants actually were motivated by a reasonable concern for the potentially disruptive effects of Plaintiff's publicly espoused political opinions, the court must conclude that her termination ran afoul of the First Amendment.

### 4. Qualified Immunity

Defendants argue that regardless of any underlying constitutional violation, they are entitled to qualified immunity that shields them from personal liability.[125] "The doctrine of qualified immunity shields officials from civil liability so long as their conduct does not violate clearly established . . . constitutional rights of which a reasonable person would have known."[126] Given the court has found a First Amendment violation, the remaining issue to be determined is whether Plaintiff's right to be free from a politically-motivated termination was clearly established. A right is clearly established when it has a "sufficiently clear foundation in then-existing precedent."[127] The rule must be "dictated by controlling authority or a robust

---

[125] Qualified immunity is only an immunity from suit for damages, not immunity from suit for declaratory or injunctive relief. *L.A. Police Protective League v. Gates*, 995 F.2d 1469, 1472 (9th Cir. 1993).

[126] *Mullenix v. Luna*, 577 U.S. 7, 11 (2015) (quotations omitted).

[127] *Nunes v. Arata, Swingle, Van Egmond & Goodwin (PLC)*, 983 F.3d 1108, 1112 (9th Cir. 2020) (quoting *District of Columbia v. Wesby*, 138 S. Ct. 577, 589 (2018)).

consensus of cases of persuasive authority."[128] "There does not need to be a 'case directly on point,' but existing precedent must place the statutory or constitutional question 'beyond debate.'"[129] The right cannot be defined with a "high level of generality."[130] This is particularly so when the circumstances involve quick judgments made by officials in uncertain and rapidly evolving circumstances, or when an outcome is otherwise highly fact dependent.[131]

It is clearly established that Defendants could not lawfully fire non-policymaking employees based on adverse political affiliation and speech. As such, Defendants' qualified immunity defense turns on whether they reasonably could have, but mistakenly, believed that it was legally appropriate to make political loyalty a requirement of Plaintiff's job. As noted above, in the vast majority of cases addressing the issue, government attorneys have been found to be policymakers.[132] This is true not only of prosecutors and city attorneys, but state assistant attorney generals as well.[133] The Ninth Circuit has acknowledged this body of case law.[134] These cases rely on the fact that government attorneys, even if supervised, often exercise significant authority on behalf of the ultimate policymaker through litigation, drafting advisory

[128] *Id.* (quoting *Wesby*, 138 S. Ct. at 589–90).
[129] *Id.* (quoting *Kisela v. Hughes*, 138 S. Ct. 1148, 1152 (2018)).
[130] *Id.*
[131] *Id.* at 1112–13; *Gilbrook v. City of Westminster*, 177 F.3d 839, 867 (9th Cir. 1999).
[132] "[C]ircuits that have addressed the *Elrod-Branti* exception in the context of government attorney dismissals, whether for assistant district attorneys or other government attorneys, have held these attorneys occupy positions requiring political loyalty and are not protected from political dismissals under the First Amendment." *Aucoin v. Haney*, 306 F.3d 268, 275 (5th Cir. 2002) (listing examples).
[133] *See Latham v. Office of Attorney Gen. of Ohio*, 395 F.3d 261, 269 (6th Cir. 2005).
[134] *Biggs*, 189 F.3d at 995.

opinions and legislation, advising agencies, and preparing contracts, and therefore they play a role in shaping and implementing policy.[135]  In *Biggs*, the Ninth Circuit held that a city attorney operated as a policymaker in city government, because, even though the attorney was a subordinate, she presented reports to the city's governing council on legal issues, worked on high-profile issues, drafted regulations and ordinances, and spoke to the press on occasion.[136]  These responsibilities, notably similar to Plaintiff's, were enough for the court to find that she occupied a position where political alignment was a valid job qualification.  Based on *Biggs*, it was reasonable for Defendants to think that a high-level assistant attorney undertaking the responsibilities she outlined in her resignation letter could be fired for political reasons.  While this court ultimately concluded that Plaintiff's position was distinguishable given her role as counsel to the Division of Elections, no existing precedent or body of persuasive case law would have made this conclusion readily apparent.  That is, there is no existing precedent that placed this issue beyond debate.

Plaintiff stresses that Alaska law provides a clear and definitive answer as to who in state government constitutes a policymaker, barring any qualified immunity defense here.  Indeed, Alaska's State Personnel Act establishes a system of personnel administration based upon the merit principle.[137]  As such, selection and retention of employees must be "secure from political influences."[138]  However, while

---

[135] *See Latham*, 395 F.3d at 268–69.
[136] *Biggs*, 189 F.3d at 995–96.
[137] Alaska Stat. § 39.25.010.
[138] *Id.*

provisions and rules adopted pursuant to the Personnel Act apply as a matter of course to all classified employees, they only apply to the exempt and partially exempt service as "specifically provided."[139]  The position of assistant attorney general falls under the partially exempt category.[140]  Partially exempt employees are exempt from some, but not all, of the rules governing job classification and payment, recruiting, appointment, and examining.[141]  Similarly, not all political protections afforded under the Personnel Act apply to partially exempt employees.  The Act provides that an employment decision affecting a *classified* employee cannot be taken or withheld on the basis of unlawful discrimination due to political beliefs, but it does not extend this protection to partially exempt employees.[142]  While the Act protects the right of a "state employee" to engage in political activity and express political opinions,[143] this protection is not unlimited.[144]  As the Alaska Supreme Court noted "the merit principle was not intended to impede the efficient management of state affairs."[145]  The court cannot conclude that the legislature, through the Personnel Act, intended to confirm that partially exempt employees, as a matter of course, are not policymakers as that term is understood in First Amendment analysis.  Even if the Act does in fact confer

---

[139] Alaska Stat. § 39.25.090.
[140] Alaska Stat. § 39.25.120(c)(3).
[141] Alaska Stat. § 39.25.120(a)–(b); Alaska Stat. § 39.25.150.
[142] Alaska Stat. § 39.25.160(g).
[143] Alaska Stat. § 39.25.178.
[144] *See, e.g.,* Alaska Stat. § 39.25.178(3) (prohibiting the display of partisan political materials "while engaged on official business"); Alaska Stat. § 39.52.170(a) (barring outside employment or volunteer services that are "incompatible or in conflict with the proper discharge of [the employee's] official duties"); 9 Alaska Admin. Code 52.090.
[145] *Moore v. State*, 875 P.2d 765, 769 (Alaska 1994).

full political protection to partially exempt employees, there is no precedent or "robust consensus of cases" holding that a state statute establishing a merit system of employment provides a definitive test for who is and who is not a policymaking employee for purposes of a First Amendment analysis.

The court concludes that the law governing the policymaking status of a government attorney with Plaintiff's job responsibilities was not so clearly established that Defendants should be denied qualified immunity.

## B. Plaintiff's State Law Claims

Plaintiff seeks relief against Defendants under state law as well.[146] She asserts that her termination was unconstitutional under state law, relying on both Article 1, § 5, which protects citizens' right to free speech, and Article XII, § 6, which establishes Alaska's merit system of public employment. She also raises a good faith and fair dealing claim.

Generally speaking, Alaska's public employee free speech cases rely heavily on federal law.[147] Consequently, given the First Amendment violation present in the circumstances here, Plaintiff's termination also was unconstitutional under state law, but Alaska does not recognize a constitutional claim for damages unless the case

---

[146] The court has jurisdiction over such claims against the State because Defendants removed the case from state court to federal court, waiving any immunity defense. *Lapides v. Bd. of Regents of Univ. Sys. of Ga.*, 535 U.S. 613, 620–24 (2002) (holding that the state, which had statutorily waived its immunity from state-law claims in state court, also waived its Eleventh Amendment immunity from suit in federal court on state-law claims for money damages when it voluntarily removed case to federal court); *Embury v. King*, 361 F.3d 562, 566 (9th Cir. 2004) ("Removal waives Eleventh Amendment immunity.").

[147] *See Wickwire v. State*, 725 P.2d 695, 700 (Alaska 1986); *State v. Haley*, 687 P.2d 305, 312 (Alaska 1984).

involves flagrant violations where no alternative remedies are otherwise available.[148] Plaintiff's § 1983 claim constitutes such an alternative remedy, even if it ultimately is barred by defenses.[149]

Despite this limitation, Plaintiff still is afforded relief for an unconstitutional termination under state law through her good faith and fair dealing claim. Pursuant to Alaska Stat. § 09.50.250, a person with a contract, quasi-contract, or tort claim against the state may raise such a claim in state court. Implicit in an employee's contract of employment with the State is a promise that the employee will not be terminated for an unconstitutional reason.[150] "[W]hen the State fires an employee for an unconstitutional reason, [it] amounts to unfair dealing as a matter of law and gives rise to contract remedies."[151] Here, Plaintiff was fired in violation of her free speech rights, which necessarily amounts to unfair dealing under state law.

Plaintiff also asserts her termination ran afoul of Article XII, § 6, which establishes a merit system of public employment. However, the court concludes that the constitutionally protected merit principle and the statute implementing it does not provide Plaintiff with an independent cause of action against the State. The constitution itself merely requires the legislature to "establish a system under which the merit principle will govern the employment of persons by the State."[152] The

---

[148] *Larson v. State*, 284 P.3d 1, 9–10 (Alaska 2012).

[149] *State v. Heisey*, 271 P.3d 1082, 1096-97 (Alaska 2012). While Plaintiff cannot seek damages for the state constitutional violation, she may proceed to the extent she seeks declaratory or injunctive relief under this claim. *Larson*, 284 P.3d at 9–10.

[150] *State v. Haley*, 687 P.2d 305, 318 (Alaska 1984).

[151] *Id.*

[152] Alaska Const. art. XII, § 6.

Personnel Act defines and implements this principle. It generally provides that selection and retention of employees must be "secure from political influences."[153] It sets forth requirements for job classification and payment, recruiting, appointment, and examining, as well as prohibitions against certain employment practices, to guarantee this merit system, but it does not explicitly confer an independent private cause of action.[154] Nor does it supplant and provide greater protection than First Amendment law with respect to the political speech and association of state employees. "As defined, the merit principle requires the recruitment, selection, and advancement of public employees under conditions of political neutrality . . . . In actual practice, however, the merit principle is more complex and ambiguous than the above definition reveals."[155] For example, Alaska Stat. § 39.25.160(g) protects employees in the *classified* service from "unlawful discrimination due to political beliefs."[156] Partially exempt employees are not afforded protection under this provision. Moreover, what constitutes "unlawful" political discrimination is necessarily defined by constitutional law. While Alaska Stat. § 39.25.178 declares that "a state employee" has the right to express political opinions, there is nothing to suggest that this right is unlimited or

---

[153] Alaska Stat. § 39.25.010(b)(5).

[154] *Cf. Walt v. State*, 751 P.2d 1345, 1351 (Alaska 1988) ("[N]o sufficient justification has been advanced which persuades us that a tort cause of action grounded on AS 39.25.160(f) should be recognized."); *Peterson v. State*, 236 P.3d 355, 368 n.44 (Alaska 2010) ("[T]he analysis of [the plaintiff's] merit selection claim is subsumed within our discussion of [his] other claims concerning the hiring process, including his claims of discrimination and his claims concerning the implied covenant of good faith and fair dealing.").

[155] *Alaska Pub. Employees Ass'n v. State*, 831 P.2d 1245, 1249 (Alaska 1992) (citations omitted).

[156] Alaska Stat. § 39.25.160(g).

*Bakalar v. Dunleavey, et al.*
Order on Motions for Summary Judgment

Case No. 3:19-cv-00025-JWS
Page 37

otherwise greater than what might be protected pursuant to *Pickering*. Indeed, "the merit principle was not intended to impede the efficient management of state affairs."[157] As noted by Defendants, "[t]his is why Alaska cases follow *Pickering* rather than simply citing the merit principle in every instance involving the speech of an employee covered by the Act."[158]

## V.   CONCLUSION

Based on the preceding discussion, Plaintiff's motion at docket 76 is GRANTED IN PART AND DENIED IN PART and Defendants' motion at docket 56 is GRANTED IN PART AND DENIED IN PART as follows:

1.   Plaintiff's termination violated her free speech and associational rights under the federal and state constitutions. Plaintiff is entitled to relief under § 1983 and state law but only to the extent she seeks prospective declaratory and injunctive relief. Qualified immunity shields Defendant Governor Dunleavy and Defendant Babcock from personal liability for this violation.

2.   Plaintiff's unconstitutional termination amounts to unfair dealing under state law.

3.   Plaintiff has no claim to relief under Alaska's merit principle.

---

[157] *Moore*, 875 P.2d at 769.
[158] Docket 86 at 30 (citing *Wickwire*, 725 P.2d at 700).

The parties are instructed to promptly confer and then within 14 days from this order's date to file a notice that identifies the remaining issues for litigation. The notice should also suggest a schedule for resolving the outstanding issues.

IT IS SO ORDERED this 20th day of January, 2022, at Anchorage, Alaska.

_____/s/ John W. Sedwick_____
JOHN W. SEDWICK
Senior United States District Judge